# EXHIBIT A

DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Anatolii Legkodymov. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and France are found in the Extradition Treaty between the United States of America and France, with Agreed Minute, signed on 23 April 1996, (the "1996 Treaty"), and the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition between the United States of America and the European Union signed on 25 June 2003, as to the application of the Extradition Treaty between the United States of America and France signed 23 April 1996, signed 30 September 2004 (the "Instrument"). Copies of the 1996 Treaty and Instrument are attached to this declaration.

3. In accordance with the provisions of the 1996 Treaty and Instrument, the Embassy of France has submitted Diplomatic Note No. 2024-0519489, dated December 20, 2024, formally requesting the extradition of Anatolii Legkodymov. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 22 of the 1996 Treaty, the United States provides legal representation in the U.S. courts for France in its extradition requests, and France provides legal representation in its courts for extradition requests made by the United States.

5. The offenses of participation in a criminal conspiracy to prepare a crime (money laundering) and money laundering for which extradition is sought are covered under Article 2 of the 1996 Treaty. The other charges presented in the request have not currently been referred to the court for consideration.

-2-

6. Under Article 11 of the 1996 Treaty, as amended by Item II of the Instrument, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in Paris. France, in submitting documents in the instant case that bear the certificate or seal of the Ministry of European and Foreign Affairs, has complied with Treaty and Instrument with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 17, 2025.

Stacy Hauf

Attachments:

1. Copy of Note

2. Copies of Treaty and Instrument

*Ambassade de France*
*aux Etats-Unis*

**UNOFFICIAL TRANSLATION**

L/LEI

2024 DEC 20  A 2: 46

DEPARTMENT OF STATE

## Re: Request for extradition of Mr. ANATOLII LEGKODYMOV

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. ANATOLII LEGKODYMOV born on August 10th, 1982 (USSR), a Russian citizen.

On July 29th, 2024, he was issued an arrest warrant by Mr. Serge TOURNAIRE, first vice-president in charge of the Pre-trial investigation at the Court of Paris (France) for:

COMPLICITY IN FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM
COMPLICITY IN FRAUDULENT MAINTENANCE IN AN AUTOMATED DATA PROCESSING SYSTEM
COMPLICITY IN THE FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED PROCESSING SYSTEM
COMPLICITY IN FRAUDULENT MODIFICATION OF DATA CONTAINED IN AN AUTOMATED PROCESSING SYSTEM
COMPLICITY IN HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM
CONSPIRACY TO COMMIT EXTORTION IN AN ORGANISED GANG
PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME
CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONNAL DATA PROCESSING SYSTEM, COMMITTED BY AN ORGANISED GANG
AGGRAVATED MONEY LAUNDERING: AIDING AN ORGANISED GANG TO FALSELY JUSTIFY THE ORIGIN OF THE OFFENDER'S ASSETS OR INCOME
AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANISED GROUP IN AN OPERATION TO INVEST, CONCEAL, OR CONVERT THE PROCEEEDS OF CRIME

This request, accompanied by an English translation, is transmitted pursuant to:

- The Extradition Treaty of April 23rd, 1996, between France and the United States of America;

- The Extradition Agreement of July 19th, 2003 between the European Union and the United States of America.

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

- 2 / 2 -

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, December 20th, 2024

**Department of State**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas BURROWS**
**Office of International Affairs**

*Ambassade de France*
*aux Etats-Unis*

Réf : Demande d'extradition de Anatolii LEGKODYMOV
N° : 2024-0519489

L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui adresser, par la présente note diplomatique, une demande d'extradition originale, accompagnée de sa traduction en langue anglaise, formée auprès du Gouvernement américain contre le nommé Anatolii LEGKODYMOV, né le 10 août 1982 en Union Soviétique, de nationalité russe, en vertu :

- du Traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique signé à Paris le 23 avril 1996
- de l'Accord entre l'Union européenne et les Etats-Unis d'Amérique en matière d'extradition signé le 25 juillet 2003 in Washington, D.C.

Anatolii LEGKODYMOV fait l'objet d'un mandat d'arrêt délivré le 29 juillet 2024 par M. Serge TOURNAIRE, premier vice-président chargé de l'instruction au tribunal judiciaire de Paris pour des faits de :

COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE DE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'EXTORSION EN BANDE ORGANISEE
PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME
COMPLICTE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE
BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT
BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT

L'Ambassade de France remercie le Département d'Etat de bien vouloir lui faire connaître la suite réservée à cette demande.

L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment

SBU - LEGAL

de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Washington, le 20 décembre 2024

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 02-201

# EXTRADITION

**Treaty Between the**

**UNITED STATES OF AMERICA**

**and FRANCE**

Signed at Paris April 23, 1996

*with*

Agreed Minute



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# FRANCE

## Extradition

*Treaty signed at Paris April 23, 1996;*
*Transmitted by the President of the United States of America*
 *to the Senate July 9, 1997 (Treaty Doc. 105-13,*
 *105th Congress, 1st Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
 *October 14, 1998 (Senate Executive Report No. 105-23,*
 *105th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
 *October 21, 1998;*
*Ratified by the President January 20, 1999;*
*Ratified by France December 13, 2001;*
*Entered into force February 1, 2002.*
*With agreed minute.*

EXTRADITION TREATY

BETWEEN

THE UNITED STATES OF AMERICA

AND

FRANCE

The President of the United States of America and the President of the French Republic,

Recalling the Extradition Treaty and accompanying Protocol between the United States of America and the Republic of France signed at Paris January 6, 1909 and the Supplementary Convention signed at Paris February 12, 1970 with Exchanges of Letters of June 2 and 11, 1970;

Noting that these treaties continue in force between the Government of the United States of America and the Government of the French Republic until entry into force of this Treaty; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime and to facilitate relations between the two States in the area of extradition by concluding a treaty for the extradition of offenders;

Have decided to conclude a new extradition treaty and have appointed as their plenipotentiaries for this purpose:

The President of the United States of America:

The Honorable, Janet Reno, Attorney General of the United States of America;

The President of the French Republic:

The Honorable, Jacques Toubon, Minister of Justice;

Who, having communicated to each other their respective full powers, which were found in good and due form, have agreed as follows:

-2-

## Article 1

### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the competent authorities in the Requesting State have charged with or found guilty of an extraditable offense.

## Article 2

### Extraditable Offenses

1.    Acts shall be extraditable if they are punished under the laws in both States by deprivation of liberty for a maximum of at least one year or by a more severe penalty.  If extradition is requested for purposes of enforcing a judgment, the time remaining to be served must be at least six months.

2.    An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of, an offense described in paragraph 1.

3.    For the purposes of this Article, an offense shall be an extraditable offense:

> (a)  whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology; or

--3--

(b)    whether or not the offense is one for which
United States federal law requires proof or an
element of proof, such as passage from one
state to another, the use of the mails, wire,
and other facilities of interstate or foreign
commerce, or the effects upon such commerce,
since such an element is required for the sole
purpose of establishing the jurisdiction of
United States federal courts.

4.    Extradition shall be granted for an extraditable
offense committed outside the territory of the Requesting
State, when the laws of the Requested State authorize the
prosecution or provide for the punishment of that offense in
similar circumstances.

5.    If the extradition request concerns distinct acts,
each punishable under the laws of the two States by the
deprivation of liberty, and if some of the acts do not fulfill
the conditions set forth in Paragraphs 1 and 2 of this Article,
the Requested State shall nonetheless grant extradition based
upon such acts.

6.    In matters concerning tax, customs duty, and
foreign exchange offenses, extradition shall be granted
pursuant to the terms set forth in paragraphs 1 and 2 of this
Article.

-4-

## Article 3
### Nationality

1.   There is no obligation upon the Requested State to grant the extradition of a person who is a national of the Requested State, but the executive authority of the United States shall have the power to surrender a national of the United States if, in its discretion, it deems it proper to do so.  The nationality of the person sought shall be the nationality of that person at the time the offense was committed.

2.   If extradition is refused solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its authorities for prosecution.

## Article 4
### Political Offenses

1.   Extradition shall not be granted by France when the offense for which extradition is requested is considered by France as a political offense or as an offense connected with a political offense or as an offense inspired by political motives.  Extradition shall not be granted by the United States when the offense for which extradition is requested is considered by the United States to be a political offense.

-5-

2.    For the purposes of this Treaty, and in accordance
with paragraph 1 of this Article, the following offenses shall
not be considered to be political offenses:

    (a)    a murder or a willful crime against the person
           of a Head of State of one of the Contracting
           States, or a member of his or her family, or
           any attempt or conspiracy to commit, or
           participation in, any of the foregoing
           offenses;

    (b)    an offense for which both Contracting States
           are obliged pursuant to a multilateral
           agreement to extradite the requested person or
           to submit the case to the competent
           authorities for decision as to prosecution;

    (c)    a serious offense involving an attack against
           the life, physical integrity or liberty of
           internationally protected persons, including
           diplomatic agents;

    (d)    an offense involving kidnapping, the taking of
           a hostage or any other form of unlawful
           detention;

    (e)    an offense involving the use of a bomb,
           grenade, rocket, automatic firearm or letter
           or parcel bomb if this use endangers persons;
           or

-6-

      (f)  an attempt or conspiracy to commit, or
           participation in, any of the offenses listed
           in paragraphs 2(b), 2(c), 2(d) or 2(e) of this
           Article.

    3.  The Requested State may deny extradition of persons who committed any of the offenses mentioned in paragraphs 2(b), 2(c), 2(d), 2(e), and 2(f) of this Article pursuant to the provisions of paragraph 1 of this Article.

    In evaluating the character of the offense, the Requested State shall take into consideration the particularly serious nature of the offense, including:

      (a)  that it created a collective danger to the
           life, physical integrity or liberty of persons;

      (b)  that it affected persons foreign to the
           motives behind it; or

      (c)  that cruel or treacherous means have been used
           in the commission of the offense.

    4.  Extradition shall not be granted if the executive authority in the case of the United States or the competent authorities in the case of France have substantial grounds for believing that the request was for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality or political opinions.

-7-

## Article 5
### Military Offenses

Extradition shall not be granted if the offense in respect of which it is requested is exclusively a military offense.

## Article 6
### Humanitarian Considerations

This Treaty does not prevent the executive authority in the case of the United States or the competent authorities in the case of France from denying extradition when surrender of the person might entail exceptionally serious consequences related to age or health.

## Article 7
### Capital Punishment

1.   When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State may refuse extradition unless the Requesting State provides the assurance that the death penalty will not be imposed or, if imposed, will not be carried out.

-8-

2.    In instances in which a Requesting State provides the assurance in accordance with this Article, the death penalty, if imposed by the courts of the Requesting State, shall not be carried out.

Article 8

Prior Prosecution

1.    Extradition shall not be granted when the person sought has been finally convicted or acquitted in the Requested State for the offense for which extradition is requested.

2.    Extradition shall not be refused on the grounds that the authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested, or to discontinue any criminal proceedings which have been instituted against the person sought for those acts.

Article 9

Lapse of Time

1.    Extradition shall be denied if prosecution of the offense or execution of the penalty has been barred by lapse of time under the laws of the Requested State.

2.    Acts in the Requesting State that would interrupt or suspend the prescriptive period are to be taken into account by the Requested State to the extent possible under its laws.

-9-

## Article 10

### Extradition Procedures and Required Documents.

1.    All requests for extradition shall be submitted through the diplomatic channel.

2.    All requests shall be supported by:

   (a)   documents, statements, or other types of information which state the nationality, probable location, and also describe the identity of the person sought in order to establish that the person is the subject of the prosecution or conviction;

   (b)   information describing the facts of the offense and the procedural history of the case;

   (c)   the text of the provisions describing the offense for which extradition is requested; and

   (d)   the text of the law prescribing the punishment for the offense.

3.    A request for extradition of a person who is sought for prosecution shall also be supported by:

   (a)   in the case of a request submitted by the United States, a duly authenticated copy of the warrant or order of arrest and the charging document; or

-10-

      (b)  in the case of a request submitted by France, an original or a duly authenticated copy of the warrant or order of arrest and such information as would justify the committal for trial of the person if the offense had been committed in the United States.

4.  A request for extradition relating to a person who has been found guilty or convicted of the offense for which extradition is sought shall also be supported by:

      (a)  in the case of a request by the United States, if the person has been convicted, the original or a duly authenticated copy of the final judgment of conviction, or, if the person has been found guilty but has not yet been sentenced, a statement by a judicial authority that the person has been found guilty, and a duly authenticated copy of the warrant of arrest;

      (b)  in the case of a request by France, the original or a duly authenticated copy of the final judgment of conviction;

      (c)  in all cases where a sentence has been imposed, a statement of the remainder of the sentence to be served; and

      (d)  in the case of a person who has been found guilty in absentia, the documents required by paragraph 3.

-11-

## Article 11
### Admissibility of Documents

The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

    (a)   in the case of a request from the United States, they are transmitted through the diplomatic channel;

    (b)   in the case of a request from France, they are certified by the principal diplomatic or principal consular officer of the United States resident in France, as provided by the extradition laws of the United States, or they are certified or authenticated in any other manner accepted by the laws of the United States.

## Article 12
### Translation

All documents submitted by the Requesting State shall be translated into the language of the Requested State.

SBU - LEGAL

-12-

Article 13

Provisional Arrest

1.    In case of urgency, a Contracting State may request the provisional arrest of the person sought pending presentation of the request for extradition.  A request for provisional arrest may be transmitted directly between the United States Department of Justice and the Ministry of Justice of the French Republic, by means of the facilities of the International Criminal Police Organization (INTERPOL), or through the diplomatic channel.

2.    The application for provisional arrest shall contain:

(a)    a description of the person sought and information concerning the person's nationality;

(b)    the location of the person sought, if known;

(c)    a brief statement of the facts of the case, including the location and approximate date of the offense;

(d)    a description of the laws violated;

(e)    a statement of the existence of a warrant of arrest or a finding of guilt or judgment of conviction against the person sought; and

(f)    a statement that a request for extradition for the person sought will follow.

-13-

3.    The Requesting State shall be notified without delay of the disposition of its application and the reasons for any denial.

4.    A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the Requested State has not received the formal request for extradition and the supporting documents required by Article 10.

5.    The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 14

Additional Information

1.    If the Requested State considers that the information furnished in support of a request for extradition is not sufficient to fulfill the requirements of this Treaty, that State may request that additional information be furnished within such reasonable length of time as it specifies.  Such additional information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of France or through the diplomatic channel.

-14-

2.    If the person sought is under arrest for purposes of extradition and the additional information furnished is not sufficient or is not received within the time specified, the person may be released from custody.  Such release shall not preclude the Requesting State from making another request in respect of the same or any other offense.

3.    When the person is released from custody in accordance with paragraph 2, the Requested State shall notify the Requesting State as soon as practicable.

Article 15

Decision and Surrender

1.    The Requested State shall notify as soon as possible the Requesting State of its decision on the request for extradition.

2.    If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial.  The Requested State shall provide copies of pertinent judicial decisions upon request.

3.    If the request for extradition is granted, the authorities of the Contracting States shall agree on the date and place for the surrender of the person sought.  The Requested State shall also notify the Requesting State of the length of time the person has spent in detention for purposes of extradition.

-15-

4.    If the person sought is not removed from the territory of the Requested State within the time prescribed by its law in the case of the United States, or in the case of France within 30 days from the date set for the surrender in accordance with paragraph 3 of this Article, that person may be discharged from custody, and the Requested State may subsequently refuse extradition for the same offense.

5.    In the event circumstances beyond the control of either Contracting State prevent the surrender or reception of the person sought, the Contracting States shall agree on a new date for the surrender, and the provisions of paragraph 4 of this Article shall apply.

Article 16

Temporary and Deferred Surrender

1.    If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.  The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting States.

-16-

2.    The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded and any sentence has been served.


Article 17

Requests for Extradition Made by Several States


If the Requested State receives requests from the other Contracting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority in the case of the United States and the competent authorities in the case of France shall determine to which State the person will be surrendered.  In making its decision, the Requested State shall consider all relevant factors, including but not limited to: whether the requests were made pursuant to treaty; the place where each offense was committed; the respective interests of the requesting States;  the gravity of the offenses; the nationality of the person sought and the victim; the possibility of further extradition between the requesting States; and the chronological order in which the requests were received from the requesting States.

-17-

## Article 18

### Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense in respect of which extradition is granted.  The articles, documents, and evidence mentioned in this Article may be surrendered even when the extradition cannot be effected because of the death, disappearance, or escape of the person sought.

2.    The Requested State may condition the surrender of the property upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable.  The Requested State may also defer the surrender of such property if it is needed as evidence in the Requested State.

3.    The rights of third parties in such property shall be duly respected.

## Article 19

### Rule of Speciality

1.    A person extradited under this Treaty shall not be detained, tried, convicted, punished, or subjected to any restriction of his freedom in the territory of the Requesting

-18-

State for any act prior to the person's surrender, other than the offense for which extradition has been granted, except in the following cases:

(a) when the Requested State has given its consent. A request for such purpose may be submitted, together with the documents listed in Article 10, and any statements made by the person extradited concerning the offense for which the consent of the Requested State is requested; or

(b) when, having had the opportunity to do so, the person extradited did not leave the territory of the Requesting State within 30 days of his final release, or returned to the territory of the Requesting State after having left it.

2. If the denomination of the offense for which a person has been extradited is altered during the proceedings under the laws of the Requesting State or such a person is charged with a differently denominated offense, the person shall be prosecuted or sentenced provided the offense under its new legal description is:

(a) based on the same set of facts contained in the extradition request and its supporting documents; and

(b) punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which he was extradited.

-19-

## Article 20

### Reextradition to a Third State

1.   When a person has been surrendered by the Requested State to the Requesting State, the Requesting State shall not surrender the person extradited to a third State for an offense prior to the person's surrender, unless:

> (a)   the Requested State consents to such surrender; or
>
> (b)   the person extradited, having had the opportunity to do so, did not leave the territory of the Requesting State within 30 days of the person's final release, or returned to the territory of the Requesting State after having left it.

2.   Before granting a request under paragraph 1(a) above, the Requested State may request the documents referred to in Article 10, and any statements made by the person extradited with respect to the offense for which the consent of the Requested State is requested.

## Article 21

### Transit

1.   Either Contracting State may authorize transportation through its territory of a person surrendered to the other State by a third State.   A request for transit shall

-20-

be made through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the French Republic. The facilities of INTERPOL may also be used to transmit such a request. It shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2. No authorization is required where air transportation is being utilized by one Contracting State and no landing is scheduled on the territory of the other Contracting State. If an unscheduled landing occurs on the territory of the other Contracting State, that Contracting State may require the request for transit as provided in paragraph 1. That Contracting State shall detain the person to be transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing.

## Article 22
### Representation and Expenses

1. The Requested State shall advise and assist the Requesting State in connection with a request for extradition. Such advice and assistance shall be rendered in accordance with the provisions of the accompanying agreed minute, which shall form an integral part of this Treaty.

-21-

2.    The Requesting State shall bear the expenses related to the translation of documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3.    Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under this Treaty.

## Article 23

### Consultation

The United States Department of Justice and the Ministry of Justice of the French Republic may consult with each other directly or through the facilities of INTERPOL in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

## Article 24

### Application

1.    This Treaty shall apply to offenses committed before as well as after the date it enters into force.

-22-

2.    Upon the entry into force of this Treaty, the
Treaty of Extradition between the United States of America and
the Republic of France signed at Paris January 6, 1909 and the
Supplementary Convention signed at Paris February 12, 1970 with
Exchanges of Letters signed at Paris June 2 and 11, 1970, shall
cease to have effect between the United States of America and
the French Republic.  Nevertheless, the 1909 Treaty, as
supplemented in 1970, shall apply to any extradition
proceedings in which extradition documents have already been
submitted to the courts of the Requested State at the time this
Treaty enters into force.


Article 25

Ratification and Entry into Force


Each Contracting State shall notify the other of the
completion of the constitutional procedures required for the
ratification of this Treaty.  The Treaty shall enter into force
on the first day of the second month following the date of
receipt of the last notification.

-23-

## Article 26

## Termination

Either Contracting State may terminate this Treaty at any time by giving written notice to the other Contracting State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF, the respective Plenipotentiaries have signed this Treaty.

DONE at Paris, in duplicate, this *23rd* day of April, 1996, in the English and French languages, both texts being equally authentic.



Agreed Minute on Representation

It is agreed that each country wishes to provide the other with the greatest degree of legal representation and legal advice (at no cost to the other) as would be permitted under its constitution and laws.

In the spirit of this agreement, the two countries further agreed to provide each other legal advice and representation (including representation in court) at least equal to that given to any other country pursuant to an extradition relationship whether existing at the present time or entered into in the future.

For the United States, the agreement means that, at a minimum, the United States will provide legal counsel to review each request for extradition submitted by France with a view to advising and counseling France concerning strengths and weaknesses in its case. Further, to the extent necessary and appropriate, the legal counsel will work with France to improve the documentation in order to increase the likelihood of France's being successful in its request for extradition. Further, the United States undertakes to provide representation for France in all courtroom litigation arising in connection with a request for extradition and all pre-hearing and post-hearing matters connected therewith. Finally, the United States undertakes to provide representation for France in connection with all appellate and "Habeas Corpus" actions in regard to a request for extradition.

For France the agreement means that at a minimum, France agrees to the following:

1)    to include in the file presented to the Chambre d'Accusation any memoranda or document transmitted by the U.S. Government in support of its extradition request in order to allow the United States Government to conduct a continuing written defense of its extradition request;

2)    to request that the United States provide supplementary information or explanations as deemed necessary;

3)    to communicate to the U.S. Government the notice of transmittal of the extradition request to the Parquet General of the Chambre d'Accusation;

4)    to seek to postpone the ruling and to transfer the case to another session of the Chambre d'Accusation, in order to allow the U.S. Government, if necessary, the opportunity to argue its position and to submit additional memoranda in response to the oral arguments put forward by the defense. This postponement would be within a strict time limit and could be pronounced automatically or at the request of the Parquet;

5)    to receive communications from a U.S. Consular official or official of the U.S. Department of Justice designated to represent the United States interests in matters related to the extradition request. The names of these officials will be given to the Ministry of Justice and, if necessary, the prosecutor in question, for each extradition request;

6)    to provide the authorized representative of the United States an opportunity, as soon as the extradition

request is made, to furnish by note to the Ministry of Justice, all legal or factual data that he or she deems useful to support the request;

7)    to communicate to the U.S. Government, by means of notice from the Ministry of Justice to the Embassy of the United States in Paris, that the request has been transmitted to the appropriate public prosecutor's office;

8)    to notify the Embassy of the United States in Paris the date of the first hearing during which the extradition request will be examined by the Chambre d'Accusation;

9)    to provide an opportunity for the authorized representative of the United States to furnish, before the hearing, an additional note within a sufficient time period for the interested party to be notified and for the note to be added to the file;

10)    to provide an opportunity for the authorized representatives of the United States to communicate, in a timely fashion, through the Ministry of Justice, to the same degree permitted to the Ministry of Justice, with the parquet general prior to the hearing examining the extradition request.

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201

# EXTRADITION

**Agreement Between the**

**UNITED STATES OF AMERICA**

**and the EUROPEAN UNION**

Signed at Washington June 25, 2003

*with*

Explanatory Note



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# EUROPEAN UNION

## Extradition

*Agreement signed at Washington June 25, 2003;*
*Transmitted by the President of the United States of America*
*    to the Senate September 28, 2006 (Treaty Doc. 109-14,*
*    109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*    July 29, 2008 (Senate Executive Report No. 110-12,*
*    110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
*    September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Approved by the European Union October 23, 2009;*
*Instruments exchanged at Washington October 28, 2009;*
*Entered into force February 1, 2010.*
*With explanatory note.*

AGREEMENT
ON EXTRADITION
BETWEEN THE UNITED STATES OF AMERICA
AND THE EUROPEAN UNION

ACUERDO
DE EXTRADICIÓN
ENTRE LOS ESTADOS UNIDOS DE AMÉRICA
Y LA UNIÓN EUROPEA

AFTALE
MELLEM AMERIKAS FORENEDE STATER
OG DEN EUROPÆISKE UNION
OM UDLEVERING

ABKOMMEN
ZWISCHEN DEN VEREINIGTEN STAATEN VON AMERIKA
UND DER EUROPÄISCHEN UNION
ÜBER AUSLIEFERUNG

ΣΥΜΦΩΝΙΑ
ΜΕΤΑΞΥ ΤΩΝ ΗΝΩΜΕΝΩΝ ΠΟΛΙΤΕΙΩΝ ΤΗΣ ΑΜΕΡΙΚΗΣ
ΚΑΙ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ
ΣΧΕΤΙΚΑ ΜΕ ΤΗΝ ΕΚΔΟΣΗ

ACCORD
ENTRE LES ÉTATS-UNIS D'AMÉRIQUE
ET L'UNION EUROPÉENNE
EN MATIÈRE D'EXTRADITION

ACCORDO
SULL'ESTRADIZIONE
TRA GLI STATI UNITI D'AMERICA
E L'UNIONE EUROPEA

OVEREENKOMST
BETREFFENDE UITLEVERING
TUSSEN DE VERENIGDE STATEN VAN AMERIKA
EN DE EUROPESE UNIE

ACORDO DE
EXTRADIÇÃO
ENTRE OS ESTADOS UNIDOS DA AMÉRICA
E A UNIÃO EUROPEIA

SOPIMUS
RIKOKSEN JOHDOSTA TAPAHTUVASTA LUOVUTTAMISESTA
AMERIKAN YHDYSVALTOJEN
JA EUROOPAN UNIONIN VÄLILLÄ

AVTAL
OM UTLÄMNING
MELLAN AMERIKAS FÖRENTA STATER
OCH EUROPEISKA UNIONEN

USA/CE/EXTR/X 1

AGREEMENT

ON EXTRADITION

BETWEEN THE UNITED STATES OF AMERICA

AND THE EUROPEAN UNION

USA/EU/EXTR/en 1

EXT LEGKODY MOV 000041
SBU - LEGAL

CONTENTS

Preamble

Article 1 ................................................................................................ Object and Purpose

Article 2 ........................................................................................................ Definitions

Article 3 .............................................. Scope of application of this Agreement in relation to
bilateral extradition treaties with Member States

Article 4 ........................................................................................... Extraditable offences

Article 5 ..................................................... Transmission and authentication of documents

Article 6 ................................................... Transmission of requests for provisional arrest

Article 7 ........................................ Transmission of documents following provisional arrest

Article 8 ........................................................................... Supplemental information

Article 9 ............................................................................... Temporary surrender

Article 10 ............................................. Requests for extradition or surrender made by several States

USA/EU/EXTR/en 2

SBU – LEGAL

Article 11 ................................................................................................Simplified extradition procedures

Article 12 ................................................................................................................................... Transit

Article 13 ....................................................................................................................Capital Punishment

Article 14 ................................................................................................ Sensitive information in a request

Article 15 ............................................................................................................................ Consultations

Article 16 ................................................................................................................Temporal Application

Article 17 .....................................................................................................................Non-derogation

Article 18 ......................................................Future bilateral extradition treaties with Member States

Article 19 ....................................................................................................Designation and notification

Article 20 ....................................................................................................... Territorial application

Article 21 .........................................................................................................................................Review

Article 22 ................................................................................................Entry into force and termination

Explanatory Note

USA/EU/EXTR/en 3

SBU - LEGAL

THE UNITED STATES OF AMERICA AND THE EUROPEAN UNION,

DESIRING further to facilitate cooperation between the United States of America and the European Union Member States,

DESIRING to combat crime in a more effective way as a means of protecting their respective democratic societies and common values,

HAVING DUE REGARD for rights of individuals and the rule of law,

MINDFUL of the guarantees under their respective legal systems which provide for the right to a fair trial to an extradited person, including the right to adjudication by an impartial tribunal established pursuant to law,

DESIRING to conclude an Agreement relating to the extradition of offenders,

HAVE AGREED AS FOLLOWS:

USA/EU/EXTR/en 4

SBU - LEGAL

# ARTICLE 1

## Object and Purpose

The Contracting Parties undertake, in accordance with the provisions of this Agreement, to provide for enhancements to cooperation in the context of applicable extradition relations between the United States of America and the Member States governing extradition of offenders.

# ARTICLE 2

## Definitions

1.    "Contracting Parties" shall mean the United States of America and the European Union.

2.    "Member State" shall mean a Member State of the European Union.

3.    "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and for a Member State, its Ministry of Justice, except that with respect to a Member State in which functions described in Articles 3, 5, 6, 8 or 12 are carried out by its Prosecutor General, that body may be designated to carry out such function in lieu of the Ministry of Justice in accordance with Article 19, unless the United States and the Member State concerned agree to designate another body.

USA/EU/EXTR/en 5

EXT_LEGKODY_GOV_000045
SBU_LEGAL

ARTICLE 3

Scope of application of this Agreement in relation
to bilateral extradition treaties with Member States

1.     The United States of America and the European Union, pursuant to the Treaty on European
Union, shall ensure that the provisions of this Agreement are applied in relation to bilateral
extradition treaties between the United States of America and the Member States, in force at the
time of the entry into force of this Agreement, under the following terms:

(a)    Article 4 shall be applied in place of bilateral treaty provisions that authorize extradition
       exclusively with respect to a list of specified criminal offences;

(b)    Article 5 shall be applied in place of bilateral treaty provisions governing transmission,
       certification, authentication or legalization of an extradition request and supporting documents
       transmitted by the requesting State;

(c)    Article 6 shall be applied in the absence of bilateral treaty provisions authorizing direct
       transmission of provisional arrest requests between the United States Department of Justice
       and the Ministry of Justice of the Member State concerned;

(d)    Article 7 shall be applied in addition to bilateral treaty provisions governing transmission of
       extradition requests;

USA/EU/EXTR/en 6

SBU - LEGAL

(e)   Article 8 shall be applied in the absence of bilateral treaty provisions governing the
submission of supplementary information; where bilateral treaty provisions do not specify the
channel to be used, paragraph 2 of that Article shall also be applied;

(f)   Article 9 shall be applied in the absence of bilateral treaty provisions authorizing temporary
surrender of persons being proceeded against or serving a sentence in the requested State;

(g)   Article 10 shall be applied, except as otherwise specified therein, in place of, or in the absence
of, bilateral treaty provisions pertaining to decision on several requests for extradition of the
same person;

(h)   Article 11 shall be applied in the absence of bilateral treaty provisions authorizing waiver of
extradition or simplified extradition procedures;

(i)   Article 12 shall be applied in the absence of bilateral treaty provisions governing transit;
where bilateral treaty provisions do not specify the procedure governing unscheduled landing
of aircraft, paragraph 3 of that Article shall also be applied;

(j)   Article 13 may be applied by the requested State in place of, or in the absence of, bilateral
treaty provisions governing capital punishment;

(k)   Article 14 shall be applied in the absence of bilateral treaty provisions governing treatment of
sensitive information in a request.

USA/EU/EXTR/en 7

SBU - LEGAL

2.  (a)  The European Union, pursuant to the Treaty on European Union, shall ensure that each Member State acknowledges, in a written instrument between such Member State and the United States of America, the application, in the manner set forth in this Article, of its bilateral extradition treaty in force with the United States of America;

   (b)  The European Union, pursuant to the Treaty on European Union, shall ensure that new Member States acceding to the European Union after the entry into force of this Agreement and having bilateral extradition treaties with the United States of America, take the measures referred to in subparagraph (a);

   (c)  The Contracting Parties shall endeavour to complete the process described in subparagraph (b) prior to the scheduled accession of a new Member State, or as soon as possible thereafter.  The European Union shall notify the United States of America of the date of accession of new Member States.

3.  If the process described in paragraph 2(b) is not completed by the date of accession, the provisions of this Agreement shall apply in the relations between the United States of America and that new Member State as from the date on which they have notified each other and the European Union of the completion of their internal procedures for that purpose.

USA/EU/EXTR/en 8

SBU – LEGAL

## ARTICLE 4

### Extraditable offences

1.    An offence shall be an extraditable offence if it is punishable under the laws of the requesting and requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.  An offence shall also be an extraditable offence if it consists of an attempt or conspiracy to commit, or participation in the commission of, an extraditable offence.  Where the request is for enforcement of the sentence of a person convicted of an extraditable offence, the deprivation of liberty remaining to be served must be at least four months.

2.    If extradition is granted for an extraditable offence, it shall also be granted for any other offence specified in the request if the latter offence is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

3.    For purposes of this Article, an offence shall be considered an extraditable offence:

(a)    regardless of whether the laws in the requesting and requested States place the offence within the same category of offences or describe the offence by the same terminology;

(b)    regardless of whether the offence is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court; and

USA/EU/EXTR/en 9

SBU - LEGAL

(c)    in criminal cases relating to taxes, customs duties, currency control and the import or export of commodities, regardless of whether the laws of the requesting and requested States provide for the same kinds of taxes, customs duties, or controls on currency or on the import or export of the same kinds of commodities.

4.    If the offence has been committed outside the territory of the requesting State, extradition shall be granted, subject to the other applicable requirements for extradition, if the laws of the requested State provide for the punishment of an offence committed outside its territory in similar circumstances.  If the laws of the requested State do not provide for the punishment of an offence committed outside its territory in similar circumstances, the executive authority of the requested State, at its discretion, may grant extradition provided that all other applicable requirements for extradition are met.

## ARTICLE 5

### Transmission and authentication of documents

1.    Requests for extradition and supporting documents shall be transmitted through the diplomatic channel, which shall include transmission as provided for in Article 7.

2.    Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the requesting State shall be admissible in extradition proceedings in the requested State without further certification, authentication, or other legalization.

USA/EU/EXTR/en 10

SBU - LEGAL

## ARTICLE 6

### Transmission of requests for provisional arrest

Requests for provisional arrest may be made directly between the Ministries of Justice of the requesting and requested States, as an alternative to the diplomatic channel. The facilities of the International Criminal Police Organization (Interpol) may also be used to transmit such a request.

## ARTICLE 7

### Transmission of documents following provisional arrest

1.     If the person whose extradition is sought is held under provisional arrest by the requested State, the requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to Article 5(1), by submitting the request and documents to the Embassy of the requested State located in the requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the requested State for purposes of applying the time limit that must be met under the applicable extradition treaty to enable the person's continued detention.

2.     Where a Member State on the date of signature of this Agreement, due to the established jurisprudence of its domestic legal system applicable at such date, cannot apply the measures referred to in paragraph 1, this Article shall not apply to it, until such time as that Member State and the United States of America, by exchange of diplomatic note, agree otherwise.

USA/EU/EXTR/en 11

SBU - LEGAL

## ARTICLE 8

### Supplemental information

1.     The requested State may require the requesting State to furnish additional information within such reasonable length of time as it specifies, if it considers that the information furnished in support of the request for extradition is not sufficient to fulfil the requirements of the applicable extradition treaty.

2.     Such supplementary information may be requested and furnished directly between the Ministries of Justice of the States concerned.

## ARTICLE 9

### Temporary surrender

1.     If a request for extradition is granted in the case of a person who is being proceeded against or is serving a sentence in the requested State, the requested State may temporarily surrender the person sought to the requesting State for the purpose of prosecution.

2.     The person so surrendered shall be kept in custody in the requesting State and shall be returned to the requested State at the conclusion of the proceedings against that person, in accordance with the conditions to be determined by mutual agreement of the requesting and requested States.  The time spent in custody in the territory of the requesting State pending prosecution in that State may be deducted from the time remaining to be served in the requested State.

USA/EU/EXTR/en 12

SBU - LEGAL

## ARTICLE 10

Requests for extradition or surrender made by several States

1.    If the requested State receives requests from the requesting State and from any other State or States for the extradition of the same person, either for the same offence or for different offences, the executive authority of the requested State shall determine to which State, if any, it will surrender the person.

2.    If a requested Member State receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offence or for different offences, the competent authority of the requested Member State shall determine to which State, if any, it will surrender the person. For this purpose, the competent authority shall be the requested Member State's executive authority if, under the bilateral extradition treaty in force between the United States and the Member State, decisions on competing requests are made by that authority; if not so provided in the bilateral extradition treaty, the competent authority shall be designated by the Member State concerned pursuant to Article 19.

3.    In making its decision under paragraphs 1 and 2, the requested State shall consider all of the relevant factors, including, but not limited to, factors already set forth in the applicable extradition treaty, and, where not already so set forth, the following:

(a)    whether the requests were made pursuant to a treaty;

USA/EU/EXTR/en 13

SBU — LEGAL

(b)    the places where each of the offences was committed;

(c)    the respective interests of the requesting States;

(d)    the seriousness of the offences;

(e)    the nationality of the victim;

(f)    the possibility of any subsequent extradition between the requesting States; and

(g)    the chronological order in which the requests were received from the requesting States.


ARTICLE 11

Simplified extradition procedures

If the person sought consents to be surrendered to the requesting State, the requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The consent of the person sought may include agreement to waiver of protection of the rule of specialty.


USA/EU/EXTR/en 14

SBU - LEGAL

## ARTICLE 12

### Transit

1.    The United States of America may authorize transportation through its territory of a person surrendered to a Member State by a third State, or by a Member State to a third State. A Member State may authorize transportation through its territory of a person surrendered to the United States of America by a third State, or by the United States of America to a third State.

2.    A request for transit shall be made through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Member State concerned. The facilities of Interpol may also be used to transmit such a request. The request shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit shall be detained in custody during the period of transit.

3.    Authorization is not required when air transportation is used and no landing is scheduled on the territory of the transit State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 2. All measures necessary to prevent the person from absconding shall be taken until transit is effected, as long as the request for transit is received within 96 hours of the unscheduled landing.

USA/EU/EXTR/en 15

SBU - LEGAL

## ARTICLE 13

### Capital Punishment

Where the offence for which extradition is sought is punishable by death under the laws in the requesting State and not punishable by death under the laws in the requested State, the requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the requesting State, on condition that the death penalty if imposed shall not be carried out.  If the requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions.  If the requesting State does not accept the conditions, the request for extradition may be denied.

## ARTICLE 14

### Sensitive information in a request

Where the requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the requested State to determine the extent to which the information can be protected by the requested State.  If the requested State cannot protect the information in the manner sought by the requesting State, the requesting State shall determine whether the information shall nonetheless be submitted.

EXT_LEGKODYMOV_000056
SBU - LEGAL

## ARTICLE 15

### Consultations

The Contracting Parties shall, as appropriate, consult to enable the most effective use to be made of this Agreement, including to facilitate the resolution of any dispute regarding the interpretation or application of this Agreement.

## ARTICLE 16

### Temporal Application

1.    This Agreement shall apply to offences committed before as well as after it enters into force.

2.    This Agreement shall apply to requests for extradition made after its entry into force. Nevertheless, Articles 4 and 9 shall apply to requests pending in a requested State at the time this Agreement enters into force.

## ARTICLE 17

### Non-derogation

1.    This Agreement is without prejudice to the invocation by the requested State of grounds for refusal relating to a matter not governed by this Agreement that is available pursuant to a bilateral extradition treaty in force between the United States of America and a Member State.

EXT_LEGKODYMOV_000057

2.    Where the constitutional principles of, or final judicial decisions binding upon, the requested State may pose an impediment to fulfilment of its obligation to extradite, and resolution of the matter is not provided for in this Agreement or the applicable bilateral treaty, consultations shall take place between the requested and requesting States.

## ARTICLE 18

### Future bilateral extradition treaties with Member States

This Agreement shall not preclude the conclusion, after its entry into force, of bilateral Agreements between the United States of America and a Member State consistent with this Agreement.

## ARTICLE 19

### Designation and notification

The European Union shall notify the United States of America of any designation pursuant to Article 2(3) and Article 10(2), prior to the exchange of written instruments described in Article 3(2) between the United States of America and the Member States.

USA/EU/EXTR/en 18

ARTICLE 20

Territorial application

1.    This Agreement shall apply:

(a)    to the United States of America;

(b)    in relation to the European Union to:

–    Member States;

–    territories for whose external relations a Member State has responsibility, or countries that are not Member States for whom a Member State has other duties with respect to external relations, where agreed upon by exchange of diplomatic note between the Contracting Parties, duly confirmed by the relevant Member State.

2    The application of this Agreement to any territory or country in respect of which extension has been made in accordance with subparagraph (b) of paragraph 1 may be terminated by either Contracting Party giving six months' written notice to the other Contracting Party through the diplomatic channel, where duly confirmed between the United States of America and the relevant Member State.

EXT_LEGKODYMOV_000059
SBU – LEGAL

ARTICLE 21

Review

The Contracting Parties agree to carry out a common review of this Agreement as necessary, and in any event no later than five years after its entry into force.  The review shall address in particular the practical implementation of the Agreement and may also include issues such as the consequences of  further development of the European Union relating to the subject matter of this Agreement, including Article 10.

ARTICLE 22

Entry into force and termination

1.     This Agreement shall enter into force on the first day following the third month after the date on which the Contracting Parties have exchanged instruments indicating that they have completed their internal procedures for this purpose.  These instruments shall also indicate that the steps specified in Article 3(2) have been completed.

USA/EU/EXTR/en 20

SBU - LEGAL

2.    Either Contracting Party may terminate this Agreement at any time by giving written notice to the other Party, and such termination shall be effective six months after the date of such notice.

In witness whereof the undersigned Plenipotentiaries have signed this Agreement

Done at Washington D.C. on the twenty-fifth day of June in the year two thousand and three, in duplicate in the Danish, Dutch, English, Finnish, French, German, Greek, Italian, Portuguese, Spanish and Swedish languages, each text being equally authentic.

USA/EU/EXTR/en 21

NOTE: Only English text will be printed in this publication.

For the United States of America
Por los Estados Unidos de América
For Amerikas Forenede Stater
Für die Vereinigten Staaten von Amerika
Για τις Ηνωμένες Πολιτείες της Αμερικής
Pour les Etats-Unis d'Amérique
Per gli Stati Uniti d'America
Voor de Verenigde Staten van Amerika
Pelos Estados Unidos da América
Amerikan yhdysvaltojen puolesta
På Amerikas förenta staters vägnar

For the European Union
Por la Unión Europea
For Den Europæiske Union
Für die Europäische Union
Για την Ευρωπαϊκή Ένωση
Pour l'Union européenne
Per l'Unione europea
Voor de Europese Unie
Pela União Europeia
Euroopan unionin puolesta
På Europeiska unionens vägnar

USA/EU/EXTR/X 3

Explanatory Note on the Agreement on Extradition between
the United States of America and the European Union

This Explanatory Note reflects understandings regarding the application of certain provisions of the Agreement on Extradition between the United States of America and the European Union (hereinafter "the Agreement") agreed between the Contracting Parties.

On ARTICLE 10

Article 10 is not intended to affect the obligations of States Parties to the Rome Statute of the International Criminal Court, nor to affect the rights of the United States of America as a non-Party with regard to the International Criminal Court.

On ARTICLE 18

Article 18 provides that the Agreement shall not preclude the conclusion, after its entry into force, of bilateral agreements on extradition between the United States of America and a Member State consistent with the Agreement.

USA/EU/EXTR/NOTE/en 1

SBU - LEGAL

Should any measures set forth in the Agreement create an operational difficulty for the United States of America or either one or more Member States, such difficulty should in the first place be resolved, if possible, through consultations between the United States of America and the Member State or Member States concerned, or, if appropriate, through the consultation procedures set out in this Agreement. Where it is not possible to address such operational difficulty through consultations alone, it would be consistent with the Agreement for future bilateral agreements between the United States of America and the Member State or Member States to provide an operationally feasible alternative mechanism that would satisfy the objectives of the specific provision with respect to which the difficulty has arisen.

USA/EU/EXTR/NOTE/en 2

*Ambassade de France*
*aux Etats-Unis*

**UNOFFICIAL TRANSLATION**

L/LEI

2024 DEC 20  A 2: 46

DEPARTMENT OF STATE

**Re: Request for extradition of Mr. ANATOLII LEGKODYMOV**

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. ANATOLII LEGKODYMOV born on August 10th, 1982 (USSR), a Russian citizen.

On July 29th, 2024, he was issued an arrest warrant by Mr. Serge TOURNAIRE, first vice-president in charge of the Pre-trial investigation at the Court of Paris (France) for:

COMPLICITY IN FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM
COMPLICITY IN FRAUDULENT MAINTENANCE IN AN AUTOMATED DATA PROCESSING SYSTEM
COMPLICITY IN THE FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED PROCESSING SYSTEM
COMPLICITY IN FRAUDULENT MODIFICATION OF DATA CONTAINED IN AN AUTOMATED PROCESSING SYSTEM
COMPLICITY IN HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM
CONSPIRACY TO COMMIT EXTORTION IN AN ORGANISED GANG
PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME
CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONNAL DATA PROCESSING SYSTEM, COMMITTED BY AN ORGANISED GANG
AGGRAVATED MONEY LAUNDERING: AIDING AN ORGANISED GANG TO FALSELY JUSTIFY THE ORIGIN OF THE OFFENDER'S ASSETS OR INCOME
AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANISED GROUP IN AN OPERATION TO INVEST, CONCEAL, OR CONVERT THE PROCEEEDS OF CRIME

This request, accompanied by an English translation, is transmitted pursuant to:

- The Extradition Treaty of April 23rd, 1996, between France and the United States of America;

- The Extradition Agreement of July 19th, 2003 between the European Union and the United States of America.

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

.../...

- 2 / 2 -

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, December 20th, 2024

**Department of State**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas BURROWS**
**Office of International Affairs**

*Ambassade de France*
*aux Etats-Unis*

Réf : Demande d'extradition de Anatolii LEGKODYMOV
N° : 2024-0519489

L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui adresser, par la présente note diplomatique, une demande d'extradition originale, accompagnée de sa traduction en langue anglaise, formée auprès du Gouvernement américain contre le nommé Anatolii LEGKODYMOV, né le 10 août 1982 en Union Soviétique, de nationalité russe, en vertu :

- du Traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique signé à Paris le 23 avril 1996
- de l'Accord entre l'Union européenne et les Etats-Unis d'Amérique en matière d'extradition signé le 25 juillet 2003 in Washington, D.C.

Anatolii LEGKODYMOV fait l'objet d'un mandat d'arrêt délivré le 29 juillet 2024 par M. Serge TOURNAIRE, premier vice-président chargé de l'instruction au tribunal judiciaire de Paris pour des faits de :

COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE DE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'EXTORSION EN BANDE ORGANISEE
PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME
COMPLICTE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE
BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT
BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT

L'Ambassade de France remercie le Département d'Etat de bien vouloir lui faire connaître la suite réservée à cette demande.

L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment

de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Washington, le 20 décembre 2024

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**

**MINISTÈRE
DE L'EUROPE
ET DES AFFAIRES
ÉTRANGÈRES**
*Liberté
Égalité
Fraternité*

**Direction des Français à l'étranger
et de l'administration consulaire**

C.A.D. WASHINGTON
ARRIVE PAR VALISE

DEC 1 9 2024 5 1

**Service des conventions,
des affaires civiles
et de l'entraide judicaire**

**Mission des conventions
et de l'entraide judiciaire**

Paris, le 12/12/2024

**DE : YANNICK ANDRIANARAHINJAKA**

**Chef de la mission des conventions et de l'entraide judiciaire**

FAE/SAEJ/CEJ n° 2024 – *0519 489*
Rédacteur : Julie CASTERAN pour Martin CHOLLET

Objet : **Demande d'extradition** formée auprès des autorités américaines à l'encontre du nommé **Anatolii LEGKODYMOV**, né le 10 août 1982 en URSS, de nationalité russe.

Référence : Dossier n°REM-2409WUZ5
PJ : 1 dossier

A la demande du ministère de la Justice, le Département vous prie de bien vouloir trouver ci-joint, avec les pièces de justice, une demande formée auprès des autorités américaines en vue de l'extradition du nommé **Anatolii LEGKODYMOV**, né le 10 août 1982 en URSS, de nationalité russe.

L'intéressé est recherché par les autorités françaises au titre d'un mandat d'arrêt décerné le 29 juillet 2024 par le juge d'instruction près le tribunal judiciaire de Paris, pour des faits qualifiés de blanchiment aggravé, complicité d'extorsion en bande organisée, complicité d'accès et maintien frauduleux dans un système de traitement automatisé des données, complicité d'introduction et modification frauduleuse de données dans un système de traitement automatisé des données, complicité d'entrave au fonctionnement d'un système de traitement automatisé des données, participation à une association de malfaiteurs en vue de la préparation d'un crime, complicité d'atteinte à un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat en bande organisée.

Cette demande est formée sur le fondement du Traité bilatéral franco-américain signé à Paris le 23 avril 1996, de l'Accord entre l'Union européenne et les États-Unis en matière d'extradition du 25 juin 2003, de la Convention sur la cybercriminalité du Conseil de l'Europe du 23 novembre 2001 et sur la Convention des Nations-Unies contre la criminalité transnationale organisée du 15 novembre 2000.

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533
75732 Paris Cedex 15

1/2

SBU – LAW ENFORCEMENT

Le Département vous serait reconnaissant de bien vouloir remettre cette demande aux autorités américaines, dès que possible, et de lui faire connaitre la suite réservée./.

YANNICK ANDRIANARAHINJAKA

À :

Ambassade de France aux États-Unis d'Amérique
WASHINGTON

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533

SBU × LAW ENFORCEMENT

**COUR D'APPEL DE PARIS**

**PARQUET DU TRIBUNAL**

**JUDICIAIRE DE PARIS**

6ème **DIVISION – SECTION A2**

Exécution des peines

Entraide Pénale Internationale

TEL : 01 44 32 56 84

FAX : 01 44 32 58 56

Paris, le 26 novembre 2024

La Procureure de la République

près le Tribunal judiciaire de Paris

A

Madame la procureure générale près

la Cour d'appel de Paris

**PARQUET DE PARIS**
Courrier Administratif

N° 2024/04065
rappeler le numéro

COUR D'APPEL DE PARIS

**1 0 DEC. 2024**

Service Général

**OBJET : Demande d'extradition visant Monsieur Anatolii Viktorovich LEGKODYMOV, à destination des autorités américaines**

**N/REF : 21064000646**

J'ai l'honneur de solliciter formellement, à l'appui des pièces jointes, l'extradition de Monsieur Anatolii Viktorovich LEGKODYMOV, né le 10 août 1982, sur la base d'un mandat d'arrêt décerné le 29 juillet 2024 par Monsieur Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, lequel a fait l'objet d'un mandat d'arrêt européen, décerné le 14 août 20224 par Madame Natacha RATEAU, premier vice-procureure de la République près le Tribunal judiciaire de Paris.

**I / Identité de la personne concernée**

- Nom : **Anatolii Viktorovich LEGKODYMOV**
- Né le **10 août 1982**
- En : **URSS**
- Sexe : **Masculin**
- Nationalité : **Russe**
- Numéro de passeport russe : **727009003**

**II / Les faits**

*Résumé des faits :*

Dans le cadre d'une action opérationnelle européenne, la direction générale de la gendarmerie nationale ainsi que 17 agences de forces de l'ordre ont mis en lumière 20 cibles prioritaires afin d'identifier et démanteler des services de blanchiment de cryptoactifs. L'une des principales cibles était rapidement identifiée comme étant l'échangeur de cryptoactifs russe BITZLATO, avec un volume de transactions évalué à plus d'un milliard de dollars depuis 2019.

La plateforme d'échange de cryptoactifs russe BITZLATO permet d'échanger rapidement des cryptoactifs tels que des bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. Elle possède un site internet en langue russe et anglaise et est accessible à tous les utilisateurs d'Internet, notamment à des clients français. Elle propose des services de P2P, d'*exchange* et de *quick exchange*. Cette plateforme est ainsi mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du *hacking* et autres activités criminelles.

Ainsi, dans son rapport de 2022 intitulé « Crypto crime report », la société *Chainalysis* note que la société BITZLATO a reçu une part importante de jetons numériques provenant d'adresses illicites et risquées. Selon la presse (*Bloomberg* et le *New York Times*), *Federation Tower*, un complexe de deux gratte-ciels situés au cœur de la ville de Moscou, abriterait de nombreuses entreprises de cryptoactifs soupçonnés de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés *darknet* et rançongiciel.

Parmi ces entreprises, se situe notamment la société BITZLATO. L'analyse de la *blockchain*, combinée aux données du trafic web, indique également qu'après les attaques par *ransomware*, la plupart des fonds extorqués sont blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du *darknet*, 224,5 millions de dollars d'escroquerie et 9 millions de dollars des attaquants de *ransomware*. Cette plateforme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites.

Les investigations réalisées permettaient de révéler que le site de BITZLATO utilisait au moins un hébergeur français, OVH, auprès de qui la société loue 56 serveurs dédiés. Parmi ces derniers, les enquêteurs parvenaient à identifier le serveur de « management », soit le serveur communiquant et permettant l'administration des autres serveurs. Ce dernier était alors copié. La procédure réalisée à cet effet permettait de révéler que les administrateurs surveillaient de près l'infrastructure.

Par la suite, l'analyse du serveur de management révélait que les membres de BITZLATO utilisaient une application interne, nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un *chat* interne et une messagerie instantanée. L'analyse de l'application MATTERMOST mettait en lumière les éléments suivants : le serveur de management était administré par « DREY » (*alias* Andrei PRYHODKO, informaticien), par « Ml2016 » (*alias* Mike LUNOV, CEO de l'entreprise) et par « Mr. Note » ou « Vanch » (*alias* Ivan BONDAREV). 132 profils utilisateurs étaient répertoriés, 1 156 conversations de groupe ou privées représentant 505 110 messages étaient identifiés, 121 channels de plus de deux personnes et 15 868 fichiers, entre le 09 avril 2018 et le 04 mai 2022. L'analyse permettait de comprendre le fonctionnement de BITZLATO, et de récupérer des messages relatifs à de potentiels partenaires, à la comptabilité, au recrutement, aux ressources-humaines, ainsi que des éléments de marketing, l'architecture technique de la plateforme et son développement, des échanges liés aux cryptoactifs, *etc*. Cette analyse permettait donc de confirmer que l'exposition des différentes adresses de cryptoactifs de l'échangeur étaient issus en majorité d'actifs illicites.

Ainsi, pour les fonds reçus par BITZLATO, il a été calculé par le service criminel le volume d'activité suivant :

- 7 % du volume d'activité de HYDRA MARKET PLACE, représentant 171 millions de

SBU – LAW ENFORCEMENT

dollars ;
- 9 % du volume d'activité du *scam* FINIKO, représentant 138 millions de dollars ;
- 3,6 % du volume de GARANTEX, représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

- 14,75 % du volume d'activité de HYDRA MARKET PLACE, soit 125 millions de dollars ;
- 14,4 % du volume d'activité du *scam* FINIKA, soit 225 millions de dollars ;
- 8,8 % du volume d'activité de GARENTEX, soit 174 millions de dollars.

Par ailleurs, 2,5 millions de dollars étaient envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de *ransomware*. En outre, deux adresses de BITZLATO recevaient plus de 65 millions de dollars depuis le mois de mars 2022 de la part de WASA13l WALLET MIXEUR. Le plus gros montant de *bitcoin* échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros. Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC (Know your customer), alors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plateforme était peu regardante sur l'identité de ses clients.

Plusieurs membres des équipes de BITZLATO faisaient l'objet de poursuites, étant soit visés par des mandats d'arrêt, soit mis en examen. Parmi ces derniers figuraient notamment Mikhaïl LUNOV, directeur général ; Aleksandr HONCHARENKO, directeur marketing de la société ; Andrii KRYSTHAL, technicien – développement mobile pour la société ; Pavel LERNER, manager du projet « bourse » de la société, ainsi que Constantin ALEKSEEV, ingénieur sur le projet « bourse » de la société.

### *Sur l'identification d'Anatolii Viktorovich LEGKODYMOV*

Anatolii Viktorovich LEGKODYMOV était directeur et actionnaire de BITZLATO. Il était également administrateur et technicien de la plateforme. Certaines conversations entre ce dernier et son associé, Anton SHKURENKO, en 2018, permettaient notamment de révéler que ces derniers avaient connaissance que le chiffre d'affaires de la société reposait sur une origine douteuse, notamment en lien avec le trafic de stupéfiants. Ces derniers évoquaient également la nécessité de créer une apparence de contrôle afin de gagner en respectabilité, sans pour autant se priver de cette source de revenus. D'autres publications permettaient également de révéler qu'Anatolii Viktorovich LEGKODYMOV avait clairement connaissance que la société BITZLATO était associée au *dark web* ou à des activités de blanchiment. L'enquête permettait également de révéler que la société ne demandait pas de KYC, et avait conscience d'aider ses clients à effectuer des transactions liées à diverses activités illicites.

Anatolii Viktorovich LEGKODIMOV, PDG de la société BITZLATO, était interpellé à Miami le 17 janvier 2023 par le FBI. A cette occasion, plusieurs supports numériques étaient saisis, dont notamment cinq téléphones et deux ordinateurs portables. Le 06 décembre 2023, le Bureau du procureur des Etats-Unis, district Est de New-York, faisait savoir par communiqué de presse qu'Anatolii Viktorovich LEGKODYMOV avait plaidé coupable devant le tribunal fédéral de Brooklyn. Selon des articles de presse, l'intéressé était condamné à une peine d'emprisonnement de 18 mois et était libéré à l'issu de sa peine. Il serait donc actuellement libre de ses mouvements sur le territoire américain.

La personne morale BITZLATO est inscrite au sein du registre des sociétés de HONG KONG sous le nom commercial « BITZLATO LIMITED » depuis le 1er décembre 2017. Les membres fondateurs sont Lev LEGKODYMOV (3400 parts), Anatoly LEGKODYMOV (4250 parts), SHAKH NOV Sergei (200 parts) et SHKURENKO Anton (2150 parts).

Depuis le 25 août 2018, les associés sont :

- LEGKODYMOV Anatolii, directeur de la société (7344 actions)

- SHKURENKO Anton (2450 actions)

- SHAKNOV Sergei (206 actions)

Son directeur général (CEO – Chief Executive Officier) est Mikhail LUNOV

Le secteur d'activité de la société est le service d'information, website et « Message board ».

Le site internet de la plate-forme fait état que la société est domiciliée UNIT 617, 6 1 F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG, adresse confirmée sur les statuts légaux de la société. Cette adresse correspond à l'adresse d'un service de secrétariat et domiciliation de sociétés : First Company of Consulting and Secretariat Services Limited. La société Bitzlato a en effet désigné cette dernière société comme société de secrétariat.

La société Bitzlato est présente dans différents pays via la localisation de ses personnels : Russie, Ukraine, Espagne, Portugal, Kenya, Nigéria, Arabie Saoudite, Chine. Les employés majoritairement russe ou ukrainien travaillent en distanciel ou en présentiel. Il a été noté que des bureaux physiques en Ukraine et Russie existaient avant la guerre en Ukraine.

La société se présente comme ayant eu un total de 102 personnels comprenant les employés actuels et anciens. Un organigramme de la société en date du 29 mars 2021, retrouvé dans la messagerie interne de la société est annexé à la procédure :



La plate-forme d'échange de crypto-actifs russe BITZLATO permet d'échanger rapidement des crypto-actifs type bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. La plate-forme d'échange possède un site internet en langue russe mais également en langue anglaise et est accessible à tous les utilisateurs du web et notamment à des clients français. Elle propose des services de pair-à-pair décentralisée de cryptomonnaies (exchange P2P) qui permet aux utilisateurs de vendre et d'acheter des cryptomonnaies directement entre eux, en utilisant leur ordinateur ou leur appareil mobile, sans passer par une autorité centrale pour faciliter les transactions, d'exchange et de quick exchange.

Les utilisateurs de la plateforme Bitzlato publiaient des annonces de vente ou d'achat de cryptomonnaies (advert) en utilisant soit l'application web Bitzlato (https://bitzlato.com/trader-workspace ), soit un des bots Telegram Bitzlato[1] (https://tmeibitzlato ) . Ainsi, une fois le bot sélectionné, le menu s'affiche, accompagné des premiers messages (cf capture d'écran ci-dessous)

---

[1] Un bot ou robot Telegram est un programme informatique qui peut être intégré à l'application de messagerie instantanée Telegram pour exécuter diverses tâches ou fournir des services Les bots peuvent interagir avec les utilisateurs en envoyant et recevant des messages Ils peuvent aussi être intégrés à d'autres services ou plateformes en ligne Ils sont souvent utilisés pour automatiser certaines tâches fastidieuses ou répétitives, fournir des informations ou pour offrir une interface de commande pour accéder à différentes fonctionnalités

SBU X LAW ENFORCEMENT



Les services proposés par les bots de BITZLATO permettaient la vente et/ou l'achat des cryptommonaies suivantes :

| | |
|---|---|
| -Bitcoin (BTC) | -Dogecoin (DOGE) |
| -Ethereum (ETH) | -Dash Coin (DASH) |
| -Tether (USDT) | -Bitcoin Cash (BCH) |
| -Usd Coin (USDC) | -Monolith Crypto Ruble (MCR) |
| -Dai (DAI) | -Monolithos DAO Token (MDT) |
| -Litecoin (LTC) | |

Les enquêteurs relevaient que les « avantages » de l'utilisation de BIZLATO, soit par son site web soit par le bot Telegram par rapport à un échangeur « classique » (tel que Binance, Coinbase…) étaient :

-aucune commission sur les transactions effectuées selon les termes des annonces disponibles

-la sécurité des échanges (niveau de protection des transactions très élevé)

-l'échange sans intermédiaire

-accès à une variété de cryptomonnaies et de méthodes de paiement

-un wallet partagé avec des bots Telegram

-bot Telegram réputé plus simple d'utilisation

Il ressort ainsi des investigations que la société propose un éventail de 11 crypto-actifs échangeables en peer to peer et exchange. Le Bot telegram (ChangeBot) propose quant à lui 8 crypto-actifs différents

| Bitzlato peer-to-peer | Bitzlato échangeur | Bot telegram (Change Bot) |
|---|---|---|
| Bitcoin (BTC) | Bitcoin (BTC) | Bitcoin (BTC) |
| Ethereum (ETH) | Ethereum (ETH) | Ethereum (ETH) |
| Bitcoin Cash (BCH) | Tether (USDT) | Tether (USDT) |
| Litecoin (LTC) | Monolith Crypto Ruble (MCR) | Litecoin (LTC) |
| Dashcoin (DASH) | MonolithosDao Token (MDT) | Dashcoin (DASH) |
| Dogecoin (DOGE) | Binance Coin (BNB) | Bitcoin Cash (BCH) |
| Tether (USDT) | Huobi Token (HT) | Dogecoin (DOGE) |
| USD Coin (USDC) | Polygon (MATIC) | Monolith Crypto Ruble (MCR) |
| DAI | Tron (TRX) | |
| Monolith Crypto Ruble (MCR) | DAI | |
| MonolithosDAO Token (MDT) | BlazarBits (BZB) | |

Cette plate-forme était mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du hacking et autres activités criminelles ;

Les risques de blanchiment d'argent par le biais du P2P découlent principalement de l'anonymat des émetteurs bénéficiaires des transactions ainsi que de l'absence de réglementation pour ces types de services financiers. Comme dans toute opération de blanchiment le volet d'opacification peut porter sur deux aspects : faire obstacle à la traçabilité de la valeur du produit du crime et/ou faire obstacle à l'identification de l'auteur ou du bénéficiaire d'une opération.  La technologie utilisée permet de s'affranchir des institutions financières pour assurer des transactions virtuelles instantanées transfrontalières, sans limite et anonymes. L'opacité des opérations financières réalisées permet de masquer l'origine illicite des produits ou fonds afin de permettre aux criminels d'en user légalement une fois injectés dans l'économie licite. Cependant, il semble très difficilement concevable au vu du nombre de transactions réalisées via la plateforme russe Bitzlato en provenance et au profit des plateformes sanctionnées par les autorités américaines que les administrateurs n'aient pas eu connaissance que les flux d'argent étaient en lien avec des activités criminelles. Ainsi, les informations relatives au site Hydra Market étaient mondialement connues et reconnues.

Ainsi, dans son rapport 2022 « Crypto crime report », la société Chainalysis note que la société BITZLATO a reçu de 2019 à 2023 une part importante (76%) de jetons numériques provenant d'adresses illicites et risquées ;

Dans son rapport en date du 18 janvier 2023 intitulé « US Authorities move against High-Risk Exchange Bitzlato for providing money landering services to ranseomware attackers and other russia-based criminals », la société Chainalisys après avoir évoqué l'arrestation du fondateur de Bizlato, Anatoly LEGKODYMOV à Miami mentionnait le rôle de Bizlato dans le blanchiment de fonds provenant d'attaques de rançongiciels et du notoire HydraMarket

La société Chainalisys présentait ses constations sous formes de graphiques :

- concernant la « légitimité des fonds reçus »



- concernant la source des fonds illicites reçus par Bitzlato à savoir :

    * 38,2 % provenant de darknetMarket,

    * 35% de scams

    * 23% de services ayant été sanctionnés

    *1,6% de rensemwares



**Sources of illicit funds sent to Bitzlato, 2019 - 2023**

Il est également expliqué que « en tout Bitzlato a reçu 2,5 milliards de crypto-actifs sur cette période et que 26 % proviennent de sources illégales et 27 % de sources considérées comme « à risques » (définit comme des fonds provenant de mixers, échangeurs à hauts risques et services basées dans des juridictions à hauts risques) »

Les sources ayant envoyés des fonds à Bitzlato sont référencées dans le graphique suivant :



**Top 20 illicit entities sending funds to Bitzlato, 2019 - 2023**

Selon la presse (Bloomberg et le New York Times), Federation Tower, un complexe de deux gratte-ciel au cœur de la ville de Moscou, abrite de nombreuses entreprises de crypto-actifs soupçonnées de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés darknet et rançongiciel. Parmi ces entreprises se situe notamment la société BITZLATO

La société BITZLATO utilisait une douzaine de noms de domaines à savoir:

- bitzlato bz
- bitzlato com
- bitzlato net
- changebot org
- monolith money
- land monolith money
- monolithos money
- price, monolith money
- trade monolith money
- 1g k. one
- s-www. Igk one
- xgpu online

qui étaient fermés puis saisis par les enquêteurs sur autorisation du juge des libertés et de la détention afin de faire cesser l'activité internet de la société.

L'analyse de la blockchain, combinée aux données du trafic web, indiquait également qu'après les attaques par ransomware, la plupart des fonds extorqués étaient blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du darknet, 224,5 millions de dollars d'escroqueries et 9 millions de dollars des attaquants de ransomware ;

Le conflit armé en Ukraine a généré une solidarité mondiale qui a permis des levées de fonds d'aide à ce pays mais également en faveur de la Russie. La cryptomonnare est utilisée par les Ukrainiens et les Russes pour financer leurs actions défensives et offensives. Cette plateforme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites. La société Chainalisys dans son rapport évoqué supra publié en 2023 mentionne des transactions entre Bizlato et des milices pro-russes ayant contribué à la guerre en Ukraine relevant que Bitzlato aurait reçu 32.000$ émanant de groupes paramilitaires russes.

➤ **S'agissant des serveurs**

Les premières investigations permettaient de révéler que le site de BITZLATO utilisait au moins un hébergeur français, OVH, auprès de qui la société louait 56 serveurs dédiés. Un schéma relationnel des serveurs était établi par les enquêteurs .

Une trentaine de serveurs étaient saisis par les enquêteurs sur ordonnance du juge des libertés et de la détention aux fins d'exploitation

Complémentairement des mesures de captation informatique étaient autorisées sur les serveurs dans la mesure où une copie physique du serveur pouvait s'avérer délicate car nécessitant, compte tenu de la configuration (serveur dédié[2]) l'arrêt du service, ce qui aurait impliqué d'éteindre le serveur, donc de de stopper toutes les opérations / actions menées par celui-ci et aurait alerté immédiatement le ou les gestionnaires du service (pouvant entraîner la perte, l'effacement ou le chiffrement des données présentes sur tous les autres serveurs).

Parmi ces serveurs, les enquêteurs parvenaient à identifier le serveur de « management »[3] (en gras dans le tableau ci-dessus), c'est-à-dire le serveur qui communique et permet l'administration des autres serveurs.

Ce serveur était copié puis saisi et scellé

Pour permettre la copie, il devait être redémarré. OVH informait les enquêteurs que le client avait tenté de le redémarrer à distance au bout de 2 ou 3 minutes puis avait déposé un ticket d'incident 7 minutes après le début de l'arrêt, démontrant que les administrateurs surveillaient de près l'infrastructure ;

---

[2] Il s'agit d'un serveur mis à disposition d'un client par un hébergeur ; ainsi toute manipulation nécessite un redémarrage
[3] IP 137.74.94.229 portant le nom de domaine « mgmt2.fr1.lgk.one »

SBU-LAW ENFORCEMENT

L'IP de connexion de ce serveur était notamment en lien avec l'adresse Email de contact du compte Linkedin shadow@bitzlato.com

L'analyse de ce serveur de management révélait que les membres de BITZLATO utilisaient une application nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un tchat interne et une messagerie instantanée. :

L'analyse de l'application **MATTERMOST** mettait en lumière les éléments suivants :

-        Le serveur de management était administré par « DREY » alias Andrei PRYHODKO (informaticien), « MI2016 » alias Mike LUNOV (CEO de l'entreprise) et « Mr Note » ou « vanch » alias Ivan BONDAREV :

-        132 profils utilisateurs étaient répertoriés, 1156 conversations de groupe ou privées représentant 505 110 messages, 121 chanels de plus de deux personnes et 15 868 fichiers, entre le 9 avril 2018 et le 4 mai 2022.

-        L'analyse permettait de comprendre le fonctionnement BITZLATO et de récupérer des messages relatifs à de potentiels partenaires, la comptabilité, le recrutement, la RH, des éléments de marketing, l'architecture technique de la plateforme et son développement, des échanges liés aux crypto-actifs…

Il ressortait de l'exploitation d'un document intitulé « Compliance buts de la compagnie « Bitzlato » » découvert dans le serveur Mattermost, dans une conversation de groupe de 3 participants (Michael LUNOV, Anton SHKURENKO et Anatoli LEGKODYMOV) qu'un audit, réalisé par la société CRYSTAL, avait été sollicité par la société BITZLATO afin de mettre en œuvre un processus de conformité de la plateforme conforme aux normes internationales. Le document, bien que non daté, était antérieur à l'été 2021 période qu'il mentionnait pour la mise en œuvre à venir de nouveaux amendements. Le rapport recommandait la mise en œuvre de plusieurs procédures telles que :

- une politique de prévention du blanchiment des capitaux (AML) en identifiant les actions pouvant être considérées comme suspectes et les ressources interdites,

- une procédure de connaissance du client  (« Know your custumer » ou KYC)[4]  qui va s'imposer à la plate-forme si elle veut continuer à fonctionner et se réfère aux recommandations du GAFI en la matière,

- une procédure de connaissance de ses transactions (KYC). A cet égard, l'audit révélait que 8 à 9 % des dépôts acceptés par la société proviendraient de fonds criminels et qu'à ce sens la plateforme servirait, pour certains utilisateurs, d'intermédiaire pour le blanchiment d'argent.

L'audit proposait des solutions en responsabilisant les employés (notamment NDA accord de confidentialité) et en créant trois départements nécessaires au processus de confidentialité KYC AML et antifraude. Au final le but était d'adopter une politique de conformité rigoureuse permettant de présenter une éthique de la société mettant en confiance les clients et responsabilisant les salariés. Cet audit était sollicité par Bitzlato pour se conformer aux normes internationales et éviter des sanctions. Il révélait qu'une partie des dépôts acceptés proviendraient de fonds criminels et proposait les solutions pour les déceler et apporter une réponse adéquate à leur traitement.

Ce rapport révélait de fait aux dirigeants de la société qu'une partie des fonds de leur plateforme étaient douteux sans préjuger du fait qu'ils avaient connaissance en amont de cette information.

Toutefois, selon plusieurs sites Web, le service Bitzlato ne demandait pas de vérification d'identité ou KYC à ses clients :

---

[4] Le processus de « Know Your Customer »› est indispensable pour évaluer le risque client afin de lutter contre la fraude, prévenir les risques de blanchiment d'argent et financement du terrorisme. Il doit concerner tous les clients physiques mais également les personnes morales en lien avec la société. Pour une compliance optimale, ce processus doit intervenir dès l'ouverture de compte client et des contrôles réguliers à différents échelons doivent être mis en place tout au long de la relation commerciale. Ce qui n'est pas mis en place par la société qui n'oblige pas aux clients de règles d'identification et de vérification.

**Why trade on Bitzlato?**

• Buy and sell cryptocurrency without any commission — 0% fee for everything. 0% — if you respond to another user's ad, 0% — if somebody responded to your ad, 0% — if you create an ad.

• No strict KYC policy. You do not need to pass verification on the platform to participate in cryptocurrency trading.

• Bitzlato supports any payment method.

• 2 user interfaces: Web-platform and Telegram-bot.

*Capture d'écran provenant du site web businessday.ng[2]*

 

Les autorités des Etats-Unis d'Amérique transmettaient aux enquêteurs des documents renfermant des données récoltées auprès de plusieurs fournisseurs de service internet basés aux Etats-Unis et utilisés par les employés de la société Bitzlato pour discuter de leurs activités commerciales en interne et/ou avec leurs clients. Il ressortait d'une analyse comparative des sociétés concurrentes (9 échangeurs de crypto-actifs[5]) de Bitzlato que cette dernière faisait de l'absence de KYC un avantage commercial / concurrentiel.

Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC lors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plateforme était peu regardante sur l'identité de ses clients.

Sur le site de Bitzlato (http://bitzlato.com ) un filtre permettait de n'afficher sur la plateforme que les annonces des vendeurs dont l'identité avait été vérifiée :



*https://bitzlato.com/p2p/buy-btc-rub*

En effet, dans l'onglet P2P trading, un filtre permet : « Verified users : Show ads of verified traders only » (capture d'écran ci-dessus)

Il s'en déduisait que la vérification du compte n'était pas obligatoire sur la plateforme et qu'il était possible de vendre de la crypto monnaie avec un compte non vérifié, notamment pour trader en Peer To Peer.

Dans un document vraisemblablement en date du 15 mars 2022 rattaché à l'adresse Mike@bitzlato.com , s'agissant d'un « Mémo » à destination des employés de la société Bitzlato, il était

---

[5] LocalBitcoin, Paxful, Binance P2P, HodlHidl, Chatex, LocalCryptos, Bestchange, Exmo et Kuna.

SBU - LAW ENFORCEMENT

évoqué la stratégie à mettre en place concernant notamment la nécessité d'une politique AML (prévention du blanchiment de capitaux) et KYC (connaissance du client).

Il ressortait de l'exploitation du MATTERMOST plusieurs conversations dans lesquelles des membres de la société BITZLATO évoquaient des activités de la société possiblement en rapport avec des activités illicites en citant notamment « Hydra, scam et virus ».

Il ressortait ainsi plusieurs conversations dans lesquelles l'utilisateur @legkodymov identifié comme étant Anatolii LEGKODYMOV, membre fondateur (associé) de la société Bitzlato, évoquait des activités illégales dans le cadre de l'activité de la société BITZLATO.

A titre d'illustration, plusieurs conversations en 2018-2019 entre Anatolii LEGKODYMOV et Anton CHKURENKO, autre membre fondateur (associé) de la société Bitzlato et identifié dans le Mattermost comme @ashkurenko, faisaient état qu'une partie de leur chiffre d'affaire était issue du placement de personnes se livrant au trafic de stupéfiants. Ils s'interrogeaient sur la façon de gérer la présence de ces fonds provenant de trafic de stupéfiants avec la possibilité d'exclure occasionnellement des utilisateurs afin de démontrer leur action de contrôle. Toutefois, il en ressort que ce contrôle serait perfectible en raison d'une volonté de garder une partie de cette clientèle :

| | | |
|---|---|---|
| 04/10/2018 08:37:52 | @ashkurenko | по сути, если мы серьезно объявим борьбу с наркоторговцами, он просто свалят на другую платформу. Мое предложение что надо номинально бороться, те, блокировать раз в месяц когда явно можно найти, а вот поддерживать рвение наших арбитров в поисках наркоманов, мне кажется это не очень правильно с точки зрения бизнеса.<br><br>**En fait, si nous déclarons sérieusement la guerre aux trafiquants de drogue, ils vont juste se barrer sur une autre plateforme. Ma proposition est qu'il faut lutter nominalement, c'est à dire, bloquer une fois par mois quand on peut trouver d'une façon évidente, mais soutenir l'entrain de nos arbitres à la recherche des drogués, il me semble que ça ne serait pas judicieux du point de vue du business.** |
| 04/10/2018 08:39:31 | @legkodymov | и естественно он вычиляя наркоматорговлю, надеется что деньги с заблокированого счёта будут бонусом<br><br>**Et bien sûr en cherchant le marché des drogués (narcomarché), il espère que l'argent du compte bloqué sera un bonus** |

| Horaire | Pseudonyme | Original | | Traduction interprétée |
|---|---|---|---|---|
| 04/10/2018 07:12:12 | @ashkurenko | Привет | | Salut |
| 04/10/2018 07:12:23 | @ashkurenko | у нас угрожающая ситуация в БТЦ | | Nous avons une situation menaçante à BTZ |
| 04/10/2018 07:12:46 | @ashkurenko | нет мелких торговцев, похоцу их шугнула борьба с наркоманией | | Il n'y a pas de petits marchands, on a l'impression qu'ils ont eu peur de la lutte contre les drogués |
| 04/10/2018 07:13:29 | @ashkurenko | у нас объявления от 5000 на покупку | | nous avons des annonces à partir de 5000 pour l'achat |
| 04/10/2018 07:13:51 | @ashkurenko | ко мшенские, на 1000-3000 только нарки закупаются | | mais il me semble qu'il n'y a que les drogués qui font des achats de 1000-3000 |
| 04/10/2018 07:14:27 | @legkodymov | Я у посмотрел отчет, вроде нехсто | | oui je regardais le rapport, ça va |
| 04/10/2018 07:19:48 | @legkodymov | мне не приходят отчёты от старых ботов | | je n'ai pas des rapports des anciens bots |
| 04/10/2018 08:35:15 | @ashkurenko | Я на счет наркомаганнов | | au sujet des magasins de drogue |
| 04/10/2018 08:35:25 | @ashkurenko | еще хочу обсудить | | je veux en parler |
| 04/10/2018 08:37:52 | @ashkurenko | по суть, если мы серьезно объявим борьбу с наркоторговцами, он просто свалят на другую платформу. Мое предложение что надо номинально бороться, те, блокировать раз в месяц когда явно можно найти, а вот поддерживать рвение наших арбитров в поисках наркоманов, мне кажется это не очень правильно с точки зрения бизнеса. | | En fait, si nous déclarons sérieusement la guerre aux trafiquants de drogue, ils vont juste se barrer sur une autre plateforme. Ma proposition est qu'il faut lutter nominalement, c'est à dire, bloquer une fois par mois quand on peut trouver d'une façon évidente, mais soutenir l'entrain de nos arbitres à la recherche des drogués, il me semble que ça ne serait pas judicieux du point de vue du business. |
| 04/10/2018 08:38:14 | @ashkurenko | мне важно твое мнение. | | Ion opinion est importante pour moi |
| 04/10/2018 08:38:59 | @legkodymov | ну у у нас только один арбитр | | nous n'avons qu'un seul arbitre |
| 04/10/2018 08:39:19 | @ashkurenko | если правильно понял я а при его к делу серьезно | | si j'ai bien compris il a pris l'affaire au sérieux |
| 04/10/2018 08:39:31 | @legkodymov | надеется что деньги с заблокированного счёта будут бонусом | | et bien sûr en cherchant le marché des drogués (narcomarché), il espère que l'argent du compte bloqué sera un bonus |
| 04/10/2018 08:40:17 | @legkodymov | надо придерживаться той политики какая в банках | | il faut tenir la même politique que dans les banques |
| 04/10/2018 08:40:19 | @legkodymov | Я незнаю как в банках | | je ne sais pas comment ils font dans les banques |
| 04/10/2018 08:40:37 | @legkodymov | Наверное если сделать перевод "за коноплю", тогда | | je suppose que quand vous faites un virement « pour le hashich », alors c'est sûr |
| 04/10/2018 08:40:46 | @legkodymov | а так никто не будет особо искать | | qu'il bloque |
| 04/10/2018 08:49:50 | @legkodymov | Ну банки избавятся | | sinon personne ne cherchera particulièrement<br>oh les banques elles s'en débarassent |
| 04/10/2018 08:50:02 | @ashkurenko | от таких клиентов | | de ces clients |
| 04/10/2018 08:50:18 | @ashkurenko | И еще СБ банка, ментам шепнет | | et encore la CB de la banque sera donnée aux flics |

| 08/03/2019 01:25:51 | @ashkurenko | Давай на совещании. У меня стойкая уверенность, что у нас нет людей в платформе, кому интересны наши новые продукты, ну, у нас сформировавшийся костяк с нишевой потребностью. Вообщем обсудим. |
| | | On en parlera à la réunion. Je suis sûr que nous n'avons pas de personnes sur la plateforme qui sont intéressés par nos nouveaux produits, c'est à dire, que nous avons un noyau dur formé avec une demande de niche. Bref, on en discutera. |
| 08/03/2019 02:15:36 | @ashkurenko | Ну, хоть обороты растут, |
| | | Bon, le chiffre d'affaire augmente |
| 08/03/2019 05:31:23 | @legkodymov | Да, одни наркоманы |
| | | Oui, il n'y a que des drogués |

De même ils estimaient que la part de leur chiffre d'affaires en rapport avec le trafic de stupéfiants se situait entre 4,5 et 30 %. Il apparaissait qu'ils avaient identifié certains des trafiquants qui étaient leurs utilisateurs puisqu'ils évoquaient une commission de 3 % les concernant :

| 08/08/2019 15:59:17 | @legkodymov | И большинство денег (77%) приносит нам крупняк, а наркоманы приносят нам только 4,5% выручки |
| | | La plus grande partie de l'argent (77%) nous est apportée par les gros, et les drogués ne nous rapportent que 4,5 % |
| | | У нас в сервисе за последний месяц 105 тыс сделок, на 1160 битков, средний чек 0.011 BTC, при этом кто-то даже сделал 1 сделку в 1.995 BTC (отредактировано) И них сделок меньше чем на 0.002 монеты (1500 руб) сделано на 53 битка, но при этом 42 тыс сделок (практически половина) Из них сделок меньше чем 0.011 монеты (8тыс руб), тоесть наш средний чек, сделано на 265 битков и это составляет 87тыс сделок (большая часть) (отредактировано) Итого могу сделать вывод что 18 тыс сделок (17%), приносят нам 900 битков (77%) оборота. И большинство денег (77%) приносит нам крупняк, а наркоманы приносят нам только 4,5% выручки |
| 08/08/2019 15:59:46 | @legkodymov | « Les drogués ne nous apportent que 4,5 % de bénéfices » |
| 08/08/2019 16:03:16 | @ashkurenko | может наркобарон быть у нас |
| | | Peut etre que nous avons un baron de la drogue chez nous |
| 08/08/2019 16:03:58 | @ashkurenko | я про связи крупняка и наркоманов |
| | | Je parle des liens des gros avec les drogués |
| 08/08/2019 16:04:53 | @ashkurenko | Ну условно дропаем нарков и уходит 30% оборота |
| | | Et bien on peut dire que si on drop les narcos on perd 30 % de chiffre d'affaire |
| 08/08/2019 16:08:19 | @legkodymov | Дропаем нарков - уходит 4.5% |
| | | On drop les narcos – on perd 4,5 % |
| 08/08/2019 16:08:53 | @legkodymov | Мы можем очень круто монетизироват ся на рекламе. Наркам одно, VIP другое |
| | | on peut faire beaucoup de monnaie sur les publicités. Un pour les narcos, un autre pour les VIP. |
| 16/08/2019 08:52:27 | @ashkurenko | 1. Нам для нарков надо делать комиссии до 3-х% |
| | | Pour les narcos on doit faire la commission de 3 % |
| 16/08/2019 17:05:24 | @legkodymov | Блин про нарков не обсудили. По хорошему каждый зашедший должен оставлять $2 в месяц минимум |
| | | Flûte on n'a pas parlé de narcos. Au mieux chaque entrant doit laisser de 2$ par mois minimum |

Il ressort de ces conversations que les deux associés de Bitzlato évoquent le fait d'être informés qu'une partie de leur chiffre est issue du placement de personnes se livrant au trafic de stupéfiants.

Notons que ces conversations sont en date de 2018-2019 et qu'ils s'interrogent sur la façon de gérer la présence de ces fonds provenant de trafic de stupéfiant avec la possibilité d'exclure occasionnellement des utilisateurs afin de démontrer leur action de contrôle. Toutefois, il ressort également que ce contrôle serait perfectible en raison d'une volonté de garder une partie de cette clientèle.

Les enquêteurs se livraient à une analyse des contreparties (counterparties) en Bitcoin sur trois périodes successives afin d'évaluer le risque de l'origine frauduleuse de la contrepartie réalisée par la société Bitzlato. Il en ressortait que le pourcentage de transactions à haut risque ou à risque sévère était important sur les périodes examinées :

| Périodes | Montants envoyés | Montants reçus |
|---|---|---|
| Pré-compliance d'avril 2018 à mai 2021 | 26,67 % | 21,18 % |
| Transition supposée de compliance du 1er juin 2021 au 31 août 2021 | 36,94 % | 25,10 % |
| Post période supposée de compliance du 1er septembre 2021 au 09 janvier 2023 | 19,79 % | 12,97 % |

De même, les autorités américaines faisaient parvenir aux enquêteurs un document comportant un recoupement d'informations et de conversations présents dans les serveurs du Freshdesk[6] de la société Bitzlato portant principalement sur les transferts de crypto-actifs de et vers HYDRA, DROP, CRYPTO-MONNAIE SALE et DARKNET.

> ➤ **s'agissant des crypto-actifs**

L'analyse du serveur de management faisait état de :

- 4.562.929 « wallets »

- 5.785.656 transferts « dépôts » entre le 06/05/2018 et le 29/09/2022

> ➤ montants totaux transférés : 106 322.57374746 BTC et 138 663.89864867 ETH

- 3.041.916 transferts « withdrawal » entre le 26/05/2018 et le 29/09/2022

> ➤ montants totaux transférés : 103 612.89387937 BTC et 134 942.91348885 ETH

Ainsi, du début de l'activité de la plateforme en mai 2018 jusqu'au 03 janvier 2023, les enquêteurs relevaient les montants ci-après :

- flux entrants :       1 926 678 511 euros

- flux sortants : 1 786 117 237 euros

L'exploitation du serveur de management nommé « mgmt2 », et notamment du ficher temporaire comportant 2760 92 adresses de crypto-actifs adossées à la blockchain Bitcoin, permettait aux enquêteurs d'établir les constatations suivantes, sur la base d'un échantillonnage de 100 adresses relevées aléatoirement dans le ficher (**D398/2**):



**Activités sur adresses utilisées**

- Activités illicites
- Activités normales

32 %

68 %

---

[6] Freshdesk est un système de gestion des tickets basé sur le Cloud qui aide les sociétés à simplifier leurs processus de support client. (cf **D573**)

SBU – LAW ENFORCEMENT

Il en ressortait que 68% des adresses présentaient un lien avec des activités illicites de la cryptosphère, ce qui semblait cohérent au regard du rapport annuel publié par la société Chainalisys en 2022, évoqué supra, qui indiquait que 76% des fonds reçus sur cet échangeur provenait d'activité illicites.

Les enquêteurs consultaient, à l'aide d'un outil de « tracing » et de « clustering »[7] les expositions[8] du cluster de Bitzlato.com, composé de 256 589 adresses publiques, avec les clusters liés à des services sanctionnés par OFAC[9], au niveau de la Blockchain Bitcoin.

S'agissant des réceptions directes, les enquêteurs constataient la présence d'exposition au niveau de plusieurs catégories malveillantes qu'ils présentaient sous forme de tableau synthétique :

| Catégories | Montant en BTC | Pourcentage vis à vis du flux |
|---|---|---|
| Rançongiciels | 19,052 BTC | 0,37 % |
| Vol de fonds | 0,02 BTC | 0,02 % |
| Financement terrorisme | 0,00012 BTC | 0,00 % |
| Arnaque | 4862,5249 BTC | 4,09 % |

Il était également mis en relief la présence de sanctions faites par l'OFAC[10] pour diverses raisons :

| Raison de la sanction | Date de la sanction | Montant en BTC | Pourcentage |
|---|---|---|---|
| OFAC SDN Blender.io | 06 mai 2022 | 148,181 BTC | 1,19 % |
| OFAC SDN Chatex.com | 08 novembre 2021 | 197,3505 BTC | 1,59 % |
| OFAC SDN Garantex.io | 05 avril 2022 | 1866,3096 BTC | 15,04 % |
| OFAC SDN Hydra MarketPlace | 05 avril 2022 | 10103,4163 BTC | 81,41 % |

S'agissant des envois directs, les enquêteurs constataient également la présence d'expositions au niveau de plusieurs catégories malveillantes :

| Catégories | Montant en BTC | Pourcentage vis à vis du flux |
|---|---|---|
| Vol de fonds | 19,8756 BTC | 0,02 % |
| Financement terrorisme | 0,0228 BTC | 0,00 % |
| Arnaque | 1095,091 BTC | 8,49 % |

Etaient également relevées la présence de sanctions avec des montants en BTC :

---

[7] Il s'agit de l'outil « reactor » de la société Chainalysis qui permet notamment de regrouper des adresses appartenant à une même personne ou entité et donc de consulter toutes les transactions de différentes adresses appartenant à cette même personne ou entité. Il permet également d'analyser la réputation des adresses et clusters .

[8] L'exposition directe correspond à un transfert de fond du cluster Bitzlato vers le cluster du service sanctionné par l'OFAC sans qu'il y ait de rebond entre les deux L'exposition indirecte correspond quant à elle à un transfert entre les deux clusters mais avec des rebonds de transactions ce qui ne les lient pas directement.

[9] Les services référencés comme "sanction", et donc sanctionnés par l'OFAC, n'ont pas respecté la loi américaine en matière de lutte ant-blanchiment ou de protection des clients ou encore sont des plateformes ou services illégaux (marché noir, piratage informatique, actions malveillantes. pédocriminalité )

[10] **Blender.io** est un mélangeur de crypto-monnaie créé en 2017 et sanctionné en 2022 pour avoir aidé le groupe Lazarus, un groupe de pirates informatiques associé au gouvernement de la Corée du Nord

**Chatex.com** est un mélangeur de crypto-monnaie sanctionné en 2021 pour avoir facilité les transactions financières d'un groupe de pirates mettant en œuvre des rançongiciels

**Hydra** était le plus grand marché illégal du Darkweb, connu pour son important trafic de drogue Il a été sanctionné le 05 avril 2022 tout comme Garantex

**Garantex.io** est un échangeur de crypto-actif fondé en 2019 et enregistré en Estonie Il a fait l'objet d'une sanction en 2022 pour être associé avec divers marchés du darkweb dont Hydra

| Raison de la sanction | Date de la sanction | Montant en BTC | Pourcentage |
|---|---|---|---|
| OFAC SDN Blender.io | 06 mai 2022 | 9246,7311 BTC | 61,24 % |
| OFAC SDN Chatex.com | 08 novembre 2021 | 163,7378 BTC | 1,08 % |
| OFAC SDN Garantex.io | 05 avril 2022 | 5514,272 BTC | 36,52 % |
| OFAC SDN Hydra MarketPlace | 05 avril 2022 | 65,3193 BTC | 0,43 % |

Il ressortait des investigations que l'exposition des différentes adresses de crypto-actifs de l'échangeur étaient issues en majorité d'activités illicites.

Ainsi, pour les fonds reçus sur BITZLATO, il a été calculé, par service criminel, le volume d'activité suivant :

-    19,7% du volume d'activité de HYDRA MARKET PLACE[11] (sanction par l'OFAC[12]) représentant 171 millions de dollars,

-    9% du volume d'activité du scam FINIKO représentant 138 millions de dollars,

-    3,6 % du volume de GARENTEX (sanctionné par l'OFAC) représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

-    14,75 % du volume d'activité de HYDRA MARKET PLACE soit 125 millions de dollars. 83 223 comptes Hydra ont reçu des $BTC directement depuis le cluster Bitzlato

-    14,4 % du volume d'activité du scam FINIKO soit 225 millions de dollars,

-    8,8 % du volume d'activité de GARENTEX soit 174 millions de dollars.

Les investigations permettaient également de relever des expositions directes avec des ransomwaes comme Dharma et Phobos, des services de mixing

L'analyse des adresses Binance de LUNOV, le CEO de BITZLATO, faisait état de l'envoi de 2 transactions vers HYDRA et de la réception indirecte des fonds du darkmarketplace .

Par ailleurs, 2,5 millions de dollars ont été envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de ransomwares, notamment Maza et Mailto (Netwalker)

Les enquêteurs relevaient même des liens avec le hack de la plateforme FTX en 2022, les fonds ayant transité par des services de mixing

En outre, deux adresses de BITZLATO ont reçu plus de 65 millions de dollars depuis mars 2022 de WASABI WALLET MIXEUR.

Le plus gros montant de Bitcoin échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros.

Les wallets de Bitzlato présentaient également des liens avec des adresses e-mail associées à des utilisations de contenus pédopornographiques ou encore d'attaques aux STAD telles que DDOS

Un rapprochement permettait également la mise en évidence de 2 852 procédures judiciaires à travers le monde en lien avec l'échangeur Bitzlato. Aussi, 90,9 % de ces rapprochements concernaient des ransomwares et le reste des signalements correspondait principalement à des escroqueries. (**D509**)

Une opération de demixing permettait la mise en évidence de liens indirects entre la plateforme Bitzlato et des ransomwares, tel que Maze et Netwalker (mailto), MEDUSALOCKER par l'utilisation de services de mixages

---

[11] Sur **HYDRA** : Voir le rapport de FlashPoint Intelligence / Chainalisys

[12] L'Office of Foreign Assets Control (OFAC) est un organisme de contrôle financier, dépendant du Département du Trésor des États-Unis. Cet « office de contrôle des actifs étrangers » est chargé de l'application des sanctions internationales américaines dans le domaine financier, notamment dans le cadre du Foreign Corrupt Practices Act (FCPA) de 1977.

SBU - LAW ENFORCEMENT

Parmi les utilisateurs de la plateforme Bitzlato qui avaient procédé à des transferts de fonds vers des « échangeurs crypto » dont Binance, les enquêteurs parvenaient, grâce à un important travail de traçabilité, à identifier ceux qui avaient effectué des retraits à destinations de cet exchange et les montants correspondants ainsi que la provenance des fonds afin d'en déterminer une éventuelle nature délictueuse. Ainsi, les enquêteurs établissaient une liste d'individus disposant d'un compte domicilié chez Binance et Bitstamp, et alimenté par des flux ayant transité par Bitzlato, flux provenant eux-mêmes d'activités illicites.

A titre d'illustration, les enquêteurs procédaient à l'analyse des flux concernant l'adresse Binance détenue par un certain KOSTANTIN GORDON né le 18 avril 1982 (de nationalité russe) à savoir 18gfUKZPXNmS71S2vThehN8rECC2pByrjQ destinataire de fonds en provenance de Bitzlato et parvenait à identifier une autre adresse détenue sur ce même compte à savoir TA9sKXFQXrNsYB19tJHiihufR8FtpgUML3. Cette dernière, adresse de dépôt de Binance également utilisée par Konstantin GORON, avait reçu des fonds très conséquents en USDT sur la blockchain TRON en provenant de l'échangeur crypto GARANTEX.IO sanctionné par l'OFAC pour des infractions de blanchiment[13]. Les échanges portaient en effet sur 112 transactions entrantes, du 17 mars 2022 au 20 novembre 2022, de GARANTEX.IO vers l'adresse de dépôt Binance pour un montant de 39 856 923 $ effectuées:



Des saisies d'actifs numériques étaient pratiquées par les enquêteurs sur les wallets comportant des soldes importants pour un total de plus de 19 millions d'euros (**D393 à D396** et **D515 à D538**).

- **La société LGK POWER LIMITED**

Les enquêteurs s'intéressaient à la société LGK LIMITED dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato.

Il résultait de l'exploitation de ces documents que le dirigeant de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit chinois avait été créée en 2014 avait pour associés :

- LEGKODYMOV Anatolii, directeur général

- SKURENKO Anton

- SHAKNOV Sergei.

Son siège social est également au UNIT 617, 6 1 F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG et a recours aux services d'une société de secrétariat « First Company of Consulting and Secretariat Services Limited. Son objet social est le développement et la programmation de

---

[13] Voir note n°8

logiciels pour les banques et les organisations commerciales ainsi que la création et la conduite de projets blockchain

Un schéma relationnel des entités liées à la société LG POWER LTD était réalisé par les enquêteurs

- **La société A-XBT**

Les enquêteurs s'intéressaient à la société A-XBT dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato.

Il résultait de l'exploitation de ces documents que le dirigeant historique de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit russe avait été créée en 2013 avait pour associés à la fondation :

- LEGKODYMOV Anatolii

- SKURENKO Anton

- SHAKNOV Sergei

Actuellement seul SKURENKO Anton est associé.

Les nouveaux directeurs généraux sont SKURENKO Anton et KOVALENKO Dmitriy

Son siège social est 141980 région de moscou, - CH Shchelkovskoe, maison 113, salle 18 et son objet social porte sur les activités liées à l'utilisation de l'informatique et technologies de l'information, traitement des données et autres activités non interdites. Il ressort de recherches en sources ouvertes que la société A-XBT fourni une prestation de location de container de minage.

Un schéma relationnel de la société A-XBT était réalisé par les enquêteurs.

- **La société GUAROO**

Les enquêteurs s'intéressaient à la société GUAROO dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato. (**D163**)

Il résultait de l'exploitation de ces documents que le dirigeant historique de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit russe avait été créée en 2016 avait pour associé à la fondation : DOLIC Jakov.

Les nouveaux directeurs généraux étaient SHAKHNOV Sergei et DOLIC Jakov.

Son siège social était 109202 Moscou, Karacharovskaya 2 ème rue, maison 1 bâtiment 1, salle 15 et son objet social portait sur le conseil, travail et gestion informatique. Traitement de données et hébergement d'informations. Cette société était liquidée le 13 septembre 2019.

Une opération coordonnée par Eurojust entre, d'une part, plusieurs pays européens (Espagne, Portugal, Chypre) sur le fondement de décisions d'enquête européennes émises par le parquet de Paris et les autorités des Etats-Unis d'Amérique, d'autres part, était réalisée le 18 janvier 2023 aux fins d'interpellations et d'audition des principaux protagonistes de la société Bitzlato ainsi que de perquisition de leur domicile.

En résumé :

SBU - LAW ENFORCEMENT

- Anatolii LEGKODYMOV a eu des fonctions de direction dans la societe A-XBT ;

- Anatolii LEGKODYMOV est en relation étroite avec un des associes de la societe Bitzlato, Anton SHKURENKO. Ils conviennent, entre 2018 et 2019, qu'une partie du chiffre d'affaires de la société repose sur des fonds d'origine douteuse, lies aux trafics de stupéfiants. Ils entendent créer une apparence de contrôle afin de gagner en respectabilité mais sont réticents à se priver d'une partie de cette source de revenu.

- Anatolii LEGKODYMOV a une réelle action dans la société BITZLATO et participe à nombre de groupes de discussion du Mattermost où sont échangés des messages en rapport avec la gestion des affaires de la société. Il a par ailleurs demeuré en Chine avec les membres de sa famille. Rappelons que BITZLATO est une société de droit chinois.

- Il participe au groupe de discussions << stable » du Mattermost dans lequel la stratégie de mise en place de Monolithos DAO est exposée. Sur ce groupe Dmitry KRYSHTAL, de l'équipe marketing de Bitzlato, fait une promotion importante de la cryptomonnaie MCR (Monolith Crypto Ruble), qui est un stable coin indexé sur le rouble et est créé par Bitzlato. L'utilisation du MCR est promu sur le forum darkmoney. Le Darkmoney.lc est un forum en langue russe/ukrainienne qui sert manifestement de transactions pour des biens ou services d'origine douteuse, dont des services de blanchiment en cryptomonnaie. Sur ce forum est présent l'utilisateur Monolithos DAO, qui est actif entre mars 2020 et mars 2021. Il propose, en soulignant bien ce fait, d'acheter MCR sans enregistrement et sans vérification depuis le bot Bitzlato. Il renvoie au compte youtube MonolithosDAO sur lequel Dmitry KRYSHTAL fait la promotion de monolith.

**Concernant le lien avec les rançongiciels :**

Les investigations ont permis de mettre en exergue les expositions du cluster BITZLATO avec les rançongiciels MAZE et NETWALKER via le mixer BITMIX.BIZ.

En effet, une opération de demixing était mise en oeuvre grâce à la recension de 11 clusters composés de 54 adresses de réception connues comme affiliées à un rançongiciel. Le demixing était effectué grâce aux outils « Reactor » et « Clain ». En effet, sur tin cluster de 201 transferts liés à BITZLATO, 36 transactions provenaient de BITMIX.BIZ. Le mixeur BITMIX.BIZ fonctionnait par le biais d'une securityfeature séparant chaque flux entrant en 2 transactions sortantes : cet outil rendait donc plus difficile la découverte de l'origine des fonds entrants. (D408/11) Une adresse sur circulant BITZLATO et correspondant à l'empreinte numérique de BITMIX.BIZ recevait des Bitcoins d'une adresse en exposition directe avec le rançongiciel MAZE. L'origine frauduleuse de certains fonds en transit sur BITZLATO était donc claire.

L'adresse clusterisée par les enquêteurs américains bc1qkqh9wjmnq90gkwemg2yrivktw2wd74u80kd3wyt, correspondant à 54 adresses, envoyait un total de 284,1111 BTC sur l'échangeur BITZLATO depuis des adresses affiliées à des rançongiciels (MAZE et MAILTONETWALKER). La quasi-totalité de ces fonds passait par le mixeur BITMIX.BIZ. Cette opération de demixing mettait en lumière le blanchiment d'argent issu de rançongiciels par le biais d'un mixeur

A partir de l'analyse des mouvements des cryptoactifs du user 35, les enquêteurs mettaient ainsi en évidence de nombreuses transactions d'users BITZLATO en lien avec des ransomwares tels que TRICKBOT, DHARMA RANSOMWARE ou encore NETWALKER, lesquels présentaient également des liens avec HYDRAMARKETPLACE, GARANTEX (sanctionnées par l'OFAC), CRYPTOMIXER ou encore FINIKO.

Les investigations permettaient également de mettre en exergue l'exposition du cluster BITZLATO avec le rançongiciel MEDUSA LOCKER.

Une opération de traçage via l'outil Chainalysis permettait en effet de remonter à un cluster ayant reçu et retransmis près de 33 BTC sur la période du 01/11/2018 au 12/10/2020 : a minima 42% des fonds entrants l'équivalent de 133 167 euros) provenaient du rançongiciel MEDUSA LOCKER, et étaient blanchis au moyen d'échangeurs-dont BITZLATO. Une grande partie des fonds allait aussi vers HYDRA.

Il était en outre mis en exergue l'exposition du cluster BITZLATO avec l'escroquerie QUBITTECH. Un échange entre @drey (identifié comme BONDAREV Ivan) et @legkodymov (LEGKODYMOV Anatolii) dans le serveur Mattermost permettait d'identifier une clé publique de la chaîne BTC, ainsi que sa clé privée. En effet, LEGKODYMOV Anatolii exportait la clé privée dans l'application BITCOINCORE, générant ainsi sa clé publique et nous donnant la possibilité de la récupérer :1DEKCIVIHDHeFLmEBA5ANbYglbJ35duLdooh. Les enquêteurs déterminaient qu'elle était directement associée à BITZLATO LTD, et sans doute plus précisément à ses administrateurs. Or une analyse permettait de relever que les fonds entrants sur l'adresse de cette clé publique provenaient indirectement à 98.57% de l'escroquerie QUBITTECH (arnaque de type Pyramide de Ponzi). En effet, une adresse entrante sur la clé 1DEKCIVIHDHeFLmEBA5ANbYg1bJ35duLdooh était liée au cluster d'adresses de l'échangeur CRYPTONATOR, et l'outil CHAINALYSIS permettait de voir que les fonds entrants sur cette adresse venaient tous de QubitTech.ai. Ce comportement était potentiellement mis en place pour brouiller les transactions et complexifier le traçage de la destination des fonds frauduleux.

Anatoly Legkodymov savait depuis le début que Bitzlato était largement utilisé par les criminels :

- **Elémets sur la connaissance de Legkodymov en 2018-2019**

Des exemples de communications de Legkodymov démontrant la connaissance de transactions illicites en 2018-2019 sont présentés ci-dessous :

> En octobre 2018, le partenaire et cofondateur de Legkodymov dans Bitzlato a signalé à Legkodymov que Bitzlato avait été abandonné par des « *petits trafiquants* » qui avaient été « *effrayés par la guerre contre la drogue* ». Son interlocuteur a alors préconisé d'adopter une approche « *nominale* » pour « *la lutte contre les trafiquants de drogue* » – « *c'est-à-dire bloquer une fois par mois quand [ils] peuvent être clairement trouvés* ».

Legkodymov a en substance acquiescé et a préconisé de fermer les yeux sur les transactions liées à la drogue en bloquant uniquement les transactions où les parties à la transaction faisaient explicitement référence à la drogue.

> Le 23 avril 2019, le partenaire et cofondateur de Legkodymov dans Bitzlato a averti ses collègues, dont Legkodymov , que « *les clients de Bitzlato sont des toxicomanes qui achètent de la drogue sur le site d'Hydra* ». Legkodymov a répondu en proposant d'étendre les services de Bitzlato aux particuliers ordinaires en quête de confidentialité.

> Le 29 mai 2019, Legkodymov a écrit à un collègue dans un chat : « *Tous les traders sont connus pour être des escrocs. Ils négocient sur des « drop », etc. Vous réalisez qu'ils ne négocient pas tous (je pense que 90 %) avec leur carte [d'identité]* ». Plus tard dans l'année, le 22 juin 2019 ou aux alentours, Legkodymov a commenté : « *Les escrocs savent qu'il est possible d'être vérifié pour un drop et de retirer de l'argent à 100 %* ».

- **Eléments sur la connaissance de Legkodymov en 2021-2022**

Bitzlato avait une contrepartie dans dark web : Hydra Market. Hydra a été fermée grâce à une action coordonnée des forces de l'ordre américaines et allemandes le 5 avril 2022, et le ministère de la Justice a rendu public un acte d'accusation contre Dmitry Olegovich Pavlov pour complot en vue de distribuer des stupéfiants et complot en vue de commettre un blanchiment d'argent, en lien avec son exploitation et son administration des serveurs utilisés pour faire fonctionner Hydra.

SBU - LAW ENFORCEMENT

À partir de 2021, Legkodymov a de plus en plus démontré des connaissances spécifiques sur Hydra Market et a reconnu à plusieurs reprises que Bitzlato était connu pour son blanchiment d'argent. Par exemple, le 6 octobre 2021, Legkodymov a posé des questions à ses employés sur Hydra Market dans un chat et a reçu un article Wikipédia en russe. Une version de cet article, telle qu'elle est parue le 26 octobre 2021, est disponible sur Internet Archive, un projet d'archivage en ligne. Sa première phrase décrit Hydra Market comme « *le plus grand marché russe du darknet pour le trafic de drogue, la plus grande ressource au monde en termes de volume de transactions illégales avec des cryptomonnaies* ». L'article notait en outre que « *[ e ]n plus des drogues, les produits populaires sur Hydra sont de la fausse monnaie et des documents, [et] des instructions pour des activités illégales. La ressource fournit également des services tels que la vente de drogue, la sécurité Internet et le piratage de comptes* ».

Legkodymov a notamment reconnu à plusieurs reprises que les propres données de Bitzlato confirmaient ce que disaient les plateformes d'analyse de blockchain tierces : Bitzlato traitait un grand volume de transactions illicites, et plus particulièrement des transactions avec Hydra Market. Le 19 octobre 2021, par exemple, après avoir entendu que le personnel de l'industrie accusait Bitzlato de coopérer avec Hydra et de faciliter les transactions de drogue, le défenseur a écrit à ses collègues cadres supérieurs : « *D'un côté, ils ont raison à propos d'Hydra. Mais d'un autre côté, [il y a] 2,5 millions d'utilisateurs d'Hydra. Tout le monde est impliqué. Cela ne peut pas être filtré.* »

Comme exposé supra, le 14 février 2022, Chainalysis, une société d'analyse de blockchain, a publié la version 2022 de son « Crypto Crime Report » annuel, qui indiquait que les utilisateurs de Bitzlato avaient reçu 206 millions de dollars des marchés du darknet et 9 millions de dollars des attaquants de ransomware. Legkodymov s'est renseigné auprès d'un subordonné, qui a partagé avec lui le graphique ci-dessous le 25 février 2022, apparemment une capture d'écran du logiciel de filtrage des transactions de Bitzlato .

| count | transaction_entity_name |
|-------|-------------------------|
| 403119 | *NULL* |
| 10 | "SatoshiMines.com" |
| 2 | "BitZino.com" |
| 546 | "Wasabi" |
| 76159 | "Hydra Market" |

Legkodymov et ses collègues ont ensuite déterminé qu'au cours des trois derniers mois, 20 % des transactions de Bitzlato avaient envoyé des fonds vers Hydra Market. « *Des retraits vers Hydra ?* » a écrit le prévenu. « *Plus de 20 % ? . . . Mettons tout à zéro, dès que possible.* »

Plus tard dans la journée, l'intéressé écrit à un collègue : « *Il s'avère que nous avons au moins 20 % de saleté. Et dans cette situation, je ne vois aucune raison de me battre avec Chainalysis .* » Le 18 février 2022, Legkodymov a écrit à son partenaire dans Bitzlato pour se plaindre que ses dirigeants ruinaient la valeur d'acquisition de Bitzlato en blanchissant de l'argent : « *À qui vais-je (allons-nous) vendre Bitzlato maintenant avec un tel rapport de Chainalysis [?] Et c'est à 90 % dû à la direction plutôt qu'à nous.* » Une semaine plus tard, le 25 février 2022, , Legkodymov écrit à son partenaire dans Bitzlato: « *J'ai beaucoup réfléchi. Je n'arrive pas à surmonter 20 % de saleté et à être totalement ignoré. et je veux fermer l'entreprise. . . . Vous ne me soutenez pas pour me débarrasser de la saleté. Nous n'avons pas de plan, mais vous prétendez que vous n'avez aucun soutien ou autre chose. Je ne suis pas intéressé à continuer dans de telles conditions.* « *Je veux fermer l'entreprise et recommencer quelque chose de nouveau, à partir de zéro* », a-t-il ajouté le lendemain. « *Vous me jetez tous sous un bus. 76 000 transactions avec Hydra et aucun intérêt du tout.* »

Environ deux mois plus tard, le 7 avril 2022, Legkodymov critique son personnel de conformité pour ne pas avoir enquêté sur sa propre exposition aux fonds illicites, en utilisant les outils à sa disposition (comme le fournisseur de conformité Valega). « *Vous n'avez toujours pas calculé combien de transferts nous avons effectués vers les marchés noirs au cours des trois derniers mois (selon Valega)* », a-t-il écrit. « *Cette ignorance est alarmante.* » Le 10 avril 2022, un responsable de la conformité a signalé au défenseur qu'au

cours des six mois précédents, sur 76 000 utilisateurs actifs, 27 000 avaient tenté de transférer des fonds vers ou depuis ce que l'employé a qualifié d'adresses de cryptomonnaie « *sales* ». Un autre employé a commenté dans le même chat : « C'est juste que les services avec un faible niveau AML sont très pratiques pour les blanchisseurs [d'argent]. Dès que nous mettrons en œuvre tous les outils AML/KYC, le nombre de transactions douteuses diminuera considérablement.

Legkodymov et ses collègues ont exprimé à plusieurs reprises leur conscience que l'exploitation de Bitzlato pourrait les mettre en danger sur le plan juridique.

À l'automne 2022, lorsque Legkodymov s'est rendu aux États-Unis, il semble avoir occupé le poste de PDG par intérim de Bitzlato . Une communication de Legkodymov à ses collègues cadres supérieurs le 11 novembre 2022 illustre l'étendue de son implication et de son autorité. « *Fondamentalement* », a-t-il écrit, « *je commence à comprendre clairement où se situe le problème et ce qu'il faut faire. . . . Au cours de cette semaine, j'ai (en tant que PDG) compris que je ne m'entendais pas personnellement au travail avec la moitié du personnel (la haute direction). La haute direction n'a pas montré de résultats avant mon arrivée, [et] c'est pourquoi je changerai la moitié du personnel si je reste PDG.* »

Comme auparavant, Legkodymov a continué à réclamer des améliorations chez Bitzlato , sans apporter de réel changement. Le 7 novembre 2022, par exemple, le défendeur a exprimé son souhait de politiques KYC plus strictes, exprimant son point de vue selon lequel « *au fil des décennies d'expérience, je suis devenu convaincu que 95 % des personnes anonymes sont des criminels* ». Un collègue a répondu que la plupart des utilisateurs de Bitzlato étaient en effet des criminels, affirmant que les petits utilisateurs étaient « *l'ex-URSS, les fans de ressources obscures, les toxicomanes, les documents et autres saletés* ». En revanche, le collègue a déclaré que les utilisateurs à plus forte valeur ajoutée étaient « *des criminels. Comme vous l'avez dit, mais tous les gros bonnets vont de toute façon obtenir des « gouttes » pour leurs besoins* ». Legkodymov a répondu que « *le simple fait d'obtenir un tas de drogués à bas prix signifie que le département marketing se relâche... c'est l'erreur qui a été commise il y a plusieurs années, et je ne veux pas la répéter* ».

### III / La qualification pénale

Les faits ci-dessus exposés, commis entre le 1er décembre 2017 et le 20 janvier 2023 en tout cas depuis temps non prescrit en France, et en tour cas sur le territoire national, et de manière indivisible au Portugal, en Espagne, en Ukraine, aux Etats-Unis, en Russie et à Hong-Kong sont les suivants :

**COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C. PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C. PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE.**
Définie par ART.323-3 AL.1 C. PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

SBU - LAW ENFORCEMENT
EX-LEGKODYMOV-00091

**COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**
Définie par ART.323-3 AL.1 C. PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-2 AL.1 C. PENAL.
Réprimée par ART.323-2 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'EXTORSION EN BANDE ORGANISEE**
Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C. PENAL.
Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME**
Définie par ART.450-1 AL.1, AL.2 C. PENAL.
Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE**
Définie par ART.323-4-1, ART.323-1, ART.323-2, ART.323-3, ART.323-3-1, ART.132-71 C. PENAL.
Réprimée par ART.323-4-1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT**
Définie par ART.324-2 2°, ART.324-1 AL.1, ART.132-71 C. PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.131-30 AL.1 C. PENAL.

**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**
Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C. PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C. PENAL.

### *IV – La procédure*

Le 06 septembre 2022, une enquête préliminaire était ouverte par le parquet de Paris, et confiée à la direction générale de la gendarmerie nationale des chefs de :

- Complicité d'accès frauduleux et maintien frauduleux dans un système de traitement automatisé de données (STAD) avec la circonstance qu'il en résulte une altération du système ;
- Complicité d'entrave au fonctionnement d'un STAD ;
- Complicité d'introduction frauduleuse de données dans un STAD ;
- Complicité de modification frauduleuse de données dans un STAD ;

- Complicité d'extorsion en bande organisée ;
- Complicité d'association de malfaiteurs en vue de commettre un crime ou un délit puni de 05 ans au moins d'emprisonnement ;
- Blanchiment de crimes ou de délits commis en bande organisée.

Le 29 juillet 2024, un mandat d'arrêt national était décerné par Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, à l'encontre d'Anatolii Viktorovich LEGKODYMOV.

En effet, quand bien même Anatolii Viktorovich LEGKODYMOV a été libéré de prison après avoir été condamné à une peine d'emprisonnement dans le cadre d'un plaider coupable avec les autorités américaines, et que l'article 113-9 du code pénal français prévoit que « aucune poursuite ne peut être exercée contre une personne justifiant qu'elle a été jugée définitivement à l'étranger pour les mêmes faits et, en cas de condamnation, que la peine a été subie ou prescrite », cet article vise uniquement « les cas prévus aux articles 113-6 et 113-7 », c'est-à-dire ceux où la loi pénale française est applicable à des infractions commises hors du territoire de la République en raison de la nationalité française de son auteur ou de sa victime. S'agissant de faits commis sur le territoire national, la décision rendue par la juridiction pénale étrangère n'a pas en France l'autorité de la chose jugée.

Dans ces conditions, un mandat d'arrêt européen était décerné à l'encontre d'Anatolii Viktorovich LEGKODYMOV le 14 août 2024 par Madame Natacha RATEAU, premier vice-procureur de la République près le Tribunal judiciaire de Paris, et une demande d'arrestation provisoire en date du 20 août 2024 était adressé aux autorités américaines.

Le 23 août 2024, une demande d'extradition était adressée aux autorités américaines.

### V –Prescription

La prescription de l'action publique, qui est interrompue par les actes d'enquête et de poursuite (articles 7, 8 et 9-2 du code de procédure pénale) est de :

- Six ans pour les infractions de complicité d'accès et maintien frauduleux dans un système de traitement automatisé de données ; complicité d'introduction frauduleuse de données dans un système de traitement automatisé de données ; complicité de modification frauduleuse de données contenues dans un système de traitement automatisé de données ; association de malfaiteurs en vue de commettre un crime ou un délit punis de 05 ans au moins ; complicité d'atteinte à un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, commise en bande organisée et blanchiment de crimes ou délits commis en bande organisée.
- Vingt années pour l'infraction de complicité d'extorsion en bande organisée.

La présente demande d'extradition est, en droit français, un acte de recherche du Ministère public, interruptif de la prescription.

*L'extradition d'Anatolii Viktorovich LEGKODYMOV sur le fondement de l'article 13 du traité bilatéral franco-américain du 23 avril 1996, entré en vigueur le 1er février 2002, ainsi que sur le fondement des articles 6 et 7 de l'accord entre l'Union européenne et les Etats-Unis en matière d'extradition en date du 25 juin 2003. En outre, la présente demande d'extradition est fondée sur la Convention sur la cybercriminalité du Conseil de l'Europe en date du 23 novembre 2001, entrée en vigueur le 1er janvier 2007 et la Convention des Nations-Unies contre la criminalité transnationale organisée, adoptée à New-York le 15 novembre 2000.*

SBU — LAW ENFORCEMENT

Je vous prie de bien vouloir trouver en annexe de ce pli :

- Le mandat d'arrêt délivré le 29 juillet 2024 par Monsieur Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris ;
- Le mandat d'arrêt européen délivré le 14 août 2024 par Madame Natacha RATEAU, premier vice-procureure de la République près le Tribunal judiciaire de Paris ;
- Les textes de définition et de répression des infractions mentionnées, de compétence des juridictions françaises, ainsi que ceux relatifs à la prescription de l'action publique.

*P/ Madame la procureure de la République*

Philippe TOCCANIER

Procureur adjoint



### APOSTILLE
#### (Convention de La Haye du 5 octobre 1961)

1. *République française*    ETATS-UNIS

Le present acte public

2. a été signé par... Philippe TOCCANIER

3. agissant en qualité de......... PRA

4. est revêtu du sceau/timbre de.... TJ Paris

........................................................

Attesté

5. à Paris

6. le........ 1 0 DEC. 2024

7. *par le Procureur général près la Cour d'appel de Paris*

........................................................

8. sous n° 10855... Sylvie SCHLANGER

9. Sceau :        Avocat général          10. Signature :

........................................................

*"L'Apostille confirme seulement l'authenticité de la signature, du sceau ou timbre sur le document. Elle ne signifie pas que le contenu du document est correct ni que la République française approuve son contenu"*

**APPEAL COURT OF PARIS**

**PROSECUTION SECTION**

**JUDICIAL COURT OF PARIS**

**6th DIVISION - SECTION A2**

**Sentence enforcement**

**International Mutual Assistance**

**in Criminal Matters**

Paris, November 26, 2024

The Prosecutor

Judicial court of Paris

To

The Public Prosecutor at the

Appeal Court of Paris

PH  : 01 44 32 56 84

FAX : 01 44 32 58 56

**SUBJECT: Extradition request for Mr Anatolii Viktorovich LEGKODYMOV, addressed to the US authorities**

REF No: 21064000646

    I hereby formally request, in support of the attached documents, the extradition of Mr Anatolii Viktorovich LEGKODYMOV, born on August 10, 1982, on the basis of an arrest warrant issued on July 29, 2024 by Mr Serge TOURNAIRE, first vice-president in charge of investigation at the Paris Judicial Court, and under European arrest warrant issued on August 14, 2024 by Ms Natacha RATEAU, first deputy prosecutor at the Judicial Court of Paris

**I / Identity of the concerned**

- Name: **Anatolii Viktorovich LEGKODYMOV**
- Date of birth: **August 10, 1982**
- In: **USSR**
- Gender: **Male**
- Nationality: **Russian**
- Russian passport number: **727009003**

Copie certifiée
conforme à l'original



## II / Case details

### Case Summary:

As part of a European operational, the Directorate General of the Gendarmerie Nationale and 17 law enforcement agencies exposed 20 priority targets to identify and dismantle crypto asset laundering services. One of the main targets was quickly identified as the Russian cryptoasset exchange BITZLATO, with an estimated transaction volume of more than Dollar1 billion since 2019.

The Russian cryptoasset exchange platform BITZLATO enables cryptoassets such as bitcoin, ethereum, litecoin, bitcoin cash, dashs, dogecoin and tether USD to be exchanged quickly for roubles. It has a website in Russian and English and is accessible to all Internet users, including French customers. It offers P2P, *exchange* and *quick exchange* services. The platform has been exposed in the media as a channel for laundering funds from *hacking* and other criminal activities.

In its 2022 "Crypto crime report", *Chainalysis* noted that BITZLATO had received a significant proportion of digital tokens from illicit and risky addresses. According to press reports (*Bloomberg* and the *New York Times*), *Federation Tower*, a two-skyscraper complex in the heart of Moscow, is home to numerous cryptoasset companies suspected of facilitating large-scale money laundering, including the acceptance of illicit crypto-currency funds obtained through scams, *darknet* markets and ransomware.

One of these companies is BITZLATO. Analysis of the *blockchain*, combined with web traffic data, also indicates that after *ransomware* attacks, most of the extorted funds are laundered through services aimed primarily at Russian users. In 2021, BITZLATO is said to have received Dollar206 million from *darknet* markets, Dollar224.5 million from scams and Dollar9 million *from ransomware* attackers. The platform has also been implicated in financing the war in Ukraine and other illicit activities.

Investigations revealed that the BITZLATO site used at least one French hosting company, OVH, from which the company rents 56 dedicated servers. Of these, the investigators were able to identify the 'management' server, i.e. the server that communicates with and enables the administration of the other servers. This was then copied. The procedure carried out for this purpose revealed that the administrators were keeping a close eye on the infrastructure.

Subsequent analysis of the management server revealed that BITZLATO members were using an internal application called "MATTERMOST". This was a communications application designed as an internal *chat* and instant messaging service. Analysis of the MATTERMOST application revealed the following: the management server was administered by 'DREY' (*alias* Andrei PRYHODKO, IT specialist), by 'Ml2016' (*alias* Mike LUNOV, CEO of the company) and by 'Mr. Note' or 'Vanch' (*alias* Ivan BONDAREV). 132 user profiles were listed, 1,156 group or private conversations representing 505,110 messages were identified, 121 channels with more than two people and 15,868 files, between April 9, 2018 and May 4, 2022. The analysis enabled us to understand how BITZLATO works, and to recover messages relating to potential partners, accounting, recruitment, human resources, as well as marketing elements, the technical architecture of the platform and its development, exchanges relating to cryptoassets, *etc*. This analysis therefore confirmed that the exposure of the exchanger's various cryptoasset addresses were mostly derived from illicit assets.

For the funds received by BITZLATO, the crime brigade calculated the following volume of business:

- 7% of HYDRA MARKET PLACE's business volume, representing Dollar171 million;

- 9% of the volume of activity of FINIKO *scam*, representing 138 million dollars;
- 3.6% of GARANTEX's volume, representing 73 million dollars.

For funds sent from BITZLATO, its calculated as follows:

- 14.75% of HYDRA MARKET PLACE's business volume, or Dollar125 million;
- 14.4% of the volume of activity of the FINIKA *scam*, i.e. 225 million dollars ;
- 8.8% of GARENTEX's business volume, or 174 million dollars.

In addition, 2.5 million dollars were sent from the BITMIX.BIZ blender to BITZLATO, funds originating from *ransomware*. In addition, two BITZLATO addresses received more than Dollar65 million since March 2022 from WASA13l WALLET MIXEUR. The largest amount of *bitcoin* exchanged in a single transaction was 200 BTC, or €8 million. Analyses showed that the BITZLATO exchange had only 14,293 KYC (Know your customer) records since 2018, even though investigators counted 3,004,389 users. This showed that the platform paid little attention to the identity of its customers.

Several members of the BITZLATO team were the subject of legal proceedings, either under arrest warrants or under investigation. These included Mikhail LUNOV, the company's managing director; Aleksandr HONCHARENKO, the company's marketing director; Andrii KRYSTHAL, the company's mobile development technician; Pavel LERNER, manager of the company's stock market project, and Constantin ALEKSEEV, an engineer on the company's stock market project.

### *On Anatolii Viktorovich LEGKODYMOV*

Anatolii Viktorovich LEGKODYMOV was a director and shareholder of BITZLATO. He was also the platform's administrator and technician. Certain conversations between Anatolii Viktorovich LEGKODYMOV and his partner Anton SHKURENKO in 2018 revealed that they were aware that the company's turnover was of dubious origin, particularly in relation to drug trafficking. They also mentioned the need to create an appearance of control in order to gain respectability, without depriving themselves of this source of income. Other publications also revealed that Anatolii Viktorovich LEGKODYMOV had clear knowledge that BITZLATO was associated with the *dark web* or money laundering activities. The investigation also revealed that the company did not ask for KYC, and was aware that it was helping its customers to carry out transactions linked to various illegal activities.

Anatolii Viktorovich LEGKODIMOV, CEO of BITZLATO, was arrested in Miami on January 17, 2023 by the FBI. A number of digital devices were seized, including five mobile phones and two laptops. On 06 December 2023, the United States Attorney's Office for the Eastern District of New York issued a press release announcing that Anatolii Viktorovich LEGKODYMOV had pleaded guilty in Brooklyn federal court. According to press reports, Anatolii Viktorovich LEGKODYMOV was sentenced to 18 months' imprisonment and was released at the end of his sentence. He is therefore currently free to move within the United States.

The legal entity BITZLATO has been registered in the HONG KONG Companies Registry under the trade name "BITZLATO LIMITED" since December 1, 2017. The founding members are Lev LEGKODYMOV (3400 shares), Anatoly LEGKODYMOV (4250 shares), SHAKH NOV Sergei (200 shares) and SHKURENKO Anton (2150 shares).

Since August 25, 2018, the partners are:

- LEGKODYMOV Anatolii, Company Director (7,344 shares)

SBU - LAW ENFORCEMENT

- SHKURENKO Anton (2450 shares)
- SHAKNOV Sergei (206 shares)

Its Chief Executive Officer (CEO) is Mikhail LUNOV.

The company's business sector is information services, websites and 'Message board'.

The platform's website states that the company's registered address is UNIT 617, 6 I F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG, an address confirmed in the company's articles of association. This address corresponds to the address of a company secretarial and domiciliation service: First Company of Consulting and Secretariat Services Limited. Bitzlato has designated the latter company as its secretarial company.

Bitzlato is present in various countries through the location of its staff: Russia, Ukraine, Spain, Portugal, Kenya, Nigeria, Saudi Arabia and China. The employees, who are mainly Russian or Ukrainian, work remotely or face-to-face. It was noted that physical offices in Ukraine and Russia existed before the war in Ukraine.

The company claims to have had a total of 102 employees, including current and former employees. An organisation chart of the company dated March 29, 2021, found in the company's internal messaging system, is attached to the proceedings:



The Russian crypto-asset exchange platform BITZLATO makes it possible to quickly exchange crypto-assets such as bitcoin, ethereum, litecoin, bitcoin cash, dashs, dogecoin and tether USD for roubles. The exchange platform has a Russian-language website, as well as an English-language one, and is accessible to all web users, including French customers. It offers decentralised peer-to-peer cryptocurrency services (P2P exchange), enabling users to buy and sell cryptocurrencies directly from each other, using their computer or mobile device, without going through a central authority to facilitate transactions, exchange and quick exchange.

Users of the Bitzlato platform published advertisements for the sale or purchase of cryptocurrencies (advert) using either the Bitzlato web application(https://bitzlato.com/trader-workspace ) or one of the Bitzlato Telegram bots[1](https://tmeibitzlato ). Once the bot has been selected, the menu is displayed, along with the first messages (see screenshot below)

[1] A Telegram bot is a computer program that can be integrated into the Telegram instant messaging application to perform various tasks or provide services Bots can interact with users by sending and receiving messages They can also be integrated into other online services or platforms They are often used to automate certain tedious or repetitive tasks, provide information or offer a command interface to access various functionalities





The services offered by the BITZLATO bots enabled the sale and/or purchase of the following cryptocurrencies:

| | |
|---|---|
| -Bitcoin(BTC) | -Dogecoin (DOGE) |
| -Ethereum(ETH) | -Dash Coin (DASH) |
| -Tether(USDT) | -Bitcoin Cash (BCH) |
| -Usd Coin (USDC) | -Monolith Crypto Ruble (MCR) |
| -Dai(DAI) | -Monolithos DAO Token (MDT |
| -Litecoin (LTC) | |

The investigators noted that the "advantages" of using BIZLATO, either via its website or via the Telegram bot, compared with a "classic" exchange (such as Binance, Coinbase, etc.) were :

-no commission on transactions carried out under the terms of the advertisements

-exchange security (very high level of transaction protection)

-exchange without intermediaries

-access to a variety of cryptocurrencies and payment methods

-a wallet shared with Telegram bots

-Telegram bot deemed easier to use

Investigations revealed that the company offers a range of 11 crypto-assets that can be exchanged via peer-to-peer and exchange. The telegram bot (ChangeBot) offers 8 different crypto-assets.

| Bitzlato peer-to-peer | Bitzlato exchanger | Bot telegram (Change Bot) |
|---|---|---|
| Bitcoin (BTC) | Bitcoin (BTC) | Bitcoin (BTC) |
| Ethereum (ETH) | Ethereum (ETH) | Ethereum (ETH) |
| Bitcoin Cash (BCH) | Monolith Crypto Ruble (MCR) | Tether (USDT) |
| Litecoin (LTC) | MonolithosDao Token (MDT) | Litecoin (LTC) |
| Dashcoin (DASH) | Binance Coin (BNB) | Dashcoin (DASH) |
| Dogecoin (DOGE) | Huobi Token (HT) | Bitcoin Cash (BCH) |
| Tether (USDT) | Polygon (MATIC) | Dogecoin (DOGE) |
| USD Coin (USDC) | Tran (TRX) | Monolith Crypto Rubie (MCR) |
| DAI | DAI | |
| Monolith Crypto Rubie (MCR) | BlazarBits (BZB) | |
| MonolithosDAO Token (MDT) | | |



This platform was highlighted in various media outlets as a channel for laundering funds from hacking and other criminal activities;

The risks of money laundering via P2P stem mainly from the anonymity of the issuers who benefit from the transactions and the lack of regulation for these types of financial services. As with any money laundering operation, the opacification aspect can relate to two aspects: impeding the traceability of the proceeds of crime and/or impeding the identification of the originator or beneficiary of a transaction. The technology used makes it possible to bypass financial institutions and carry out instantaneous cross-border virtual transactions that are unlimited and anonymous. The opacity of the financial transactions carried out makes it possible to mask the illicit origin of the products or funds so that criminals can use them legally once they have been injected into the legal economy. However, given the number of transactions carried out via the Russian platform Bitzlato from and for the benefit of platforms sanctioned by the US authorities, it seems very difficult to imagine that the administrators were unaware that the money flows were linked to criminal activities. The information relating to the Hydra Market website was therefore known and recognised worldwide.

In its 2022 "Crypto crime report", Chainalysis notes that between 2019 and 2023, BITZLATO received a significant proportion (76%) of digital tokens from illicit and risky addresses;

In its report dated January 18, 2023 entitled "US Authorities move against High-Risk Exchange Bitzlato for providing money laundering services to ranseomware attackers and other russia-based criminals", Chainalisys, after referring to the arrest of Bitzlato founder Anatoly LEGKODYMOV in Miami, mentioned Bizlato's role in laundering funds from ransomware attacks and the notorious HydraMarket.

Chainalisys presented its findings in graph form:

- concerning the "legitimacy of the funds received".



**Yearly cryptocurrency value received by Bitzlato by source:
Legitimate vs. Risky vs. Illicit, 2019 – 2023**

© Chainalysis

concerning the source of the illicit funds received by Bitzlato, namely:

    * 38.2% from darknetMarket,

    * 35% of scams

    * 23% of services were sanctioned

    *1.6% of rensemwares





**Sources of illicit funds sent to Bitzlato, 2019 - 2023**

It is also explained that "in total Bitzlato received 2.5 billion in crypto-assets over this period and that 26% came from illegal sources and 27% from sources considered 'risky' (defined as funds from mixers, high-risk exchangers and services based in high-risk jurisdictions)."

The sources that sent funds to Bitzlato are listed in the following graph



**Top 20 illicit entities sending funds to Bitzlato, 2019 - 2023**

According to press reports (Bloomberg and the New York Times), Federation Tower, a two-skyscraper complex in the heart of Moscow, is home to numerous crypto-asset companies suspected of facilitating large-scale money laundering, including the acceptance of illicit crypto-currency funds obtained through scams, darknet markets and ransomware. These companies include BITZLATO

BITZLATO company used a dozen domain names:

- bitzlato bz
- bitzlato com
- bitzlato net
- changebot org
- monolith money
- land monolith money
- monolithos money
- price, monolith money
- trade monolith money
- lg k. one
- s-www. lgk one
- xgpu online

which were closed and then seized by the investigators with the authorisation of the liberties and detention judge in order to stop the company's internet activity.

Analysis of the blockchain, combined with web traffic data, also indicated that after ransomware attacks, most of the extorted funds were laundered through services aimed primarily at Russian users. By 2021, BITZLATO would have received Dollar206 million from darknet markets, Dollar224.5 million from scams and Dollar9 million from ransomware attackers;

The armed conflict in Ukraine has generated global solidarity that has led to funds being raised to help the country, but also to help Russia. The cryptocurrency is used by Ukrainians and Russians to finance their defensive and offensive actions. The platform has also been implicated in financing the war in Ukraine and other illicit activities. In its above-mentioned report published in 2023, Chainalisys mentions transactions between Bizlato and pro-Russian militias that contributed to the war in Ukraine, noting that Bitzlato received Dollar32,000 from Russian paramilitary groups.

➢ **With regard to servers**

Initial investigations revealed that the BITZLATO site used at least one French host, OVH, from which the company rented 56 dedicated servers. A diagram showing the relationships between the servers was drawn up by the investigators.

Around thirty servers were seized by the investigators by order of the judge in charge of liberties and detention, for the purposes of verification.

In addition, computer capture measures were authorised on the servers insofar as a physical copy of the server could prove tricky because, given the configuration (dedicated server[2] ), it would have been necessary to shut down the service, which would have meant shutting down the server and therefore stopping all operations/actions carried out by it, and would have immediately alerted the service manager(s) (which could result in the loss, deletion or encryption of data present on all the other servers).

Among these servers, the investigators were able to identify the "management" server[3] (in bold in the table above), i.e. the server that communicates with and enables the administration of the other servers.

This server was copied then seized and sealed

---

[2] This is a server made available to a customer by a hosting provider, so any manipulation requires a reboot.
[1] IP 137.74.94.229 with the domain name "mgmt2.fr1.lgk.one".



To enable copying, it had to be restarted. OVH informed investigators that the customer had tried to restart it remotely after 2 or 3 minutes, and had then filed an incident ticket 7 minutes after the shutdown began, demonstrating that the administrators were closely monitoring the infrastructure;

The connection IP of this server was linked to the contact email address of the Linkedin account shadow@bitzlato.com

Analysis of this management server revealed that BITZLATO members were using an application called "MATTERMOST". This was a communications application designed as an internal chat and instant messaging system. :

Analysis of the **MATTERMOST** application highlighted the following points:

-The management server was administered by "DREY" alias Andrei PRYHODKO (IT specialist), "MI2016" alias Mike LUNOV (CEO of the company) and "Mr Note" or "vanch" alias Ivan BONDAREV :

-132 user profiles were listed, 1156 group or private conversations representing 505,110 messages, 121 chats involving more than two people and 15,868 files, between April 9, 2018 and May 4, 2022.

-The analysis enabled us to understand how BITZLATO works and to retrieve messages relating to potential partners, accounting, recruitment, HR, marketing elements, the technical architecture of the platform and its development, exchanges relating to crypto-assets, etc.

It emerged from a document entitled "Compliance goals of the company "Bitzlato"" discovered on the Mattermost server, in a group conversation between 3 participants (Michael LUNOV, Anton SHKURENKO and Anatoli LEGKODYMOV) that an audit, carried out by the company CRYSTAL, had been requested by the company BITZLATO in order to implement a compliance process for the platform in accordance with international standards. The document, although undated, was dated prior to the summer of 2021, the period it mentioned for the future implementation of new amendments. The report recommended the implementation of several procedures such as :

- a policy to prevent money laundering (AML) by identifying actions that may be considered suspicious and prohibited resources,

- a "know your custumer" (KYC) procedure[4] , which will be mandatory for the platform if it is to continue to operate, and which refers to the FATF recommendations in this area,

- a Know Your Customer (KYC) procedure. In this respect, the audit revealed that 8 to 9% of the deposits accepted by the company came from criminal funds and that, in this sense, the platform served, for certain users, as an intermediary for money laundering.

The audit proposed solutions by making employees more accountable (in particular NDA confidentiality agreement) and by creating three departments necessary for the KYC AML confidentiality and anti-fraud process. In the end, the aim was to adopt a rigorous compliance policy that would enable the company to present an ethos that would instil confidence in customers and give employees a sense of responsibility. This audit was requested by Bitzlato in order to comply with international standards and avoid sanctions. It revealed that some of the deposits accepted came from criminal funds and proposed solutions to detect them and provide an appropriate response to their handling.

This report revealed to the company's directors that some of the funds on their platform were doubtful, without prejudging the fact that they had prior knowledge of this information.

---

[1] The 'Know Your Customer' process is essential for assessing customer risk in order to combat against fraud, money laundering and the financing of terrorism. It must apply to all individual customers, as well as to legal entities linked to the company. For optimum compliance, this process must be in place from the moment a customer account is opened, and regular checks at various levels must be carried out throughout the business relationship. This is not the case for companies that do not require their customers to comply with identification and verification rules.

Copie certifiée conforme à l'original

SBU ✕ LAW ENFORCEMENT

**Why trade on Bitzlato?**

● Buy and sell cryptocurrency without any commission – 0% fee for everything. 0% — if you respond to another user's ad, 0% — if somebody responded to your ad, 0% — if you create an ad.

● No strict KYC policy. You do not need to pass verification on the platform to participate in cryptocurrency trading.

● Bitzlato supports any payment method.

● 2 user interfaces: Web-platform and Telegram-bot.

Screen shot from the web site *businessday.ng*[2]

    The authorities in the United States of America provided the investigators with documents containing data collected from several internet service providers based in the United States and used by Bitzlato employees to discuss their business activities internally and/or with their customers. A comparative analysis of Bitzlato's competitors (9 crypto-asset exchangers[5]) showed that Bitzlato used the absence of KYC as a commercial/competitive advantage.

    The analyses showed that, since 2018, the BITZLATO exchange had only 14,293 KYCs, even though the investigators counted 3,004,389 users. This showed that the platform paid little attention to the identity of its customers.

    On the Bitzlato site(http://bitzlato.com ), a filter ensured that only ads from sellers whose identity had been verified were displayed on the platform:



*https://bitzlato.com/p2p/buy-btc-rub*

In fact, in the P2P trading tab, a filter allows : "Verified users: Show ads of verified traders only" (screenshot above)

This meant that account verification was not mandatory on the platform and that it was possible to sell crypto currency with an unverified account, particularly for Peer To Peer trading.

    In a document probably dated March 15, 2022 attached to the address Mike@bitzlato.com , a "Memo" for Bitzlato's employees, the strategy to be

---

[5]LocalBitcoin, Paxful, Binance P2P, HodlHidl, Chatex, LocalCryptos, Bestchange, Exmo and Kuna.

Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator
registered with
the Appeal
Court of Paris
(English)
1, Bd St. Martin - 75003 Paris

SBU×LAW ENFORCEMENT

put in place was mentioned, in particular concerning the need for an AML (prevention of money laundering) and KYC (know your customer) policy.

The MATTERMOST analysis revealed a number of conversations in which members of the BITZLATO company referred to the company's activities as possibly related to illegal activities, citing in particular "Hydra, scam and virus".

This revealed several conversations in which the user @legkodymov, identified as Anatolii LEGKODYMOV, a founding member (partner) of the company Bitzlato, mentioned illegal activities in the context of the activity of the company BITZLATO.

By way of illustration, several conversations in 2018-2019 between Anatolii LEGKODYMOV and Anton CHKURENKO, another founding member (partner) of the company Bitzlato and identified in the Mattermost as @ashkurenko, mentioned that part of their turnover came from the placement of people involved in drug trafficking. They wondered how to manage the presence of these funds from drug trafficking, with the possibility of occasionally excluding users in order to demonstrate their control action. However, it emerged that this control could be improved because of a desire to keep some of this clientele:

| | | |
|---|---|---|
| 04/10/2018 08:37:52 | @ashkurenko | ***Translator's note : Text in foreign language*** **In fact, if we seriously declare war on drug dealers, they'll just move on to another platform. My proposal is that we should fight nominally, i.e., block once a month when we can find it in an obvious, but to support the drive of our referees in the search for druggies, it seems to me, would be unwise from a business point of view.** |
| 04/10/2018 08:39:31 | @legkodymov | ***Translator's note : Text in foreign language*** **And of course, by seeking out the drug market (narcomarket), he hopes that the money in the blocked account will be a bonus.** |

| TIME | Pseudonym | Original | | Interpreter translation |
|---|---|---|---|---|
| 04/10/2018 07:12 12 | @ashkurenko | | | Hi |
| 04/10/2018 07:12: 23 | @ashkurenko | | | We have a threatening situation at BTZ |
| | | | | There are no small *dealers* it looks like they are afraid of the fight |
| 04/10/2018 07:12:46 | @ashkurenko | | | against drug |
| 04/16#2018 07:13:29 | @ashkurenko | | | we had ads starting at 5000 for purchase |
| 04/10/2018 07:13 51 | @ashkurenko | | | but it seems to me that only drug addicts buy 1000-3000 |
| 04/10/2018 07:14 27 | @ashkurenko | | | **Yes, I'll look at the report, it's fine** |
| 04/10/2018 07:19:48 | @ashkurenko | | | I don't have any reports from the old bots |
| **04/10/2018 08:35:15** | @ashkurenko | ***Translator's note :*** | | about drug store |
| 04/10/2018 08:35:25 | @ashkurenko | ***Text in foreign*** | | I want to talk |
| | | ***language*** | | |
| | | | | |
| 04/10/2018 08:37:52 | @ashkurenko | | | **In fact, if we seriously declare war on drug traffickers, they will go** |
| 04/10/2018 08:38:14 | @ashkurenko | | | **to** another platform My suggestion is that we fight it nominally. |
| 04/10/2018 08:38:59 | @ashkurenko | | | i.e., block one time per month when we can find an obvious way, |
| 04/10/2018 08:39:19 | @ashkurenko | | | must **support** our referees in their search for drug addicts. |
| | | | | *I felt it wouldn't make sense from a business point of view.* |
| 04/10/2018 06 39 31 | @ashkurenko | | | your opinion is important to me |
| 04/10/2018 08:40:17 | @ashkurenko | | | we only have one referee |
| 04/10/2018 08:40:19 | @ashkurenko | | | if I'm right, he took the matter seriously |
| | | | | and, of course, by seeking out the drug market, he hopes that the blocked |
| | | | | account agent will be a bonus. |
| 04/10/2018 08:40::37 | @ashkurenko | | | have to follow the same policy as the banks |
| 04/10/2018 08:40:46 | @ashkurenko | | | I don't know how they did it in the banks |
| 04/1(22018 08:49:50 | @ashkurenko | | | I think that when you make transfer « for hasish » they block |
| 04/10/2018 08:50:02 | @ashkurenko | | | Otherwise, I do not know how they can search |
| 04/10/2018 08:50:18 | @ashkurenko | | | oh the banks they get rid of |
| | | | | their clients |
| | | | | Moreoer the CB (account) will be handed over to the cops |

Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator
registered with the Appeal
Court of Paris
(English)
1, Bd St Martin - 75003 Paris

| | |
|---|---|
| 08/03/2019 01:25:51 @ashkurenko | *Translator's note : Text in foreign language* |
| | **We'll talk about it at the meeting. I'm sure we don't have any people on the platform who are interested in our new products, in other words, we have a hard core formed with a niche demand. Anyway, we'll talk about it.** |
| 08/03/2019 02: 15 :36@ashkurenko | *Translator's note : Text in foreign language* |
| | **Well, sales are up** |
| 08/03/2019 05:31:23@legkodymov | *Translator's note : Text in foreign language* |
| | **Yes, there are only drug addicts** |

They also estimated that between 4.5% and 30% of their sales were related to drug trafficking. It appeared that they had identified some of the traffickers who were their users, since they quoted a commission of 3% for them:

| | |
|---|---|
| 08/08/2019 15:59:17   @legkodymov | *Translator's note : Text in foreign language* |
| | Most of the money (77%) comes from big business, and drug addicts only bring in 4.5% |
| | *Translator's note : Text in foreign language* |
| 08/08/2019 15:59:46   @legkodymov | *Translator's note : Text in foreign language* |
| | (Drug addicts only bring in 4.5% of our profits) |
| 08/08/2019 16:03:16   @ashkurenko | *Translator's note : Text in foreign language* |
| | Maybe we've got a drug baron on our hands |
| 08/08/2019 16:03:58   @ashkurenko | *Translator's note : Text in foreign language* |
| | I'm talking about the links between big people and drug addicts |
| 08/08/2019 16:04:53   @ashkurenko | *Translator's note : Text in foreign language* |
| | Well, if we drop the narcos, we lose 30% of our turnover. |
| 08/08/2019 16:08:19   @legkodymov | *Translator's note : Text in foreign language* |
| | We drop the narcos - we lose 4.5 |
| 08/08/2019 16:08:53   @legkodymov | *Translator's note : Text in foreign language* |
| | you can make a lot of money on advertising. One for the narcos, another for VIP |
| 16/08/2019 08:52:27   @ashkurenko | *Translator's note : Text in foreign language* |
| | For narcos, we have to charge a 3% commission |
| 16/08/2019 17:05:24   @legkodymov | *Translator's note : Text in foreign language* |
| | Blimey, we didn't mention narcos. At best, each entrant must leave 25 per month minimum |

It emerges from these conversations that Bitzlato's two partners talk about being informed that part of their turnover comes from people involved in drug trafficking.

It should be noted that these conversations are dated 2018-2019 and that they are considering how to manage the presence of these funds from drug trafficking with the possibility of occasionally excluding users in order to demonstrate their control action. However, it also appears that this control could be improved because of a desire to keep some of this clientele.

The investigators carried out an analysis of Bitcoin counterparties over three successive periods in order to assess the risk of the fraudulent origin of the counterparty made by Bitzlato. The results showed that the percentage of high-risk or severe-risk transactions was significant over the periods examined:

| Period | Amount sent | Amount Received |
|---|---|---|
| Pre-compliance from April 2018 to May 2021 | 26,67 % | 21,18 % |
| Assumed transition of compliance from 1 June 2021 to 31 August 2021 | 36,94 % | 25,10 % |
| Post compliance period from 1 September 2021 to 09 January 2023 | 19,79 % | 12,97 % |

Similarly, the US authorities sent investigators a document containing a cross-reference of information and conversations on Bitzlato's Freshdesk[6] servers relating mainly to transfers of crypto-assets to and from HYDRA, DROP, CRYPTO-MONNAIE SALE and DARKNET

➢ **with regard to crypto-assets**

The management server analysis showed:

- 4,562,929 wallets

- 5,785,656 "deposit" transfers between 06/05/2018 and 29/09/2022

  ➢ total amounts transferred: 106 322.57374746 BTC and 138 663.89864867 ETH

- 3,041,916 withdrawal transfers between 26/05/2018 and 29/09/2022

  ➢ total amounts transferred: 103 612.89387937 BTC and 134 942.91348885 ETH

From the start of the platform's activity in May 2018 to 03 January 2023, the investigators noted the following amounts:

- inflows: 1,926,678,511 €

- outflows: 1,786,117,237 €

Verifying the management server named "mgmt2", and in particular the temporary file containing 2,760,92 addresses of crypto-assets backed by the Bitcoin blockchain, the investigators were able to establish the following findings, based on a sampling of 100 addresses taken at random from the file (**D398/2**):





---

[6][1] Freshdesk is a cloud-based ticket management system that helps companies simplify their customer support processes. (see D573)



This showed that 68% of the addresses were linked to illicit activities in the cryptosphere, which seemed consistent with the annual report published by Chainalisys in 2022, mentioned above, which indicated that 76% of the funds received on this exchange came from illicit activities.

Using a tracing and clustering tool [7], the investigators consulted the exposures [8] of the Bitzlato.com cluster, made up of 256,589 public addresses, with the clusters linked to services sanctioned by OFAC [9], at the level of the Bitcoin blockchain.

With regard to direct receptions, the investigators noted the presence of exposure at the level of several malicious categories, which they presented in the form of a summary table

| Categories | Amount in BTC | Percentage relative to flow |
|---|---|---|
| Ransomware | 19,052 BTC | 0,37% |
| Theft of funds | 0,02 BTC | 0,02% |
| Financing terrorism | 0,00012 BTC | 0,00% |
| Scam | 4862,5249 BTC | 4,09% |

It also highlighted the presence of sanctions made by OFAC [10] for various reasons:

| Reason for sanction | Date of sanction | Amount in BTC | Percentage |
|---|---|---|---|
| OFAC SDN Blender.io | May 6, 2022 | 148,181 BTC | 1,19 % |
| OFAC SDN Chatex.com | November 8, 2021 | 197,3505 BTC | 1,59 % |
| OFAC SDN Garantex.io | April 5, 2022 | 1866,3096 BTC | 15,04% |
| OFAC SDN Hydra MarketPlace | April 5, 2022 | 10103,4163 BTC | 81,41% |

With regard to direct transfers, the investigators also noted the presence of exposure in several malicious categories:

| Categories | Amount in BTC | Percentage relative to flow |
|---|---|---|
| Theft of funds | 19,8756 BTC | 0,02% |
| Financing terrorism | 0,0228 BTC | 0,00% |
| Scam | 1095,091 BTC | 8,49%% |

The presence of penalties with amounts in BTC was also noted:

7 This is Chainalysis' "reactor" tool, which can be used to group together addresses belonging to the same person or entity, and thus to view all the transactions for different addresses belonging to the same person or entity. It can also be used to analyse the reputation of addresses and clusters.

8 Direct exposure corresponds to a transfer of funds from the Bitzlato cluster to the OFAC-sanctioned service cluster, with no bounces between the two. Indirect exposure corresponds to a transfer between the two clusters, but with transaction bounces, which do not link them directly.

9 The services listed as 'sanctioned', and therefore sanctioned by OFAC, have not complied with US anti-money laundering or customer protection laws, or are illegal platforms or services (black market, computer hacking, malicious acts, pedocriminality, etc.).

10 Blender.io is a crypto-currency blender created in 2017 and sanctioned in 2022 for helping the Lazarus group, a group of hackers associated with the government of North Korea

Chatex.com is a crypto-currency blender sanctioned in 2021 for facilitating financial transactions for a group of hackers implementing Ransomware

Hydra was the largest illegal marketplace on the Darkweb, known for its extensive drug trafficking It was sanctioned on April 5, 2022, as was Garantex

Garantex.io is a crypto-asset exchange founded in 2019 and registered in Estonia It was sanctioned in 2022 for being associated with various darkweb markets including Hydra

| Reason for sanction | Date of sanction | Amount in BTC | Percentage |
|---|---|---|---|
| OFAC SDN Blender.io | May 6, 2022 | 9246,7311 BTC | 61,24 % |
| OFAC SDN Chatex.com | November 8, 2021 | 163,7378 BTC | 1,08% |
| OFAC SDN Garantex.io | April 5, 2022 | 5514,272 BTC | 36,52% |
| OFAC SDN Hydra MarketPlace | April 5, 2022 | 65,3193 BTC | 0,43% |

The investigations revealed that the exposure of the various crypto-asset addresses on the exchange was mainly the result of illicit activities.

For the funds received on BITZLATO, the following volume of activity was calculated for each by the crime brigade :

- 19.7% of the volume of activity of HYDRA MARKET PLACE[11] (sanctioned by OFAC[12]) representing 171 million dollars,

- 9% of the volume of activity of the FINIKO scam, representing Dollar138 million,

- 3.6% of the volume of GARENTEX (sanctioned by OFAC) representing Dollar73 million.

For funds sent from BITZLATO, it was calculated that :

- 14.75% of the business volume of HYDRA MARKET PLACE, i.e. Dollar125 million. 83,223 Hydra accounts received Dollar BTC directly from the Bitzlato cluster

- 14.4% of the volume of activity of the FINIKO scam, i.e. Dollar225 million,

- 8.8% of GARENTEX's business volume, i.e. Dollar174 million.

The investigations also revealed direct exposure to ransomware, such as Dharma and Phobos, and to mixing services.

Analysis of the Binance addresses of LUNOV, the CEO of BITZLATO, showed that 2 transactions had been sent to HYDRA and that darkmarketplace funds had been received indirectly.

In addition, 2.5 million dollars had been sent from the BITMIX.BIZ blender to BITZLATO, with the funds coming from ransomware, in particular Maza and Mailto (Netwalker).

The investigators even noted links with the hack of the FTX platform in 2022, with the funds transiting through mixing services.

In addition, two BITZLATO addresses have received more than Dollar 65 million since March 2022 from WASABI WALLET MIXEUR.

The largest amount of Bitcoin exchanged in a single transaction was 200 BTC, or 8 million €.

Bitzlato's wallets also contained links to e-mail addresses associated with the use of child pornography and DDOS attacks.

A comparison also revealed 2,852 legal proceedings worldwide linked to the Bitzlato exchange. Also, 90.9% of these reconciliations concerned ransomware and the rest of the reports corresponded mainly to scams. (**D509**)

A demixing operation revealed indirect links between the Bitzlato platform and ransomware, such as Maze and Netwalker (mailto), MEDUSALOCKER through the use of mixing services

[11] On **HYDRA**: See the FlashPoint Intelligence / Chainalisys report
[12] The Office of Foreign Assets Control (OFAC) is a financial control agency within the US Treasury Department. OFAC is responsible for enforcing US international financial sanctions, particularly under the 1977 Foreign Corrupt Practices Act (FCPA).

Among the users of the Bitzlato platform who had transferred funds to crypto exchanges such as Binance, the investigators were able, thanks to extensive tracing work, to identify those who had made withdrawals to this exchange and the corresponding amounts, as well as the source of the funds, in order to determine whether they were of a criminal nature. For example, the investigators drew up a list of individuals who had accounts with Binance and Bitstamp, which had been funded by funds that had passed through Bitzlato, and which had themselves originated from illegal activities.

By way of illustration the investigators analysed the flows concerning the Binance address held by a certain KOSTANTIN GORDON born on    April 18, 1982 (of Russian nationality), namely 18gfUKZPXNmS71S2vThehN8rECC2pByrjQ, recipient of funds from Bitzlato, and managed to identify another address held on this same account, namely TA9sKXFQXrNsYB19tJHiihufR8FtpgUML3. The latter, a Binance deposit address also used by Konstantin GORON, had received very substantial funds in USDT on the TRON blockchain from the GARANTEX.IO crypto exchange sanctioned by OFAC for money laundering offences[13]. The exchanges involved 112 incoming transactions, from March 17, 2022 to November 20, 2022, from GARANTEX.IO to the Binance deposit address for an amount of Dollar39,856,923 carried out:



Investigators seized digital assets from wallets with large balances totalling more than €19 million (**D393 to D396 and D515 to D538**).

- **LGK POWER LIMITED**

The investigators were interested in the company LGK LIMITED, where several documents relating to statutory information and accounting data found in the MATTERMOST established a link with the company Bitzlato.

These documents showed that the director of this company was Anatolii LEGKODYMOV, who was also a partner in BITZLATO. This company, incorporated under Chinese law in 2014, had the following partners:

- LEGKODYMOV Anatolii, Managing Director

- SKURENKO Anton

- SHAKNOV Sergei.

Its registered office is also at UNIT 617, 6 1F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG and uses the services of a secretarial company 'First Company of Consulting and Secretariat Services Limited. Its corporate purpose is the development and programming

[13] See note 8

of software for banks and commercial organisations, and the creation and management of blockchain projects.

A relationship diagram of the entities linked to LG POWER LTD was drawn up by the investigators

- **The company A-XBT**

The investigators were interested in A-XBT, a company for which several documents relating to statutory information and accounting data found in MATTERMOST established a link with Bitzlato.

These documents showed that the former director of this company was Anatolii LEGKODYMOV, who was also a partner in BITZLATO. This company, incorporated under Russian law in 2013, was founded with the following partners:

- LEGKODYMOV Anatolii

- SKURENKO Anton

- SHAKNOV Sergei

Currently only SKURENKO Anton is a partner.

The new managing directors are SKURENKO Anton and KOVALENKO Dmitriy.

The company's registered office is 141980 Moscow region, - CH Shchelkovskoe, house 113, room 18 and its corporate purpose covers activities related to the use of computers and information technologies, data processing and other unauthorised activities. Open-source research shows that A-XBT provides a mining container rental service.

A relationship diagram of A-XBT was drawn up by the investigators.

- **The company GUAROO**

The investigators were interested in GUAROO, a company for which several documents relating to statutory information and accounting data found in MATTERMOST established a link with Bitzlato (**D163**).

These documents showed that the former manager of this company was Anatolii LEGKODYMOV, who was also a partner in BITZLATO. This company, incorporated under Russian law in 2016, had DOLIC Jakov as its founding partner.

The new Managing Directors were SHAKHNOV Sergei and DOLIC Jakov.

Its registered office was 109202 Moscow, Karacharovskaya 2 street, house 1 building 1, room 15 and its corporate purpose was IT consulting, work and management. Data processing and data hosting. This company was liquidated on September 13, 2019.

An operation coordinated by Eurojust between several European countries (Spain, Portugal and Cyprus) on the basis of European investigation decisions issued by the Paris public prosecutor's office and the authorities of the United States of America was carried out on January 18, 2023 for the purpose of arresting and hearing the main protagonists of the Bitzlato company and searching their homes

In summary:

SBU - LAW ENFORCEMENT

- Anatolii LEGKODYMOV has held management positions in A-XBT ;

- Anatolii LEGKODYMOV has a close relationship with one of the partners of Bitzlato, Anton SHKURENKO. Between 2018 and 2019, they agreed that part of the company's turnover was based on funds of dubious origin, linked to drug trafficking. They intend to create an appearance of control in order to gain respectability, but are reluctant to deprive themselves of part of this source of income.

- Anatolii LEGKODYMOV is an active member of the BITZLATO company and participates in a number of Mattermost discussion groups where messages relating to the management of the company's affairs are exchanged. He has also lived in China with members of his family. BITZLATO is a company incorporated under Chinese law.

- He is a member of the Mattermost <<stable> discussion group in which the strategy for setting up Monolithos DAO is set out. On this group Dmitry KRYSHTAL, from Bitzlato's marketing team, is heavily promoting the MCR (Monolith Crypto Ruble) cryptocurrency, which is a stablecoin indexed to the rouble and is created by Bitzlato. The use of MCR is promoted on the darkmoney forum. Darkmoney.Ic is a Russian/Ukrainian language forum that is clearly used for transactions for goods or services of dubious origin, including cryptocurrency laundering services. This forum features the user Monolithos DAO, who was active between March 2020 and March 2021. It offers to buy MCR without registration or verification from the Bitzlato bot, emphasising this fact. He refers to the MonolithosDAO youtube account on which Dmitry KRYSHTAL promotes monolith.

**Regarding the link with ransomware:**

Investigations have highlighted the exposure of the BITZLATO cluster to the MAZE and NETWALKER ransomware via the BITMIX.BIZ mixer.

A demixing operation was carried out by identifying 11 clusters made up of 54 reception addresses known to be affiliated with ransomware. Demixing was carried out using the 'Reactor' and 'Clain' tools. In fact, out of a cluster of 201 transfers linked to BITZLATO, 36 transactions came from BITMIX.BIZ. The BITMIX.BIZ mixer worked by means of a securityfeature separating each incoming flow into 2 outgoing transactions: this tool therefore made it more difficult to discover the origin of incoming funds. (D408/11) An address circulating BITZLATO and corresponding to the digital fingerprint of BITMIX.BIZ received Bitcoins from an address directly exposed to the MAZE ransomware. The fraudulent origin of certain funds in transit on BITZLATO was therefore clear.

The address clustered by the American investigators bc1qkqh9wjmnq90gkwemg2yrivktw2wd74u80kd3wyt, corresponding to 54 addresses, sent a total of 284,1111 BTC on the BITZLATO exchange from addresses affiliated with ransomware (MAZE and MAILTONETWALKER). Almost all of these funds passed through the BITMIX.BIZ mixer. This demixing operation highlighted the laundering of ransomware money through a blender.

By analysing the movements of user 35 cryptoassets, the investigators were able to identify numerous BITZLATO user transactions linked to ransomware such as TRICKBOT, DHARMA RANSOMWARE and NETWALKER, which were also linked to HYDRAMARKETPLACE, GARANTEX (sanctioned by OFAC), CRYPTOMIXER and FINIKO.

The investigations also highlighted the exposure of the BITZLATO cluster to the MEDUSA LOCKER ransomware.

A tracing operation using the Chainalysis tool made it possible to trace a cluster that had received and retransmitted nearly 33 BTC over the period from 01/11/2018 to 12/10/2020: at least 42% of the incoming funds (the equivalent of €133,167) came from the MEDUSA LOCKER ransomware, and were laundered through exchanges-including BITZLATO. A large proportion of the funds also went to HYDRA.

Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator registered with the Appeal Court of Paris (English)
1, Bd St. Martin 75003 Paris

It also highlighted the exposure of the BITZLATO cluster to the QUBITTECH scam. An exchange between @drey (identified as BONDAREV Ivan) and @legkodymov (LEGKODYMOV Anatolii) on the Mattermost server identified a public key for the BTC chain, as well as its private key. LEGKODYMOV Anatolii exported the private key to the BITCOINCORE application, generating its public key and enabling us to recover it: 1DEKCIVIHDHeFLmEBA5ANbYglbJ35duLdooh. The investigators determined that it was directly associated with BITZLATO LTD, and probably more precisely with its administrators. An analysis revealed that 98.57% of the incoming funds to this public key address came indirectly from the QUBITTECH scam (Ponzi scheme). In fact, an incoming address on the 1DEKCIVIHDHeFLmEBA5ANbYg1bJ35duLdooh key was linked to the CRYPTONATOR exchange address cluster, and the CHAINALYSIS tool showed that the incoming funds on this address all came from QubitTech.ai. This behaviour was potentially put in place to confuse the transactions and make it more difficult to trace the destination of the fraudulent funds.

Anatoly Legkodymov knew all along that Bitzlato was widely used by criminals:

- **Highlights of Legkodymov's knowledge in 2018-2019**

  Examples of Legkodymov's communications demonstrating knowledge of illicit transactions in 2018-2019 are set out below:

➢ In October 2018, Legkodymov's partner and co-founder in Bitzlato reported to Legkodymov that Bitzlato had been abandoned by ' *small-time dealers* " who had been " *scared off by the war on drugs* '. His interlocutor then advocated adopting a ' *nominal* " approach to " *the fight against drug traffickers* " - " *i.e. blocking once a month when [they] can clearly be found* '.

  Legkodymov essentially agreed and advocated turning a blind eye to drug-related transactions by only blocking transactions where the parties to the transaction made explicit reference to drugs.

➢ On April 23, 2019, Legkodymov's partner and co-founder in Bitzlato warned his colleagues, including Legkodymov , that ' *Bitzlato's customers are drug addicts who buy drugs from the Hydra site* '. Legkodymov responded by proposing to extend Bitzlato's services to ordinary individuals seeking confidentiality.

➢ On May 29, 2019, Legkodymov wrote to a colleague in a chat: ' *All traders are known to be crooks. They trade on 'drops' etc. You realise that not all of them (I think 90%) trade with their [ID] card* .' Later in the year, on or around June 22, 2019, Legkodymov commented, ' *Crooks know that it is possible to be verified for a drop and withdraw 100% money* .'

- **Facts about Legkodymov in 2021-2022**

  Bitzlato had a dark web counterpart: Hydra Market. Hydra was shut down through coordinated action by US and German law enforcement on April 5, 2022, and the Department of Justice issued an indictment against Dmitry Olegovich Pavlov for conspiracy to distribute narcotics and conspiracy to commit money laundering, in connection with his operation and administration of the servers used to run Hydra.

From 2021, Legkodymov increasingly demonstrated specific knowledge about Hydra Market and repeatedly acknowledged that Bitzlato was known for money laundering. For example, on October 6, 2021, Legkodymov asked his employees about Hydra Market in a chat and received a Wikipedia article in Russian. A version of this article, as it appeared on October 26, 2021, is available on the Internet Archive, an online archiving project. Its first sentence described Hydra Market as 'Russia's *largest darknet market for drug trafficking, the world's largest resource in terms of volume of illegal transactions with cryptocurrencies*'. The article further noted that ' *more than drugs, popular products on Hydra include counterfeit currency and documents, [and] instructions for illegal activities. The resource also provides services such as drug sales, Internet security and account hacking .*'

In particular, Legkodymov repeatedly acknowledged that Bitzlato's own data confirmed what third-party blockchain analysis platforms were saying: Bitzlato was processing a large volume of illicit transactions, particularly transactions with Hydra Market. On October 19, 2021, for example, after hearing that industry personnel were accusing Bitzlato of cooperating with Hydra and facilitating drug transactions, the defendant wrote to his senior executive colleagues: ' *On the one hand, they are right about Hydra. But on the other hand, [there are] 2.5 million Hydra users. Everyone is involved. It can't be filtered.*'

As set out above, on February 14, 2022, Chainalysis , a blockchain analytics company, published the 2022 version of its annual 'Crypto Crime Report', which stated that Bitzlato users had received Dollar 206 million from darknet markets and Dollar 9 million from ransomware attackers. Legkodymov checked with a subordinate, who shared with him the graph below on February 25, 2022, apparently a screenshot of Bitzlato's transaction filtering software.

| count | transaction_entity_name |
|---|---|
| 403119 | *NULL* |
| 10 | "SatoshiMines.com" |
| 2 | "BitZino.com" |
| 546 | "Wasabi" |
| 76159 | "Hydra Market" |

Legkodymov and his colleagues then determined that over the past three months, 20% of Bitzlato's trades had sent funds to Hydra Market. 'Withdrawals *to Hydra?* ' wrote the defendant. ' *More than 20%? . Let's reset everything to zero, as soon as possible.*'

Later that day, he wrote to a colleague: ' *It turns out that we have at least 20% dirt. And in this situation, I see no reason to fight with Chainalysis.* On February 18, 2022, Legkodymov wrote to his partner in Bitzlato to complain that its management was ruining Bitzlato's acquisition value by laundering money: ' *Who am I (are we) going to sell Bitzlato to now with such a Chainalysis report [...] And this is 90% due to the management rather than us.*' A week later, on February 25, 2022, Legkodymov wrote to his partner in Bitzlato: ' *I have been thinking a lot. I can't get over 20% dirt and being totally ignored. and I want to close the business. ... . You're not supporting me to get rid of the dirt. We don't have a plan, but you claim you don't have any support or anything. I'm not interested in continuing under these conditions. 'I want to close the business and start something new, from scratch,'* he added the next day. "*You're all throwing me under the bus. 76,000 transactions with Hydra and no interest at all.*'

Around two months later, on April 7 2022, Legkodymov criticised his compliance staff for failing to investigate his own exposure to illicit funds, using the tools at their disposal (such as compliance provider Valega). ' *You still haven't calculated how many transfers we have made to black markets in the last three months (according to Valega )*,' he wrote. 'This *ignorance is alarming.* On April 19, 2022, a compliance officer reported to the defendant that

SBU¹ LAW ENFORCEMENT

at in the previous six months, out of 76,000 active users, 27,000 had attempted to transfer funds to or from what the employee described as ' *dirty* ' cryptocurrency addresses. Another employee commented in the same chat: 'It's just that services with a low AML level are very convenient for [money] launderers. As soon as we implement all the AML/KYC tools, the number of suspicious transactions will drop considerably.'

Legkodymov and his colleagues have repeatedly expressed their awareness that operating Bitzlato could put them in legal jeopardy.

In the autumn of 2022, when Legkodymov travelled to the US, he appears to have been acting CEO of Bitzlato . A communication from Legkodymov to his senior management colleagues on November 11 2022 illustrates the extent of his involvement and authority. 'Fundamentally ,' he wrote, ' *I am beginning to understand clearly where the problem lies and what needs to be done... . Over the course of this week, I (as CEO) have come to understand that I personally do not get along at work with half of the staff (senior management). Senior management did not show results before I arrived, [and] that is why I will change half the staff if I remain CEO.* '

As before, Legkodymov continued to call for improvements at Bitzlato, without making any real changes. On November 7, 2022, for example, the defendant expressed his desire for stricter KYC policies, expressing his view that ' *over decades of experience, I have become convinced that 95% of anonymous people are criminals* '. A colleague replied that most of Bitzlato's users were indeed criminals, claiming that the smaller users were ' *the former USSR, fans of obscure resources, drug addicts, documents and other filth* '. In contrast, the colleague said that higher value users were ' *criminals. As you said, but all the big guys are going to get 'drops' for their needs anyway*'. Legkodymov replied that '*the simple fact of getting a bunch of cheap junkies means that the marketing department is slacking off... that's the mistake that was made several years ago, and I don't want to repeat it* '.

### III / Criminal classification

The facts set out above, committed between December 1, 2017 and January 20, 2023, in any event for a period that is not covered by statutory limitation in France, and in any event on French territory, and indivisibly in Portugal, Spain, Ukraine, the United States, Russia and Hong Kong, are as follows:

**COMPLICITY IN FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM**
Defined by ART.323-1 AL.1 C. PENAL.
Punishable under ART.323-1 AL.1, ART.323-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL

**COMPLICITY IN FRAUDULENT MAINTENANCE IN AN AUTOMATED DATA PROCESSING SYSTEM**
Defined by ART.323-1 AL.1 C. PENAL.
Punishable by ART.323-1 AL.1, ART.323-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL.

**COMPLICITY IN THE FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED PROCESSING SYSTEM.**
Defined by ART.323-3 AL.1 C. PENAL.
Punishable by ART.323-3 AL.1, ART.323-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL.

**COMPLICITY IN FRAUDULENT MODIFICATION OF DATA CONTAINED IN AN AUTOMATED PROCESSING SYSTEM**
Defined by ART.323-3 AL.1 C. PENAL.
Punishable by ART.323-3 AL.1, ART.323-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL.

**COMPLICITY IN HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM**
Defined by ART.323-2 AL.1 C. PENAL.
Punishable by ART.323-2 AL.1, ART.323-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL.

**CONSPIRACY TO COMMIT EXTORTION IN AN ORGANISED GANG**
Defined by ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C. PENAL.
Punishable by ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL

**PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME**
Defined by ART.450-1 AL.1, AL.2 C. PENAL.
Punishable by ART.450-1 AL.2, ART.450-3, ART.450-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL.

**CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONAL DATA PROCESSING SYSTEM, COMMITTED BY AN ORGANISED GANG**
Defined by ART.323-4-1, ART.323-1, ART.323-2, ART.323-3, ART.323-3-1, ART.132-71 C. PENAL.
Punishable by ART.323-4-1, ART.323-5 C. PENAL.
And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the C. PENAL.

**AGGRAVATED MONEY LAUNDERING: AIDING AN ORGANISED GANG TO FALSELY THE ORIGIN OF THE OFFENDER'S ASSETS OR INCOME**
Defined by ART.324-2 2°, ART.324-1 AL.1, ART.132-71 C. PENAL.
Punishable by ART.324-2 AL.1, ART.324-3, ART.324-7, ART.131-30 AL.1 C. PENAL.

**AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANISED GROUP IN AN OPERATION TO INVEST, CONCEAL OR CONVERT THE PROCEEDS OF A CRIME**
Defined by ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C. PENAL.
Punishable by ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C. PENAL.

### *IV - The procedure*

On September 6, 2022, a preliminary investigation was initiated by the Paris Public Prosecutor's Office, and entrusted to the Gendarmerie National Headquarters on the grounds of :

- Complicity in fraudulent access to and maintenance of an automated data processing system (STAD) with the circumstance that this results in an alteration of the system;
- Obstructing the operation of an STAD system;
- Conspiracy to fraudulently introduce data into an STAD;
- Aiding and abetting the fraudulent modification of data in a STAD;

SBU - LAW ENFORCEMENT

- Complicity in organised extortion ;
- Conspiracy to form a criminal association with a view to committing a felony or misdemeanour punishable by at least five years' imprisonment;
- Laundering of proceeds from crimes or offences committed in an organised gang.

On July 29, 2024, a national arrest warrant was issued for Anatolii Viktorovich LEGKODYMOV by Serge TOURNAIRE, First Vice-President in charge of the investigation at the Paris Judicial Court.

Even though Anatolii Viktorovich LEGKODYMOV was released from prison after being sentenced to a term of imprisonment as part of a guilty plea with the American authorities, and even though Article 113-9 of the French Criminal Code provides that 'no proceedings may be brought against a person who can prove that he or she has been finally judged abroad for the same acts and, in the event of conviction, that the sentence has been served or is time-barred', this article refers only to "the cases provided for in articles 113-6 and 113-7", i.e. those where French criminal law is applicable to offences committed outside French territory because of the French nationality of the perpetrator or victim. In the case of offences committed on French territory, the decision handed down by the foreign criminal court does not have the force of res judicata in France.

In these circumstances, a European arrest warrant was issued for Anatolii Viktorovich LEGKODYMOV on August 14, 2024 by Ms Natacha RATEAU, First Deputy Public Prosecutor at the Paris Judicial Court, and a request for provisional arrest dated August 20, 2024 was sent to the American authorities.

On August 23, 2024, an extradition request was addressed to the American authorities based on the agreement adopted at New York on November 15, 200

### V - Statute of limitations

The statute of limitations for public prosecution, which is interrupted by acts of investigation and prosecution (articles 7, 8 and 9-2 of the Code of Criminal Procedure), is :

- Six years for the offences of complicity in fraudulent access to and maintenance of an automated data processing system; complicity in fraudulent introduction of data into an automated data processing system; complicity in fraudulent modification of data contained in an automated data processing system; criminal conspiracy in view of committing a crime or a tort punished with upto 5-year imprisonement, complicity in obstructing an automated personal data processing system implemented by the State, committed in group and laundering of crime or tort proceeds committed in organised group.
- Twenty years for the offence of complicity in extortion as part of an organised gang.

Under French law, this extradition request is an act of investigation by the Public Prosecutor, interrupting the statute of limitations.

*The extradition of Anatolii Viktorovich LEGKODYMOV on the basis of Article 13 of the bilateral Franco-American treaty of April 23, 1996, which came into force on February 1, 2002, and on the basis of Articles 6 and 7 of the agreement between the European Union and the United States on extradition dated June 25, 2003. This request for provisional arrest is also based on the Council of Europe Convention on Cybercrime of November 23, 2001, which entered into force on January 1, 2007, and the United Nations Convention against Transnational Organized Crime, adopted in New York on November 15, 2000.*

SBU X LAW ENFORCEMENT

Please find enclosed :

- The arrest warrant issued on July 29, 2024 by Mr Serge TOURNAIRE, First Vice-President in charge of the investigation at the Paris Judicial Court;
- The European arrest warrant issued on August 14, 2024 by Ms Natacha RATEAU, First Deputy Public Prosecutor at the Paris Judicial Court;
- The texts defining and punishing the above-mentioned offences, the jurisdiction of the French courts, and those relating to the statute of limitations for public prosecution.

*For / The Public Prosecutor*

Philippe TOCCANIER
Deputy Public Prosecutor
*Signature Illegible / Seal*

I, the undersigned Arindam Bhattacharya,
Sworn translator registered with the
Appeal Court of Paris, certify that the
following translation is true to the original
document in French ...21.646...
bearing the number. Paris, Date : December 4, 2024

Copie certifiée
conforme à l'original

APPEAL COURT OF PARIS
# PARIS JUDICIAL COURT

**Office of Brice HANSEMANN**
Vice-President in charge of the investigation

Prosecution no.: 22249000099
Investigation no : JIJ182523000002
Justice Id: 2202293307Y
Procedure : penal

## ARREST WARRANT
### FRENCH REPUBLIC - ON BEHALF OF THE FRENCH PEOPLE

July 29, 2024 ,
I, Serge TOURNAIRE, Senior Vice-President in charge of the investigation, substituting Brice Hansemann, Vice-President in charge of the investigation, having regard to Article 84 of the Penal Code, having regard to the urgency, at our chambers at the Judicial Court of Paris;

Having regard to articles 122, 123, 124, 131, 133, 134 and 141-2 of the Penal Code;

Having regard to the proceedings against :

**LEGKODYMOV Anatolii Viktorovich**
born August 10,1982 in the USSR
Residence: address unknown
Gender: Male
Nationality: Russian

Indicted for

Serious and corroborating evidence of having committed in FRANCE, and in any case on national territory, and indivisibly, in PORTUGAL, SPAIN, CYPRUS, UKRAINE, the UNITED STATES, RUSSIA and HONG KONG, between December 1, 2017 and January 20,2023, in any case for a period that is not statute-barred, the acts of :

### COMPLICITY IN FRAUDULENT ACCESS AND MAINTENANCE OF AN AUTOMATED DATA PROCESSING SYSTEM
Acts provided for and punishable under articles 121-4, 121-5, 121-6. 323-1, 323-5, 323-7 of Penal Code Natinf 1619 and 1637

### CONSPIRACY TO FRAUDULENTLY INTRODUCE DATA INTO AN AUTOMATED DATA PROCESSING SYSTEM
Offences provided for and punishable under articles 121-4, 121-5, 121-6, 323-3 paragraph 1, 323-5 of the Penal Code Natinf 1671

### CONSPIRACY TO FRAUDULENTLY MODIFY DATA CONTAINED IN AN AUTOMATED DATA PROCESSING SYSTEM
Offences provided for and punishable under articles 121-4, 121-5, 121-6, 323-3 paragraph 1, 323-5 of the Penal Code Natinf 1675

### CONSPIRACY TO HINDER THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM
Offences referred to and punishable under articles 121-4, 121-5, 121-6, 323-2, 323-5, 323-7 of the Penal Code Natinf 1667

### COMPLICITY IN ORGANISED EXTORTION

Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator registered with the Appeal Court of Paris (English)
1, Bd St. Martin - 75003 Paris

SBU × LAW ENFORCEMENT

Offences provided for and punishable under articles 121-4, 121-5, /2/-6, 131-26-2, 132-71, 312-6 paragraph 1, 312-1 paragraph 1, 312-13, 312-14 Natinf 10822

**CRIMINAL CONSPIRACY TO COMMIT A FELONY OR OFFENCE PUNISHABLE BY AT LEAST 5 YEARS' IMPRISONMENT** Offences provided for and punishable under by articles 121-4, 121-5, 121-6, 450-1, 450-3 et 450-5 of Penal Code Natinf 7168

**CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONAL DATA PROCESSING SYSTEM, COMMITTED BY AN ORGANISED GANG**
Offences provided for and punishable under Articles 121-4, 121-5, 121-6, 323 4 I, 323 1, 3232, 323 3, 323 3 1, 132 71, 323 4 1, 323 5 of Penal Code Natinf 30832

**LAUNDERING OF CRIMES OR OFFENCES COMMITTED BY AN ORGANISED GANG**
Offences provided for and punishable under Articles 324-1, 324-1-1, 324-2, 324-3, 324-4, 324-5, 324-6, 324-7, 324-8 of the Criminal Code Natinf20659, 20660

As part of a European operation, the Directorate General of the Gendarmerie and 17 law enforcement agencies have highlighted 20 priority targets to identify and dismantle crypto-asset laundering services. One of the main targets is Russian crypto-asset exchanger BITZLATO with an estimated transaction volume of more than $1 billion since 2019. The Russian crypto-asset exchange platform BITZLATO allows crypto-assets such as bitcoin, ethereum, litecoins, bitcoin cash, dashs, dogecoins and tether USD to be quickly exchanged for roubles. The exchange platform has a Russian and English website, and is accessible to all web users, including French customers. It offers P2P, exchange and quick exchange services. This platform has been highlighted in various media as a channel for laundering funds from hacking and other criminal activities. In its 2022 'Crypto crime report', Chainalysis company notes that BITZLATO has received a significant proportion of digital tokens from illicit and risky addresses. According to the press (Bloomberg and the New York Times), Federation Tower, a two-skyscraper complex in the heart of Moscow, is home to a number of crypto-asset companies suspected of facilitating large-scale money laundering, including acceptance of illicit crypto-currency funds obtained through scams, darknet markets and ransomware. Among these companies is BITZLATO. Analysis of the blockchain, combined with web traffic data, also indicates that after ransomware attacks, most of the extorted funds are laundered through Russian users. In 2021, BITZLATO would have received $206 million from darknet markets, $224.5 million from scams and $9 million from ransomware attackers. The platform is also alleged to have been involved in financing the war in Ukraine and other illicit activities.

A preliminary investigation was initiated by the Paris public prosecutor's office on September 6, 2022 and entrusted to the national gendarmerie directorate on charges of:

- Complicity in fraudulent access and maintenance in an automated data processing system (STAD) with the circumstance that it results in an alteration of the system (Natinf 1619 - 1637)
- Obstructing the operation of an STAD (Natinf 1667)
- Complicity in fraudulent introduction of data into a STAD (Natinf 1671)
- Complicity in fraudulent modification of data in an STAD (Natinf 1675)
- Complicity in organised extortion (Natinf 10822)
- Conspiracy to commit a felony or misdemeanour punishable by at least 5 years (Natinf 7168)
- Laundering of crimes or offences committed in an organised gang (Natinf 20659 and 20660)

The investigations revealed that the BITZLATO site uses at least one French host, OVH, from which the company rents 56 dedicated servers. Of these, the investigators were able to identify the 'management' server, i.e. the server that communicates with and enables the administration of the other servers. This server was copied. To enable the copying to be made, it had to be restarted. OVH informed the investigators that the customer had tried to restart it remotely after 2 or 3 minutes, then filed an incident ticket 7 minutes after the shutdown had begun, demonstrating that the administrators were closely monitoring the infrastructure. Analysis of this management server revealed that members of **BITZLATO** were using an

SBU×LAW ENFORCEMENT

application called 'MATTERMOST'. This was a communications application designed as an internal chat and instant messaging service. Analysis of the MATTERMOST application revealed the following: the management server was administered by 'DREY' alias Andrei PRYHODKO (IT specialist), 'MI2016' alias Mike LUNOV (company CEO) and 'Mr Note' or 'vanch' alias Ivan BONDAREV. 132 user profiles were listed, 1156 group or private conversations representing 505,110 messages, 121 chats involving more than two people and 15,868 files, between 9 April 2018 and 4 May 2022. The analysis made it possible to understand how BITZLATO worked and to recover messages relating to potential partners, accounting, recruitment, HR, marketing elements, the platform's technical architecture and its development, exchanges related to crypto-assets, etc. This confirmed that the exposure of the various crypto-asset addresses on the exchange were mostly from illicit activities.

Thus, for funds received on BITZLATO, the following volume of activity was calculated by criminal service:
7% of the business volume of HYDRA MARKET PLACE, representing 171 million dollars,

9% of the volume of activity of the FINIKO scam, representing 138 million dollars,

3.6% of GARENTEX's volume, representing $73 million.

For the funds sent from BITZLATO, it was calculated :

14.75% of HYDRA MARKET PLACE's business volume, i.e. 125 million dollars,

14.4% of the activity volume of the FINIKO scam, i.e. 225 million dollars,

8.8% of GAFtENTEX's business volume , i.e. $174 million.

In addition, 2.5 million dollars were sent from the BITMIX.BIZ MIXER to BITZLATO, funds derived from ransomware. In addition, two BITZLATO addresses have received more than $65 million since March 2022 from WASA131 WALLET MIXER. The largest amount of Bitcoin exchanged in a single transaction was 200 BTC, or €8 million. The analyses showed that the BITZLATO exchange had only 14,293 KYCs since 2018, even though the investigators counted 3,004,389 users. This showed that the platform was not very careful about the identity of its customers.

Several members of BITZLATO's teams were prosecuted, either under arrest or under indictment:
-Mikhaïl LUNOV Managing Director,

-Aleksandr HONCHARENKO company marketing director

-Andrii KRYSTHAL Technician - Mobile Development for the company;

- Pavel LERNER, manager of the company's stock market project

- Constantin ALEKSEEV, engineer on the company's stock market project

Anatolii LEGKODYMOV, CEO of BITZLATO, was arrested in Miami on January 17, 2023 by the FBI. Several digital devices were seized, including 5 mobile phones and 2 laptops. On December 6, 2023, the U.S. Attorney's Office for the Eastern District of New York issued a press release announcing that Anatolii Legkodymov had pleaded guilty in Brooklyn federal court (E.D.N.Y. case no. 23-CR-496 (ENV)). According to press reports, Anatolii LEGKODYMOV was sentenced to 18 months' imprisonment and was released at the end of his sentence. He is therefore currently free.

Anatolii LEGKODYMOV (Russian) was the director and shareholder of BITZALTO He was an administrator and technician of the platform. Conversations between Anatolii LEGKODYMOV and his partner Anton SHKURENKO in 2018 show that they were aware that the company's turnover was based on dubious sources, in particular  with drug trafficking, and they spoke of the need to create an appearance of control to gain respectability without depriving themselves of this source of income. Other posts showed that he was aware that BITZLATO was associated via social networks and press articles with the Hydra-type dark web or with money-laundering activities. The investigation also revealed that BITZALTO did not ask for KYC (Know your customer) and was aware that it was helping its customers to carry out transactions linked to various illegal activities.

Anatolii LEGKODYMOV was released from prison after being sentenced to a term of imprisonment as part of a guilty plea with the American authorities ; that article 113-9 of the Penal Code, which states that 'no

*proceedings may be* brought *against a person who can prove that he has been judged abroad for the same acts and, in the event of conviction, that the sentence has been served or is time-barred'*, refers only to *'the cases provided for in articles 113-6 and 113-7'*, i.e. those in which French penal law is applicable to offences committed outside the territory of the Republic because of the French nationality of the perpetrator or victim; that in the case of offences committed on French territory, the decision handed down by a foreign criminal court does not have the force of res judicata in France; that the current address of Anatolii LEGKODYMOV, a Russian national, is unknown; that in any event, he has no domicile in France; in these circumstances, the issue of an arrest warrant is necessary to prosecute him and is proportionate in view of the facts of criminal conspiracy and criminal acts committed as part of an organised gang and generating astronomical profits.

Authorise and order all officers or agents of the judicial police and all law enforcement officers, in accordance with the law, to look out and produce the above-mentioned person;

Request the warden of the prison in the place of arrest to receive and detain the person under arrest warrant until otherwise ordered;

We request any law enforcement officer to whom this warrant is displayed to assist in its execution if necessary;

In witness whereof this warrant has been signed by Us, Affix our seal

The Senior Vice-President in charge of the investigation,

**Serge TOURNAIRE**
**Seal/ Signature illegible**



Prosecution N° - 22240000090 - File N° JIJ182523000002 - Page 4 /5
ARREST WARRANT of Legkodymov Anatolii Viktorovich



I, the undersigned Arindam Bhattacharya.
Sworn translator registered with the
Appeal Court of Paris, certify that the
following translation is true to the original
document in French
bearing the number ....2.2.2.4.99A
Paris, Date : August 23, 2024

SBU×LAW ENFORCEMENT

**MINISTRY
OF JUSTICE**
*Liberty*
*Equality*
*Fraternity*

### APPEAL COURT OF PARIS
### PARIS JUDICIAL COURT

**EUROPEAN ARREST WARRANT**

**[A030]** This warrant has been issued by a competent judicial authority. I request that the person mentioned below be arrested and surrendered to the judicial authorities for the purpose of conducting a criminal prosecution or executing a custodial sentence or detention order.

a) <u>Information concerning the identity of the person sought :</u>

**[A006]** Name: **LEGKODYMOV**

**[A007]** First name(s): **Anatolii Viktorovich**

**[A008]** Maiden name, if any :

**[A11]** Alias, if any :

**[A12]** Sex : **Male**

**[A13]** Nationality: **Russian**

**[A009]** Date of birth : **August 10, 1982**

**[A010]** Place of birth : **USSR**

**Parenthood unknown**

**[A061]** Residence and/or known address : **no known address**

**Likely to be in the USA**

**[M083]** Language(s) understood (if known): **not known**

**[A058]** Distinguishing features/description of the wanted person: **not known**

**[A059 and A060]** Wanted person's photograph and fingerprints, if available and can be provided, or contact details to obtain this information or a DNA profile (if this data can be provided but has not been included) :

**None**





1

b) <u>Decision on which the European arrest warrant is based :</u>

SBU - LAW ENFORCEMENT

**[A031 and A032]** Arrest warrant or judicial decision having the same force: **Arrest warrant of July 29, 2024**

**[A033] Type: Arrest warrant issued by Serge TOURNAIRE, Senior Vice-President in charge of the investigation, substituting Brice HANSEMANN, Vice-President in charge of the investigation at the Paris Judicial Court, (art 131 CPP)**

**[A035 and A036]** Enforceable judgment: **None**
**A037]** Reference: **22249000099**

c) <u>Indication of the length of the sentence :</u>

**[A034]** Maximum length of custodial sentence or detention order that may be imposed for the offence(s) committed :

<div align="center">

**20 years' imprisonment**

</div>

[A38] Length of custodial sentence or detention order imposed :

[A39] Remaining sentence to be served :

**[M083] d) <u>Indicate whether the person appeared in person at the trial which led to the decision:</u>**

1.❑ Yes, the person appeared in person at the trial which led to the decision.

2.❑ No, the person did not appear in person at the trial which led to the decision.

3. If you have ticked the box in point 2, please confirm whether:

❑3.1 a) the person was summoned in person on.... (day/month/year) and was thus informed of the scheduled date and place of the trial which led to the decision, and whether he or she was informed that a decision may be handed down if he or she did not appear ;

OR

❑ 3.1 (b) the person was not summoned in person but by other means actually received official information about the scheduled date and place of the trial which led to the decision in such a manner that it was unequivocally established that the person was aware of the scheduled trial and was informed that a decision might be handed down if he or she did not appear for the trial ;

OR



SBU EX LAW ENFORCEMENT

❑ 3.2 having been informed of the scheduled trial, the person concerned instructed legal counsel, who was appointed either by the person concerned or by the State, to defend him at the trial, and was actually defended by that counsel during the trial ;

OR

❑ 3.3 the person concerned was served with the decision .... (day/month/year) and was expressly informed about the right to a retrial or to an appeal, in which the person concerned has the right to participate and which allows the merits of the case, including fresh evidence, to be re-examined and which may lead to the original decision being quashed, and

❑ the person concerned has expressly indicated that he or she does not contest the decision;

OR

❑ the person concerned has not requested a retrial or an appeal within the time limit set;

OR

❑3.4 the person concerned was not personally served with the decision, but

- he will receive it personally without delay after it has been handed over, and

- when he receives it, he will be expressly informed about the right to a retrial or to an appeal, in which he has the right to participate and which allows the merits of the case, including fresh evidence, to be re-examined and which may lead to the original decision being quashed, and

- the person will be informed of the time limit within which he or she must request a retrial or an appeal, which is ...days.

4. If you have ticked the box in 3.1(b), 3.2 or 3.3 above, please indicate how the relevant condition has been met:

## e) Offence(s) :

[M083] THIS WARRANT RELATES TO A TOTAL OF **10 OFFENCES.**

[A042, A 043, A044 and A045] Description of the circumstances in which the offence(s) was (were) committed, including the time (date and time), place and degree of participation in the offence(s) by the person:

**Perpetrator and accomplice of offences committed between December 1, 2017 and  January 20, 2023 in France, and in any case on national territory, and indivisibly, in Portugal, Spain, CYPRUS, UKRAINE, the UNITED STATES, RUSSIA and HONG KONG, and since time not barred by the statute of limitations.**

3

An investigation was launched, which established the existence of a Russian cryptoasset exchange called 'BITZLATO'.

It enabled cryptoassets such as bitcoin, ethereum, litecoin, bitcoin cash, dashs, dogecoins and tether USD to be exchanged rapidly for roubles at any time. It had a website accessible to all web users. The founders of the platform were identified as Russian nationals who had set up their company in CHINA.

This platform was used to facilitate the laundering of funds from hacking and other criminal activities. A study of the servers seized in connection with this case confirmed the platform's complicity in criminal activities. By 2021, the platform had received $440 million from fraudulent activities.

**Anatolii Viktorovich LEGKODYMOV** was identified as one of the three founding members of the company. He was arrested on January 17, 2023 in Miami. He was convicted in the United States and is currently believed to be at large in the country.

**[A040 AND A041] <u>Nature and legal classification of the offence(s) and applicable legal provisions :</u>**

## COMPLICITY IN FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM

Defined by ART.323-1 AL.1 of PENAL CODE

Punishable by ART.323-1 AL.1, ART.323-5 of PENAL CODE.

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE

## COMPLICITY IN FRAUDULENT MAINTENANCE IN AN AUTOMATED DATA PROCESSING SYSTEM

Defined by ART.323-1 AL.1 of PENAL CODE.

Punishable by ART.323-1 AL.1, ART.323-5 of PENAL CODE.

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE.

## COMPLICITY IN THE FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED PROCESSING SYSTEM.

Defined by ART.323-3 AL.1 of PENAL CODE.

Punishable by ART.323-3 AL.1, ART.323-5 of PENAL CODE

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE.

## COMPLICITY IN THE FRAUDULENT MODIFICATION OF DATA CONTAINED IN AN AUTOMATED PROCESSING SYSTEM

Defined by ART.323-3 AL.1 of PENAL CODE.

Punishable by ART.323-3 AL.1, ART.323-5 of PENAL CODE.

4

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE.

Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator
registered with
the Appeal
Court of Paris
(English)
1, Bd St. Martin - 75003 Paris

## COMPLICITY IN HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM

Defined by ART.323-2 AL.1 of PENAL CODE.

Punishable by ART.323-2 AL.1, ART.323-5 of PENAL CODE.

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE.

## CONSPIRACY TO COMMIT EXTORTION IN AN ORGANISED GANG

Defined by ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 of PENAL CODE.

Punishable by ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 of PENAL CODE.

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE.

## PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME

Defined by ART.450-1 AL.1, AL.2 of PENAL CODE.

Punishable by ART.450-1 AL.2, ART.450-3, ART.450-5 of PENAL CODE

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of the of PENAL CODE.

## CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONAL DATA PROCESSING SYSTEM, COMMITTED BY AN ORGANISED GANG

Defined by ART.323-4-1, ART.323-1, ART.323-2, ART.323-3, ART.323-3-1, ART.132-71 of PENAL CODE

Penalized by ART.323-4-1, ART.323-5 of PENAL CODE.

And having regard to articles 121-4, 121-5, 121-6 and 121-7 of PENAL CODE.

## AGGRAVATED MONEY LAUNDERING: AIDING AN ORGANISED GROUP TO FALSELY JUSTIFY THE ORIGIN OF THE OFFENDER'S ASSETS OR INCOME

Defined by ART.324-2 2°, ART.324-1 AL.1, ART.132-71 of PENAL CODE

Punishable by ART.324-2 AL.1, ART.324-3, ART.324-7, ART.131-30 AL.1 of PENAL CODE

## AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANISED GROUP IN AN OPERATION TO INVEST, CONCEAL OR CONVERT THE PROCEEDS OF A CRIME

Defined by ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 of PENAL CODE.

Punishable by ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 of PENAL CODE.

5

**[M083] I Tick, if applicable, if it concerns one or more of the following offences punishable in France by a sentence of 3 years or more as defined by French law :**

☒ **Participation in a criminal conspiracy**

☐ Terrorism

☐ Human trafficking

☐ Sexual exploitation of children and child pornography

☐ Narcotic drugs and psychotropic substances trafficking

☐ Illicit trafficking in arms, munitions and explosives

☐ Corruption

☐ Fraud, including fraud affecting the financial interests of the European Communities within the meaning of the Convention of 26 July 1995 on the protection of the European Communities' financial interests.
☒ **Laundering the proceeds of crime**

☐ Counterfeiting currency, including the euro

☐Cybercrime

☐ Environmental crime, including illicit trafficking in endangered animal species and illicit trafficking in endangered plant species

☐ Facilitating unauthorised entry and residence

☐Murder, battery

☐ Illicit trafficking in human organs and tissue

☐ Kidnapping, illegal restraint and hostage taking

☐Racism and xenophobia

☐ Theft committed by an organised gang or with a weapon

☐ Illicit trafficking in cultural goods, including antiques and works of art

☐ Swindling

☒ **Extortion**

☐ Counterfeiting and product piracy

☐ Falsification of administrative documents and trafficking in forgeries

☐ Falsification of means of payment

☐ Illicit trafficking in hormonal substances and other growth promoters

☐ Illicit trafficking in nuclear and radioactive materials

6

☐ Trafficking in stolen vehicles

☐ Rape

☐ Arson

☐ Crimes and offences within the jurisdiction of the International Criminal Court

☐ Hijacking of aircraft/ships

☐ Sabotage

**II [A044] <u>Full description of offence or offences which do not fall within the scope of point I above</u> :**

**f) [M083] <u>Other circumstances relevant to the case (optional information):</u>**
(NOTE: it is possible to include here remarks on extraterritoriality, acts interrupting the statute of limitations and other consequences of the offence)

**g) [M083] <u>This warrant also relates to the seizure and delivery of items that may be used as evidence.</u>**
This warrant also relates to the seizure and handing over of objects acquired by the wanted person as a result of the offence:

description of the objects (and whereabouts) (if known)

**h) [M083] ☐ <u>The offence(s) for which this warrant has been issued is (are) punishable by a custodial sentence or detention order for life or has (have) had the effect of such a sentence or detention order:</u>**
THE LEGAL SYSTEM OF THE ISSUING MEMBER STATE PROVIDES FOR A REVIEW OF THE SENTENCE IMPOSED - UPON REQUEST OR AT THE LATEST AFTER 20 YEARS - WITH A VIEW TO THE NON-EXECUTION OF SUCH SENTENCE OR MEASURE.

AND/or

THE FRENCH LEGAL SYSTEM PROVIDES FOR THE APPLICATION OF CLEMENCY MEASURES TO WHICH THE PERSON IS ENTITLED UNDER THE LAW WITH A VIEW TO THE NON-ENFORCEMENT OF THAT SENTENCE.

**i) [A030] <u>Judicial authority which issued the warrant</u> :**

<u>OFFICIAL DESIGNATION OF THE JUDICIAL AUTHORITY</u>: Public prosecutor of the Judicial Court of Paris

<u>NAME OF REPRESENTATIVE</u> : **Mrs NATACHA RATEAU**

POSITION (TITLE): **Senior Deputy Public Prosecutor**



Copie certifiée
conforme à l'original

7

FILE REFERENCE. **22249000099**
ADDRESS: **Parvis du Tribunal de Paris - 75859 CEDEX 17**

<u>PROSECUTION SECTION :</u>

SBU – LAW ENFORCEMENT

**PHONE NUMBER: +33 1 70 60 80 60**
**FAX NUMBER: + 33 1 44 32 78 77**
**E-MAIL: mandats.a2.tj-paris@justice.fr**

**DETAILS OF THE PERSON TO CONTACT TO MAKE PRACTICAL ARRANGEMENTS FOR THE HANDOVER OF THE PERSON :**

**Ms Natacha RATEAU, Judicial Magistrate**

**TELEPHONE NUMBER: +33 1 70 60 80 60**
**FAX NUMBER: + 33 1 44 32 78 77**
**E-MAIL: mandats.a2.tj-paris@justice.fr**

as well as the National Transfers Department (DAP) and Mrs Rohra GHOLEM, Head of Department, SNT, on the following numbers
**MOBILE TELEPHONE NUMBER:** 00 33 681 49 77 99
**PHONE NUMBER:** 00 33 188 28 60 28
E-MAIL : snt.dap-ems@justice.gouv.fr

SIGNATURE OF THE ISSUING JUDICIAL AUTHORITY (PUBLIC PROSECUTOR OR PUBLIC PROSECUTOR'S OFFICE), OR ITS REPRESENTATIVE

NAME: **Mrs NATACHA RATEAU**

POSITION (TITLE): **Senior Deputy Prosecutor**

DATE:14/08/24
OFFICIAL STAMP (IF AVAILABLE)

*Seal / Signature illegible*

Copie certifiée
conforme à l'original

I, the undersigned Arindam Bhattacharya Sworn translator registered with the Appeal Court of Paris, certify that the following translation is true to the document in French bearing the number 222499 Paris, Date : August 23, 2024

8

APPENDIX 1: LEGISLATION CONCERNING THE CRIMINAL CHARGES
BROUGHT AGAINST ANATOLII VIKTOROVICH
LEGKODYMOV, THE STATUTE OF LIMITATIONS ON
PROSECUTION AND THE JURISDICTION OF FRENCH COURTS

## COMPLICITY IN FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM

### Article 323-1 of the Penal Code

The act of fraudulently accessing or remaining in all or part of an automated data processing system is punishable by three years' imprisonment and a fine of €100,000.

When the result is either the deletion or modification of data contained in the system, or an alteration in the operation of the system, the penalty is five years' imprisonment and a fine of €150,000.

When the offences provided for in the first two paragraphs have been committed against an automated personal data processing system implemented by the State, the penalty is increased to seven years' imprisonment and a fine of €300,000.

### Article 323-5 of the Penal Code

Natural persons guilty of the offences provided for in this section are also liable to the following additional penalties:

1° Disqualification from civic, civil and family rights for up to five years, in accordance with article 131-26 ;

2° Prohibition, for a period of up to five years, from holding a public office or engaging in the professional or social activity in the exercise of which, or on the occasion of which, the offence was committed;

3° Confiscation of the material that was used or intended to be used to commit the offence, or of the material that is the product of the offence, with the exception of objects that can be returned;

4° Closure, for a maximum of five years, of the establishments or one or more of the establishments of the company used to commit the incriminated acts;

5° Exclusion from public contracts for a maximum of five years;

6° A ban, for a maximum of five years, on issuing cheques other than those enabling the drawer to

withdraw funds from the drawee, or those that are certified;

7° Posting or broadcasting the decision pronounced under the conditions set out in article 131-35.

### Article 121-4 of the Penal Code

The offender is the person who :

1° Commits the offence ;

2° Attempts to commit a felony or, in the cases provided for by law, a misdemeanor.

### Article 121-5 of the Penal Code

An attempt to commit an offence is deemed to have been made when, although it has begun to be carried out, it has only been suspended or failed to take effect due to circumstances beyond the control of the perpetrator.

### Article 121-6 of the Penal Code

An accomplice to the offence, as defined in article 121-7, will be punished as the perpetrator.

### Article 121-7 of the penal code

.An accomplice to a felony or misdemeanor is any person who knowingly, by aid or assistance, facilitated its preparation or commission.

An accomplice is also a person who, by gift, promise, threat, order or abuse of authority or power, incited an offence or gave instructions for its commission.

## COMPLICITY IN THE FRAUDULENT MAINTENANCE OF AN AUTOMATED DATA PROCESSING SYSTEM

### Article 323-1 of the Penal Code

*See above.*

### Article 323-5 of the Penal Code

*See above.*

### Article 121-4 of the penal code

*See above.*

### Article 121-5 of the penal code

*See above.*



### Article 121-6 of the Penal Code

*See above.*

### Article 121-7 of the Penal Code

*See above.*

## COMPLICITY IN FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED DATA PROCESSING SYSTEM.

### Article 323-3 of the penal code

The act of fraudulently introducing data into an automated processing system, or of fraudulently extracting, holding, reproducing, transmitting, deleting or modifying the data it contains, is punishable by five years' imprisonment and a fine of €150,000.

When this offence is committed against a State-operated automated personal data processing system, the penalty is increased to seven years' imprisonment and a €300,000 fine.

### Article 323-5 of the Penal Code

*See above.*

### Article 121-4 of the Penal Code

*See above.*

### Article 121-5 of the penal code

*See above.*

### Article 121-6 of the penal code

*See above.*

### Article 121-7 of the penal code

*See above.*

## COMPLICITY IN FRAUDULENT MODIFICATION OF DATA IN AN AUTOMATED DATA PROCESSING SYSTEM

### Article 323-3 of the penal code

*See above.*



*Copie certifiée conforme à l'original*



### Article 323-5 of the Penal Code

*See above.*

### Article 121-4 of the Penal Code

*See above.*

### Article 121-5 of the penal code

*See above.*

### Article 121-6 of the penal code

*See above.*

### Article 121-7 of the penal code

*See above.*

## COMPLICITY IN HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM

### Article 323-2 of the penal code

Obstructing or distorting the operation of an automated data processing system is punishable by five years' imprisonment and a fine of €150,000.

When this offence has been committed against an automated personal data processing system implemented by the State, the penalty is increased to seven years' imprisonment and a €300,000 fine.

### Article 323-5 of the penal code

*See above.*

### Article 121-4 of the penal code

*See above.*

### Article 121-5 of the penal code

*See above.*

### Article 121-6 of the penal code

*See above.*



**Article 121-7 of the penal code**

*See above.*

## COMPLICITY IN ORGANIZED EXTORTION

**Article 312-1 of the penal code**

Extortion is the act of obtaining by violence, threat of violence or coercion either a signature, a commitment or a renunciation, or the revelation of a secret, or the handing over of funds, securities or any other property.

Extortion is punishable by seven years' imprisonment and a fine of 100,000 euros.

**Article 312-6 of the penal code**

Organized extortion is punishable by twenty years' imprisonment and a fine of 150,000 euros.

It is punishable by thirty years' imprisonment and a fine of 150,000 euros when it is preceded, accompanied or followed by violence against a third party resulting in permanent mutilation or disability.

It is punishable by life imprisonment when committed either with the use or threat of a weapon, or by a person carrying a weapon subject to authorization or the carrying of which is prohibited.

The first two paragraphs of article 132-23 relating to the lock-in period are applicable to offences under the present article.

**Article 312-13 of the penal code**

I. - Natural persons guilty of one of the offences provided for in the present chapter are also liable to the following additional penalties:

1° Disqualification from civic, civil and family rights, in accordance with article 131-26 :

2° Prohibition, in accordance with article 131-27, either from holding a public office or from carrying out the professional or social activity in the exercise or in connection with the exercise of which the offence was committed, this prohibition being definitive or provisional in the cases provided for in articles 312-3 to 312-7 and for a maximum of five years in the cases provided for in articles 312-1, 312-2 and 312-10, either from exercising a commercial or industrial profession, or from directing, administering, managing or controlling in any capacity whatsoever, directly or indirectly, on one's own behalf or on behalf of another, a commercial or industrial enterprise or a commercial company. These disqualifications may be imposed cumulatively;

3° (Repealed) ;



4° Confiscation of the material that was used or intended to be used to commit the offence, or of the material that is the product of the offence, with the exception of objects that may be returned;

5° A residence ban in accordance with the provisions of article 131-31.

II. - In the event of conviction for offences under the present chapter, the additional penalty of a ban on holding or carrying a weapon subject to authorization for a period of up to five years is mandatory.

However, the court may, in a specially reasoned decision when the conviction is handed down by a criminal court, decide not to impose this penalty, in consideration of the circumstances of the offence and the personality of the offender.

### Article 312-14 of the Penal Code

Foreign nationals guilty of any of the offences defined in section 1 of this chapter may be banned from French territory under the conditions set out in article 131-30, either permanently or for a maximum of ten years.

### Article 131-26-2 of the Penal Code

I. - The additional penalty of ineligibility mentioned in 2° of article 131-26 and in article 131-26-1 is mandatory for any person guilty of an offence mentioned in II of the present article or of a felony.

This conviction is entered in bulletin no. 2 of the criminal record provided for in the Penal Code for the duration of the ineligibility period.

II. - The offenses for which ineligibility is mandatory are as follows:

1° Offenses under articles 222-9, 222-11, 222-12, 222-14, 222-14-1, 222-14-4, 222-15, 222-15-1 and 222-27 to 222-33-2-2 of the present Code;

2° The offences provided for in articles 225-1 to 225-2 ;

3° The offences set out in articles 313-1, 313-2 and 314-1 to 314-3, as well as concealment and money laundering;

4° The offences provided for in Chapter I of Title II of Book IV;

5° the offences provided for in articles 432-10 to 432-15, 433-1 and 433-2, 434-9, 434-9-1, 434-43-1, 435-1 to 435-10 and 445-1 to 445-2-1, as well as the handling or laundering of offences proceeds;

6° The offences provided for in articles 441-2 to 441-6, as well as the handling or laundering of such offences proceeds;

7° Offenses under articles L. 86 to L. 88-1, L. 91 to L. 104, L. 106 to L. 109, L. 111, L. 113 and L. 116 of the French Electoral Code;

8° The offences provided for in articles 1741 and 1743 of the General Tax Code, when committed in an organized gang or when they result from one of the behaviours mentioned

in 1° to 5° of article L. 228 of the Book of Tax Procedures, as well as their concealment or laundering;

9° Offences under Articles L. 465-1 to L. 465-3-3 of the French Monetary and Financial Code, as well as the handling or laundering of such offences;

10° The offences provided for in articles L. 241-3 and L. 242-6 of the French Commercial Code, as well as their concealment or laundering;

11° The offences set out in article L. 113-1 of the French Electoral Code and article 11-5 of Act no. 88-227 of March 11, 1988 on the financial transparency of political life;

12° The offenses provided for in I of article LO 135-1 of the electoral code and in article 26 of law no. 2013-907 of October 11, 2013 on the transparency of public life;
[Provisions declared unconstitutional by decision no. 2017-752 DC of September 8, 2017].

14° The offence of participation in an association de malfaiteurs provided for in article 450-1 of the present code, when its object is a crime or an offence mentioned in 1° to 13° of the present II.

III. - However, the court may, in a specially reasoned decision, decide not to impose the penalty provided for in this article, in consideration of the circumstances of the offence and the personality of the perpetrator.

### Article 132-71 of the Penal Code

Any group formed or agreement established with a view to preparing one or more offences, as characterized by one or more material facts, constitutes an organized gang within the meaning of the law.

### Article 121-4 of the Penal Code

*See above.*

### Article 121-5 of the Penal Code

*See above.*

### Article 121-6 of the penal code

*See above.*

### Article 121-7 of the penal code

*See above.*





## PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME

### Article 450-1 of the Penal Code

Any group formed or agreement established with a view to the preparation, characterized by one or more material facts, of one or more felonies or misdemeanours punishable by at least five years' imprisonment constitutes a criminal conspiracy.

Where the offences are crimes or misdemeanours punishable by ten years' imprisonment, participation in a criminal conspiracy is punishable by ten years' imprisonment and a fine of 150,000 euros.

Where the offences prepared are misdemeanours punishable by at least five years' imprisonment, participation in a criminal conspiracy is punishable by five years' imprisonment and a fine of 75,000 euros.

### Article 450-3 of the Penal Code

Natural persons guilty of the offence provided for in article 450-1 are also liable to the following additional penalties:

1° Disqualification from civic, civil and family rights, in accordance with the provisions of article 131-26 ;

2° Prohibition, in accordance with the provisions of article 131-27, either from holding a public office or carrying out the professional or social activity in the exercise or on the occasion of the exercise of which the offence was committed, or from exercising a commercial or industrial profession, or from directing, administering, managing or controlling in any capacity whatsoever, directly or indirectly, on one's own behalf or on behalf of another, a commercial or industrial enterprise or a commercial company. These disqualifications may be imposed cumulatively;

3° A residence ban, in accordance with article 131-31.

These persons may also be subject to the other additional penalties incurred for the crimes and misdemeanors that the group or conspiracy was intended to prepare.

### Article 450-5 of the Penal Code

Natural and legal persons found guilty of the offences provided for in the second paragraph of article 450-1 and in article 321-6-1 are also liable to the additional penalty of confiscation of all or part of the property belonging to them or, subject to the rights of the owner in good faith, of which they have free disposal, whatever its nature, whether movable or immovable, divided or undivided.

### Article 121-4 of the Penal Code

*See above.*

### Article 121-5 of the Penal Code

*See above.*

### Article 121-6 of the Penal Code

*See above.*

### Article 121-7 of the Penal Code

*See above.*




## CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONAL DATA PROCESSING SYSTEM, COMMITTED IN AN ORGANIZED GANG

### Article 323-4-1 of the Penal Code

When the offences provided for in <u>articles 323-1 to 323-3-1</u> have been committed as part of an organized gang, the penalty is increased to ten years' imprisonment and a fine of €300,000.

### Article 323-1 of the Penal Code

*See above.*

### Article 323-2 of the Penal Code

*See above.*

### Article 323-3 of the penal code

*See above.*



### Article 323-5 of the penal code

*See above.*

### Article 323-3-1 of the penal code

Importing, possessing, offering, transferring or making available equipment, instruments, computer programs or data designed or specially adapted to commit one or more of the offences provided for in <u>articles 323-1 to 323-3</u>, without a legitimate reason, in particular research or computer security, is

punishable by the penalties laid down respectively for the offence itself or for the most severely punished offence.

### Article 132-71 of the Penal Code

*See above.*

### Article 121-4 of the Penal Code

*See above.*



### Article 121-5 of the penal code

*See above.*

### Article 121-6 of the penal code

*See above.*



### Article 121-7 of the penal code

*See above.*

## AGGRAVATED MONEY LAUNDERING: AIDING ORGANIZED GROUP TO FALSELY JUSTIFY THE ORIGIN OF THE OFFENDER'S ASSETS OR INCOME

### Article 324-2 of the Penal Code

Money laundering is punishable by ten years' imprisonment and a fine of 750,000 euros:

1° When committed on a regular basis or using the facilities provided by the exercise of a professional activity;

2° When committed as part of an organized gang.

### Article 324-1 of the Penal Code

Money laundering is the act of facilitating, by any means whatsoever, the false justification of the origin of the assets or income of the perpetrator of a crime or misdemeanor that has procured the latter a direct or indirect profit.

Money laundering also includes assisting in the investment, concealment or conversion of the direct or indirect proceeds of a crime or misdemeanor.

Laundering is punishable by five years' imprisonment and a fine of 375,000 euros.

### Article 132-71 of the Penal Code



*See above.*

## Article 324-3 of the Penal Code

The fines referred to in Articles 324-1 and 324-2 may be increased to half the value of the assets or funds involved in the money-laundering operations.

## Article 324-7 of the Penal Code

Any person who has attempted to commit the offences provided for in the present section shall be exempt from punishment if, having alerted the administrative or judicial authorities, he has helped to prevent the offence from being committed and to identify any other perpetrators or accomplices.

The custodial sentence incurred by the perpetrator or accomplice of one of the offences provided for in the present section is reduced by half if, having warned the administrative or judicial authority, he has enabled the offence to be brought to an end or, where applicable, the other perpetrators or accomplices to be identified.

## Article 131-30 of the Penal Code

Any foreigner guilty of a felony, an offence punishable by a prison sentence of three years or more, or an offence for which the penalty of expulsion from French territory is provided by law, may be deported either permanently or for a maximum period of ten years. Without prejudice to article 131-30-2, the court takes into account the length of time the foreign national has been present on French territory, as well as the nature, length and intensity of his or her ties with France, when deciding whether to impose a deportation order.

The deportation order automatically entails the deportation of the convicted person to the border, where applicable, on expiry of his or her prison sentence.

When the deportation order accompanies an unsuspended custodial sentence, its application is suspended while the sentence is being served. It resumes on the day on which the deprivation of liberty
ends.

The deportation order ceases to have effect on expiry of the period set by the sentencing decision. This period runs from the date on which the convicted offender leaves French territory, as determined in accordance with the procedures laid down by decree of the State Counsel

A disqualification from French territory imposed at the same time as a prison sentence does not prevent this sentence from being subject to semi-liberty, work release, electronically supervised home detention or temporary absences for the purpose of preparing an application for release.



## AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANIZED GROUP IN THE PLACEMENT, CONCEALMENT OR CONVERSION OF THE PROCEEDS OF A CRIME

### Article 324-2 of the Penal Code

*See above.*

### Article 324-1 of the Penal Code

*See above.*

### Article 132-71 of the penal code

*See above.*

### Article 324-3 of the penal code

*See above.*

### Article 324-7 of the penal code

*See above.*

### Article 324-8 of the penal code

Any foreigner guilty of one of the offenses defined in articles 324-1 and 324-2 may be banned from French territory under the conditions set out in article 131-30, either permanently or for a maximum of ten years.

## ON THE STATUTE OF LIMITATIONS

### Article 7 of the penal code

Public prosecution for crimes is statute-barred twenty years after the day on which the offence was committed.

Public prosecution of the crimes mentioned in articles 706-16, 706-26 and 706-167 of the present code, articles 214-1 to 2014-4 of the penal code and Book IV -A of the same code shall be barred after thirty years from the date on which the offence was committed.

Public prosecution of the crimes mentioned in articles 211-1 to 212-3 of the aforementioned code is not subject to any statute of limitations.



## Article 8 of the penal code

Public prosecution for misdemeanors is statute-barred after six years from the date on which the offense was committed.

Public prosecution of the offences mentioned in article 706-47 of the present code, when committed against minors, with the exception of those mentioned in articles 222-29-1 and 227-26 of the Penal Code, shall be statute-barred after ten years from the age of attaining majority.

Public prosecution of the offences mentioned in articles 222-12, 222-29-1 and 227-26 of the same code, when committed against minors, is statute-barred after twenty years from the age of majority.

The public prosecution of the offences mentioned in article 706-167 of the present code, when they are punishable by ten years' imprisonment, as well as that of the offences mentioned in articles 706-16 of the present code, excluding those defined in articles 421-2-5 to 421-2-5-2 of the Penal Code, and 706-26 of the present code and in Book IV bis of the Penal Code, shall be statute-barred after twenty years from the day on which the offence was committed.

## Article 9-2 of the penal code

The limitation period for public action is interrupted by :

1° Any action by the public prosecutor or the civil party to initiate proceedings, as provided for in articles 80, 82, 87, 88, 388, 531 and 532 of the present code and article 65 of the law of July 29, 1881 on freedom of the press;

2° Any investigation carried out by the Public Prosecutor's Office, or any report drawn up by an officer of the judicial police or an authorized agent exercising judicial police powers with a view to investigating and prosecuting the perpetrators of an offence;

3° Any investigative act provided for in articles 79 to 230 of the present code, carried out by an examining magistrate, an investigating chamber or magistrates and judicial police officers delegated by them, effectively tending to the investigation and prosecution of the perpetrators of an offence;

4° Any judgment or ruling, even if not final, if it is not null and void.

Any act, judgment or ruling mentioned in 1° to 4° shall start a limitation period equal to the initial period.

The present article applies to related offences and to perpetrators or accomplices not covered by one of these acts, judgments or orders.

## EXTRATERRITORIAL JURISDICTION OF FRENCH COURTS

### Article 113-6 of the penal code

French criminal law is applicable to any crime committed by a French national outside the territory of the Republic.

It is applicable to misdemeanors committed by French nationals outside the territory of the Republic if the acts are punishable under the law of the country where they were committed.

It is applicable to infringements of the provisions of Regulation (EC) No 561/2006 of the European Parliament and of the Council of 15 March 2006 on the harmonization of certain social legislation relating to road transport, committed in another Member State of the European Union and recorded in France, subject to the provisions of Article 692 of the penal code or justification of an administrative sanction which has been enforced or can no longer be enforced.

The present article is applied even if the accused has acquired French nationality subsequent to the offence for which he or she is charged.

### Article 113-7 of the penal code

French criminal law is applicable to any crime, as well as to any offence punishable by imprisonment, committed by a French national or by a foreigner outside the territory of the Republic when the victim is of French nationality at the time of the offence.

### Article 113-8 of the penal code

In the cases provided for in articles 113-6 and 113-7, offences may only be prosecuted at the request of the public prosecutor. Prosecution must be preceded by a complaint from the victim or his beneficiaries, or by an official denunciation by the authority of the country where the offence was committed.

### Article 113-8-1 of the penal code

Without prejudice to the application of articles 113-6 to 113-8, French criminal law is also applicable to any felony or misdemeanor punishable by at least five years' imprisonment committed outside the territory of the Republic by a foreigner whose extradition has been refused to the requesting State by the French authorities on the grounds, either that the act for which extradition had been requested is punishable by a penalty or security measure contrary to French public policy, or that the person claimed would have been tried in the said State by a court which does not provide the fundamental guarantees of procedure and protection of the rights of the defense, or that the act in question is a political offence.
The offences referred to in the first paragraph may only be prosecuted at the request of the public prosecutor. It must be preceded by an official denunciation, transmitted by the Minister of Justice, from the authority of the country where the act was committed and which requested extradition.

### Article 113-9 of the penal code

In the cases provided for in articles 113-6 and 113-7, no proceedings may be taken against a person who can prove that he or she has been finally judged abroad for the same acts and, in the event of conviction, that the sentence has been served or is time-barred.

### Article 113-10 of the penal code



In the cases provided for in <u>articles 113-6 and 113-7</u>, no prosecution may be brought against a person who can prove that he or she has been finally judged abroad for the same acts and, in the event of conviction, that the sentence has been served or is time-barred.



Copie certifiée
conforme à l'original

I, the undersigned Arindam Bhattacharya
Sworn translator registered with the
Appeal Court of Paris, certify that the
following translation is true to the original
document in French
bearing the number ..222499A
Paris, Date : August 27, 2024

*Ambassade de France*
*aux Etats-Unis*

**UNOFFICIAL TRANSLATION**

L/LEI

2024 DEC 20  A 2: 46

DEPARTMENT OF STATE

Re: Request for extradition of Mr. ANATOLII LEGKODYMOV

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. ANATOLII LEGKODYMOV born on August 10th, 1982 (USSR), a Russian citizen.

On July 29th, 2024, he was issued an arrest warrant by Mr. Serge TOURNAIRE, first vice-president in charge of the Pre-trial investigation at the Court of Paris (France) for:

COMPLICITY IN FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM
COMPLICITY IN FRAUDULENT MAINTENANCE IN AN AUTOMATED DATA PROCESSING SYSTEM
COMPLICITY IN THE FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED PROCESSING SYSTEM
COMPLICITY IN FRAUDULENT MODIFICATION OF DATA CONTAINED IN AN AUTOMATED PROCESSING SYSTEM
COMPLICITY IN HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM
CONSPIRACY TO COMMIT EXTORTION IN AN ORGANISED GANG
PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME
CONSPIRACY TO BREACH A STATE-OPERATED AUTOMATED PERSONNAL DATA PROCESSING SYSTEM, COMMITTED BY AN ORGANISED GANG
AGGRAVATED MONEY LAUNDERING: AIDING AN ORGANISED GANG TO FALSELY JUSTIFY THE ORIGIN OF THE OFFENDER'S ASSETS OR INCOME
AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANISED GROUP IN AN OPERATION TO INVEST, CONCEAL, OR CONVERT THE PROCEEEDS OF CRIME

This request, accompanied by an English translation, is transmitted pursuant to:

- The Extradition Treaty of April 23rd, 1996, between France and the United States of America;

- The Extradition Agreement of July 19th, 2003 between the European Union and the United States of America.

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

.../...

- 2 / 2 -

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, December 20th, 2024

**Department of State**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas BURROWS**
**Office of International Affairs**

*Ambassade de France*
*aux Etats-Unis*

Réf : Demande d'extradition de Anatolii LEGKODYMOV
N° : 2024-0519489

      L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui adresser, par la présente note diplomatique, une demande d'extradition originale, accompagnée de sa traduction en langue anglaise, formée auprès du Gouvernement américain contre le nommé Anatolii LEGKODYMOV, né le 10 août 1982 en Union Soviétique, de nationalité russe, en vertu :

- du Traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique signé à Paris le 23 avril 1996
- de l'Accord entre l'Union européenne et les Etats-Unis d'Amérique en matière d'extradition signé le 25 juillet 2003 in Washington, D.C.

      Anatolii LEGKODYMOV fait l'objet d'un mandat d'arrêt délivré le 29 juillet 2024 par M. Serge TOURNAIRE, premier vice-président chargé de l'instruction au tribunal judiciaire de Paris pour des faits de :

COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE DE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
COMPLICITE D'EXTORSION EN BANDE ORGANISEE
PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME
COMPLICTE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE
BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT
BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT

      L'Ambassade de France remercie le Département d'Etat de bien vouloir lui faire connaître la suite réservée à cette demande.

      L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment

de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Washington, le 20 décembre 2024

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**



**MINISTÈRE
DE L'EUROPE
ET DES AFFAIRES
ÉTRANGÈRES**
*Liberté
Égalité
Fraternité*

C.A.D. WASHINGTON
ARRIVE PAR VALISE

DEC 19 2024 5 1

**Direction des Français à l'étranger
et de l'administration consulaire**

**Service des conventions,
des affaires civiles
et de l'entraide judicaire**

**Mission des conventions
et de l'entraide judiciaire**

Paris, le 12/12/2024

**DE : YANNICK ANDRIANARAHINJAKA**

**Chef de la mission des conventions et de l'entraide judiciaire**

FAE/SAEJ/CEJ n° 2024 – *0519 489*
Rédacteur : Julie CASTERAN pour Martin CHOLLET

<u>Objet</u> : **Demande d'extradition** formée auprès des autorités américaines à l'encontre du nommé **Anatolii LEGKODYMOV**, né le 10 août 1982 en URSS, de nationalité russe.

<u>Référence</u> : Dossier n°REM-2409WUZ5
PJ : 1 dossier

A la demande du ministère de la Justice, le Département vous prie de bien vouloir trouver ci-joint, avec les pièces de justice, une demande formée auprès des autorités américaines en vue de l'extradition du nommé **Anatolii LEGKODYMOV**, né le 10 août 1982 en URSS, de nationalité russe.

L'intéressé est recherché par les autorités françaises au titre d'un mandat d'arrêt décerné le 29 juillet 2024 par le juge d'instruction près le tribunal judiciaire de Paris, pour des faits qualifiés de blanchiment aggravé, complicité d'extorsion en bande organisée, complicité d'accès et maintien frauduleux dans un système de traitement automatisé des données, complicité d'introduction et modification frauduleuse de données dans un système de traitement automatisé des données, complicité d'entrave au fonctionnement d'un système de traitement automatisé des données, participation à une association de malfaiteurs en vue de la préparation d'un crime, complicité d'atteinte à un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat en bande organisée.

Cette demande est formée sur le fondement du Traité bilatéral franco-américain signé à Paris le 23 avril 1996, de l'Accord entre l'Union européenne et les États-Unis en matière d'extradition du 25 juin 2003, de la Convention sur la cybercriminalité du Conseil de l'Europe du 23 novembre 2001 et sur la Convention des Nations-Unies contre la criminalité transnationale organisée du 15 novembre 2000.

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533
75732 Paris Cedex 15                    1/2

SBU - LAW ENFORCEMENT

Le Département vous serait reconnaissant de bien vouloir remettre cette demande aux autorités américaines, dès que possible, et de lui faire connaitre la suite réservée./.

YANNICK ANDRIANARAHINJAKA

À :
Ambassade de France aux États-Unis d'Amérique
WASHINGTON

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533

**COUR D'APPEL DE PARIS**

**PARQUET DU TRIBUNAL**

**JUDICIAIRE DE PARIS**

**6ème DIVISION – SECTION A2**

Exécution des peines

Entraide Pénale Internationale

TEL : 01 44 32 56 84

FAX : 01 44 32 58 56

Paris, le 26 novembre 2024

**La Procureure de la République**

**près le Tribunal judiciaire de Paris**

**A**

**Madame la procureure générale près**

**la Cour d'appel de Paris**

**PARQUET DE PARIS**
Courrier Administratif

N° 2024|04065
rappeler le numéro

COUR D'APPEL DE PARIS

10 DEC. 2024

Service Général

**OBJET : Demande d'extradition visant Monsieur Anatolii Viktorovich LEGKODYMOV, à destination des autorités américaines**

**N/REF : 21064000646**

J'ai l'honneur de solliciter formellement, à l'appui des pièces jointes, l'extradition de Monsieur Anatolii Viktorovich LEGKODYMOV, né le 10 août 1982, sur la base d'un mandat d'arrêt décerné le 29 juillet 2024 par Monsieur Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, lequel a fait l'objet d'un mandat d'arrêt européen, décerné le 14 août 20224 par Madame Natacha RATEAU, premier vice-procureure de la République près le Tribunal judiciaire de Paris.

**I / Identité de la personne concernée**

- Nom : **Anatolii Viktorovich LEGKODYMOV**
- Né le **10 août 1982**
- En : **URSS**
- Sexe : **Masculin**
- Nationalité : **Russe**
- Numéro de passeport russe : **727009003**

### II / Les faits

*Résumé des faits :*

Dans le cadre d'une action opérationnelle européenne, la direction générale de la gendarmerie nationale ainsi que 17 agences de forces de l'ordre ont mis en lumière 20 cibles prioritaires afin d'identifier et démanteler des services de blanchiment de cryptoactifs. L'une des principales cibles était rapidement identifiée comme étant l'échangeur de cryptoactifs russe BITZLATO, avec un volume de transactions évalué à plus d'un milliard de dollars depuis 2019.

La plateforme d'échange de cryptoactifs russe BITZLATO permet d'échanger rapidement des cryptoactifs tels que des bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. Elle possède un site internet en langue russe et anglaise et est accessible à tous les utilisateurs d'Internet, notamment à des clients français. Elle propose des services de P2P, d'*exchange* et de *quick exchange*. Cette plateforme est ainsi mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du *hacking* et autres activités criminelles.

Ainsi, dans son rapport de 2022 intitulé « Crypto crime report », la société *Chainalysis* note que la société BITZLATO a reçu une part importante de jetons numériques provenant d'adresses illicites et risquées. Selon la presse (*Bloomberg* et le *New York Times*), *Federation Tower*, un complexe de deux gratte-ciels situés au cœur de la ville de Moscou, abriterait de nombreuses entreprises de cryptoactifs soupçonnés de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés *darknet* et rançongiciel.

Parmi ces entreprises, se situe notamment la société BITZLATO. L'analyse de la *blockchain*, combinée aux données du trafic web, indique également qu'après les attaques par *ransomware*, la plupart des fonds extorqués sont blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du *darknet*, 224,5 millions de dollars d'escroquerie et 9 millions de dollars des attaquants de *ransomware*. Cette plateforme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites.

Les investigations réalisées permettaient de révéler que le site de BITZLATO utilisait au moins un hébergeur français, OVH, auprès de qui la société loue 56 serveurs dédiés. Parmi ces derniers, les enquêteurs parvenaient à identifier le serveur de « management », soit le serveur communiquant et permettant l'administration des autres serveurs. Ce dernier était alors copié. La procédure réalisée à cet effet permettait de révéler que les administrateurs surveillaient de près l'infrastructure.

Par la suite, l'analyse du serveur de management révélait que les membres de BITZLATO utilisaient une application interne, nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un *chat* interne et une messagerie instantanée. L'analyse de l'application MATTERMOST mettait en lumière les éléments suivants : le serveur de management était administré par « DREY » (*alias* Andrei PRYHODKO, informaticien), par « Ml2016 » (*alias* Mike LUNOV, CEO de l'entreprise) et par « Mr. Note » ou « Vanch » (*alias* Ivan BONDAREV). 132 profils utilisateurs étaient répertoriés, 1 156 conversations de groupe ou privées représentant 505 110 messages étaient identifiés, 121 channels de plus de deux personnes et 15 868 fichiers, entre le 09 avril 2018 et le 04 mai 2022. L'analyse permettait de comprendre le fonctionnement de BITZLATO, et de récupérer des messages relatifs à de potentiels partenaires, à la comptabilité, au recrutement, aux ressources-humaines, ainsi que des éléments de marketing, l'architecture technique de la plateforme et son développement, des échanges liés aux cryptoactifs, *etc*. Cette analyse permettait donc de confirmer que l'exposition des différentes adresses de cryptoactifs de l'échangeur étaient issus en majorité d'actifs illicites.

Ainsi, pour les fonds reçus par BITZLATO, il a été calculé par le service criminel le volume d'activité suivant :

-   7 % du volume d'activité de HYDRA MARKET PLACE, représentant 171 millions de

SBU - LAW ENFORCEMENT

dollars ;
- 9 % du volume d'activité du *scam* FINIKO, représentant 138 millions de dollars ;
- 3,6 % du volume de GARANTEX, représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

- 14,75 % du volume d'activité de HYDRA MARKET PLACE, soit 125 millions de dollars ;
- 14,4 % du volume d'activité du *scam* FINIKA, soit 225 millions de dollars ;
- 8,8 % du volume de d'activité de GARENTEX, soit 174 millions de dollars.

Par ailleurs, 2,5 millions de dollars étaient envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de *ransomware*. En outre, deux adresses de BITZLATO recevaient plus de 65 millions de dollars depuis le mois de mars 2022 de la part de WASA13l WALLET MIXEUR. Le plus gros montant de *bitcoin* échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros. Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC (Know your customer), alors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plateforme était peu regardante sur l'identité de ses clients.

Plusieurs membres des équipes de BITZLATO faisaient l'objet de poursuites, étant soit visés par des mandats d'arrêt, soit mis en examen. Parmi ces derniers figuraient notamment Mikhaïl LUNOV, directeur général ; Aleksandr HONCHARENKO, directeur marketing de la société ; Andrii KRYSTHAL, technicien – développement mobile pour la société ; Pavel LERNER, manager du projet « bourse » de la société, ainsi que Constantin ALEKSEEV, ingénieur sur le projet « bourse » de la société.

### *Sur l'identification d'Anatolii Viktorovich LEGKODYMOV*

Anatolii Viktorovich LEGKODYMOV était directeur et actionnaire de BITZLATO. Il était également administrateur et technicien de la plateforme. Certaines conversations entre ce dernier et son associé, Anton SHKURENKO, en 2018, permettaient notamment de révéler que ces derniers avaient connaissance que le chiffre d'affaires de la société reposait sur une origine douteuse, notamment en lien avec le trafic de stupéfiants. Ces derniers évoquaient également la nécessité de créer une apparence de contrôle afin de gagner en respectabilité, sans pour autant se priver de cette source de revenus. D'autres publications permettaient également de révéler qu'Anatolii Viktorovich LEGKODYMOV avait clairement connaissance que la société BITZLATO était associée au *dark web* ou à des activités de blanchiment. L'enquête permettait également de révéler que la société ne demandait pas de KYC, et avait conscience d'aider ses clients à effectuer des transactions liées à diverses activités illicites.

Anatolii Viktorovich LEGKODIMOV, PDG de la société BITZLATO, était interpellé à Miami le 17 janvier 2023 par le FBI. A cette occasion, plusieurs supports numériques étaient saisis, dont notamment cinq téléphones et deux ordinateurs portables. Le 06 décembre 2023, le Bureau du procureur des Etats-Unis, district Est de New-York, faisait savoir par communiqué de presse qu'Anatolii Viktorovich LEGKODYMOV avait plaidé coupable devant le tribunal fédéral de Brooklyn. Selon des articles de presse, l'intéressé était condamné à une peine d'emprisonnement de 18 mois et était libéré à l'issu de sa peine. Il serait donc actuellement libre de ses mouvements sur le territoire américain.

La personne morale BITZLATO est inscrite au sein du registre des sociétés de HONG KONG sous le nom commercial « BITZLATO LIMITED » depuis le 1er décembre 2017. Les membres fondateurs sont Lev LEGKODYMOV (3400 parts), Anatoly LEGKODYMOV (4250 parts), SHAKH NOV Sergei (200 parts) et SHKURENKO Anton (2150 parts).

Depuis le 25 août 2018, les associés sont :

- LEGKODYMOV Anatolii, directeur de la société (7344 actions)

- SHKURENKO Anton (2450 actions)

- SHAKNOV Sergei (206 actions)

Son directeur général (CEO – Chief Executive Officier) est Mikhail LUNOV

Le secteur d'activité de la société est le service d'information, website et « Message board ».

Le site internet de la plate-forme fait état que la société est domiciliée UNIT 617, 6 1 F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG, adresse confirmée sur les statuts légaux de la société. Cette adresse correspond à l'adresse d'un service de secrétariat et domiciliation de sociétés : First Company of Consulting and Secretariat Services Limited. La société Bitzlato a en effet désigné cette dernière société comme société de secrétariat.

La société Bitzlato est présente dans différents pays via la localisation de ses personnels : Russie, Ukraine, Espagne, Portugal, Kenya, Nigéria, Arabie Saoudite, Chine. Les employés majoritairement russe ou ukrainien travaillent en distanciel ou en présentiel. Il a été noté que des bureaux physiques en Ukraine et Russie existaient avant la guerre en Ukraine.

La société se présente comme ayant eu un total de 102 personnels comprenant les employés actuels et anciens. Un organigramme de la société en date du 29 mars 2021, retrouvé dans la messagerie interne de la société est annexé à la procédure :



La plate-forme d'échange de crypto-actifs russe BITZLATO permet d'échanger rapidement des crypto-actifs type bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. La plate-forme d'échange possède un site internet en langue russe mais également en langue anglaise et est accessible à tous les utilisateurs du web et notamment à des clients français. Elle propose des services de pair-à-pair décentralisée de cryptomonnaies (exchange P2P) qui permet aux utilisateurs de vendre et d'acheter des cryptomonnaies directement entre eux, en utilisant leur ordinateur ou leur appareil mobile, sans passer par une autorité centrale pour faciliter les transactions, d'exchange et de quick exchange.

Les utilisateurs de la plateforme Bitzlato publiaient des annonces de vente ou d'achat de cryptomonnaies (advert) en utilisant soit l'application web Bitzlato (https://bitzlato.com/trader-workspace ), soit un des bots Telegram Bitzlato[1] (https://tmeibitzlato ) . Ainsi, une fois le bot sélectionné, le menu s'affiche, accompagné des premiers messages (cf capture d'écran ci-dessous)

---

[1] Un bot ou robot Telegram est un programme informatique qui peut être intégré à l'application de messagerie instantanée Telegram pour exécuter diverses tâches ou fournir des services Les bots peuvent interagir avec les utilisateurs en envoyant et recevant des messages Ils peuvent aussi être intégrés à d'autres services ou plateformes en ligne Ils sont souvent utilisés pour automatiser certaines tâches fastidieuses ou répétitives, fournir des informations ou pour offrir une interface de commande pour accéder à différentes fonctionnalités

SBU X LAW ENFORCEMENT



Les services proposés par les bots de BITZLATO permettaient la vente et/ou l'achat des cryptommonaies suivantes :

| | |
|---|---|
| -Bitcoin (BTC) | -Dogecoin (DOGE) |
| -Ethereum (ETH) | -Dash Coin (DASH) |
| -Tether (USDT) | -Bitcoin Cash (BCH) |
| -Usd Coin (USDC) | -Monolith Crypto Ruble (MCR) |
| -Dai (DAI) | -Monolithos DAO Token (MDT) |
| -Litecoin (LTC) | |

Les enquêteurs relevaient que les « avantages » de l'utilisation de BIZLATO, soit par son site web soit par le bot Telegram par rapport à un échangeur « classique » (tel que Binance, Coinbase…) étaient :

-aucune commission sur les transactions effectuées selon les termes des annonces disponibles

-la sécurité des échanges (niveau de protection des transactions très élevé)

-l'échange sans intermédiaire

-accès à une variété de cryptomonnaies et de méthodes de paiement

-un wallet partagé avec des bots Telegram

-bot Telegram réputé plus simple d'utilisation

Il ressort ainsi des investigations que la société propose un éventail de 11 crypto-actifs échangeables en peer to peer et exchange. Le Bot telegram (ChangeBot) propose quant à lui 8 crypto-actifs différents

| Bitzlato peer-to-peer | Bitzlato échangeur | Bot telegram (Change Bot) |
|---|---|---|
| Bitcoin (BTC) | Bitcoin (BTC) | Bitcoin (BTC) |
| Ethereum (ETH) | Ethereum (ETH) | Ethereum (ETH) |
| Bitcoin Cash (BCH) | Tether (USDT) | Tether (USDT) |
| Litecoin (LTC) | Monolith Crypto Ruble (MCR) | Litecoin (LTC) |
| Dashcoin (DASH) | MonolithosDao Token (MDT) | Dashcoin (DASH) |
| Dogecoin (DOGE) | Binance Coin (BNB) | Bitcoin Cash (BCH) |
| Tether (USDT) | Huobi Token (HT) | Dogecoin (DOGE) |
| USD Coin (USDC) | Polygon (MATIC) | Monolith Crypto Ruble (MCR) |
| DAI | Tron (TRX) | |
| Monolith Crypto Ruble (MCR) | DAI | |
| MonolithosDAO Token (MDT) | BlazarBits (BZB) | |

Cette plate-forme était mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du hacking et autres activités criminelles ;

Les risques de blanchiment d'argent par le biais du P2P découlent principalement de l'anonymat des émetteurs bénéficiaires des transactions ainsi que de l'absence de réglementation pour ces types de services financiers. Comme dans toute opération de blanchiment le volet d'opacification peut porter sur deux aspects : faire obstacle à la traçabilité de la valeur du produit du crime et/ou faire obstacle à l'identification de l'auteur ou du bénéficiaire d'une opération. La technologie utilisée permet de s'affranchir des institutions financières pour assurer des transactions virtuelles instantanées transfrontalières, sans limite et anonymes. L'opacité des opérations financières réalisées permet de masquer l'origine illicite des produits ou fonds afin de permettre aux criminels d'en user légalement une fois injectés dans l'économie licite. Cependant, il semble très difficilement concevable au vu du nombre de transactions réalisées via la plateforme russe Bitzlato en provenance et au profit des plateformes sanctionnées par les autorités américaines que les administrateurs n'aient pas eu connaissance que les flux d'argent étaient en lien avec des activités criminelles. Ainsi, les informations relatives au site Hydra Market étaient mondialement connues et reconnues.

Ainsi, dans son rapport 2022 « Crypto crime report », la société Chainalysis note que la société BITZLATO a reçu de 2019 à 2023 une part importante (76%) de jetons numériques provenant d'adresses illicites et risquées ;

Dans son rapport en date du 18 janvier 2023 intitulé « US Authorities move against High-Risk Exchange Bitzlato for providing money landering services to ranseomware attackers and other russia-based criminals », la société Chainalisys après avoir évoqué l'arrestation du fondateur de Bizlato, Anatoly LEGKODYMOV à Miami mentionnait le rôle de Bizlato dans le blanchiment de fonds provenant d'attaques de rançongiciels et du notoire HydraMarket

La société Chainalisys présentait ses constations sous formes de graphiques :

- concernant la « légitimité des fonds reçus »



- concernant la source des fonds illicites reçus par Bitzlato à savoir :

    * 38,2 % provenant de darknetMarket,

    * 35% de scams

    * 23% de services ayant été sanctionnés

    *1,6% de rensemwares

SBU – LAW ENFORCEMENT



Il est également expliqué que « en tout Bitzlato a reçu 2,5 milliards de crypto-actifs sur cette période et que 26 % proviennent de sources illégales et 27 % de sources considérées comme « à risques » (définit comme des fonds provenant de mixers, échangeurs à hauts risques et services basées dans des juridictions à hauts risques) »

Les sources ayant envoyés des fonds à Bitzlato sont référencées dans le graphique suivant :



Selon la presse (Bloomberg et le New York Times), Federation Tower, un complexe de deux gratte-ciel au cœur de la ville de Moscou, abrite de nombreuses entreprises de crypto-actifs soupçonnées de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés darknet et rançongiciel. Parmi ces entreprises se situe notamment la société BITZLATO

La société BITZLATO utilisait une douzaine de noms de domaines à savoir:

- bitzlato bz
- bitzlato com
- bitzlato net
- changebot org
- monolith money
- land monolith money
- monolithos money
- price, monolith money
- trade monolith money
- 1g k. one
- s-www. Igk one
- xgpu online

qui étaient fermés puis saisis par les enquêteurs sur autorisation du juge des libertés et de la détention afin de faire cesser l'activité internet de la société.

L'analyse de la blockchain, combinée aux données du trafic web, indiquait également qu'après les attaques par ransomware, la plupart des fonds extorqués étaient blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du darknet, 224,5 millions de dollars d'escroqueries et 9 millions de dollars des attaquants de ransomware ;

Le conflit armé en Ukraine a généré une solidarité mondiale qui a permis des levées de fonds d'aide à ce pays mais également en faveur de la Russie. La cryptomonnare est utilisée par les Ukrainiens et les Russes pour financer leurs actions défensives et offensives. Cette plateforme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites. La société Chainalisys dans son rapport évoqué supra publié en 2023 mentionne des transactions entre Bizlato et des milices pro-russes ayant contribué à la guerre en Ukraine relevant que Bitzlato aurait reçu 32.000$ émanant de groupes paramilitaires russes.

➢ **S'agissant des serveurs**

Les premières investigations permettaient de révéler que le site de BITZLATO utilisait au moins un hébergeur français, OVH, auprès de qui la société louait 56 serveurs dédiés. Un schéma relationnel des serveurs était établi par les enquêteurs .

Une trentaine de serveurs étaient saisis par les enquêteurs sur ordonnance du juge des libertés et de la détention aux fins d'exploitation

Complémentairement des mesures de captation informatique étaient autorisées sur les serveurs dans la mesure où une copie physique du serveur pouvait s'avérer délicate car nécessitant, compte tenu de la configuration (serveur dédié[2]) l'arrêt du service, ce qui aurait impliqué d'éteindre le serveur, donc de de stopper toutes les opérations / actions menées par celui-ci et aurait alerté immédiatement le ou les gestionnaires du service (pouvant entraîner la perte, l'effacement ou le chiffrement des données présentes sur tous les autres serveurs).

Parmi ces serveurs, les enquêteurs parvenaient à identifier le serveur de « management »[3] (en gras dans le tableau ci-dessus), c'est-à-dire le serveur qui communique et permet l'administration des autres serveurs.

Ce serveur était copié puis saisi et scellé

Pour permettre la copie, il devait être redémarré. OVH informait les enquêteurs que le client avait tenté de le redémarrer à distance au bout de 2 ou 3 minutes puis avait déposé un ticket d'incident 7 minutes après le début de l'arrêt, démontrant que les administrateurs surveillaient de près l'infrastructure ;

---

[2] Il s'agit d'un serveur mis à disposition d'un client par un hébergeur ; ainsi toute manipulation nécessite un redémarrage
[3] IP 137.74.94.229 portant le nom de domaine « mgmt2.fr1.lgk.one »

SBU – LAW ENFORCEMENT

L'IP de connexion de ce serveur était notamment en lien avec l'adresse Email de contact du compte Linkedin shadow@bitzlato.com

L'analyse de ce serveur de management révélait que les membres de BITZLATO utilisaient une application nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un tchat interne et une messagerie instantanée. :

L'analyse de l'application **MATTERMOST** mettait en lumière les éléments suivants :

- Le serveur de management était administré par « DREY » alias Andrei PRYHODKO (informaticien), « MI2016 » alias Mike LUNOV (CEO de l'entreprise) et « Mr Note » ou « vanch » alias Ivan BONDAREV :

- 132 profils utilisateurs étaient répertoriés, 1156 conversations de groupe ou privées représentant 505 110 messages, 121 chanels de plus de deux personnes et 15 868 fichiers, entre le 9 avril 2018 et le 4 mai 2022.

- L'analyse permettait de comprendre le fonctionnement BITZLATO et de récupérer des messages relatifs à de potentiels partenaires, la comptabilité, le recrutement, la RH, des éléments de marketing, l'architecture technique de la plateforme et son développement, des échanges liés aux crypto-actifs…

Il ressortait de l'exploitation d'un document intitulé « Compliance buts de la compagnie « Bitzlato » » découvert dans le serveur Mattermost, dans une conversation de groupe de 3 participants (Michael LUNOV, Anton SHKURENKO et Anatoli LEGKODYMOV) qu'un audit, réalisé par la société CRYSTAL, avait été sollicité par la société BITZLATO afin de mettre en œuvre un processus de conformité de la plateforme conforme aux normes internationales. Le document, bien que non daté, était antérieur à l'été 2021 période qu'il mentionnait pour la mise en œuvre à venir de nouveaux amendements. Le rapport recommandait la mise en œuvre de plusieurs procédures telles que :

- une politique de prévention du blanchiment des capitaux (AML) en identifiant les actions pouvant être considérées comme suspectes et les ressources interdites,

- une procédure de connaissance du client (« Know your custumer » ou KYC)[4] qui va s'imposer à la plate-forme si elle veut continuer à fonctionner et se réfère aux recommandations du GAFI en la matière,

- une procédure de connaissance de ses transactions (KYC). A cet égard, l'audit révélait que 8 à 9 % des dépôts acceptés par la société proviendraient de fonds criminels et qu'a ce sens la plateforme servirait, pour certains utilisateurs, d'intermédiaire pour le blanchiment d'argent.

L'audit proposait des solutions en responsabilisant les employés (notamment NDA accord de confidentialité) et en créant trois départements nécessaires au processus de confidentialité KYC AML et antifraude. Au final le but était d'adopter une politique de conformité rigoureuse permettant de présenter une éthique de la société mettant en confiance les clients et responsabilisait les salariés. Cet audit était sollicité par Bitzlato pour se conformer aux normes internationales et éviter des sanctions. Il révélait qu'une partie des dépôts acceptés proviendraient de fonds criminels et proposait les solutions pour les déceler et apporter une réponse adéquate à leur traitement.

Ce rapport révélait de fait aux dirigeants de la société qu'une partie des fonds de leur plateforme étaient douteux sans préjuger du fait qu'ils avaient connaissance en amont de cette information.

Toutefois, selon plusieurs sites Web, le service Bitzlato ne demandait pas de vérification d'identité ou KYC à ses clients :

---

[4] Le processus de « Know Your Customer »› est indispensable pour évaluer le risque client afin de lutter contre la fraude, prévenir les risques de blanchiment d'argent et financement du terrorisme. Il doit concerner tous les clients physiques mais également les personnes morales en lien avec la société. Pour une compliance optimale, ce processus doit intervenir dès l'ouverture de compte client et des contrôles réguliers à différents échelons doivent être mis en place tout au long de la relation commerciale. Ce qui n'est pas mis en place par la société qui n'oblige pas aux clients de règles d'identification et de vérification.

SBU – LAW ENFORCEMENT

**Why trade on Bitzlato?**

• Buy and sell cryptocurrency without any commission — 0% fee for everything. 0% — if you respond to another user's ad, 0% — if somebody responded to your ad, 0% — if you create an ad.
• No strict KYC policy. You do not need to pass verification on the platform to participate in cryptocurrency trading.
• Bitzlato supports any payment method.
• 2 user interfaces: Web-platform and Telegram-bot.

Capture d'écran provenant du site web *businessday.ng*[2]

Les autorités des Etats-Unis d'Amérique transmettaient aux enquêteurs des documents renfermant des données récoltées auprès de plusieurs fournisseurs de service internet basés aux Etats-Unis et utilisés par les employés de la société Bitzlato pour discuter de leurs activités commerciales en interne et/ou avec leurs clients. Il ressortait d'une analyse comparative des sociétés concurrentes (9 échangeurs de crypto-actifs[5]) de Bitzlato que cette dernière faisait de l'absence de KYC un avantage commercial / concurrentiel.

Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC lors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plateforme était peu regardante sur l'identité de ses clients.

Sur le site de Bitzlato (http://bitzlato.com ) un filtre permettait de n'afficher sur la plateforme que les annonces des vendeurs dont l'identité avait été vérifiée :



*https://bitzlato.com/p2p/buy-btc-rub*

En effet, dans l'onglet P2P trading, un filtre permet : « Verified users : Show ads of verified traders only » (capture d'écran ci-dessus)

Il s'en déduisait que la vérification du compte n'était pas obligatoire sur la plateforme et qu'il était possible de vendre de la crypto monnaie avec un compte non vérifié, notamment pour trader en Peer To Peer.

Dans un document vraisemblablement en date du 15 mars 2022 rattaché à l'adresse Mike@bitzlato.com , s'agissant d'un « Mémo » à destination des employés de la société Bitzlato, il était

---

[5] LocalBitcoin, Paxful, Binance P2P, HodlHidl, Chatex, LocalCryptos, Bestchange, Expo et Kuna.

évoqué la stratégie à mettre en place concernant notamment la nécessité d'une politique AML (prévention du blanchiment de capitaux) et KYC (connaissance du client).

Il ressortait de l'exploitation du MATTERMOST plusieurs conversations dans lesquelles des membres de la société BITZLATO évoquaient des activités de la société possiblement en rapport avec des activités illicites en citant notamment « Hydra, scam et virus ».

Il ressortait ainsi plusieurs conversations dans lesquelles l'utilisateur @legkodymov identifié comme étant Anatolii LEGKODYMOV, membre fondateur (associé) de la société Bitzlato, évoquait des activités illégales dans le cadre de l'activité de la société BITZLATO.

A titre d'illustration, plusieurs conversations en 2018-2019 entre Anatolii LEGKODYMOV et Anton CHKURENKO, autre membre fondateur (associé) de la société Bitzlato et identifié dans le Mattermost comme @ashkurenko, faisaient état qu'une partie de leur chiffre d'affaire était issue du placement de personnes se livrant au trafic de stupéfiants. Ils s'interrogeaient sur la façon de gérer la présence de ces fonds provenant de trafic de stupéfiants avec la possibilité d'exclure occasionnellement des utilisateurs afin de démontrer leur action de contrôle. Toutefois, il en ressort que ce contrôle serait perfectible en raison d'une volonté de garder une partie de cette clientèle :

| | | |
|---|---|---|
| 04/10/2018 08:37:52 | @ashkurenko | по сути, если мы серьезно объявим борьбу с наркоторговцами, он просто свалят на другую платформу. Мое предложение что надо номинально бороться, те, блокировать раз в месяц когда явно можно найти, а вот поддерживать рвение наших арбитров в поисках наркоманов, мне кажется это не очень правильно с точки зрения бизнеса. |
| | | **En fait, si nous déclarons sérieusement la guerre aux trafiquants de drogue, ils vont juste se barrer sur une autre plateforme. Ma proposition est qu'il faut lutter nominalement, c'est à dire, bloquer une fois par mois quand on peut trouver d'une façon évidente, mais soutenir l'entrain de nos arbitres à la recherche des drogués, il me semble que ça ne serait pas judicieux du point de vue du business.** |
| 04/10/2018 08:39:31 | @legkodymov | и естественно он вычиляя наркоматорговлю, надеется что деньги с заблокированого счёта будут бонусом |
| | | **Et bien sûr en cherchant le marché des drogués (narcomarché), il espère que l'argent du compte bloqué sera un bonus** |

| Horaire | Pseudonyme | Original | Traduction interprété |
|---|---|---|---|
| 04/10/2018 07:12:12 | @ashkurenko | Привет | Salut |
| 04/10/2018 07:12:23 | @ashkurenko | у нас угрожающая ситуация в БТЦ | Nous avons une situation menaçante à BTZ |
| 04/10/2018 07:12:46 | @ashkurenko | нет мелких торговцев, похоку их шупала борьба с наркоманией | Il n'y a pas de petits marchands, on a l'impression qu'ils ont eu peur de la lutte contre les drogués |
| 04/10/2018 07:13:29 | @ashkurenko | у нас объявления от 5000 на покупку | nous avons des annonces à partir de 5000 pour l'achat |
| 04/10/2018 07:13:51 | @ashkurenko | ко наверное, на 1000-3000 только нарки закупаются | mais il me semble qu'il n'y a que les drogués qui font des achats de 1000-3000 |
| 04/10/2018 07:14:27 | @legkodymov | Ну я посмотрел отчет, вроде несто | oui je regardais le rapport, ça va |
| 04/10/2018 07:19:48 | @ashkurenko | мне не приходят отчёты от старых ботов | je n'ai pas des rapports des anciens bots |
| 04/10/2018 08:35:15 | @ashkurenko | Я на очет наркоматзивнов | au sujet des magasins de drogue |
| 04/10/2018 08:35:25 | @ashkurenko | еще хочу обсудить | je veux en parler |
| 04/10/2018 08:37:52 | @ashkurenko | по сути, если мы серьезно объявим борьбу с наркоторговцами, он просто свалат на другую платформу. Мое предложение что надо номинально бороться, те, блокировать раз в месяц когда явно можно найти, а вот поддерживать рвение наших арбитров в поисках наркоманов, мне кажется это не очень правильно с точки зрения бизнеса. | En fait, si nous déclarons sérieusement la guerre aux trafiquants de drogue, ils vont juste se barrer sur une autre plateforme. Ma proposition est qu'il faut lutter nominalement, c'est à dire, bloquer une fois par mois quand on peut trouver d'une façon évidente, mais soutenir l'entrain de nos arbitres à la recherche des drogués, il me semble que ça ne serait pas judicieux du point de vue du business. |
| 04/10/2018 08:38:14 | @legkodymov | мне важно твое мнение. | ton opinion est importante pour moi |
| 04/10/2018 08:38:59 | @legkodymov | у у нас только один арбитр | nous n'avons qu'un seul arbitre |
| 04/10/2018 08:39:19 | @ashkurenko | если правильно я пра понял дела серьезно | si j'ai bien compris il a pris l'affaire au sérieux |
| 04/10/2018 08:39:31 | @legkodymov | и естественно он вычиляя наркоматорговлю, надеется что деньги с заблокированого счёта будут бонусом | et bien sûr en cherchant le marché des drogués (narcomarché), il espère que l'argent du compte bloqué sera un bonus |
| 04/10/2018 08:40:17 | @legkodymov | надо придерживаться той политики какая в банках | il faut tenir la même politique que dans les banques |
| 04/10/2018 08:40:19 | @legkodymov | Я незнаю как в банках | je ne sais pas comment ils font dans les banques |
| 04/10/2018 08:40:37 | @legkodymov | Наверкое если сделать перевод "за коноплю", тогда | je suppose que quand vous faites un virement « pour le hashich », alors c'est sûr |
| 04/10/2018 08:40:37 | @legkodymov | блокнут конечно | qu'il bloque |
| 04/10/2018 08:40:46 | @legkodymov | а так никто не будет особо искать | sinon personne ne cherchera particulièrement |
| 04/10/2018 08:49:50 | @legkodymov | Ну банки избавятся | oh les banques elles s'en débarassent |
| 04/10/2018 08:50:02 | @ashkurenko | от таких клиентов | de ces clients |
| 04/10/2018 08:50:18 | @ashkurenko | И еще СБ банка, ментам шепкет | et encore la CB de la banque sera donnée aux flics |

| 08/03/2019 01:25:51 | @ashkurenko | Давай на совещании. У меня стойкая уверенность, что у нас нет людей в платформе, кому интересны наши новые продукты, ну, у нас сформировавшийся костяк с нишевой потребностью. Вообщем обсудим. |
| | | On en parlera à la réunion. Je suis sûr que nous n'avons pas de personnes sur la plateforme qui sont intéressés par nos nouveaux produits, c'est dire, que nous avons un noyau dur formé avec une demande de niche. Bref, on en discutera. |
| 08/03/2019 02:15:36 | @ashkurenko | Ну, хоть обороты растут. |
| | | Bon, le chiffre d'affaire augmente |
| 08/03/2019 05:31:23 | @legkodymo | Да, одни наркоманы |
| | | Oui, il n'y a que des drogués |

De même ils estimaient que la part de leur chiffre d'affaires en rapport avec le trafic de stupéfiants se situait entre 4,5 et 30 %. Il apparaissait qu'ils avaient identifié certains des trafiquants qui étaient leurs utilisateurs puisqu'ils évoquaient une commission de 3 % les concernant :

| | | Feuillet n° 374 |
| 08/08/2019 15:59:17 | @legkodymov | И большинство денег (77%) приносит нам крупняк, а наркоманы приносят нам только 4,5% выручки |
| | | La plus grande partie de l'argent (77%) nous est apportée par les gros, et les drogués ne nous rapportent que 4,5 % |
| | | У нас в сервисе за последний месяц 105 тыс сделок, на 1160 битков, средний чек 0.011 BTC, при этом кто-то даже сделал 1 сделку на 1.995 BTC (отредактировано) И них сделок меньше чем на 0.002 монеты (1500 руб) сделано на 53 битка, но при этом 42 тыс сделок (практически половина) Из них сделок меньше чем 0.011 монеты (8тыс руб), тоесть наш средний чек, сделано на 265 битков и это составляет 87тыс сделок (большая часть) (отредактировано) Итого могу сделать вывод что 18 тыс сделок (17%), приносят нам 900 битков (77%) оборота. И большинство денег (77%) приносит нам крупняк, а наркоманы приносят нам только 4,5% выручки |
| 08/08/2019 15:59:46 | @legkodymov | « Les drogués ne nous apportent que 4,5 % de bénéfices » |
| 08/08/2019 16:03:16 | @ashkurenko | может наркобарон быть у нас |
| | | Peut etre que nous avons un baron de la drogue chez nous |
| 08/08/2019 16:03:58 | @ashkurenko | я про связи крупняка и наркоманов |
| | | Je parle des liens des gros avec les drogués |
| 08/08/2019 16:04:53 | @ashkurenko | Ну условно дропаем наркош и уходит 30% оборота |
| | | Et bien on peut dire que si on drop les narcos on perd 30 % de chiffre d'affaire |
| 08/08/2019 16:08:19 | @legkodymov | Дропаем наркош - уходит 4.5% |
| | | On drop les narcos – on perd 4,5 % |
| 08/08/2019 16:08:53 | @legkodymov | Мы можем очень круто монетизироват ся на рекламе. Наркам одно, VIP другое |
| | | on peut faire beaucoup de monnaie sur les publicités. Un pour les narcos, un autre pour les VIP. |
| 16/08/2019 08:52:27 | @ashkurenko | 1. Нам для наркош надо делать комиссии до 3-х% |
| | | Pour les narcos on doit faire la commission de 3 % |
| 16/08/2019 17:05:24 | @legkodymov | Блин про наркош не обсудили. По хорошему каждый зашедший должен оставлять $2 в месяц минимум |
| | | Flûte on n'a pas parlé de narcos. Au mieux chaque entrant doit laisser de 2$ par mois minimum |

Il ressort de ces conversations que les deux associés de Bitzlato évoquent le fait d'être informés qu'une partie de leur chiffre est issue du placement de personnes se livrant au trafic de stupéfiants.

Notons que ces conversations sont en date de 2018-2019 et qu'ils s'interrogent sur la façon de gérer la présence de ces fonds provenant de trafic de stupéfiant avec la possibilité d'exclure occasionnellement des utilisateurs afin de démontrer leur action de contrôle. Toutefois, il ressort également que ce contrôle serait perfectible en raison d'une volonté de garder une partie de cette clientèle.

Les enquêteurs se livraient à une analyse des contreparties (counterparties) en Bitcoin sur trois périodes successives afin d'évaluer le risque de l'origine frauduleuse de la contrepartie réalisée par la société Bitzlato. Il en ressortait que le pourcentage de transactions à haut risque ou à risque sévère était important sur les périodes examinées :

| Périodes | Montants envoyés | Montants reçus |
|---|---|---|
| Pré-compliance d'avril 2018 à mai 2021 | 26,67 % | 21,18 % |
| Transition supposée de compliance du 1er juin 2021 au 31 août 2021 | 36,94 % | 25,10 % |
| Post période supposée de compliance du 1er septembre 2021 au 09 janvier 2023 | 19,79 % | 12,97 % |

De même, les autorités américaines faisaient parvenir aux enquêteurs un document comportant un recoupement d'informations et de conversations présents dans les serveurs du Freshdesk[6] de la société Bitzlato portant principalement sur les transferts de crypto-actifs de et vers HYDRA, DROP, CRYPTO-MONNAIE SALE et DARKNET.

> ➢ **s'agissant des crypto-actifs**

L'analyse du serveur de management faisait état de :

- 4.562.929 « wallets »

- 5.785.656 transferts « dépôts » entre le 06/05/2018 et le 29/09/2022

> ➢ montants totaux transférés : 106 322.57374746 BTC et 138 663.89864867 ETH

- 3.041.916 transferts « withdrawal » entre le 26/05/2018 et le 29/09/2022

> ➢ montants totaux transférés : 103 612.89387937 BTC et 134 942.91348885 ETH

Ainsi, du début de l'activité de la plateforme en mai 2018 jusqu'au 03 janvier 2023, les enquêteurs relevaient les montants ci-après :

- flux entrants :     1 926 678 511 euros

- flux sortants : 1 786 117 237 euros

L'exploitation du serveur de management nommé « mgmt2 », et notamment du ficher temporaire comportant 2760 92 adresses de crypto-actifs adossées à la blockchain Bitcoin, permettait aux enquêteurs d'établir les constatations suivantes, sur la base d'un échantillonnage de 100 adresses relevées aléatoirement dans le ficher (**D398/2**):



**Activités sur adresses utilisées**

■ Activités illicites
■ Activités normales

32 %
68 %

---

[6] Freshdesk est un système de gestion des tickets basé sur le Cloud qui aide les sociétés à simplifier leurs processus de support client. (cf **D573**)

SBU - LAW ENFORCEMENT

Il en ressortait que 68% des adresses présentaient un lien avec des activités illicites de la cryptosphère, ce qui semblait cohérent au regard du rapport annuel publié par la société Chainalisys en 2022, évoqué supra, qui indiquait que 76% des fonds reçus sur cet échangeur provenait d'activité illicites.

Les enquêteurs consultaient, à l'aide d'un outil de « tracing » et de « clustering »[7] les expositions[8] du cluster de Bitzlato.com, composé de 256 589 adresses publiques, avec les clusters liés à des services sanctionnés par OFAC[9], au niveau de la Blockchain Bitcoin.

S'agissant des réceptions directes, les enquêteurs constataient la présence d'exposition au niveau de plusieurs catégories malveillantes qu'ils présentaient sous forme de tableau synthétique :

| Catégories | Montant en BTC | Pourcentage vis à vis du flux |
|---|---|---|
| Rançongiciels | 19,052 BTC | 0,37 % |
| Vol de fonds | 0,02 BTC | 0,02 % |
| Financement terrorisme | 0,00012 BTC | 0,00 % |
| Arnaque | 4862,5249 BTC | 4,09 % |

Il était également mis en relief la présence de sanctions faites par l'OFAC[10] pour diverses raisons :

| Raison de la sanction | Date de la sanction | Montant en BTC | Pourcentage |
|---|---|---|---|
| OFAC SDN Blender.io | 06 mai 2022 | 148,181 BTC | 1,19 % |
| OFAC SDN Chatex.com | 08 novembre 2021 | 197,3505 BTC | 1,59 % |
| OFAC SDN Garantex.io | 05 avril 2022 | 1866,3096 BTC | 15,04 % |
| OFAC SDN Hydra MarketPlace | 05 avril 2022 | 10103,4163 BTC | 81,41 % |

S'agissant des envois directs, les enquêteurs constataient également la présence d'expositions au niveau de plusieurs catégories malveillantes :

| Catégories | Montant en BTC | Pourcentage vis à vis du flux |
|---|---|---|
| Vol de fonds | 19,8756 BTC | 0,02 % |
| Financement terrorisme | 0,0228 BTC | 0,00 % |
| Arnaque | 1095,091 BTC | 8,49 % |

Etaient également relevées la présence de sanctions avec des montants en BTC :

---

[7] Il s'agit de l'outil « reactor » de la société Chainalysis qui permet notamment de regrouper des adresses appartenant à une même personne ou entité et donc de consulter toutes les transactions de différentes adresses appartenant à cette même personne ou entité. Il permet également d'analyser la réputation des adresses et clusters .

[8] L'exposition directe correspond à un transfert de fond du cluster Bitzlato vers le cluster du service sanctionné par l'OFAC sans qu'il y ait de rebond entre les deux L'exposition indirecte correspond quant à elle à un transfert entre les deux clusters mais avec des rebonds de transactions ce qui ne les lient pas directement.

[9] Les services référencés comme "sanction", et donc sanctionnés par l'OFAC, n'ont pas respecté la loi américaine en matière de lutte ant-blanchiment ou de protection des clients ou encore sont des plateformes ou services illégaux (marché noir, piratage informatique, actions malveillantes. pédocriminalité )

[10] **Blender.io** est un mélangeur de crypto-monnaie créé en 2017 et sanctionné en 2022 pour avoir aidé le groupe Lazarus, un groupe de pirates informatiques associé au gouvernement de la Corée du Nord

**Chatex.com** est un mélangeur de crypto-monnaie sanctionné en 2021 pour avoir facilité les transactions financières d'un groupe de pirates mettant en œuvre des rançongiciels

**Hydra** était le plus grand marché illégal du Darkweb, connu pour son important trafic de drogue Il a été sanctionné le 05 avril 2022 tout comme Garantex

**Garantex.io** est un échangeur de crypto-actif fondé en 2019 et enregistré en Estonie Il a fait l'objet d'une sanction en 2022 pour être associé avec divers marchés du darkweb dont Hydra

| Raison de la sanction | Date de la sanction | Montant en BTC | Pourcentage |
|---|---|---|---|
| OFAC SDN Blender.io | 06 mai 2022 | 9246,7311 BTC | 61,24 % |
| OFAC SDN Chatex.com | 08 novembre 2021 | 163,7378 BTC | 1,08 % |
| OFAC SDN Garantex.io | 05 avril 2022 | 5514,272 BTC | 36,52 % |
| OFAC SDN Hydra MarketPlace | 05 avril 2022 | 65,3193 BTC | 0,43 % |

Il ressortait des investigations que l'exposition des différentes adresses de crypto-actifs de l'échangeur étaient issues en majorité d'activités illicites.

Ainsi, pour les fonds reçus sur BITZLATO, il a été calculé, par service criminel, le volume d'activité suivant :

- 19,7% du volume d'activité de HYDRA MARKET PLACE[11] (sanction par l'OFAC[12]) représentant 171 millions de dollars,

- 9% du volume d'activité du scam FINIKO représentant 138 millions de dollars,

- 3,6 % du volume de GARENTEX (sanctionné par l'OFAC) représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

- 14,75 % du volume d'activité de HYDRA MARKET PLACE soit 125 millions de dollars. 83 223 comptes Hydra ont reçu des $BTC directement depuis le cluster Bitzlato

- 14,4 % du volume d'activité du scam FINIKO soit 225 millions de dollars,

- 8,8 % du volume d'activité de GARENTEX soit 174 millions de dollars.

Les investigations permettaient également de relever des expositions directes avec des ransomwaes comme Dharma et Phobos, des services de mixing

L'analyse des adresses Binance de LUNOV, le CEO de BITZLATO, faisait état de l'envoi de 2 transactions vers HYDRA et de la réception indirecte des fonds du darkmarketplace .

Par ailleurs, 2,5 millions de dollars ont été envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de ransomwares, notamment Maza et Mailto (Netwalker)

Les enquêteurs relevaient même des liens avec le hack de la plateforme FTX en 2022, les fonds ayant transité par des services de mixing

En outre, deux adresses de BITZLATO ont reçu plus de 65 millions de dollars depuis mars 2022 de WASABI WALLET MIXEUR.

Le plus gros montant de Bitcoin échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros.

Les wallets de Bitzlato présentaient également des liens avec des adresses e-mail associées à des utilisations de contenus pédopornographiques ou encore d'attaques aux STAD telles que DDOS

Un rapprochement permettait également la mise en évidence de 2 852 procédures judiciaires à travers le monde en lien avec l'échangeur Bitzlato. Aussi, 90,9 % de ces rapprochements concernaient des ransomwares et le reste des signalements correspondait principalement à des escroqueries. (D509)

Une opération de demixing permettait la mise en évidence de liens indirects entre la plateforme Bitzlato et des ransomwares, tel que Maze et Netwalker (mailto), MEDUSALOCKER par l'utilisation de services de mixages

---

[11] Sur **HYDRA** : Voir le rapport de FlashPoint Intelligence / Chainalisys

[12] L'Office of Foreign Assets Control (OFAC) est un organisme de contrôle financier, dépendant du Département du Trésor des États-Unis. Cet « office de contrôle des actifs étrangers » est chargé de l'application des sanctions internationales américaines dans le domaine financier, notamment dans le cadre du Foreign Corrupt Practices Act (FCPA) de 1977.

SBU-LAW ENFORCEMENT

Parmi les utilisateurs de la plateforme Bitzlato qui avaient procédé à des transferts de fonds vers des « échangeurs crypto » dont Binance, les enquêteurs parvenaient, grâce à un important travail de traçabilité, à identifier ceux qui avaient effectué des retraits à destinations de cet exchange et les montants correspondants ainsi que la provenance des fonds afin d'en déterminer une éventuelle nature délictueuse. Ainsi, les enquêteurs établissaient une liste d'individus disposant d'un compte domicilié chez Binance et Bitstamp, et alimenté par des flux ayant transité par Bitzlato, flux provenant eux-mêmes d'activités illicites.

A titre d'illustration, les enquêteurs procédaient à l'analyse des flux concernant l'adresse Binance détenue par un certain KOSTANTIN GORDON né le 18 avril 1982 (de nationalité russe) à savoir 18gfUKZPXNmS71S2vThehN8rECC2pByrjQ destinataire de fonds en provenance de Bitzlato et parvenait à identifier une autre adresse détenue sur ce même compte à savoir TA9sKXFQXrNsYB19tJHiihufR8FtpgUML3. Cette dernière, adresse de dépôt de Binance également utilisée par Konstantin GORON, avait reçu des fonds très conséquents en USDT sur la blockchain TRON en provenant de l'échangeur crypto GARANTEX.IO sanctionné par l'OFAC pour des infractions de blanchiment[13]. Les échanges portaient en effet sur 112 transactions entrantes, du 17 mars 2022 au 20 novembre 2022, de GARANTEX.IO vers l'adresse de dépôt Binance pour un montant de 39 856 923 $ effectuées:



Des saisies d'actifs numériques étaient pratiquées par les enquêteurs sur les wallets comportant des soldes importants pour un total de plus de 19 millions d'euros (**D393 à D396** et **D515 à D538**).

- **La société LGK POWER LIMITED**

Les enquêteurs s'intéressaient à la société LGK LIMITED dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato.

Il résultait de l'exploitation de ces documents que le dirigeant de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit chinois avait été créée en 2014 avait pour associés :

- LEGKODYMOV Anatolii, directeur général

- SKURENKO Anton

- SHAKNOV Sergei.

Son siège social est également au UNIT 617, 6 1 F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG et a recours aux services d'une société de secrétariat « First Company of Consulting and Secretariat Services Limited. Son objet social est le développement et la programmation de

---

[13] Voir note n°8

logiciels pour les banques et les organisations commerciales ainsi que la création et la conduite de projets blockchain

Un schéma relationnel des entités liées à la société LG POWER LTD était réalisé par les enquêteurs

- **La société A-XBT**

Les enquêteurs s'intéressaient à la société A-XBT dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato.

Il résultait de l'exploitation de ces documents que le dirigeant historique de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit russe avait été créée en 2013 avait pour associés à la fondation :

- LEGKODYMOV Anatolii

- SKURENKO Anton

- SHAKNOV Sergei

Actuellement seul SKURENKO Anton est associé.

Les nouveaux directeurs généraux sont SKURENKO Anton et KOVALENKO Dmitriy

Son siège social est 141980 région de moscou, - CH Shchelkovskoe, maison 113, salle 18 et son objet social porte sur les activités liées à l'utilisation de l'informatique et technologies de l'information, traitement des données et autres activités non interdites. Il ressort de recherches en sources ouvertes que la société A-XBT fourni une prestation de location de container de minage.

Un schéma relationnel de la société A-XBT était réalisé par les enquêteurs.

- **La société GUAROO**

Les enquêteurs s'intéressaient à la société GUAROO dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato. (**D163**)

Il résultait de l'exploitation de ces documents que le dirigeant historique de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit russe avait été créée en 2016 avait pour associé à la fondation : DOLIC Jakov.

Les nouveaux directeurs généraux étaient SHAKHNOV Sergei et DOLIC Jakov.

Son siège social était 109202 Moscou, Karacharovskaya 2 ème rue, maison 1 bâtiment 1, salle 15 et son objet social portait sur le conseil, travail et gestion informatique. Traitement de données et hébergement d'informations. Cette société était liquidée le 13 septembre 2019.

Une opération coordonnée par Eurojust entre, d'une part, plusieurs pays européens (Espagne, Portugal, Chypre) sur le fondement de décisions d'enquête européennes émises par le parquet de Paris et les autorités des Etats-Unis d'Amérique, d'autres part, était réalisée le 18 janvier 2023 aux fins d'interpellations et d'audition des principaux protagonistes de la société Bitzlato ainsi que de perquisition de leur domicile.

En résumé :

SBU - LAW ENFORCEMENT

- Anatolii LEGKODYMOV a eu des fonctions de direction dans la societe A-XBT ;

- Anatolii LEGKODYMOV est en relation étroite avec un des associes de la societe Bitzlato, Anton SHKURENKO. Ils conviennent, entre 2018 et 2019, qu'une partie du chiffre d'affaires de la société repose sur des fonds d'origine douteuse, lies aux trafics de stupéfiants. Ils entendent créer une apparence de contrôle afin de gagner en respectabilité mais sont réticents à se priver d'une partie de cette source de revenu.

- Anatolii LEGKODYMOV a une réelle action dans la société BITZLATO et participe à nombre de groupes de discussion du Mattermost où sont échangés des messages en rapport avec la gestion des affaires de la société. Il a par ailleurs demeuré en Chine avec les membres de sa famille. Rappelons que BITZLATO est une société de droit chinois.

- Il participe au groupe de discussions << stable » du Mattermost dans lequel la stratégie de mise en place de Monolithos DAO est exposée. Sur ce groupe Dmitry KRYSHTAL, de l'équipe marketing de Bitzlato, fait une promotion importante de la cryptomonnaie MCR (Monolith Crypto Ruble), qui est un stable coin indexé sur le rouble et est créé par Bitzlato. L'utilisation du MCR est promu sur le forum darkmoney. Le Darkmoney.lc est un forum en langue russe/ukrainienne qui sert manifestement de transactions pour des biens ou services d'origine douteuse, dont des services de blanchiment en cryptomonnaie. Sur ce forum est présent l'utilisateur Monolithos DAO, qui est actif entre mars 2020 et mars 2021. Il propose, en soulignant bien ce fait, d'acheter MCR sans cryptomonnaie et sans vérification depuis le bot Bitzlato. Il renvoie au compte youtube MonolithosDAO sur lequel Dmitry KRYSHTAL fait la promotion de monolith.

**<u>Concernant le lien avec les rançongiciels :</u>**

Les investigations ont permis de mettre en exergue les expositions du cluster BITZLATO avec les rançongiciels MAZE et NETWALKER via le mixer BITMIX.BIZ.

En effet, une opération de demixing était mise en oeuvre grâce à la recension de 11 clusters composés de 54 adresses de réception connues comme affiliées à un rançongiciel. Le demixing était effectué grâce aux outils « Reactor » et « Clain ». En effet, sur tin cluster de 201 transferts liés à BITZLATO, 36 transactions provenaient de BITMIX.BIZ. Le mixeur BITMIX.BIZ fonctionnait par le biais d'une securityfeature séparant chaque flux entrant en 2 transactions sortantes : cet outil rendait donc plus difficile la découverte de l'origine des fonds entrants. (D408/11) Une adresse sur circulant BITZLATO et correspondant à l'empreinte numérique de BITMIX.BIZ recevait des Bitcoins d'une adresse en exposition directe avec le rançongiciel MAZE. L'origine frauduleuse de certains fonds en transit sur BITZLATO était donc claire.

L'adresse clusterisée par les enquêteurs américains bc1qkqh9wjmnq90gkwemg2yrivktw2wd74u80kd3wyt, correspondant à 54 adresses, envoyait un total de 284,1111 BTC sur l'échangeur BITZLATO depuis des adresses affiliées à des rançongiciels (MAZE et MAILTONETWALKER). La quasi-totalité de ces fonds passait par le mixeur BITMIX.BIZ. Cette opération de demixing mettait en lumière le blanchiment d'argent issu de rançongiciels par le biais d'un mixeur

A partir de l'analyse des mouvements des cryptoactifs du user 35, les enquêteurs mettaient ainsi en évidence de nombreuses transactions d'users BITZLATO en lien avec des ransomwares tels que TRICKBOT, DHARMA RANSOMWARE ou encore NETWALKER, lesquels présentaient également des liens avec HYDRAMARKETPLACE, GARANTEX (sanctionnées par l'OFAC), CRYPTOMIXER ou encore FINIKO.

Les investigations permettaient également de mettre en exergue l'exposition du cluster BITZLATO avec le rançongiciel MEDUSA LOCKER.

Une opération de traçage via l'outil Chainalysis permettait en effet de remonter à un cluster ayant reçu et retransmis près de 33 BTC sur la période du 01/11/2018 au 12/10/2020 : a minima 42% des fonds entrants l'équivalent de 133 167 euros) provenaient du rançongiciel MEDUSA LOCKER, et étaient blanchis au moyen d'échangeurs-dont BITZLATO. Une grande partie des fonds allait aussi vers HYDRA.

Il était en outre mis en exergue l'exposition du cluster BITZLATO avec l'escroquerie QUBITTECH. Un échange entre @drey (identifié comme BONDAREV Ivan) et @legkodymov (LEGKODYMOV Anatolii) dans le serveur Mattermost permettait d'identifier une clé publique de la chaîne BTC, ainsi que sa clé privée. En effet, LEGKODYMOV Anatolii exportait la clé privée dans l'application BITCOINCORE, générant ainsi sa clé publique et nous donnant la possibilité de la récupérer :1DEKCIVIHDHeFLmEBA5ANbYglbJ35duLdooh. Les enquêteurs déterminaient qu'elle était directement associée à BITZLATO LTD, et sans doute plus précisément à ses administrateurs. Or une analyse permettait de relever que les fonds entrants sur cette clé publique provenaient indirectement à 98.57% de l'escroquerie QUBITTECH (arnaque de type Pyramide de Ponzi). En effet, une adresse entrante sur la clé 1DEKCIVIHDHeFLmEBA5ANbYg1bJ35duLdooh était liée au cluster d'adresses de l'échangeur CRYPTONATOR, et l'outil CHAINALYSIS permettait de voir que les fonds entrants sur cette adresse venaient tous de QubitTech.ai. Ce comportement était potentiellement mis en place pour brouiller les transactions et complexifier le traçage de la destination des fonds frauduleux.

Anatoly Legkodymov savait depuis le début que Bitzlato était largement utilisé par les criminels :

- **Elémets sur la connaissance de Legkodymov en 2018-2019**

Des exemples de communications de Legkodymov démontrant la connaissance de transactions illicites en 2018-2019 sont présentés ci-dessous :

➢ En octobre 2018, le partenaire et cofondateur de Legkodymov dans Bitzlato a signalé à Legkodymov que Bitzlato avait été abandonné par des « *petits trafiquants* » qui avaient été « *effrayés par la guerre contre la drogue* ». Son interlocuteur a alors préconisé d'adopter une approche « *nominale* » pour « *la lutte contre les trafiquants de drogue* » – « *c'est-à-dire bloquer une fois par mois quand [ils] peuvent être clairement trouvés* ».

Legkodymov a en substance acquiescé et a préconisé de fermer les yeux sur les transactions liées à la drogue en bloquant uniquement les transactions où les parties à la transaction faisaient explicitement référence à la drogue.

➢ Le 23 avril 2019, le partenaire et cofondateur de Legkodymov dans Bitzlato a averti ses collègues, dont Legkodymov , que « *les clients de Bitzlato sont des toxicomanes qui achètent de la drogue sur le site d'Hydra* ». Legkodymov a répondu en proposant d'étendre les services de Bitzlato aux particuliers ordinaires en quête de confidentialité.

➢ Le 29 mai 2019, Legkodymov a écrit à un collègue dans un chat : « *Tous les traders sont connus pour être des escrocs. Ils négocient sur des « drop », etc. Vous réalisez qu'ils ne négocient pas tous (je pense que 90 %) avec leur carte [d'identité]* ». Plus tard dans l'année, le 22 juin 2019 ou aux alentours, Legkodymov a commenté : « *Les escrocs savent qu'il est possible d'être vérifié pour un drop et de retirer de l'argent à 100 %* ».

- **Eléments sur la connaissance de Legkodymov en 2021-2022**

Bitzlato avait une contrepartie dans dark web : Hydra Market. Hydra a été fermée grâce à une action coordonnée des forces de l'ordre américaines et allemandes le 5 avril 2022, et le ministère de la Justice a rendu public un acte d'accusation contre Dmitry Olegovich Pavlov pour complot en vue de distribuer des stupéfiants et complot en vue de commettre un blanchiment d'argent, en lien avec son exploitation et son administration des serveurs utilisés pour faire fonctionner Hydra.

SBU - LAW ENFORCEMENT

À partir de 2021, Legkodymov a de plus en plus démontré des connaissances spécifiques sur Hydra Market et a reconnu à plusieurs reprises que Bitzlato était connu pour son blanchiment d'argent. Par exemple, le 6 octobre 2021, Legkodymov a posé des questions à ses employés sur Hydra Market dans un chat et a reçu un article Wikipédia en russe. Une version de cet article, telle qu'elle est parue le 26 octobre 2021, est disponible sur Internet Archive, un projet d'archivage en ligne. Sa première phrase décrit Hydra Market comme « *le plus grand marché russe du darknet pour le trafic de drogue, la plus grande ressource au monde en termes de volume de transactions illégales avec des cryptomonnaies* ». L'article notait en outre que « *[ e ]n plus des drogues, les produits populaires sur Hydra sont de la fausse monnaie et des documents, [et] des instructions pour des activités illégales. La ressource fournit également des services tels que la vente de drogue, la sécurité Internet et le piratage de comptes* ».

Legkodymov a notamment reconnu à plusieurs reprises que les propres données de Bitzlato confirmaient ce que disaient les plateformes d'analyse de blockchain tierces : Bitzlato traitait un grand volume de transactions illicites, et plus particulièrement des transactions avec Hydra Market. Le 19 octobre 2021, par exemple, après avoir entendu que le personnel de l'industrie accusait Bitzlato de coopérer avec Hydra et de faciliter les transactions de drogue, le défendeur a écrit à ses collègues cadres supérieurs : « *D'un côté, ils ont raison à propos d'Hydra. Mais d'un autre côté, [il y a] 2,5 millions d'utilisateurs d'Hydra. Tout le monde est impliqué. Cela ne peut pas être filtré.* »

Comme exposé supra, le 14 février 2022, Chainalysis, une société d'analyse de blockchain, a publié la version 2022 de son « Crypto Crime Report » annuel, qui indiquait que les utilisateurs de Bitzlato avaient reçu 206 millions de dollars des marchés du darknet et 9 millions de dollars des attaquants de ransomware. Legkodymov s'est renseigné auprès d'un subordonné, qui a partagé avec lui le graphique ci-dessous le 25 février 2022, apparemment une capture d'écran du logiciel de filtrage des transactions de Bitzlato .

| count | transaction_entity_name |
|--------|------------------------|
| 403119 | *NULL* |
| 10 | "SatoshiMines.com" |
| 2 | "BitZino.com" |
| 546 | "Wasabi" |
| 76159 | "Hydra Market" |

Legkodymov et ses collègues ont ensuite déterminé qu'au cours des trois derniers mois, 20 % des transactions de Bitzlato avaient envoyé des fonds vers Hydra Market. « *Des retraits vers Hydra ?* » a écrit le prévenu. « *Plus de 20 % ? . . . Mettons tout à zéro, dès que possible.* »

Plus tard dans la journée, l'intéressé écrit à un collègue : « *Il s'avère que nous avons au moins 20 % de saleté. Et dans cette situation, je ne vois aucune raison de me battre avec Chainalysis .* » Le 18 février 2022, Legkodymov a écrit à son partenaire dans Bitzlato pour se plaindre que ses dirigeants ruinaient la valeur d'acquisition de Bitzlato en blanchissant de l'argent : « *À qui vais-je (allons-nous) vendre Bitzlato maintenant avec un tel rapport de Chainalysis ['?] Et c'est à 90 % dû à la direction plutôt qu'à nous.* » Une semaine plus tard, le 25 février 2022, , Legkodymov écrit à son partenaire dans Bitzlato: « *J'ai beaucoup réfléchi. Je n'arrive pas à surmonter 20 % de saleté et à être totalement ignoré. et je veux fermer l'entreprise. . . . Vous ne me soutenez pas pour me débarrasser de la saleté. Nous n'avons pas de plan, mais vous prétendez que vous n'avez aucun soutien ou autre chose. Je ne suis pas intéressé à continuer dans de telles conditions. « Je veux fermer l'entreprise et recommencer quelque chose de nouveau, à partir de zéro* », a-t-il ajouté le lendemain. « *Vous me jetez tous sous un bus. 76 000 transactions avec Hydra et aucun intérêt du tout.* »

Environ deux mois plus tard, le 7 avril 2022, Legkodymov critique son personnel de conformité pour ne pas avoir enquêté sur sa propre exposition aux fonds illicites, en utilisant les outils à sa disposition (comme le fournisseur de conformité Valega). « *Vous n'avez toujours pas calculé combien de transferts nous avons effectués vers les marchés noirs au cours des trois derniers mois (selon Valega )* », a-t-il écrit. « *Cette ignorance est alarmante.* » Le 10 avril 2022, un responsable de la conformité a signalé au défendeur qu'au

cours des six mois précédents, sur 76 000 utilisateurs actifs, 27 000 avaient tenté de transférer des fonds vers ou depuis ce que l'employé a qualifié d'adresses de cryptomonnaie « *sales* ». Un autre employé a commenté dans le même chat : « C'est juste que les services avec un faible niveau AML sont très pratiques pour les blanchisseurs [d'argent]. Dès que nous mettrons en œuvre tous les outils AML/KYC, le nombre de transactions douteuses diminuera considérablement.

Legkodymov et ses collègues ont exprimé à plusieurs reprises leur conscience que l'exploitation de Bitzlato pourrait les mettre en danger sur le plan juridique.

À l'automne 2022, lorsque Legkodymov s'est rendu aux États-Unis, il semble avoir occupé le poste de PDG par intérim de Bitzlato . Une communication de Legkodymov à ses collègues cadres supérieurs le 11 novembre 2022 illustre l'étendue de son implication et de son autorité. « *Fondamentalement* », a-t-il écrit, « *je commence à comprendre clairement où se situe le problème et ce qu'il faut faire. . . . Au cours de cette semaine, j'ai (en tant que PDG) compris que je ne m'entendais pas personnellement au travail avec la moitié du personnel (la haute direction). La haute direction n'a pas montré de résultats avant mon arrivée, [et] c'est pourquoi je changerai la moitié du personnel si je reste PDG.* »

Comme auparavant, Legkodymov a continué à réclamer des améliorations chez Bitzlato , sans apporter de réel changement. Le 7 novembre 2022, par exemple, le défendeur a exprimé son souhait de politiques KYC plus strictes, exprimant son point de vue selon lequel « *au fil des décennies d'expérience, je suis devenu convaincu que 95 % des personnes anonymes sont des criminels* ». Un collègue a répondu que la plupart des utilisateurs de Bitzlato étaient en effet des criminels, affirmant que les petits utilisateurs étaient « *l'ex-URSS, les fans de ressources obscures, les toxicomanes, les documents et autres saletés* ». En revanche, le collègue a déclaré que les utilisateurs à plus forte valeur ajoutée étaient « *des criminels. Comme vous l'avez dit, mais tous les gros bonnets vont de toute façon obtenir des « gouttes » pour leurs besoins* ». Legkodymov a répondu que « *le simple fait d'obtenir un tas de drogués à bas prix signifie que le département marketing se relâche... c'est l'erreur qui a été commise il y a plusieurs années, et je ne veux pas la répéter* ».

### III / La qualification pénale

Les faits ci-dessus exposés, commis entre le 1er décembre 2017 et le 20 janvier 2023 en tout cas depuis temps non prescrit en France, et en tour cas sur le territoire national, et de manière indivisible au Portugal, en Espagne, en Ukraine, aux Etats-Unis, en Russie et à Hong-Kong sont les suivants :

**COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C. PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C. PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE.**
Définie par ART.323-3 AL.1 C. PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**
Définie par ART.323-3 AL.1 C. PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-2 AL.1 C. PENAL.
Réprimée par ART.323-2 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'EXTORSION EN BANDE ORGANISEE**
Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C. PENAL.
Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME**
Définie par ART.450-1 AL.1, AL.2 C. PENAL.
Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE**
Définie par ART.323-4-1, ART.323-1, ART.323-2, ART.323-3, ART.323-3-1, ART.132-71 C. PENAL.
Réprimée par ART.323-4-1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT**
Définie par ART.324-2 2°, ART.324-1 AL.1, ART.132-71 C. PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.131-30 AL.1 C. PENAL.

**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**
Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C. PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C. PENAL.

### *IV – La procédure*

Le 06 septembre 2022, une enquête préliminaire était ouverte par le parquet de Paris, et confiée à la direction générale de la gendarmerie nationale des chefs de :

- Complicité d'accès frauduleux et maintien frauduleux dans un système de traitement automatisé de données (STAD) avec la circonstance qu'il en résulte une altération du système ;
- Complicité d'entrave au fonctionnement d'un STAD ;
- Complicité d'introduction frauduleuse de données dans un STAD ;
- Complicité de modification frauduleuse de données dans un STAD ;

SBU – LAW ENFORCEMENT

- Complicité d'extorsion en bande organisée ;
- Complicité d'association de malfaiteurs en vue de commettre un crime ou un délit puni de 05 ans au moins d'emprisonnement ;
- Blanchiment de crimes ou de délits commis en bande organisée.

Le 29 juillet 2024, un mandat d'arrêt national était décerné par Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, à l'encontre d'Anatolii Viktorovich LEGKODYMOV.

En effet, quand bien même Anatolii Viktorovich LEGKODYMOV a été libéré de prison après avoir été condamné à une peine d'emprisonnement dans le cadre d'un plaider coupable avec les autorités américaines, et que l'article 113-9 du code pénal français prévoit que « aucune poursuite ne peut être exercée contre une personne justifiant qu'elle a été jugée définitivement à l'étranger pour les mêmes faits et, en cas de condamnation, que la peine a été subie ou prescrite », cet article vise uniquement « les cas prévus aux articles 113-6 et 113-7 », c'est-à-dire ceux où la loi pénale française est applicable à des infractions commises hors du territoire de la République en raison de la nationalité française de son auteur ou de sa victime. S'agissant de faits commis sur le territoire national, la décision rendue par la juridiction pénale étrangère n'a pas en France l'autorité de la chose jugée.

Dans ces conditions, un mandat d'arrêt européen était décerné à l'encontre d'Anatolii Viktorovich LEGKODYMOV le 14 août 2024 par Madame Natacha RATEAU, premier vice-procureur de la République près le Tribunal judiciaire de Paris, et une demande d'arrestation provisoire en date du 20 août 2024 était adressé aux autorités américaines.

Le 23 août 2024, une demande d'extradition était adressée aux autorités américaines.

### V – Prescription

La prescription de l'action publique, qui est interrompue par les actes d'enquête et de poursuite (articles 7, 8 et 9-2 du code de procédure pénale) est de :

- Six ans pour les infractions de complicité d'accès et maintien frauduleux dans un système de traitement automatisé de données ; complicité d'introduction frauduleuse de données dans un système de traitement automatisé de données ; complicité de modification frauduleuse de données contenues dans un système de traitement automatisé de données ; association de malfaiteurs en vue de commettre un crime ou un délit punis de 05 ans au moins ; complicité d'atteinte à un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, commise en bande organisée et blanchiment de crimes ou délits commis en bande organisée.
- Vingt années pour l'infraction de complicité d'extorsion en bande organisée.

La présente demande d'extradition est, en droit français, un acte de recherche du Ministère public, interruptif de la prescription.

*L'extradition d'Anatolii Viktorovich LEGKODYMOV sur le fondement de l'article 13 du traité bilatéral franco-américain du 23 avril 1996, entré en vigueur le 1ᵉʳ février 2002, ainsi que sur le fondement des articles 6 et 7 de l'accord entre l'Union européenne et les Etats-Unis en matière d'extradition en date du 25 juin 2003. En outre, la présente demande d'extradition est fondée sur la Convention sur la cybercriminalité du Conseil de l'Europe en date du 23 novembre 2001, entrée en vigueur le 1ᵉʳ janvier 2007 et la Convention des Nations-Unies contre la criminalité transnationale organisée, adoptée à New-York le 15 novembre 2000.*

SBU × LAW ENFORCEMENT

Je vous prie de bien vouloir trouver en annexe de ce pli :

- Le mandat d'arrêt délivré le 29 juillet 2024 par Monsieur Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris ;
- Le mandat d'arrêt européen délivré le 14 août 2024 par Madame Natacha RATEAU, premier vice-procureure de la République près le Tribunal judiciaire de Paris ;
- Les textes de définition et de répression des infractions mentionnées, de compétence des juridictions françaises, ainsi que ceux relatifs à la prescription de l'action publique.

*P/ Madame la procureure de la République*

Philippe TOCCANIER

Procureur adjoint



**APOSTILLE**

*(Convention de La Haye du 5 octobre 1961)*

1. *République française*   ETATS-UNIS

Le present acte public

2. a été signé par.... Philippe TOCCANIER

3. agissant en qualité de........ PRA

4. est revêtu du sceau/timbre de.... TJ PARIS

..................................................

Attesté

5. à Paris

6. le........ 1 0 DEC. 2024

7. par le Procureur général près la Cour d'appel de Paris

..................................................

8. sous n° 10855L Sylvie SCHLANGER

9. Sceau :        Avocat général        10. Signature :

..................................................

"L'Apostille confirme seulement l'authenticité de la signature, du sceau ou timbre sur le document. Elle ne signifie pas que le contenu du document est correct ou que la République française approuve son contenu"

**COUR D'APPEL DE PARIS**

**PARQUET DU TRIBUNAL**

**JUDICIAIRE DE PARIS**

**6ᵉᵐᵉ DIVISION – SECTION A2**

Exécution des peines

**Entraide Pénale Internationale**

Paris, le 26 novembre 2024

**La Procureure de la République**

**près le Tribunal judiciaire de Paris**

**A**

**Madame la procureure générale près**

**la Cour d'appel de Paris**

TEL : 01 44 32 56 84

FAX : 01 44 32 58 56

**OBJET : Demande d'extradition visant Monsieur Anatolii Viktorovich LEGKODYMOV, à destination des autorités américaines**

N/REF : 21064000646

J'ai l'honneur de solliciter formellement, à l'appui des pièces jointes, l'extradition de Monsieur Anatolii Viktorovich LEGKODYMOV, né le 10 août 1982, sur la base d'un mandat d'arrêt décerné le 29 juillet 2024 par Monsieur Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, lequel a fait l'objet d'un mandat d'arrêt européen, décerné le 14 août 20224 par Madame Natacha RATEAU, premier vice-procureure de la République près le Tribunal judiciaire de Paris.

**I / Identité de la personne concernée**

- Nom : **Anatolii Viktorovich LEGKODYMOV**
- Né le **10 août 1982**
- En : **URSS**
- Sexe : **Masculin**
- Nationalité : **Russe**
- Numéro de passeport russe : **727009003**



SBU – LAW ENFORCEMENT



## II / Les faits

*Résumé des faits :*

Dans le cadre d'une action opérationnelle européenne, la direction générale de la gendarmerie nationale ainsi que 17 agences de forces de l'ordre ont mis en lumière 20 cibles prioritaires afin d'identifier et démanteler des services de blanchiment de cryptoactifs. L'une des principales cibles était rapidement identifiée comme étant l'échangeur de cryptoactifs russe BITZLATO, avec un volume de transactions évalué à plus d'un milliard de dollars depuis 2019.

La plateforme d'échange de cryptoactifs russe BITZLATO permet d'échanger rapidement des cryptoactifs tels que des bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. Elle possède un site internet en langue russe et anglaise et est accessible à tous les utilisateurs d'Internet, notamment à des clients français. Elle propose des services de P2P, d'*exchange* et de *quick exchange*. Cette plateforme est ainsi mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du *hacking* et autres activités criminelles.

Ainsi, dans son rapport de 2022 intitulé « Crypto crime report », la société *Chainalysis* note que la société BITZLATO a reçu une part importante de jetons numériques provenant d'adresses illicites et risquées. Selon la presse (*Bloomberg* et le *New York Times*), *Federation Tower*, un complexe de deux gratte-ciels situés au cœur de la ville de Moscou, abriterait de nombreuses entreprises de cryptoactifs soupçonnés de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés *darknet* et rançongiciel.

Parmi ces entreprises, se situe notamment la société BITZLATO. L'analyse de la *blockchain*, combinée aux données du trafic web, indique également qu'après les attaques par *ransomware*, la plupart des fonds extorqués sont blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du *darknet*, 224,5 millions de dollars d'escroquerie et 9 millions de dollars des attaquants de *ransomware*. Cette plateforme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites.

Les investigations réalisées permettaient de révéler que le site de BITZLATO utilisait au moins un hébergeur français, OVH, auprès de qui la société loue 56 serveurs dédiés. Parmi ces derniers, les enquêteurs parvenaient à identifier le serveur de « management », soit le serveur communiquant et permettant l'administration des autres serveurs. Ce dernier était alors copié. La procédure réalisée à cet effet permettait de révéler que les administrateurs surveillaient de près l'infrastructure.

Par la suite, l'analyse du serveur de management révélait que les membres de BITZLATO utilisaient une application interne, nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un *chat* interne et une messagerie instantanée. L'analyse de l'application MATTERMOST mettait en lumière les éléments suivants : le serveur de management était administré par « DREY » (*alias* Andrei PRYHODKO, informaticien), par « MI2016 » (*alias* Mike LUNOV, CEO de l'entreprise) et par « Mr. Note » ou « Vanch » (*alias* Ivan BONDAREV). 132 profils utilisateurs étaient répertoriés, 1 156 conversations de groupe ou privées représentant 505 110 messages étaient identifiés, 121 channels de plus de deux personnes et 15 868 fichiers, entre le 09 avril 2018 et le 04 mai 2022. L'analyse permettait de comprendre le fonctionnement de BITZLATO, et de récupérer des messages relatifs à de potentiels partenaires, à la comptabilité, au recrutement, aux ressources-humaines, ainsi que des éléments de marketing, l'architecture technique de la plateforme et son développement, des échanges liés aux cryptoactifs, *etc.* Cette analyse permettait donc de confirmer que l'exposition des différentes adresses de cryptoactifs de l'échangeur étaient issus en majorité d'actifs illicites.

Ainsi, pour les fonds reçus par BITZLATO, il a été calculé par le service criminel le volume d'activité suivant :

7 % du volume d'activité de HYDRA MARKET PLACE, représentant 171 millions de

dollars ;
- 9 % du volume d'activité du *scam* FINIKO, représentant 138 millions de dollars ;
- 3,6 % du volume de GARANTEX, représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

- 14,75 % du volume d'activité de HYDRA MARKET PLACE, soit 125 millions de dollars ;
- 14,4 % du volume d'activité du *scam* FINIKA, soit 225 millions de dollars ;
- 8,8 % du volume d'activité de GARENTEX, soit 174 millions de dollars.

Par ailleurs, 2,5 millions de dollars étaient envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de *ransomware*. En outre, deux adresses de BITZLATO recevaient plus de 65 millions de dollars depuis le mois de mars 2022 de la part de WASA131 WALLET MIXEUR. Le plus gros montant de *bitcoin* échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros. Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC (Know your customer), alors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plateforme était peu regardante sur l'identité de ses clients.

Plusieurs membres des équipes de BITZLATO faisaient l'objet de poursuites, étant soit visés par des mandats d'arrêt, soit mis en examen. Parmi ces derniers figuraient notamment Mikhaïl LUNOV, directeur général ; Aleksandr HONCHARENKO, directeur marketing de la société ; Andrii KRYSTHAL, technicien – développement mobile pour la société ; Pavel LERNER, manager du projet « bourse » de la société, ainsi que Constantin ALEKSEEV, ingénieur sur le projet « bourse » de la société.

### Sur l'identification d'Anatolii Viktorovich LEGKODYMOV

Anatolii Viktorovich LEGKODYMOV était directeur et actionnaire de BITZLATO. Il était également administrateur et technicien de la plateforme. Certaines conversations entre ce dernier et son associé, Anton SHKURENKO, en 2018, permettaient notamment de révéler que ces derniers avaient connaissance que le chiffre d'affaires de la société reposait sur une origine douteuse, notamment en lien avec le trafic de stupéfiants. Ces derniers évoquaient également la nécessité de créer une apparence de contrôle afin de gagner en respectabilité, sans pour autant se priver de cette source de revenus. D'autres publications permettaient également de révéler qu'Anatolii Viktorovich LEGKODYMOV avait clairement connaissance que la société BITZLATO était associée au *dark web* ou à des activités de blanchiment. L'enquête permettait également de révéler que la société ne demandait pas de KYC, et avait conscience d'aider ses clients à effectuer des transactions liées à diverses activités illicites.

Anatolii Viktorovich LEGKODIMOV, PDG de la société BITZLATO, était interpellé à Miami le 17 janvier 2023 par le FBI. A cette occasion, plusieurs supports numériques étaient saisis, dont notamment cinq téléphones et deux ordinateurs portables. Le 06 décembre 2023, le Bureau du procureur des Etats-Unis, district Est de New-York, faisait savoir par communiqué de presse qu'Anatolii Viktorovich LEGKODYMOV avait plaidé coupable devant le tribunal fédéral de Brooklyn. Selon les articles de presse, l'intéressé était condamné à une peine d'emprisonnement de 18 mois et était libéré à l'issu de sa peine. Il serait donc actuellement libre de ses mouvements sur le territoire américain.

La personne morale BITZLATO est inscrite au sein du registre des sociétés de HONG KONG sous le nom commercial « BITZLATO LIMITED » depuis le 1er décembre 2017. Les membres fondateurs sont Lev LEGKODYMOV (3400 parts), Anatoly LEGKODYMOV (4250 parts), SHAKH NOV Sergei (200 parts) et SHKURENKO Anton (2150 parts).

Depuis le 25 août 2018, les associés sont :

- LEGKODYMOV Anatolii, directeur de la société (7344 actions)

SBU – LAW ENFORCEMENT

- SHKURENKO Anton (2450 actions)

- SHAKNOV Sergei (206 actions)

Son directeur général (CEO – Chief Executive Officier) est Mikhail LUNOV.

Le secteur d'activité de la société est le service d'information, website et « Message board ».

Le site internet de la plate-forme fait état que la société est domiciliée UNIT 617, 6 1 F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG, adresse confirmée sur les statuts légaux de la société. Cette adresse correspond à l'adresse d'un service de secrétariat et domiciliation de sociétés : First Company of Consulting and Secretariat Services Limited. La société Bitzlato a en effet désigné cette dernière société comme société de secrétariat.

La société Bitzlato est présente dans différents pays via la localisation de ses personnels : Russie, Ukraine, Espagne, Portugal, Kenya, Nigéria, Arabie Saoudite, Chine. Les employés majoritairement russe ou ukrainien travaillent en distanciel ou en présentiel. Il a été noté que des bureaux physiques en Ukraine et Russie existaient avant la guerre en Ukraine.

La société se présente comme ayant eu un total de 102 personnels comprenant les employés actuels et anciens. Un organigramme de la société en date du 29 mars 2021, retrouvé dans la messagerie interne de la société est annexé à la procédure :



La plate-forme d'échange de crypto-actifs russe BITZLATO permet d'échanger rapidement des crypto-actifs type bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. La plate-forme d'échange possède un site internet en langue russe mais également en langue anglaise et est accessible à tous les utilisateurs du web et notamment à des clients français. Elle propose des services de pair-à-pair décentralisée de cryptomonnaies (exchange P2P) qui permet aux utilisateurs de vendre et d'acheter des cryptomonnaies directement entre eux, en utilisant leur ordinateur ou leur appareil mobile, sans passer par une autorité centrale pour faciliter les transactions, d'exchange et de quick exchange.

Les utilisateurs de la plateforme Bitzlato publiaient des annonces de vente ou d'achat de cryptomonnaies (advert) en utilisant soit l'application web Bitzlato (https://bitzlato.com/trader-workspace ), soit un des bots Telegram Bitzlato[1] (https://tmeibitzlato ) . Ainsi, une fois le bot sélectionné, le menu s'affiche, accompagné des premiers messages (cf capture d'écran ci-dessous)

---

[1] Un bot ou robot Telegram est un programme informatique qui peut être intégré à l'application de messagerie instantanée Telegram pour exécuter diverses tâches ou fournir des services Les bots peuvent interagir avec les utilisateurs en envoyant et recevant des messages Ils peuvent aussi être intégrés à d'autres services ou plateformes en ligne Ils sont souvent utilisés pour automatiser certaines tâches fastidieuses ou répétitives, fournir des informations ou pour offrir une interface de commande pour accéder à différentes fonctionnalités



Les services proposés par les bots de BITZLATO permettaient la vente et/ou l'achat des cryptommonaies suivantes :

| | |
|---|---|
| -Bitcoin (BTC) | -Dogecoin (DOGE) |
| -Ethereum (ETH) | -Dash Coin (DASH) |
| -Tether (USDT) | -Bitcoin Cash (BCH) |
| -Usd Coin (USDC) | -Monolith Crypto Ruble (MCR) |
| -Dai (DAI) | -Monolithos DAO Token (MDT) |
| -Litecoin (LTC) | |

Les enquêteurs relevaient que les « avantages » de l'utilisation de BIZLATO, soit par son site web soit par le bot Telegram par rapport à un échangeur « classique » (tel que Binance, Coinbase...) étaient :

-aucune commission sur les transactions effectuées selon les termes des annonces disponibles

-la sécurité des échanges (niveau de protection des transactions très élevé)

-l'échange sans intermédiaire

-accès à une variété de cryptomonnaies et de méthodes de paiement

-un wallet partagé avec des bots Telegram

-bot Telegram réputé plus simple d'utilisation

Il ressort ainsi des investigations que la société propose un éventail de 11 crypto-actifs échangeables en peer to peer et exchange. Le Bot telegram (ChangeBot) propose quant à lui 8 crypto-actifs différents

| Bitzlato peer-to-peer | Bitzlato télégram | Bot telegram (Change Bot) |
|---|---|---|
| Bitcoin (BTC) | Bitcoin (BTC) | Bitcoin (BTC) |
| Ethereum (ETH) | Ethereum (ETH) | Ethereum (ETH) |
| Bitcoin Cash (BCH) | Tether (USDT) | Tether (USDT) |
| Litecoin (LTC) | Monolith Crypto Ruble (MCR) | Litecoin (LTC) |
| Dashcoin (DASH) | MonolithosDao Token (MDT) | Dashcoin (DASH) |
| Dogecoin (DOGE) | Binance Coin (BNB) | Bitcoin Cash (BCH) |
| Tether (USDT) | Huobi Token (HT) | Dogecoin (DOGE) |
| USD Coin (USDC) | Polygon (MATIC) | Monolith Crypto Ruble (MCR) |
| DAI | Tron (TRX) | |
| Monolith Crypto Ruble (MCR) | DAI | |
| MonolithosDAO Token (MDT) | BlazarBits (BZB) | |



Cette plate-forme était mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du hacking et autres activités criminelles ;

SBU-LAW ENFORCEMENT

Les risques de blanchiment d'argent par le biais du P2P découlent principalement de l'anonymat des émetteurs bénéficiaires des transactions ainsi que de l'absence de réglementation pour ces types de services financiers. Comme dans toute opération de blanchiment le volet d'opacification peut porter sur deux aspects : faire obstacle à la traçabilité de la valeur du produit du crime et/ou faire obstacle à l'identification de l'auteur ou du bénéficiaire d'une opération. La technologie utilisée permet de s'affranchir des institutions financières pour assurer des transactions virtuelles instantanées transfrontalières, sans limite et anonymes. L'opacité des opérations financières réalisées permet de masquer l'origine illicite des produits ou fonds afin de permettre aux criminels d'en user légalement une fois injectés dans l'économie licite. Cependant, il semble très difficilement concevable au vu du nombre de transactions réalisées via la plateforme russe Bitzlato en provenance et au profit des plateformes sanctionnées par les autorités américaines que les administrateurs n'aient pas eu connaissance que les flux d'argent étaient en lien avec des activités criminelles. Ainsi, les informations relatives au site Hydra Market étaient mondialement connues et reconnues.

Ainsi, dans son rapport 2022 « Crypto crime report », la société Chainalysis note que la société BITZLATO a reçu de 2019 à 2023 une part importante (76%) de jetons numériques provenant d'adresses illicites et risquées ;

Dans son rapport en date du 18 janvier 2023 intitulé « US Authorities move against High-Risk Exchange Bitzlato for providing money landering services to ranseomware attackers and other russia-based criminals », la société Chainalisys après avoir évoqué l'arrestation du fondateur de Bitzlato, Anatoly LEGKODYMOV à Miami mentionnait le rôle de Bizlato dans le blanchiment de fonds provenant d'attaques de rançongiciels et du notoire HydraMarket.

La société Chainalisys présentait ses constations sous formes de graphiques :

- concernant la « légitimité des fonds reçus »



**Yearly cryptocurrency value received by Bitzlato by source: Legitimate vs. Risky vs. Illicit, 2019 – 2023**

☐ Illicit   ☐ Risky   ■ Legitimate

©Chainalysis

- concernant la source des fonds illicites reçus par Bitzlato à savoir :

    * 38,2 % provenant de darknetMarket,

    * 35% de scams

    * 23% de services ayant été sanctionnés

    *1,6% de rensemwares

SBU – LAW ENFORCEMENT



Il est également expliqué que « en tout Bitzlato a reçu 2,5 milliards de crypto-actifs sur cette période et que 26 % proviennent de sources illégales et 27 % de sources considérées comme « à risques » (définit comme des fonds provenant de mixers, échangeurs à hauts risques et services basées dans des juridictions à hauts risques) »

Les sources ayant envoyés des fonds à Bitzlato sont référencées dans le graphique suivant :



Selon la presse (Bloomberg et le New York Times), Federation Tower, un complexe de deux gratte-ciel au cœur de la ville de Moscou; abrite de nombreuses entreprises de crypto-actifs soupçonnées de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés darknet et rançongiciel. Parmi ces entreprises se situe notamment la société BITZLATO



La société BITZLATO utilisait une douzaine de noms de domaines à savoir :

- bitzlato bz
- bitzlato com
- bitzlato net
- changebot org
- monolith money
- land monolith money
- monolithos money
- price, monolith money
- trade monolith money
- lg k. one
- s-www. lgk one
- xgpu online

qui étaient fermés puis saisis par les enquêteurs sur autorisation du juge des libertés et de la détention afin de faire cesser l'activité internet de la société.

L'analyse de la blockchain, combinée aux données du trafic web, indiquait également qu'après les attaques par ransomware, la plupart des fonds extorqués étaient blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du darknet, 224,5 millions de dollars d'escroqueries et 9 millions de dollars des attaquants de ransomware ;

Le conflit armé en Ukraine a généré une solidarité mondiale qui a permis des levées de fonds d'aide à ce pays mais également en faveur de la Russie. La cryptomonnaie est utilisée par les Ukrainiens et les Russes pour financer leurs actions défensives et offensives. Cette plateforme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites. La société Chainalisys dans son rapport évoqué supra publié en 2023 mentionne des transactions entre Bizlato et des milices pro-russes ayant contribué à la guerre en Ukraine relevant que Bitzlato aurait reçu 32.000$ émanant de groupes paramilitaires russes.

➢ S'agissant des serveurs

Les premières investigations permettaient de révéler que le site de BITZLATO utilisait au moins un hébergeur français, OVH, auprès de qui la société louait 56 serveurs dédiés. Un schéma relationnel des serveurs était établi par les enquêteurs .

Une trentaine de serveurs étaient saisis par les enquêteurs sur ordonnance du juge des libertés et de la détention aux fins d'exploitation

Complémentairement des mesures de captation informatique étaient autorisées sur les serveurs dans la mesure où une copie physique du serveur pouvait s'avérer délicate car nécessitant, compte tenu de la configuration (serveur dédié[2]) l'arrêt du service, ce qui aurait impliqué d'éteindre le serveur, donc de de stopper toutes les opérations / actions menées par celui-ci et aurait alerté immédiatement le ou les gestionnaires du service (pouvant entraîner la perte, l'effacement ou le chiffrement des données présentes sur tous les autres serveurs).

Parmi ces serveurs, les enquêteurs parvenaient à identifier le serveur de « management »[3] (en gras dans le tableau ci-dessus), c'est-à-dire le serveur qui communique et permet l'administration des autres serveurs.

Ce serveur était copié puis saisi et scellé

Pour permettre la copie, il devait être redémarré. OVH informait les enquêteurs que le client avait tenté de le redémarrer à distance au bout de 2 ou 3 minutes puis avait déposé un ticket d'incident 7 minutes après le début de l'arrêt, démontrant que les administrateurs surveillaient de près l'infrastructure ;



---

[2] Il s'agit d'un serveur mis à disposition d'un client par un hébergeur ; ainsi toute manipulation nécessite un redémarrage
[3] IP 137.74.94.229 portant le nom de domaine « mgmt2.fr1.lgk.one »

L'IP de connexion de ce serveur était notamment en lien avec l'adresse Email de contact du compte Linkedin shadow@bitzlato.com

L'analyse de ce serveur de management révélait que les membres de BITZLATO utilisaient une application nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un tchat interne et une messagerie instantanée. :

L'analyse de l'application **MATTERMOST** mettait en lumière les éléments suivants :

- Le serveur de management était administré par « DREY » alias Andrei PRYHODKO (informaticien), « MI2016 » alias Mike LUNOV (CEO de l'entreprise) et « Mr Note » ou « vanch » alias Ivan BONDAREV :

- 132 profils utilisateurs étaient répertoriés, 1156 conversations de groupe ou privées représentant 505 110 messages, 121 chanels de plus de deux personnes et 15 868 fichiers, entre le 9 avril 2018 et le 4 mai 2022.

L'analyse permettait de comprendre le fonctionnement BITZLATO et de récupérer des messages relatifs à de potentiels partenaires, la comptabilité, le recrutement, la RH, des éléments de marketing, l'architecture technique de la plateforme et son développement, des échanges liés aux crypto-actifs...

Il ressortait de l'exploitation d'un document intitulé « Compliance buts de la compagnie « Bitzlato » » découvert dans le serveur Mattermost, dans une conversation de groupe de 3 participants (Michael LUNOV, Anton SHKURENKO et Anatoli LEGKODYMOV) qu'un audit, réalisé par la société CRYSTAL, avait été sollicité par la société BITZLATO afin de mettre en œuvre un processus de conformité de la plateforme conforme aux normes internationales. Le document, bien que non daté, était antérieur à l'été 2021 période qu'il mentionnait pour la mise en œuvre à venir de nouveaux amendements. Le rapport recommandait la mise en œuvre de plusieurs procédures telles que :

- une politique de prévention du blanchiment des capitaux (AML) en identifiant les actions pouvant être considérées comme suspectes et les ressources interdites,

- une procédure de connaissance du client (« Know your custumer » ou KYC)[4] qui va s'imposer à la plateforme si elle veut continuer à fonctionner et se réfère aux recommandations du GAFI en la matière,

- une procédure de connaissance de ses transactions (KYC). A cet égard, l'audit révélait que 8 à 9 % des dépôts acceptés par la société proviendraient de fonds criminels et qu'à ce sens la plateforme servirait, pour certains utilisateurs, d'intermédiaire pour le blanchiment d'argent.

L'audit proposait des solutions en responsabilisant les employés (notamment NDA accord de confidentialité) et en créant trois départements nécessaires au processus de confidentialité KYC AML et antifraude. Au final le but était d'adopter une politique de conformité rigoureuse permettant de présenter une éthique de la société mettant en confiance les clients et responsabilisant les salariés. Cet audit était sollicité par Bitzlato pour se conformer aux normes internationales et éviter des sanctions. Il révélait qu'une partie des dépôts acceptés proviendraient de fonds criminels et proposait les solutions pour les déceler et apporter une réponse adéquate à leur traitement.

Ce rapport révélait de fait aux dirigeants de la société qu'une partie des fonds de leur plateforme étaient douteux sans préjuger du fait qu'ils avaient connaissance en amont de cette information.

Toutefois, selon plusieurs sites Web, le service Bitzlato ne demandait pas de vérification d'identité ou KYC à ses clients :

---

[4] Le processus de « Know Your Customer »» est indispensable pour évaluer le risque client afin de lutter contre la fraude, prévenir les risques de blanchiment d'argent et financement du terrorisme. Il doit concerner tous les clients physiques mais également les personnes morales en lien avec la société. Pour une compliance optimale, ce processus doit intervenir dès l'ouverture de compte client et des contrôles réguliers à différents échelons doivent être mis en place tout au long de la relation commerciale. Ce qui n'est pas mis en place par la société qui n'oblige pas aux clients de règles d'identification et de vérification.

**Why trade on Bitzlato?**

● Buy and sell cryptocurrency without any commission – 0% fee for everything. 0% – if you respond to another user's ad, 0% – if somebody responded to your ad, 0% – if you create an ad.

● No strict KYC policy. You do not need to pass verification on the platform to participate in cryptocurrency trading.

● Bitzlato supports any payment method.

● 2 user interfaces: Web-platform and Telegram-bot.

*Capture d'écran provenant du site web businessday.ng[2]*

Les autorités des Etats-Unis d'Amérique transmettaient aux enquêteurs des documents renfermant des données récoltées auprès de plusieurs fournisseurs de service internet basés aux Etats-Unis et utilisés par les employés de la société Bitzlato pour discuter de leurs activités commerciales en interne et/ou avec leurs clients. Il ressortait d'une analyse comparative des sociétés concurrentes (9 échangeurs de crypto-actifs[5]) de Bitzlato que cette dernière faisait de l'absence de KYC un avantage commercial / concurrentiel.

Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC lors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plateforme était peu regardante sur l'identité de ses clients.

Sur le site de Bitzlato (http://bitzlato.com ) un filtre permettait de n'afficher sur la plateforme que les annonces des vendeurs dont l'identité avait été vérifiée :



*https://bitzlato.com/p2p/buy-btc-rub*

En effet, dans l'onglet P2P trading, un filtre permet : « Verified users : Show ads of verified traders only » (capture d'écran ci-dessus).

Il s'en déduisait que la vérification du compte n'était pas obligatoire sur la plateforme et qu'il était possible de vendre de la crypto monnaie avec un compte non vérifié, notamment pour trader en Peer To Peer.

Dans un document vraisemblablement en date du 15 mars 2022 rattaché à l'adresse Mike@bitzlato.com , s'agissant d'un « Mémo » à destination des employés de la société Bitzlato, il était

---

[5] LocalBitcoin, Paxful, Binance P2P, HodlHidl, Chatex, LocalCryptos, Bestchange, Exmo et Kuna.

évoqué la stratégie à mettre en place concernant notamment la nécessité d'une politique AML (prévention du blanchiment de capitaux) et KYC (connaissance du client).

Il ressortait de l'exploitation du MATTERMOST plusieurs conversations dans lesquelles des membres de la société BITZLATO évoquaient des activités de la société possiblement en rapport avec des activités illicites en citant notamment « Hydra, scam et virus ».

Il ressortait ainsi plusieurs conversations dans lesquelles l'utilisateur @legkodymov identifié comme étant Anatolii LEGKODYMOV, membre fondateur (associé) de la société Bitzlato, évoquait des activités illégales dans le cadre de l'activité de la société BITZLATO.

A titre d'illustration, plusieurs conversations en 2018-2019 entre Anatolii LEGKODYMOV et Anton CHKURENKO, autre membre fondateur (associé) de la société Bitzlato et identifié dans le Mattermost comme @ashkurenko, faisaient état qu'une partie de leur chiffre d'affaire était issue du placement de personnes se livrant au trafic de stupéfiants. Ils s'interrogeaient sur la façon de gérer la présence de ces fonds provenant de trafic de stupéfiants avec la possibilité d'exclure occasionnellement des utilisateurs afin de démontrer leur action de contrôle. Toutefois, il en ressort que ce contrôle serait perfectible en raison d'une volonté de garder une partie de cette clientèle :

| | | |
|---|---|---|
| 04/10/2018 08:37:52 | @ashkurenko | по сути, если мы серьезно обьявим борьбу с наркоторговцами, он просто свалят на другую платформу. Мое предложение что надо номинально бороться, те, блокировать раз в месяц когда явно можно найти, а вот поддерживать рвение наших арбитров в поисках наркоманов, мне кажется это не очень правильно с точки зрения бизнеса. |
| | | En fait, si nous déclarons sérieusement la guerre aux trafiquants de drogue, ils vont juste se barrer sur une autre plateforme. Ma proposition est qu'il faut lutter nominalement, c'est à dire, bloquer une fois par mois quand on peut trouver d'une façon évidente, mais soutenir l'entrain de nos arbitres à la recherche des drogués, il me semble que ça ne serait pas judicieux du point de vue du business. |
| 04/10/2018 08:39:31 | @legkodymov | и естественно он вычисля наркоторговлю, надеется что деньги с заблокированного счёта будут бонусом |
| | | Et bien sûr en cherchant le marché des drogués (narcomarché), il espère que l'argent du compte bloqué sera un bonus |

| Horaire | Pseudonyme | Original | Traduction interprète |
|---|---|---|---|
| 04/10/2018 07:12:12 | @ashkurenko | Привет | Salut |
| 04/10/2018 07:12:23 | @ashkurenko | у нас угрожающая ситуация в БТЦ | Nous avons une situation menaçante à BTZ |
| 04/10/2018 07:12:46 | @ashkurenko | нет мелких торговцев, всяку их шпуля борьба с наркоманией | Il n'y a pas de petits marchands, on a l'impression qu'ils ont eu peur de la lutte contre les drogués |
| 04/10/2018 07:13:32 | @ashkurenko | у нас обьявления от 5000 на покупку | nous avons des annonces à partir de 5000 pour l'achat |
| 04/10/2018 07:13:54 | @ashkurenko | но наверное, на 1000-3000 только карил закупаются | mais il me semble qu'il n'y a que les drogués qui font des achats de 1000-3000 |
| 04/10/2018 07:14:27 | @legkodymov | Ну я восмотрел отчет, вроде какого | oui je regardais le rapport, je vais |
| 04/10/2018 07:19:45 | @ashkurenko | мне не приходят отчеты от старых ботов | je n'ai pas des rapports des anciens bots |
| 04/10/2018 08:39:15 | @legkodymov | Я на счет наркоматериков | au sujet des magasins de drogue |
| 04/10/2018 08:35:25 | @ashkurenko | еще хочу обсудить | je veux en parler |
| 04/10/2018 08:37:52 | @ashkurenko | по сути, если мы серьезно обьявим борьбу с наркоторговцами, он просто свалят на другую платформу. Мое предложение что надо номинально бороться, те, блокировать раз в месяц когда явно можно найти, а вот поддерживать рвение наших арбитров в поисках наркоманов, мне кажется это не очень правильно с точки зрения бизнеса. | En fait, si nous déclarons sérieusement la guerre aux trafiquants de drogue, ils vont juste se barrer sur une autre plateforme. Ma proposition est qu'il faut lutter nominalement, c'est à dire, bloquer une fois par mois quand on peut trouver d'une façon évidente, mais soutenir l'entrain de nos arbitres à la recherche des drogués, il me semble que ça ne serait pas judicieux du point de vue du business. |
| 04/10/2018 08:38:14 | @ashkurenko | эта важно твоя алиен арбитр | Ton opinion est importante pour moi |
| 04/10/2018 08:38:58 | @legkodymov | ну у нас только один арбитр | nous n'avons qu'un seul arbitre |
| 04/10/2018 08:39:19 | @ashkurenko | если я тебя правильно понял | si j'ai bien compris à un pris l'affaire au sérieux |
| 04/10/2018 08:39:31 | @legkodymov | и естественно он вычисля наркоторговлю, надеется что деньги с заблокированного счёта будут бонусом | et bien sûr en cherchant le marché des drogués (narcomarché), il espère que l'argent du compte bloqué sera un bonus |
| 04/10/2018 08:40:17 | @legkodymov | надо придерживаться той политики какая в банках | il faut tenir la même politique que dans les banques |
| 04/10/2018 08:40:19 | @legkodymov | Я незнаю как в банках | je ne sais pas comment ils font dans les banques |
| 04/10/2018 08:40:37 | @legkodymov | Наверное если сделать перевод "за аконопно", тогда | je suppose que quand vous faites un virement « pour le haschich », alors c'est sûr qu'il bloque |
| 04/10/2018 08:40:49 | @legkodymov | блокнут конечно | |
| 04/10/2018 08:42:49 | @legkodymov | а так никто не будет особо искать | sinon personne ne cherchera particulièrement |
| 04/10/2018 08:49:50 | @ashkurenko | Ну баки избавятся | oh les banques elles s'en débarrassent |
| 04/10/2018 08:50:02 | @ashkurenko | от таких клиентов | de ces clients |
| 04/10/2018 08:50:18 | @ashkurenko | И еще CS банка, ментам цивент | et encore la CB de la banque sera donnée aux flics |

Copie certifiée conforme à l'original

Aridam BHATTACHARYA
Sworn Translator
registered with
the Appeal
Court of Paris
(English)
1, Bd St. Martin - 75003 Paris

| | | |
|---|---|---|
| 08/03/2019 01:25:51 | @ashkurenko | Давай на совещании. У меня стойкая уверенность, что у нас нет людей в платформе, кому интересны наши новые продукты, ну, у нас сформировавшийся костяк с нишевой потребностью. Вообщем обсудим. |
| | | On en parlera à la réunion. Je suis sûr que nous n'avons pas de personnes sur la plateforme qui sont intéressées par nos nouveaux produits, c'est à dire, que nous avons un noyau dur formé avec une demande de niche. Bref, on en discutera. |
| 08/03/2019 02:15:36 | @ashkurenko | Ну, хоть обороты растут. |
| | | Bon, le chiffre d'affaire augmente |
| 08/03/2019 05:31:23 | @legkodymov | Да, одни наркоманы |
| | | Oui, il n'y a que des drogués |

De même ils estimaient que la part de leur chiffre d'affaires en rapport avec le trafic de stupéfiants se situait entre 4,5 et 30 %. Il apparaissait qu'ils avaient identifié certains des trafiquants qui étaient leurs utilisateurs puisqu'ils évoquaient une commission de 3 % les concernant :

Feuillet n° 3/4

| | | |
|---|---|---|
| 08/08/2019 15:59:17 | @legkodymov | И большинство денег (77%) приносят нам крупняк, а наркоманы приносят нам только 4,5% выручки |
| | | La plus grande partie de l'argent (77%) nous est apportée par les gros, et les drogués ne nous rapportent que 4,5 % |
| | | У нас в сервисе за последний месяц 105 тыс сделок, на 1160 битков, средний чек 0.011 BTC, при этом кто-то даже сделал 1 сделку на 1.995 BTC (отредактировано) И них сделок меньше чем на 0.002 монеты (1500 руб) сделано на 53 битка, но при этом 42 тыс сделок (практически половина) Из них сделок меньше 0.011 монеты (8тыс руб), тоесть наш средний чак, сделано на 265 битков и это составляет 87тыс сделок (большая часть) (отредактировано) Итого могу сделать вывод что 18 тыс сделок (17%), приносят нам 900 битков (77%) оборота. И большинство денег (77%) приносят нам крупняк, а наркоманы приносят нам только 4,5% выручки |
| 08/08/2019 15:59:46 | @legkodymov | « Les drogués ne nous apportent que 4,5 % de bénéfices » |
| 08/08/2019 16:03:16 | @ashkurenko | может наркобарон быть у нас |
| | | Peut etre que nous avons un baron de la drogue chez nous |
| 08/08/2019 16:03:58 | @ashkurenko | я про связи крупняка и наркоманоз |
| | | Je parle des liens des gros avec les drogués |
| 08/08/2019 16:04:53 | @ashkurenko | Ну условно дропаем нарков и уходит 30% оборота |
| | | Et bien on peut dire que si on drop les narcos on perd 30 % de chiffre d'affaire |
| 08/08/2019 16:08:19 | @legkodymov | Дропаем нарков - уходит 4.5% |
| | | On drop les narcos – on perd 4,5 % |
| 08/08/2019 16:08:53 | @legkodymov | Мы можем очень круто монетизироват ся на рекламе. Наркам одно, VIP другое |
| | | on peut faire beaucoup de monnaie sur les publicités. Un pour les narcos, un autre pour les VIP. |
| 16/08/2019 08:52:27 | @ashkurenko | 1. Нам для нарков надо делать комиссии до 3-х% |
| | | Pour les narcos on doit faire la commission de 3 % |
| 16/08/2019 17:05:24 | @legkodymov | Блин про нарков не обсудили. По хорошему каждый зашедший должен оставлять $2 в месяц минимум |
| | | Flûte on n'a pas parlé de narcos. Au mieux chaque entrant doit laisser de 2$ par mois minimum |

Il ressort de ces conversations que les deux associés de Bitzlato évoquent le fait d'être informés qu'une partie de leur chiffre est issue du placement de personnes se livrant au trafic de stupéfiants.

Notons que ces conversations sont en date de 2018-2019 et qu'ils s'interrogent sur la façon de gérer la présence de ces fonds provenant de trafic de stupéfiant avec la possibilité d'exclure occasionnellement des utilisateurs afin de démontrer leur action de contrôle. Toutefois, il ressort également que ce contrôle serait perfectible en raison d'une volonté de garder une partie de cette clientèle.

Les enquêteurs se livraient à une analyse des contreparties (counterparties) en Bitcoin sur trois périodes successives afin d'évaluer le risque de l'origine frauduleuse de la contrepartie réalisée par la société Bitzlato. Il en ressortait que le pourcentage de transactions à haut risque ou à risque sévère était important sur les périodes examinées :

Copie certifiée conforme à l'original

Sworn Translator registered with the Appeal Court of Paris (English)

SBU - LAW ENFORCEMENT

| Périodes | Montants envoyés | Montants reçus |
|---|---|---|
| Pré-compliance d'avril 2018 à mai 2021 | 26,67 % | 21,18 % |
| Transition supposée de compliance du 1ᵉʳ juin 2021 au 31 août.2021 | 36,94 % | 25,10 % |
| Post période supposée de compliance du 1ᵉʳ septembre 2021 au 09 janvier 2023 | 19,79 % | 12,97 % |

De même, les autorités américaines faisaient parvenir aux enquêteurs un document comportant un recoupement d'informations et de conversations présents dans les serveurs du Freshdesk[6] de la société Bitzlato portant principalement sur les transferts de crypto-actifs de et vers HYDRA, DROP, CRYPTO-MONNAIE SALE et DARKNET.

> ➢ **s'agissant des crypto-actifs**

L'analyse du serveur de management faisait état de :

- 4.562.929 « wallets »

- 5.785.656 transferts « dépôts » entre le 06/05/2018 et le 29/09/2022

> ➢ montants totaux transférés : 106 322.57374746 BTC et 138 663.89864867 ETH

- 3.041.916 transferts « withdrawal » entre le 26/05/2018 et le 29/09/2022

> ➢ montants totaux transférés : 103 612.89387937 BTC et 134 942.91348885 ETH

Ainsi, du début de l'activité de la plateforme en mai 2018 jusqu'au 03 janvier 2023, les enquêteurs relevaient les montants ci-après :

- flux entrants :     1 926 678 511 euros

- flux sortants : 1 786 117 237 euros

L'exploitation du serveur de management nommé « mgmt2 », et notamment du fichier temporaire comportant 2760 92 adresses de crypto-actifs adossées à la blockchain Bitcoin, permettait aux enquêteurs d'établir les constatations suivantes, sur la base d'un échantillonnage de 100 adresses relevées aléatoirement dans le fichier (D398/2):





---

[6] Freshdesk est un système de gestion des tickets basé sur le Cloud qui aide les sociétés à simplifier leurs processus de support client. (cf **D573**)

Il en ressortait que 68% des adresses présentaient un lien avec des activités illicites de la cryptosphère, ce qui semblait cohérent au regard du rapport annuel publié par la société Chainalisys en 2022, évoqué supra, qui indiquait que 76% des fonds reçus sur cet échangeur provenait d'activité illicites.

Les enquêteurs consultaient, à l'aide d'un outil de « tracing » et de « clustering »[7] les expositions[8] du cluster de Bitzlato.com, composé de 256 589 adresses publiques, avec les clusters liés à des services sanctionnés par OFAC[9], au niveau de la Blockchain Bitcoin.

S'agissant des réceptions directes, les enquêteurs constataient la présence d'exposition au niveau de plusieurs catégories malveillantes qu'ils présentaient sous forme de tableau synthétique :

| Catégories | Montant en BTC | Pourcentage vis à vis du flux |
|---|---|---|
| Rançongiciels | 19,052 BTC | 0,37 % |
| Vol de fonds | 0,02 BTC | 0,02 % |
| Financement terrorisme | 0,00012 BTC | 0,00 % |
| Arnaque | 4862,5249 BTC | 4,09 % |

Il était également mis en relief la présence de sanctions faites par l'OFAC[10] pour diverses raisons :

| Raison de la sanction | Date de la sanction | Montant en BTC | Pourcentage |
|---|---|---|---|
| OFAC SDN Blender.io | 06 mai 2022 | 148,181 BTC | 1,19 % |
| OFAC SDN Chatex.com | 08 novembre 2021 | 197,3505 BTC | 1,59 % |
| OFAC SDN Garantex.io | 05 avril 2022 | 1866,3096 BTC | 15,04 % |
| OFAC SDN Hydra MarketPlace | 05 avril 2022 | 10103,4163 BTC | 81,41 % |

S'agissant des envois directs, les enquêteurs constataient également la présence d'expositions au niveau de plusieurs catégories malveillantes :

| Catégories | Montant en BTC | Pourcentage vis à vis du flux |
|---|---|---|
| Vol de fonds | 19,8756 BTC | 0,02 % |
| Financement terrorisme | 0,0228 BTC | 0,00 % |
| Arnaque | 1095,091 BTC | 8,49 % |

Etaient également relevées la présence de sanctions avec des montants en BTC :

---

[7] Il s'agit de l'outil « reactor » de la société Chainalysis qui permet notamment de regrouper des adresses appartenant à une même personne ou entité et donc de consulter toutes les transactions de différentes adresses appartenant à cette même personne ou entité. Il permet également d'analyser la réputation des adresses et clusters .

[8] L'exposition directe correspond à un transfert de fond du cluster Bitzlato vers le cluster du service sanctionné par l'OFAC sans qu'il y ait de rebond entre les deux L'exposition indirecte correspond quant à elle à un transfert entre les deux clusters mais avec des rebonds de transactions ce qui ne les lient pas directement.

[9] Les services référencés comme "sanction", et donc sanctionnés par l'OFAC, n'ont pas respecté la loi américaine en matière de lutte ant-blanchiment ou de protection des clients ou encore sont des plateformes ou services illégaux (marché noir, piratage informatique, actions malveillantes. pédocriminalité )

[10] Blender.io est un mélangeur de crypto-monnaie créé en 2017 et sanctionné en 2022 pour avoir aidé le groupe Lazarus, un groupe de pirates informatiques associé au gouvernement de la Corée du Nord
Chatex.com est un mélangeur de crypto-monnaie sanctionné en 2021 pour avoir facilité les transactions financières d'un groupe de pirates mettant en œuvre des rançongiciels
Hydra était le plus grand marché illégal du Darkweb, connu pour son important trafic de drogue Il a été sanctionné le 05 avril 2022 tout comme Garantex
Garantex.io est un échangeur de crypto-actif fondé en 2019 et enregistré en Estonie Il a fait l'objet d'une sanction en 2022 pour être associé avec divers marchés du darkweb dont Hydra

| Raison de la sanction | Date de la sanction | Montant en BTC | Pourcentage |
|---|---|---|---|
| OFAC SDN Blender.io | 06 mai 2022 | 9246,7311 BTC | 61,24 % |
| OFAC SDN Chatex.com | 08 novembre 2021 | 163,7378 BTC | 1,08 % |
| OFAC SDN Garantex.io | 05 avril 2022 | 5514,272 BTC | 36,52 % |
| OFAC SDN Hydra MarketPlace | 05 avril 2022 | 65,3193 BTC | 0,43 % |

Il ressortait des investigations que l'exposition des différentes adresses de crypto-actifs de l'échangeur étaient issues en majorité d'activités illicites.

Ainsi, pour les fonds reçus sur BITZLATO, il a été calculé, par service criminel, le volume d'activité suivant :

- 19,7% du volume d'activité de HYDRA MARKET PLACE[11] (sanction par l'OFAC[12]) représentant 171 millions de dollars,

- 9% du volume d'activité du scam FINIKO représentant 138 millions de dollars,

- 3,6 % du volume de GARENTEX (sanctionné par l'OFAC) représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

- 14,75 % du volume d'activité de HYDRA MARKET PLACE soit 125 millions de dollars. 83 223 comptes Hydra ont reçu des $BTC directement depuis le cluster Bitzlato

- 14,4 % du volume d'activité du scam FINIKO soit 225 millions de dollars,

- 8,8 % du volume d'activité de GARENTEX soit 174 millions de dollars.

Les investigations permettaient également de relever des expositions directes avec des ransomwaes comme Dharma et Phobos, des services de mixing

L'analyse des adresses Binance de LUNOV, le CEO de BITZLATO, faisait état de l'envoi de 2 transactions vers HYDRA et de la réception indirecte des fonds du darkmarketplace .

Par ailleurs, 2,5 millions de dollars ont été envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de ransomwares, notamment Maza et Mailto (Netwalker)

Les enquêteurs relevaient même des liens avec le hack de la plateforme FTX en 2022, les fonds ayant transité par des services de mixing

En outre, deux adresses de BITZLATO ont reçu plus de 65 millions de dollars depuis mars 2022 de WASABI WALLET MIXEUR.

Le plus gros montant de Bitcoin échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros.

Les wallets de Bitzlato présentaient également des liens avec des adresses e-mail associées à des utilisations de contenus pédopornographiques ou encore d'attaques aux STAD telles que DDOS

Un rapprochement permettait également la mise en évidence de 2 852 procédures judiciaires à travers le monde en lien avec l'échangeur Bitzlato. Aussi, 90,9 % de ces rapprochements concernaient des ransomwares et le reste des signalements correspondait principalement à des escroqueries. (D509)

Une opération de demixing permettait la mise en évidence de liens indirects entre la plateforme Bitzlato et des ransomwares, tel que Maze et Netwalker (mailto), MEDUSALOCKER par l'utilisation de services de mixages

---

[11] Sur HYDRA : Voir le rapport de FlashPoint Intelligence / Chainalisys

[12] L'Office of Foreign Assets Control (OFAC) est un organisme de contrôle financier, dépendant du Département du Trésor des États-Unis. Cet « office de contrôle des actifs étrangers » est chargé de l'application des sanctions internationales américaines dans le domaine financier, notamment dans le cadre du Foreign Corrupt Practices Act (FCPA) de 1977.

Parmi les utilisateurs de la plateforme Bitzlato qui avaient procédé à des transferts de fonds vers des « échangeurs crypto » dont Binance, les enquêteurs parvenaient, grâce à un important travail de traçabilité, à identifier ceux qui avaient effectué des retraits à destinations de cet exchange et les montants correspondants ainsi que la provenance des fonds afin d'en déterminer une éventuelle nature délictueuse. Ainsi, les enquêteurs établissaient une liste d'individus disposant d'un compte domicilié chez Binance et Bitstamp, et alimenté par des flux ayant transité par Bitzlato, flux provenant eux-mêmes d'activités illicites.

A titre d'illustration, les enquêteurs procédaient à l'analyse des flux concernant l'adresse Binance détenue par un certain KOSTANTIN GORDON né le 18 avril 1982 (de nationalité russe) à savoir 18gfUKZPXNmS71S2vTheHN8rECC2pByrjQ destinataire de fonds en provenance de Bitzlato et parvenait à identifier une autre adresse détenue sur ce même compte à savoir TA9sKXFQXrNsYB19tJHiihufR8FtpgUML3. Cette dernière, adresse de dépôt de Binance également utilisée par Konstantin GORON, avait reçu des fonds très conséquents en USDT sur la blockchain TRON en provenance de l'échangeur crypto GARANTEX.IO sanctionné par l'OFAC pour des infractions de blanchiment[13]. Les échanges portaient en effet sur 112 transactions entrantes, du 17 mars 2022 au 20 novembre 2022, de GARANTEX.IO vers l'adresse de dépôt Binance pour un montant de 39 856 923 $ effectuées:



Des saisies d'actifs numériques étaient pratiquées par les enquêteurs sur les wallets comportant des soldes importants pour un total de plus de 19 millions d'euros (**D393 à D396 et D515 à D538**).

- **La société LGK POWER LIMITED**

Les enquêteurs s'intéressaient à la société LGK LIMITED dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato.

Il résultait de l'exploitation de ces documents que le dirigeant de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit chinois avait été créée en 2014 avait pour associés :

- LEGKODYMOV Anatolii, directeur général

- SKURENKO Anton

- SHAKNOV Sergei.

Son siège social est également au UNIT 617, 6 1 F, 131-132 CONNAUGHT ROAD WEST, SOLO WORKSHOPS, HONG KONG et a recours aux services d'une société de secrétariat « First Company of Consulting and Secretariat Services Limited. Son objet social est le développement et la programmation de

---

[13] Voir note n°8

logiciels pour les banques et les organisations commerciales ainsi que la création et la conduite de projets blockchain

Un schéma relationnel des entités liées à la société LG POWER LTD était réalisé par les enquêteurs

- **La société A-XBT**

Les enquêteurs s'intéressaient à la société A-XBT dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato.

Il résultait de l'exploitation de ces documents que le dirigeant historique de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit russe avait été créée en 2013 avait pour associés à la fondation :

- LEGKODYMOV Anatolii

- SKURENKO Anton

- SHAKNOV Sergei

Actuellement seul SKURENKO Anton est associé.

Les nouveaux directeurs généraux sont SKURENKO Anton et KOVALENKO Dmitriy

Son siège social est 141980 région de moscou, - CH Shchelkovskoe, maison 113, salle 18 et son objet social porte sur les activités liées à l'utilisation de l'informatique et technologies de l'information, traitement des données et autres activités non interdites. Il ressort de recherches en sources ouvertes que la société A-XBT fourni une prestation de location de container de minage.

Un schéma relationnel de la société A-XBT était réalisé par les enquêteurs.

- **La société GUAROO**

Les enquêteurs s'intéressaient à la société GUAROO dont plusieurs documents ayant trait aux informations statutaires et données comptables retrouvés dans le MATTERMOST établissaient un lien avec la société Bitzlato. **(D163)**

Il résultait de l'exploitation de ces documents que le dirigeant historique de cette société était Anatolii LEGKODYMOV, également associé de la société BITZLATO. Cette société de droit russe avait été créée en 2016 avait pour associé à la fondation : DOLIC Jakov.

Les nouveaux directeurs généraux étaient SHAKHNOV Sergei et DOLIC Jakov.

Son siège social était 109202 Moscou, Karacharovskaya 2 ème rue, maison 1 bâtiment 1, salle 15 et son objet social portait sur le conseil, travail et gestion informatique. Traitement de données et hébergement d'informations. Cette société était liquidée le 13 septembre 2019.

Une opération coordonnée par Eurojust entre, d'une part, plusieurs pays européens (Espagne, Portugal, Chypre) sur le fondement de décisions d'enquête européennes émises par le parquet de Paris et les autorités des Etats-Unis d'Amérique, d'autre part, était réalisée le 18 janvier 2023 aux fins d'interpellations et d'audition des principaux protagonistes de la société Bitzlato ainsi que de perquisition de leur domicile.

En résumé :

- Anatolii LEGKODYMOV a eu des fonctions de direction dans la societe A-XBT ;

- Anatolii LEGKODYMOV est en relation étroite avec un des associes de la societe Bitzlato, Anton SHKURENKO. Ils conviennent, entre 2018 et 2019, qu'une partie du chiffre d'affaires de la société repose sur des fonds d'origine douteuse, lies aux trafics de stupéfiants. Ils entendent créer une apparence de contrôle afin de gagner en respectabilité mais sont réticents à se priver d'une partie de cette source de revenu.

- Anatolii LEGKODYMOV a une réelle action dans la société BITZLATO et participe à nombre de groupes de discussion du Mattermost où sont échangés des messages en rapport avec la gestion des affaires de la société. Il a par ailleurs demeuré en Chine avec les membres de sa famille. Rappelons que BITZLATO est une société de droit chinois.

- Il participe au groupe de discussions << stable » du Mattermost dans lequel la stratégie de mise en place de Monolithos DAO est exposée. Sur ce groupe Dmitry KRYSHTAL, de l'équipe marketing de Bitzlato, fait une promotion importante de la cryptomonnaie MCR (Monolith Crypto Ruble), qui est un stable coin indexé sur le rouble et est créé par Bitzlato. L'utilisation du MCR est promu sur le forum darkmoney. Le Darkmoney.lc est un forum en langue russe/ukrainienne qui sert manifestement de transactions pour des biens ou services d'origine douteuse, dont des services de blanchiment en cryptomonnaie. Sur ce forum est présent l'utilisateur Monolithos DAO, qui est actif entre mars 2020 et mars 2021. Il propose, en soulignant bien ce fait, d'acheter MCR sans enregistrement et sans vérification depuis le bot Bitzlato. Il renvoie au compte youtube MonolithosDAO sur lequel Dmitry KRYSHTAL fait la promotion de monolith.

**Concernant le lien avec les rançongiciels :**

Les investigations ont permis de mettre en exergue les expositions du cluster BITZLATO avec les rançongiciels MAZE et NETWALKER via le mixer BITMIX.BIZ.

En effet, une opération de demixing était mise en oeuvre grâce à la recension de 11 clusters composés de 54 adresses de réception connues comme affiliées à un rançongiciel. Le demixing était effectué grâce aux outils « Reactor » et « Clain ». En effet, sur tin cluster de 201 transferts liés à BITZLATO, 36 transactions provenaient de BITMIX.BIZ. Le mixeur BITMIX.BIZ fonctionnait par le biais d'une security feature séparant chaque flux entrant en 2 transactions sortantes : cet outil rendait donc plus difficile la découverte de l'origine des fonds entrants. (D408/11) Une adresse sur circulant BITZLATO et correspondant à l'empreinte numérique de BITMIX.BIZ recevait des Bitcoins d'une adresse en exposition directe avec le rançongiciel MAZE. L'origine frauduleuse de certains fonds en transit sur BITZLATO était donc claire.

L'adresse clusterisée par les enquêteurs américains bc1qkqh9wjmnq90gkwemg2yrivktw2wd74u80kd3wyt, correspondant à 54 adresses, envoyait un total de 284,1111 BTC sur l'échangeur BITZLATO depuis des adresses affiliées à des rançongiciels (MAZE et MAILTONETWALKER). La quasi-totalité de ces fonds passait par le mixeur BITMIX.BIZ. Cette opération de demixing mettait en lumière le blanchiment d'argent issu de rançongiciels par le biais d'un mixeur

A partir de l'analyse des mouvements des cryptoactifs du user 35, les enquêteurs mettaient ainsi en évidence de nombreuses transactions d'users BITZLATO en lien avec des ransomwares tels que TRICKBOT, DHARMA RANSOMWARE ou encore NETWALKER, lesquels présentaient également des liens avec HYDRAMARKETPLACE, GARANTEX (sanctionnées par l'OFAC), CRYPTOMIXER ou encore FINIKO.

Les investigations permettaient également de mettre en exergue l'exposition du cluster BITZLATO avec le rançongiciel MEDUSA LOCKER.

Une opération de traçage via l'outil Chainalysis permettait en effet de remonter à un cluster ayant reçu et retransmis près de 33 BTC sur la période du 01/11/2018 au 12/10/2020 : a minima 42% des fonds entrants, l'équivalent de 133 167 euros) provenaient du rançongiciel MEDUSA LOCKER, et étaient blanchis au moyen d'échangeurs dont BITZLATO. Une grande partie des fonds allait aussi vers HYDRA.

Il était en outre mis en exergue l'exposition du cluster BITZLATO avec l'escroquerie QUBITTECH. Un échange entre @drey (identifié comme BONDAREV Ivan) et @legkodymov (LEGKODYMOVAnatolii) dans le serveur Mattermost permettait d'identifier une clé publique de la chaîne BTC, ainsi que sa clé privée. En effet, LEGKODYMOV Anatolii exportait la clé privée dans l'application BITCOINCORE, générant ainsi sa clé publique et nous donnant la possibilité de la récupérer :1DEKCIVIHDHeFLmEBA5ANbYglbJ35duLdooh. Les enquêteurs déterminaient qu'elle était directement associée à BITZLATO LTD, et sans doute plus précisément à ses administrateurs. Or une analyse permettait de relever que les fonds entrants sur l'adresse de cette clé publique provenaient indirectement à 98.57% de l'escroquerie QUBITTECH (arnaque de type Pyramide de Ponzi). En effet, une adresse entrante sur la clé 1DEKCIVIHDHeFLmEBA5ANbYg1bJ35duLdooh était liée au cluster d'adresses de l'échangeur CRYPTONATOR, et l'outil CHAINALYSIS permettait de voir que les fonds entrants sur cette adresse venaient tous de QubitTech.ai. Ce comportement était potentiellement mis en place pour brouiller les transactions et complexifier le traçage de la destination des fonds frauduleux.

Anatoly Legkodymov savait depuis le début que Bitzlato était largement utilisé par les criminels :

- <u>Elémets sur la connaissance de Legkodymov en 2018-2019</u>

Des exemples de communications de Legkodymov démontrant la connaissance de transactions illicites en 2018-2019 sont présentés ci-dessous :

➢ En octobre 2018, le partenaire et cofondateur de Legkodymov dans Bitzlato a signalé à Legkodymov que Bitzlato avait été abandonné par des « *petits trafiquants* » qui avaient été « *effrayés par la guerre contre la drogue* ». Son interlocuteur a alors préconisé d'adopter une approche « *nominale* » pour « *la lutte contre les trafiquants de drogue* » – « *c'est-à-dire bloquer une fois par mois quand [ils] peuvent être clairement trouvés* ».

Legkodymov a en substance acquiescé et a préconisé de fermer les yeux sur les transactions liées à la drogue en bloquant uniquement les transactions où les parties à la transaction faisaient explicitement référence à la drogue.

➢ Le 23 avril 2019, le partenaire et cofondateur de Legkodymov dans Bitzlato a averti ses collègues, dont Legkodymov , que « *les clients de Bitzlato sont des toxicomanes qui achètent de la drogue sur le site d'Hydra* ». Legkodymov a répondu en proposant d'étendre les services de Bitzlato aux particuliers ordinaires en quête de confidentialité.

➢ Le 29 mai 2019, Legkodymov a écrit à un collègue dans un chat : « *Tous les traders sont connus pour être des escrocs. Ils négocient sur des « drop », etc. Vous réalisez qu'ils ne négocient pas tous (je pense que 90 %) avec leur carte [d'identité]* ». Plus tard dans l'année, le 22 juin 2019 ou aux alentours, Legkodymov a commenté : « *Les escrocs savent qu'il est possible d'être vérifié pour un drop et de retirer de l'argent à 100 %* ».

- <u>Éléments sur la connaissance de Legkodymov en 2021-2022</u>

Bitzlato avait une contrepartie dans dark web : Hydra Market. Hydra a été fermée grâce à une action coordonnée des forces de l'ordre américaines et allemandes le 5 avril 2022, et le ministère de la Justice a rendu public un acte d'accusation contre Dmitry Olegovich Pavlov pour complot en vue de distribuer des stupéfiants et complot en vue de commettre un blanchiment d'argent, en lien avec son exploitation et son administration des serveurs utilisés pour faire fonctionner Hydra.

À partir de 2021, Legkodymov a de plus en plus démontré des connaissances spécifiques sur Hydra Market et a reconnu à plusieurs reprises que Bitzlato était connu pour son blanchiment d'argent. Par exemple, le 6 octobre 2021, Legkodymov a posé des questions à ses employés sur Hydra Market dans un chat et a reçu un article Wikipédia en russe. Une version de cet article, telle qu'elle est parue le 26 octobre 2021, est disponible sur Internet Archive, un projet d'archivage en ligne. Sa première phrase décrit Hydra Market comme « *le plus grand marché russe du darknet pour le trafic de drogue, la plus grande ressource au monde en termes de volume de transactions illégales avec des cryptomonnaies* ». L'article notait en outre que « *[ e ]n plus des drogues, les produits populaires sur Hydra sont de la fausse monnaie et des documents, [et] des instructions pour des activités illégales. La ressource fournit également des services tels que la vente de drogue, la sécurité Internet et le piratage de comptes* ».

Legkodymov a notamment reconnu à plusieurs reprises que les propres données de Bitzlato confirmaient ce que disaient les plateformes d'analyse de blockchain tierces : Bitzlato traitait un grand volume de transactions illicites, et plus particulièrement des transactions avec Hydra Market. Le 19 octobre 2021, par exemple, après avoir entendu que le personnel de l'industrie accusait Bitzlato de coopérer avec Hydra et de faciliter les transactions de drogue, le défendeur a écrit à ses collègues cadres supérieurs : « *D'un côté, ils ont raison à propos d'Hydra. Mais d'un autre côté, [il y a] 2,5 millions d'utilisateurs d'Hydra. Tout le monde est impliqué. Cela ne peut pas être filtré.* »

Comme exposé supra, le 14 février 2022, Chainalysis , une société d'analyse de blockchain, a publié la version 2022 de son « Crypto Crime Report » annuel, qui indiquait que les utilisateurs de Bitzlato avaient reçu 206 millions de dollars des marchés du darknet et 9 millions de dollars des attaquants de ransomware. Legkodymov s'est renseigné auprès d'un subordonné, qui a partagé avec lui le graphique ci-dessous le 25 février 2022, apparemment une capture d'écran du logiciel de filtrage des transactions de Bitzlato .



| count | transaction_entity_name |
|-------|-------------------------|
| 403119 | *NULL* |
| 10 | "SatoshiMines.com" |
| 2 | "BitZino.com" |
| 546 | "Wasabi" |
| 76159 | "Hydra Market" |

Legkodymov et ses collègues ont ensuite déterminé qu'au cours des trois derniers mois, 20 % des transactions de Bitzlato avaient envoyé des fonds vers Hydra Market. « *Des retraits vers Hydra ?* » a écrit le prévenu. « *Plus de 20 % ? . . . Mettons tout à zéro, dès que possible.* »

Plus tard dans la journée, l'intéressé écrit à un collègue : « *Il s'avère que nous avons au moins 20 % de saleté. Et dans cette situation , je ne vois aucune raison de me battre avec Chainalysis .* » Le 18 février 2022, Legkodymov a écrit à son partenaire dans Bitzlato pour se plaindre que ses dirigeants ruinaient la valeur d'acquisition de Bitzlato en blanchissant de l'argent : « *À qui vais-je (allons-nous) vendre Bitzlato maintenant avec un tel rapport de Chainalysis [?] Et c'est à 90 % dû à la direction plutôt qu'à nous.* » Une semaine plus tard, le 25 février 2022, , Legkodymov écrit à son partenaire dans Bitzlato : « *J'ai beaucoup réfléchi. Je n'arrive pas à surmonter 20 % de saleté et à être totalement ignoré. et je veux fermer l'entreprise. . . . Vous ne me soutenez pas pour me débarrasser de la saleté. Nous n'avons pas de plan, mais vous prétendez que vous n'avez aucun soutien ou autre chose. Je ne suis pas intéressé à continuer dans de telles conditions.* « *Je veux fermer l'entreprise et recommencer quelque chose de nouveau, à partir de zéro* », a-t-il ajouté le lendemain. « *Vous me jetez tous sous un bus. 76 000 transactions avec Hydra et aucun intérêt du tout.* »

Environ deux mois plus tard, le 7 avril 2022, Legkodymov critique son personnel de conformité pour ne pas avoir enquêté sur sa propre exposition aux fonds illicites, en utilisant les outils à sa disposition (comme le fournisseur de conformité Valega). « *Vous n'avez toujours pas calculé combien de transferts nous avons effectués vers les marchés noirs au cours des trois derniers mois (selon Valega )* », a-t-il écrit. « *Cette ignorance est alarmante.* » Le 10 avril 2022, un responsable de la conformité a signalé au défendeur qu'au

SBU-LAW ENFORCEMENT

cours des six mois précédents, sur 76 000 utilisateurs actifs, 27 000 avaient tenté de transférer des fonds vers ou depuis ce que l'employé a qualifié d'adresses de cryptomonnaie « *sales* ». Un autre employé a commenté dans le même chat : « C'est juste que les services avec un faible niveau AML sont très pratiques pour les blanchisseurs [d'argent]. Dès que nous mettrons en œuvre tous les outils AML/KYC, le nombre de transactions douteuses diminuera considérablement.

Legkodymov et ses collègues ont exprimé à plusieurs reprises leur conscience que l'exploitation de Bitzlato pourrait les mettre en danger sur le plan juridique.

À l'automne 2022, lorsque Legkodymov s'est rendu aux États-Unis, il semble avoir occupé le poste de PDG par intérim de Bitzlato . Une communication de Legkodymov à ses collègues cadres supérieurs le 11 novembre 2022 illustre l'étendue de son implication et de son autorité. « *Fondamentalement* », a-t-il écrit, « *je commence à comprendre clairement où se situe le problème et ce qu'il faut faire. . . . Au cours de cette semaine, j'ai (en tant que PDG) compris que je ne m'entendais pas personnellement au travail avec la moitié du personnel (la haute direction). La haute direction n'a pas montré de résultats avant mon arrivée, [et] c'est pourquoi je changerai la moitié du personnel si je reste PDG.* »

Comme auparavant, Legkodymov a continué à réclamer des améliorations chez Bitzlato , sans apporter de réel changement. Le 7 novembre 2022, par exemple, le défendeur a exprimé son souhait de politiques KYC plus strictes, exprimant son point de vue selon lequel « *au fil des décennies d'expérience, je suis devenu convaincu que 95 % des personnes anonymes sont des criminels* ». Un collègue a répondu que la plupart des utilisateurs de Bitzlato étaient en effet des criminels, affirmant que les petits utilisateurs étaient « *l'ex-URSS, les fans de ressources obscures, les toxicomanes, les documents et autres saletés* ». En revanche, le collègue a déclaré que les utilisateurs à plus forte valeur ajoutée étaient « *des criminels. Comme vous l'avez dit, mais tous les gros bonnets vont de toute façon obtenir des « gouttes » pour leurs besoins* ». Legkodymov a répondu que « *le simple fait d'obtenir un tas de drogués à bas prix signifie que le département marketing se relâche... c'est l'erreur qui a été commise il y a plusieurs années, et je ne veux pas la répéter* ».

### III / La qualification pénale

Les faits ci-dessus exposés, commis entre le 1ᵉʳ décembre 2017 et le 20 janvier 2023 en tout cas depuis temps non prescrit en France, et en tour cas sur le territoire national, et de manière indivisible au Portugal, en Espagne, en Ukraine, aux Etats-Unis, en Russie et à Hong-Kong sont les suivants :

**COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C. PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C. PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE.**
Définie par ART.323-3 AL.1 C. PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL



Copie certifiée conforme à l'original

**COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**
Définie par ART.323-3 AL.1 C. PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-2 AL.1 C. PENAL.
Réprimée par ART.323-2 AL.1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'EXTORSION EN BANDE ORGANISEE**
Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C. PENAL.
Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME**
Définie pár ART.450-1 AL.1, AL.2 C. PENAL.
Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**COMPLICITE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE**
Définie par ART.323-4-1, ART.323-1, ART.323-2, ART.323-3, ART.323-3-1, ART.132-71 C. PENAL.
Réprimée par ART.323-4-1, ART.323-5 C. PENAL.
Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C. PENAL

**BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT**
Définie par ART.324-2 2°, ART.324-1 AL.1, ART.132-71 C. PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.131-30 AL.1 C. PENAL.

**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**
Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C. PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C. PENAL.

### IV – La procédure

Le 06 septembre 2022, une enquête préliminaire était ouverte par le parquet de Paris, et confiée à la direction générale de la gendarmerie nationale des chefs de :

- Complicité d'accès frauduleux et maintien frauduleux dans un système de traitement automatisé de données (STAD) avec la circonstance qu'il en résulte une altération du système ;
- Complicité d'entrave au fonctionnement d'un STAD ;
- Complicité d'introduction frauduleuse de données dans un STAD ;
- Complicité de modification frauduleuse de données dans un STAD ;

- Complicité d'extorsion en bande organisée ;
- Complicité d'association de malfaiteurs en vue de commettre un crime ou un délit puni de 05 ans au moins d'emprisonnement ;
- Blanchiment de crimes ou de délits commis en bande organisée.

Le 29 juillet 2024, un mandat d'arrêt national était décerné par Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, à l'encontre d'Anatolii Viktorovich LEGKODYMOV.

En effet, quand bien même Anatolii Viktorovich LEGKODYMOV a été libéré de prison après avoir été condamné à une peine d'emprisonnement dans le cadre d'un plaider coupable avec les autorités américaines, et que l'article 113-9 du code pénal français prévoit que « aucune poursuite ne peut être exercée contre une personne justifiant qu'elle a été jugée définitivement à l'étranger pour les mêmes faits et, en cas de condamnation, que la peine a été subie ou prescrite », cet article vise uniquement « les cas prévus aux articles 113-6 et 113-7 », c'est-à-dire ceux où la loi pénale française est applicable à des infractions commises hors du territoire de la République en raison de la nationalité française de son auteur ou de sa victime. S'agissant de faits commis sur le territoire national, la décision rendue par la juridiction pénale étrangère n'a pas en France l'autorité de la chose jugée.

Dans ces conditions, un mandat d'arrêt européen était décerné à l'encontre d'Anatolii Viktorovich LEGKODYMOV le 14 août 2024 par Madame Natacha RATEAU, premier vice-procureur de la République près le Tribunal judiciaire de Paris, et une demande d'arrestation provisoire en date du 20 août 2024 était adressé aux autorités américaines.

Le 23 août 2024, une demande d'extradition était adressée aux autorités américaines.

## V – Prescription

La prescription de l'action publique, qui est interrompue par les actes d'enquête et de poursuite (articles 7, 8 et 9-2 du code de procédure pénale) est de :

- Six ans pour les infractions de complicité d'accès et maintien frauduleux dans un système de traitement automatisé de données ; complicité d'introduction frauduleuse de données dans un système de traitement automatisé de données ; complicité de modification frauduleuse de données contenues dans un système de traitement automatisé de données ; association de malfaiteurs en vue de commettre un crime ou un délit punis de 05 ans au moins ; complicité d'atteinte à un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, commise en bande organisée et blanchiment de crimes ou délits commis en bande organisée.
- Vingt années pour l'infraction de complicité d'extorsion en bande organisée.

La présente demande d'extradition est, en droit français, un acte de recherche du Ministère public, interruptif de la prescription.

*L'extradition d'Anatolii Viktorovich LEGKODYMOV sur le fondement de l'article 13 du traité bilatéral franco-américain du 23 avril 1996, entré en vigueur le 1er février 2002, ainsi que sur le fondement des articles 6 et 7 de l'accord entre l'Union européenne et les Etats-Unis en matière d'extradition en date du 25 juin 2003. En outre, la présente demande d'extradition est fondée sur la Convention sur la cybercriminalité du Conseil de l'Europe en date du 23 novembre 2001, entrée en vigueur le 1er janvier 2007 et la Convention des Nations-Unies contre la criminalité transnationale organisée, adoptée à New-York le 15 novembre 2000.*

Je vous prie de bien vouloir trouver en annexe de ce pli :

- Le mandat d'arrêt délivré le 29 juillet 2024 par Monsieur Serge TOURNAIRE, premier vice-président chargé de l'instruction près le Tribunal judiciaire de Paris ;
- Le mandat d'arrêt européen délivré le 14 août 2024 par Madame Natacha RATEAU, premier vice-procureure de la République près le Tribunal judiciaire de Paris ;
- Les textes de définition et de répression des infractions mentionnées, de compétence des juridictions françaises, ainsi que ceux relatifs à la prescription de l'action publique.

*P/ Madame la procureure de la République*
Philippe TOCCANIER
Procureur adjoint



Visé sous le n° 21 646
(Ce n° correspond au n° de la traduction)
«NE VARIETUR»

0 4 DEC. 2024



Copie certifiée
conforme à l'original

COUR D'APPEL DE PARIS
# TRIBUNAL JUDICIAIRE DE PARIS

**Cabinet de Brice HANSEMANN**
vice-président chargé de l'instruction

N° Parquet :          22249000099
N° Instruction :   JIJI82523000002
Identifiant justice :   2202293307Y
Procédure :          criminelle

# MANDAT D'ARRÊT

## REPUBLIQUE FRANCAISE - AU NOM DU PEUPLE FRANCAIS

Le 29 juillet 2024 ,

Nous, Serge TOURNAIRE, premier vice-président chargé de l'instruction, substituant Brice HANSEMANN, vice-président chargé de l'instruction, régulièrement empêché, vu l'article 84 du code de procédure pénale, vu l'urgence, étant en notre cabinet au Tribunal judiciaire de Paris ;

Vu les articles 122, 123, 124, 131, 133, 134, 141-2 du code de procédure pénale ;

Vu la procédure suivie contre :

**LEGKODYMOV Anatolii Viktorovich**
né le 10 août 1982 en URSS
demeurant : adresse inconnue
Sexe : M
Nationalité : russe

Mis en cause pour

Des indices graves et concordants d'avoir en FRANCE, et en tout cas sur le territoire national, et de manière indivisible, au PORTUGAL, en ESPAGNE, à CHYPRE, en UKRAINE, aux ETATS-UNIS en RUSSIE et à HONG KONG, entre le 1er décembre 2017 et le 20 janvier 2023, en tout cas depuis temps non prescrit, commis les faits de :

**COMPLICITE D'ACCES ET MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Faits prévus et réprimés par les articles 121-4, 121-5, 121-6. 323-1, 323-5, 323-7 du Code pénal Natinf 1619 et 1637

**COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Faits prévus et réprimés par les articles 121-4, 121-5, 121-6, 323-3 alinéa 1, 323-5 du Code pénal Natinf 1671

**COMPLICTTE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Faits prévus et réprimés par les articles 121-4, 121-5, 121-6, 323-3 alinéa 1, 323-5 du Code pénal Natinf 1675

**COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D' UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES** Faits prévus et réprimés par les articles 121-4, 121-5, 121-6,323-2, 323-5, 323-7 du Code pénal Natinf 1667

**COMPLICITE D'EXTORSION EN BANDE ORGANISEE**

Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator
registered with
the Appeal
Court of Paris
(English)
1 Bd St. Martin - 75003 Paris

N° Parquet : 22249000099 - N° de dossier : JIJI82523000002
MANDAT D'ARRÊT de Legkodymov Anatolii Viktorovich

Page 1/8

SBU – LAW ENFORCEMENT

Faits prévus et réprimés par les articles 121-4, 121-5, l2l-6,131-26-2, 132-71, 312-6 alinéa 1, 312-1 alinéa 1, 312-13, 312-14 Natinf 10822

**ASSOCIATION DE MALFAITEURS EN VUE DE COMMETTRE UN CRIME OU UN DELIT PUNIS DE 5 ANS AU MOINS** Faits prévus et réprimés par les articles 121-4, 121-5, 121-6, 450-1, 450-3 et 450-5 du Code pénal Natinf 7168

**COMPLICITE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT,COMMISE EN BANDE ORGANISEE**
Faits prévus et réprimés par les articles 121-4, 121-5, 121-6, 323 4 I, 323 1, 3232, 323 3, 323 3 1, 132 71,323 4 1, 323 5 du Code pénal Natinf30832

**BLANCHIMENT DE CRIMES OU DELITS COMMIS EN BANDE ORGANISEE**
Faits prévus et réprimés par les articles 324-1, 324-1-1, 324-2, 324-3, 324-4, 324-5, 324-6, 324-7, 324-8 du Code pénal Natinf20659, 20660

Dans le cadre d'une action opérationnelle européenne, la direction générale de la gendarmerie nationale et 17 agences de force de l'ordre ont mis en lumière 20 cibles prioritaires, afin d'identifier et démanteler des services de blanchiment de crypto-actifs. Une des principales cibles est l'échangeur de crypto-actifs russe BITZLATO avec un volume de transactions évalué à plus d'un milliard de dollars depuis 2019. La plate-forme d'échange de crypto-actifs russe BITZLATO permet d'échanger rapidement des crypto-actifs type bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD contre des roubles. La plate-forme d'échange possède un site internet en langue russe mais également en langue anglaise et est accessible à tous les utilisateurs du web et notamment à des clients français. Elle propose des services de P2P, d'exchange et de quick exchange. Cette plate-forme est mise en lumière dans divers espaces médiatiques comme un canal favorisant le blanchiment de fonds issus du hacking et autres activités criminelles. Ainsi, dans son rapport 2022 « Crypto crime report », la société Chainalysis note que la société BITZLATO a reçu une part importante de jetons numériques provenant d'adresses illicites et risquées. Selon la presse (Bloomberg et le New York Times), Federation Tower, un complexe de deux gratte-ciel au cœur de la ville de Moscou, abrite de nombreuses entreprises de crypto-actifs soupçonnées de faciliter le blanchiment d'argent à grande échelle, y compris l'acceptation de fonds de crypto-monnaie illicites obtenus par le biais d'escroqueries, de marchés darknet et rançongiciel. Parmi ces entreprises se situe notamment la société BITZLATO. L'analyse de la blockchain, combinée aux données du trafic web, indique également qu'après les attaques par ransomware, la plupart des fonds extorqués sont blanchis par des services destinés principalement aux utilisateurs russes. En 2021, BITZLATO aurait ainsi reçu 206 millions de dollars des marchés du darknet, 224,5 millions de dollars d'escroqueries et 9 millions de dollars des attaquants de ransomware. Cette plate forme serait également mise en cause dans le financement de la guerre en Ukraine et dans d'autres activités illicites.

Une enquête préliminaire a été ouverte par le parquet de Paris le 6 septembre 2022 et confiée à la direction générale de la gendarmerie nationale sous les chefs de :

- Complicité d'accès frauduleux et maintien frauduleux dans un système de traitement automatisé de données (STAD) avec la circonstance qu'il en résulte une altération du système (Natinf 1619 - 1637)

- Complicité d'entrave au fonctionnement d'un STAD (Natinf 1667)

- Complicité d'introduction frauduleuse de données dans un STAD (Natinf 1671)

- Complicité de modification frauduleuse de donnée dans un STAD (Natinf 1675)

- Complicité d'extorsion en bande organisée (Natinf 10822)

- Complicité d'association de malfaiteurs en vue de commettre un crime ou un délit punis de 5 ans au moins (Natinf 7168)

- Blanchiment de crimes ou de délits commis en bande organisée (Natinf 20659 et 20660)

Les investigations ont permis de révéler que le site de BITZLATO utilise un hébergeur français, OVH, auprès de qui la société loue 56 serveurs dédiés. Parmi ceux-ci, les enquêteurs parvenaient à identifier le serveur de « management », c'est-à-dire le serveur qui communique et permet l'administration des autres serveurs. Ce serveur était copié. Pour permettre la copie, il devait être redémarré. OVH informait les enquêteurs que le client avait tenté de le redémarrer à distance au bout de 2 ou 3 minutes puis avait déposé un ticket d'incident 7 minutes après le début de l'arrêt, démontrant que les membres de BITZLATO utilisaient une infrastructure. L'analyse de ce serveur de management révélait que les administrateurs surveillaient de près

Copie certifiée conforme à l'original

SBU - LAW ENFORCEMENT

application nommée « MATTERMOST ». Il s'agissait d'une application de communication conçue comme un tchat interne et une messagerie instantanée. L'analyse de l'application MATTERMOST mettait en lumière les éléments suivants : le serveur de management était administré par « DREY » alias Andrei PRYHODKO (informaticien), « MI2016 » alias Mike LUNOV (CEO de l'entreprise) et « Mr Note » ou « vanch » alias Ivan BONDAREV. 132 profils utilisateurs étaient répertoriés, 1156 conversations de groupe ou privées représentant 505 110 messages, 121 chanels de plus de deux personnes et 15 868 fichiers, entre le 9 avril 2018 et le 4 mai 2022. L'analyse permettait de comprendre le fonctionnement BITZLATO et de récupérer des messages relatifs à de potentiels partenaires, la comptabilité, le recrutement, la RH, des éléments de marketing, l'architecture technique de la plate-forme et son développement, des échanges liés aux crypto-actifs, etc. Ceci confirmait que l'exposition des différentes adresses de crypto-actifs de l'échangeur étaient issues en majorité d'activités illicites.

Ainsi, pour les fonds reçus sur BITZLATO, il a été calculé, par service criminel, le volume d'activité suivant :

7% du volume d'activité de HYDRA MARKET PLACE représentant 171 millions de dollars,

9% du volume d'activité du scam FINIKO représentant 138 millions de dollars,

3,6 % du volume de GARENTEX représentant 73 millions de dollars.

Pour les fonds envoyés depuis BITZLATO, il a été calculé :

14,75 % du volume d'activité de HYDRA MARKET PLACE soit 125 millions de dollars,

14,4 % du volume d'activité du scam FINIKO soit 225 millions de dollars,

8,8 % du volume d'activité de GAFtENTEX soit 174 millions de dollars.

Par ailleurs, 2,5 millions de dollars ont été envoyés depuis le mixeur BITMIX.BIZ sur BITZLATO, fonds provenant de ransomware. En outre, deux adresses de BITZLATO ont reçu plus de 65 millions de dollars depuis mars 2022 de WASA13I WALLET MIXEUR. Le plus gros montant de Bitcoin échangé en une seule transaction était de 200 BTC, soit 8 millions d'euros. Il ressortait des analyses que l'échangeur BITZLATO ne détenait, depuis 2018, que 14 293 KYC, alors même que les enquêteurs dénombraient 3 004 389 utilisateurs. Ceci démontrait que la plate-forme était peu regardante sur l'identité de ses clients.

Plusieurs membres des équipes de BITZLATO ont fait l'objet de poursuites, étant soit visés par des mandats d'arrêt, soit mis en examen :

-Mikhaïl LUNOV directeur général,

-Aleksandr HONCHARENKO directeur marketing de la société

-Andril KRYSTHAL Technicien - Développement Mobile pour la société ;

-Pavel LERNER, manager du projet « bourse », de la société

-Constantin ALEKSEEV ingénieur sur le projet « bourse » de la société

Anatolii LEGKODYMOV, PDG de la société BITZLATO, a été interpellé à Miami le 17 janvier 2023 par le FBI. A cette occasion, ont été saisis plusieurs supports numériques dont, notamment, 5 téléphones et 2 ordinateurs portables. Le 06 décembre 2023, le Bureau du procureur des Etats-Unis, district Est de New York, a fait savoir par communiqué de presse qu'Anatolii Legkodymov avait plaidé coupable devant le tribunal fédéral de Brooklyn (dossier E.D.N.Y n°23-CR-496 (ENV). Selon des articles de presse, Anatolii LEGKODYMOV a été condamné à une peine d'emprisonnement de 18 mois et été libéré à l'issue de la peine. Il serait donc actuellement libre de ses mouvements.

Anatolii LEGKODYMOV (Russe) était le directeur et actionnaire de BITZALTO Il était administrateur et technicien de la plate forme. Des conversations entre Anatolii LEGKODYMOV et son associe Anton SHKURENKO en 2018 montrent que ceux-ci avaient connaissance que le chiffre d'affaires de la société reposait sur une origine douteuse et notamment en lien avec le trafic de stupéfiants et évoquaient la nécessité de créer un apparence de contrôle afin de gagner en respectabilité, sans pour autant se priver de cette source de revenu. D'autres posts démontrent qu'il avait connaissance que la société BITZATO était associée via les réseaux sociaux et des articles de presse au dark web type Hydra ou à des activités de blanchiment. L'enquête a aussi révélé que la société BITZALTO ne demandait pas de KYC (Know your customer) et avait conscience d'aider ses clients à effectuer des transactions liées à diverses activités illicites.

SBU * LAW ENFORCEMENT

Attendu que Anatolii LEGKODYMOV a été libéré de prison après avoir été condamné à une peine d'emprisonnement dans le cadre d'un plaider coupable avec les autorités américaines ; que l'article 113-9 du Code pénal selon lequel «aucune poursuite ne peut être exercée contre une personne justifiant qu'elle a été jugée définitivement à l'étranger pour les mêmes faits et, en cas de condamnation, que la peine a été subie ou prescrite» vise ainsi uniquement «les cas prévus aux articles 113-6 et 113-7», c'est-à-dire ceux où la loi pénale française est applicable à des infractions commises hors du territoire de la République en raison de la nationalité française de son auteur ou de sa victime ; que s'agissant de faits commis sur le territoire national, la décision rendue par une juridiction pénale étrangère n'a pas en France, l'autorité de la chose jugée ; que l'adresse actuelle de Anatolii LEGKODYMOV, ressortissant russe, est inconnue ; qu'en tout état de cause, il ne dispose d'aucun domicile en France ; que dans ces conditions, la délivrance d'un mandat d'arrêt est nécessaire pour effectuer des poursuites à son encontre et proportionné s'agissant de faits d'association de malfaiteurs et de faits de nature criminelle commis en bande organisée et générant des profits astronomiques.

Mandons et ordonnons à tous officiers ou agents de police judiciaire et à tous agents de la force publique, en se conformant à la loi, de rechercher et de conduire devant Nous la personne susvisée ;

Enjoignons au directeur de la maison d'arrêt du lieu d'arrestation de la recevoir et de la détenir en état de mandat d'arrêt jusqu'à ce qu'il en soit autrement ordonné ;

Requérons tout dépositaire de la force publique auquel le présent mandat sera exhibé de prêter main-forte pour son exécution en cas de besoin ;

En foi de quoi le présent mandat a été signé par Nous et scellé de notre sceau.

Le premier vice-président chargé de l'instruction,

Serge TOURNAIRE







Visé sous le n° 2224-99A
(Ce n° correspond au n° de la traduction)
«NE VARIETUR»

2 3 AOUT 2024

SBU – LAW ENFORCEMENT



**MINISTÈRE
DE LA JUSTICE**

*Liberté
Égalité
Fraternité*

### COUR D'APPEL DE PARIS
### TRIBUNAL JUDICIAIRE DE PARIS

**MANDAT D'ARRÊT EUROPÉEN**

**[A030]** Le présent mandat a été émis par une autorité judiciaire compétente. Je demande que la personne mentionnée ci-dessous soit arrêtée et remise aux autorités judiciaires aux fins de l'exercice de poursuites pénales ou de l'exécution d'une peine ou d'une mesure de sûreté privative de liberté.

a) **Renseignements relatifs à l'identité de la personne recherchée :**

**[A006]** Nom patronymique : **LEGKODYMOV**

**[A007]** Prénom(s) : **Anatolii Viktorovich**

**[A008]** Nom d'épouse, s'il y a lieu :

**[A011]** Alias, s'il y a lieu :

**[A012]** Sexe : **Masculin**

**[A013]** Nationalité : **Russe**

**[A009]** Date de naissance : **10 août 1982**

**[A010]** Lieu de naissance : **en URSS**

**Filiation inconnue**

**[A061]** Résidence et/ou adresse connue : **sans domicile connu**

**Susceptible de se trouver aux Etats-Unis**

**[M083]** La ou les langues que la personne recherchée comprend (si connu) : **Ignorée**

**[A058]** Traits distinctifs/description de la personne recherchée : **Ignorés**

**[A059 et A060]** Photo et empreintes digitales de la personne recherchée, si elles sont disponibles et s'il est possible de les communiquer, ou les coordonnées de la personne à contacter afin d'obtenir ces informations ou un profil A.D.N. (si ces données peuvent être communiquées, mais n'ont pas été incluses) : **Néant**



*Copie certifiée conforme à l'original*

1

**b) Décision sur laquelle se fonde le mandat d'arrêt européen :**

**[A031 et A032]** Mandat d'arrêt ou décision judiciaire ayant la même force : **Mandat d'arrêt décerné le 29 juillet 2024**

**[A033] Type : Mandat d'arrêt délivré par Serge TOURNAIRE, Premier vice-président chargé de l'instruction, substituant Brice HANSEMANN, vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, régulièrement empêché (art 131 CPP)**

**[A035 et A036]** Jugement exécutoire : **Néant**

**[A037]** Référence : **22249000099**

**c) Indications sur la durée de la peine :**

**[A034]** Durée maximale de la peine ou mesure de sûreté privatives de liberté qui peut être prononcée pour l'infraction/les infractions commise(s) :

**20 ans de réclusion criminelle**

**[A038]** Durée de la peine ou mesure de sûreté privatives de liberté infligée :

**[A039]** Peine restant à purger :

**[M083] d) Indiquez si l'intéressé a comparu en personne au procès qui a mené à la décision :**

1. ☐  Oui, l'intéressé a comparu en personne au procès qui a mené à la décision.

2. ☐  Non, l'intéressé n'a pas comparu en personne au procès qui a mené à la décision.

3. Si vous avez coché la case du point 2, veuillez confirmer si:

☐   3.1 a) l'intéressé a été cité à personne le.... (jour/mois/année) et a ainsi été informé de la date et du lieu fixés pour le procès qui a mené à la décision, et s'il a été informé qu'une décision pouvait être rendue en cas de non-comparution ;

OU

☐   3.1 b) l'intéressé n'a pas été cité à personne, mais a été informé officiellement et effectivement par d'autres moyens de la date et du lieu fixés pour le procès qui mené à la décision, de telle sorte qu'il a été établi de manière non équivoque que l'intéressé a eu connaissance du procès prévu, et a été informé qu'une décision pouvait être rendue en cas de non-comparution ;

OU




2

Copie certifiée conforme à l'original

☐  3.2  ayant eu connaissance du procès prévu, l'intéressé a donné mandat à un conseil juridique, qui a été désigné soit par l'intéressé soit par l'État, pour le défendre au procès, et a été effectivement défendu par ce conseil pendant le procès ;

OU

☐  3.3  l'intéressé s'est vu signifier la décision le .... (jour/mois/année) et a été expressément informé de son droit à une nouvelle procédure de jugement ou à une procédure d'appel, à laquelle l'intéressé a le droit de participer et qui permet de réexaminer l'affaire sur le fond, en tenant compte des nouveaux éléments de preuve, et peut aboutir à une infirmation de la décision initiale, et

☐  l'intéressé a indiqué expressément qu'il ne contestait pas la décision ;

OU

☐  l'intéressé n'a pas demandé une nouvelle procédure de jugement ou une procédure d'appel dans le délai imparti ;

OU

☐  3.4  l'intéressé n'a pas reçu personnellement la signification de la décision, mais

–  il la recevra personnellement sans délai après la remise, et

–  lorsqu'il l'aura reçue, il sera expressément informé de son droit à une nouvelle procédure de jugement ou à une procédure d'appel, à laquelle l'intéressé a le droit de participer et qui permet de réexaminer l'affaire sur le fond, en tenant compte des nouveaux éléments de preuve, et peut aboutir à une infirmation de la décision initiale, et

–  il sera informé du délai dans lequel il doit demander une nouvelle procédure de jugement ou une procédure d'appel, soit ...jours.

4. Si vous avez coché la case du point 3.1 b), 3.2 ou 3.3 ci-dessus, veuillez indiquer comment la condition concernée a été remplie :
................................................................................................................................................
................................................................................................................................................

e) Infraction(s) :

[M083] LE PRESENT MANDAT SE RAPPORTE AU TOTAL A 10 INFRACTIONS.

[A042, A 043, A044 et A045] Description des circonstances dans lesquelles la ou les infractions ont été commises, y compris le moment (la date et l'heure), le lieu ainsi que le degré de participation de la personne recherchée à l'infraction ou aux infractions :

Auteur et complice des faits commis entre le 1er décembre 2017 et le 20 janvier 2023 en France, et en tout cas sur le territoire national, et de manière indivisible, au Portugal, en Espagne, à CHYPRE, en UKRAINE, aux ETATS-UNIS, en RUSSIE et à HONG-KONG, et depuis temps non prescrit.




Une enquête était diligentée, elle permettait d'établir l'existence d'une plate-forme d'échange de cryptoactifs russe nommée « BITZLATO.»

Elle permettait d'échanger rapidement des cryptoactifs type bitcoins, ethereum, litecoins, bitcoins cash, dashs, dogecoins et tether USD à tout moment contre des roubles. Elle possédait un site internet accessible à tous les utilisateurs du web. Les fondateurs de la plate-forme étaient identifiés, il s'agissait de ressortissants russes ayant implanté leur société en CHINE.

Cette plate-forme était utilisée pour faciliter le blanchiment de fonds issus du hacking et autres activités criminelles. L'étude des serveurs saisis dans le cadre de ce dossier permettait de confirmer la complicité de la plateforme à des activités criminelles. En 2021, la plateforme avait reçu 440 millions de dollars provenant d'activités frauduleuses.

**Anatolii Viktorovich LEGKODYMOV** était identifié comme l'un des trois membres fondateurs de la société. Il a été interpellé le 17 janvier 2023 à Miami. Il a été condamné aux Etats-Unis et serait actuellement en liberté sur le territoire américain.

---

**[A040 ET A041] Nature et qualification juridique de la ou des infractions et dispositions légales applicables :**

**COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**

Définie par ART.323-1 AL.1 C.PENAL.

Réprimée par ART.323-1 AL.1, ART.323-5 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**COMPLICITE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**

Définie par ART.323-1 AL.1 C.PENAL.

Réprimée par ART.323-1 AL.1, ART.323-5 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE.**

Définie par ART.323-3 AL.1 C.PENAL.

Réprimée par ART.323-3 AL.1, ART.323-5 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**

Définie par ART.323-3 AL.1 C.PENAL.

Réprimée par ART.323-3 AL.1, ART.323-5 C.PENAL.

4



Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**

Définie par ART.323-2 AL.1 C.PENAL.

Réprimée par ART.323-2 AL.1, ART.323-5 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**COMPLICITE D'EXTORSION EN BANDE ORGANISEE**

Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C.PENAL.

Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME**

Définie par ART.450-1 AL.1, AL.2 C.PENAL.

Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**COMPLICITE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE**

Définie par ART.323-4-1, ART.323-1, ART.323-2, ART.323-3, ART.323-3-1, ART.132-71 C.PENAL.

Réprimée par ART.323-4-1, ART.323-5 C.PENAL.

Et vu les articles 121-4, 121-5, 121-6 et 121-7 du C.PENAL

**BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS D'UN DELIT**

Définie par ART.324-2 2°, ART.324-1 AL.1, ART.132-71 C.PENAL.

Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.131-30 AL.1 C.PENAL.

**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**

Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C.PENAL.

Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C.PENAL.



Copie certifiée conforme à l'original

Arindam BHATTACHARYA
Sworn Translator
registered with
the Appeal
Court of Paris
(English)
1, Bd St. Martin - 75003 Paris

5

**[M083]  I.  Cocher le cas échéant, s'il s'agit d'une ou des infractions suivantes punies en France d'une peine d'une durée égale ou supérieure à 3 ans telles qu'elles sont définies par le droit français :**

☒  **Participation à une organisation criminelle**

☐  Terrorisme

☐  Traite des êtres humains

☐  Exploitation sexuelle des enfants et pornographie infantile

☐  Trafic illicite de stupéfiants et de substances psychotropes

☐  Trafic illicite d'armes, de munitions et d'explosifs

☐  Corruption

☐  Fraude, y compris la fraude portant atteinte aux intérêts financiers des Communautés européennes au sens de la convention du 26 juillet 1995 relative à la protection des intérêts financiers des Communautés européennes

☒  **Blanchiment du produit du crime**

☐  Faux monnayage, y compris la contrefaçon de l'euro

☒  **Cybercriminalité**

☐  Crimes et délits contre l'environnement, y compris le trafic illicite d'espèces animales menacées et le trafic illicite d'espèces et d'essences végétales menacées

☐  Aide à l'entrée et au séjour irréguliers

☐  Homicide volontaire, coups et blessures graves

☐  Trafic illicite d'organes et de tissus humains

☐  Enlèvement, séquestration et prise d'otage

☐  Racisme et xénophobie

☐  Vols commis en bande organisée ou avec arme

☐  Trafic illicite de biens culturels, y compris antiquités et œuvres d'art

☐  Escroquerie

☒  **Extorsion**

☐  Contrefaçon et piratage de produits

☐  Falsification de documents administratifs et trafic de faux

☐  Falsification de moyens de paiement

☐  Trafic illicite de substances hormonales et autres facteurs de croissance

☐  Trafic illicite de matières nucléaires et radioactives

6

Copie certifiée conforme à l'original

PROCUREUR DE LA RÉPUBLIQUE PRÈS LE TRIBUNAL JUDICIAIRE DE PARIS ★ P341 ★

Arindam BHATTACHARYA
Sworn Translator registered with the Appeal Court of Paris (English)
1, Bd St. Martin - 75003

☐  Trafic de véhicules volés

☐  Viol

☐  Incendie volontaire

☐  Crimes et délits relevant de compétence de la Cour pénale internationale

☐  Détournement d'avion/navire

☐  Sabotage

---

**II. [A044]  Description complète de l'infraction ou des infractions qui ne relèvent pas des cas visés au point I ci-avant :**

---

**f) [M083]  Autres circonstances pertinentes en l'espèce (informations facultatives) :**
(NB : il est possible d'inclure ici des remarques sur l'extra-territorialité, les actes interruptifs de prescription et autres conséquences de l'infraction)

---

**g) [M083]  Le présent mandat se rapporte également à la saisie et à la remise des objets qui peuvent servir de pièces à conviction.**

Le présent mandat se rapporte également à la saisie et à la remise des objets acquis par la personne recherchée du fait de l'infraction :

description des objets (et lieu où ils se trouvent) (s'ils sont connus) :

---

**h) [M083] ☐   L'infraction ou les infractions pour laquelle ou lesquelles ce mandat a été émis est ou sont passibles d'une peine ou mesure de sûreté privative de liberté à caractère perpétuel ou a (ont) eu pour effet une telle peine ou mesure :**

LE SYSTÈME JURIDIQUE DE L'ÉTAT MEMBRE D'ÉMISSION PRÉVOIT UNE RÉVISION DE LA PEINE INFLIGÉE - SUR DEMANDE OU AU PLUS TARD APRÈS 20 ANS - EN VUE DE LA NON-EXÉCUTION DE CETTE PEINE OU MESURE.

ET/OU

LE SYSTÈME JURIDIQUE FRANÇAIS PRÉVOIT L'APPLICATION DE MESURES DE CLÉMENCE AUXQUELLES LA PERSONNE PEUT PRÉTENDRE EN VERTU DE LA LÉGISLATION EN VUE DE LA NON-EXÉCUTION DE CETTE PEINE.

---

**i) [A030] Autorité judiciaire qui a émis le mandat :**

DÉSIGNATION OFFICIELLE DE L'AUTORITÉ JUDICIAIRE : Procureur de la République près le Tribunal judiciaire de Paris

NOM DE SON REPRÉSENTANT : MADAME NATACHA RATEAU
FONCTION (TITRE) : Premier vice-procureur

7

*Copie certifiée conforme à l'original*

Sworn Translator
registered with
the Appeal
Court of Paris
(English)

Arindam BHATTACHARYA
1, Bd St. Martin - 75003 Paris

Reference du Dossier : **22249000099**
Adresse : **Parvis du Tribunal de Paris - 75859 CEDEX 17**

Permanence du Parquet :
N° de telephone : **+33 1 70 60 80 60**
N° de telecopie : **+ 33 1 44 32 78 77**
Courriel : **mandats.a2.tj-paris@justice.fr**

---

Coordonnees de la personne a contacter afin de prendre les dispositions pratiques necessaires a la remise de la personne :

**Madame Natacha RATEAU, magistrate de l'ordre judiciaire**

N° de telephone de la permanence : **+33 1 70 60 80 60**
N° de telecopie : **+ 33 1 44 32 78 77**
Courriel : **mandats.a2.tj-paris@justice.fr**

ainsi que **le service national des transfèrements** (DAP) et Madame Rohra GHOLEM, Chef de service, Responsable du SNT, aux numéros suivants :
N° de telephone mobile de permanence : 00 33 681 49 77 99
N° de telephone : 00 33 186 28 60 28
Courriel : snt.dap-ems@justice.gouv.fr

---

Signature de l'autorite judiciaire d'emission (Procureur general ou Procureur de la Republique), ou de son representant

Nom : **Madame Natacha RATEAU**

Fonction (titre) : **Première vice-procureure**

Date : 14/08/24

Cachet officiel (s'il est disponible) :

---

Arindam BHATTACHARYA
Sworn Translator
registered with
the Appeal
Court of Paris
(English)
1, Bd St. Martin - 75003 Paris

Copie certifiée
conforme à l'original

Visé sous le n° 222499
(Ce n° correspond au n° de la traduction)
«NE VARIETUR»

2 3 AOUT 2024



---

## ANNEXE 1 : LEGISLATION RELATIVE AUX QUALIFICATIONS PENALES RETENUES CONTRE ANATOLII VIKTOROVICH LEGKODYMOV, A LA PRESCRIPTION DE L'ACTION PUBLIQUE ET A LA COMPETENCE DES JURIDICTIONS FRANCAISES

---

### COMPLICITE D'ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES

#### Article 323-1 du code pénal

Le fait d'accéder ou de se maintenir, frauduleusement, dans tout ou partie d'un système de traitement automatisé de données est puni de trois ans d'emprisonnement et de 100 000 € d'amende.

Lorsqu'il en est résulté soit la suppression ou la modification de données contenues dans le système, soit une altération du fonctionnement de ce système, la peine est de cinq ans d'emprisonnement et de 150 000 € d'amende.

Lorsque les infractions prévues aux deux premiers alinéas ont été commises à l'encontre d'un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, la peine est portée à sept ans d'emprisonnement et à 300 000 € d'amende.

#### Article 323-5 du code pénal

Les personnes physiques coupables des délits prévus au présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction, pour une durée de cinq ans au plus, des droits civiques, civils et de famille, suivant les modalités de l'article 131-26 ;

2° L'interdiction, pour une durée de cinq ans au plus, d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice de laquelle ou à l'occasion de laquelle l'infraction a été commise ;

3° La confiscation de la chose qui a servi ou était destinée à commettre l'infraction ou de la chose qui en est le produit, à l'exception des objets susceptibles de restitution ;

4° La fermeture, pour une durée de cinq ans au plus, des établissements ou de l'un ou de plusieurs des établissements de l'entreprise ayant servi à commettre les faits incriminés ;

5° L'exclusion, pour une durée de cinq ans au plus, des marchés publics ;

6° L'interdiction, pour une durée de cinq ans au plus, d'émettre des chèques autres que ceux qui

permettent le retrait de fonds par le tireur auprès du tiré ou ceux qui sont certifiés ;

7° L'affichage ou la diffusion de la décision prononcée dans les conditions prévues par l'article 131-35.

### Article 121-4 du code pénal

Est auteur de l'infraction la personne qui :

1° Commet les faits incriminés ;

2° Tente de commettre un crime ou, dans les cas prévus par la loi, un délit.

### Article 121-5 du code pénal

La tentative est constituée dès lors que, manifestée par un commencement d'exécution, elle n'a été suspendue ou n'a manqué son effet qu'en raison de circonstances indépendantes de la volonté de son auteur.

### Article 121-6 du code pénal

Sera puni comme auteur le complice de l'infraction, au sens de l'article 121-7.

### Article 121-7 du code pénal

Est complice d'un crime ou d'un délit la personne qui sciemment, par aide ou assistance, en a facilité la préparation ou la consommation.

Est également complice la personne qui par don, promesse, menace, ordre, abus d'autorité ou de pouvoir aura provoqué à une infraction ou donné des instructions pour la commettre.

### COMPLICITE DE MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES

### Article 323-1 du code pénal

*Voir ci-dessus.*

### Article 323-5 du code pénal

*Voir ci-dessus.*

### Article 121-4 du code pénal

*Voir ci-dessus.*

### Article 121-5 du code pénal

*Voir ci-dessus.*







### Article 121-6 du code pénal

*Voir ci-dessus.*

### Article 121-7 du code pénal

*Voir ci-dessus.*

## COMPLICITE D'INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE.

### Article 323-3 du code pénal

Le fait d'introduire frauduleusement des données dans un système de traitement automatisé, d'extraire, de détenir, de reproduire, de transmettre, de supprimer ou de modifier frauduleusement les données qu'il contient est puni de cinq ans d'emprisonnement et de 150 000 € d'amende.

Lorsque cette infraction a été commise à l'encontre d'un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, la peine est portée à sept ans d'emprisonnement et à 300 000 € d'amende.

### Article 323-5 du code pénal

*Voir ci-dessus.*

### Article 121-4 du code pénal

*Voir ci-dessus.*

### Article 121-5 du code pénal

*Voir ci-dessus.*

### Article 121-6 du code pénal

*Voir ci-dessus.*

### Article 121-7 du code pénal

*Voir ci-dessus.*



## COMPLICITE DE MODIFICATION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE

### Article 323-3 du code pénal

*Voir ci-dessus.*



### Article 323-5 du code pénal

*Voir ci-dessus.*

### Article 121-4 du code pénal

*Voir ci-dessus.*

### Article 121-5 du code pénal

*Voir ci-dessus.*

### Article 121-6 du code pénal

*Voir ci-dessus.*

### Article 121-7 du code pénal

*Voir ci-dessus.*

## COMPLICITE D'ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES

### Article 323-2 du code pénal

Le fait d'entraver ou de fausser le fonctionnement d'un système de traitement automatisé de données est puni de cinq ans d'emprisonnement et de 150 000 € d'amende.

Lorsque cette infraction a été commise à l'encontre d'un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, la peine est portée à sept ans d'emprisonnement et à 300 000 € d'amende.

### Article 323-5 du code pénal

*Voir ci-dessus.*

### Article 121-4 du code pénal

*Voir ci-dessus.*

### Article 121-5 du code pénal

*Voir ci-dessus.*

### Article 121-6 du code pénal

*Voir ci-dessus.*



Copie certifiée conforme à l'original

### Article 121-7 du code pénal

*Voir ci-dessus.*

### COMPLICITE D'EXTORSION EN BANDE ORGANISEE

### Article 312-1 du code pénal

L'extorsion est le fait d'obtenir par violence, menace de violences ou contrainte soit une signature, un engagement ou une renonciation, soit la révélation d'un secret, soit la remise de fonds, de valeurs ou d'un bien quelconque.

L'extorsion est punie de sept ans d'emprisonnement et de 100 000 euros d'amende.

### Article 312-6 du code pénal

L'extorsion en bande organisée est punie de vingt ans de réclusion criminelle et de 150 000 euros d'amende.

Elle est punie de trente ans de réclusion criminelle et de 150 000 euros d'amende lorsqu'elle est précédée, accompagnée ou suivie de violences sur autrui ayant entraîné une mutilation ou une infirmité permanente.

Elle est punie de la réclusion criminelle à perpétuité lorsqu'elle est commise soit avec usage ou menace d'une arme, soit par une personne porteuse d'une arme soumise à autorisation ou dont le port est prohibé.

Les deux premiers alinéas de l'article 132-23 relatif à la période de sûreté sont applicables aux infractions prévues par le présent article.

### Article 312-13 du code pénal

I. – Les personnes physiques coupables de l'une des infractions prévues au présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction des droits civiques, civils et de famille, suivant les modalités prévues par l'article 131-26 ;

2° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, cette interdiction étant définitive ou provisoire dans les cas prévus aux articles 312-3 à 312-7 et pour une durée de cinq ans au plus dans les cas prévus aux articles 312-1, 312-2 et 312-10, soit d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

3° (Abrogé) ;

4° La confiscation de la chose qui a servi ou était destinée à commettre l'infraction ou de la chose qui en est le produit, à l'exception des objets susceptibles de restitution ;

5° L'interdiction de séjour suivant les modalités prévues par l'article 131-31.

II. – En cas de condamnation pour les infractions prévues au présent chapitre, le prononcé de la peine complémentaire d'interdiction de détenir ou de porter, pour une durée de cinq ans au plus, une arme soumise à autorisation est obligatoire.

Toutefois, la juridiction peut, par une décision spécialement motivée lorsque la condamnation est prononcée par une juridiction correctionnelle, décider de ne pas prononcer cette peine, en considération des circonstances de l'infraction et de la personnalité de son auteur.

### Article 312-14 du code pénal

L'interdiction du territoire français peut être prononcée dans les conditions prévues par l'article 131-30, soit à titre définitif, soit pour une durée de dix ans au plus, à l'encontre de tout étranger coupable de l'une des infractions définies à la section 1 du présent chapitre.

### Article 131-26-2 du code pénal

I. – Le prononcé de la peine complémentaire d'inéligibilité mentionnée au 2° de l'article 131-26 et à l'article 131-26-1 est obligatoire à l'encontre de toute personne coupable d'un délit mentionné au II du présent article ou d'un crime.

Cette condamnation est mentionnée au bulletin n° 2 du casier judiciaire prévu à l'article 775 du code de procédure pénale pendant toute la durée de l'inéligibilité.

II. – Les délits pour lesquels l'inéligibilité est obligatoirement prononcée sont les suivants :

1° Les délits prévus aux articles 222-9, 222-11, 222-12, 222-14, 222-14-1, 222-14-4, 222-15, 222-15-1 et 222-27 à 222-33-2-2 du présent code ;

2° Les délits prévus aux articles 225-1 à 225-2 ;

3° Les délits prévus aux articles 313-1, 313-2 et 314-1 à 314-3, ainsi que leur recel ou leur blanchiment ;

4° Les délits prévus au chapitre Ier du titre II du livre IV ;

5° Les délits prévus aux articles 432-10 à 432-15, 433-1 et 433-2, 434-9, 434-9-1, 434-43-1, 435-1 à 435-10 et 445-1 à 445-2-1, ainsi que leur recel ou leur blanchiment ;

6° Les délits prévus aux articles 441-2 à 441-6, ainsi que leur recel ou leur blanchiment ;

7° Les délits prévus aux articles L. 86 à L. 88-1, L. 91 à L. 104, L. 106 à L. 109, L. 111, L. 113 et L. 116 du code électoral ;

8° Les délits prévus aux articles 1741 et 1743 du code général des impôts, lorsqu'ils sont commis en bande organisée ou lorsqu'ils résultent de l'un des comportements mentionnés aux 1°

SBU LAW ENFORCEMENT

à 5° de l'article L. 228 du livre des procédures fiscales, ainsi que leur recel ou leur blanchiment ;

9° Les délits prévus aux articles L. 465-1 à L. 465-3-3 du code monétaire et financier, ainsi que leur recel ou leur blanchiment ;

10° Les délits prévus aux articles L. 241-3 et L. 242-6 du code de commerce, ainsi que leur recel ou leur blanchiment ;

11° Les délits prévus à l'article L. 113-1 du code électoral et à l'article 11-5 de la loi n° 88-227 du 11 mars 1988 relative à la transparence financière de la vie politique ;

12° Les délits prévus au I de l'article LO 135-1 du code électoral et à l'article 26 de la loi n° 2013-907 du 11 octobre 2013 relative à la transparence de la vie publique ;
[Dispositions déclarées non conformes à la Constitution par la décision n° 2017-752 DC du 8 septembre 2017.]

14° Le délit de participation à une association de malfaiteurs prévu à l'article 450-1 du présent code, lorsqu'il a pour objet un crime ou un délit mentionné aux 1° à 13° du présent II.

III. – Toutefois, la juridiction peut, par une décision spécialement motivée, décider de ne pas prononcer la peine prévue par le présent article, en considération des circonstances de l'infraction et de la personnalité de son auteur.

### Article 132-71 du code pénal

Constitue une bande organisée au sens de la loi tout groupement formé ou toute entente établie en vue de la préparation, caractérisée par un ou plusieurs faits matériels, d'une ou de plusieurs infractions.

### Article 121-4 du code pénal

*Voir ci-dessus.*

### Article 121-5 du code pénal

*Voir ci-dessus.*

### Article 121-6 du code pénal

*Voir ci-dessus.*

### Article 121-7 du code pénal

*Voir ci-dessus.*





## PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME

### Article 450-1 du code pénal

Constitue une association de malfaiteurs tout groupement formé ou entente établie en vue de la préparation, caractérisée par un ou plusieurs faits matériels, d'un ou plusieurs crimes ou d'un ou plusieurs délits punis d'au moins cinq ans d'emprisonnement.

Lorsque les infractions préparées sont des crimes ou des délits punis de dix ans d'emprisonnement, la participation à une association de malfaiteurs est punie de dix ans d'emprisonnement et de 150 000 euros d'amende.

Lorsque les infractions préparées sont des délits punis d'au moins cinq ans d'emprisonnement, la participation à une association de malfaiteurs est punie de cinq ans d'emprisonnement et de 75 000 euros d'amende.

### Article 450-3 du code pénal

Les personnes physiques coupables de l'infraction prévue par l'article 450-1 encourent également les peines complémentaires suivantes :

1° L'interdiction des droits civiques, civils et de famille, suivant les modalités prévues par l'article 131-26 ;

2° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, soit d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

3° L'interdiction de séjour, suivant les modalités prévues par l'article 131-31.

Peuvent être également prononcées à l'encontre de ces personnes les autres peines complémentaires encourues pour les crimes et les délits que le groupement ou l'entente avait pour objet de préparer.

### Article 450-5 du code pénal

Les personnes physiques et morales reconnues coupables des infractions prévues au deuxième alinéa de l'article 450-1 et à l'article 321-6-1 encourent également la peine complémentaire de confiscation de tout ou partie des biens leur appartenant ou, sous réserve des droits du propriétaire de bonne foi, dont elles ont la libre disposition, quelle qu'en soit la nature, meubles ou immeubles, divis ou indivis.





### Article 121-4 du code pénal

*Voir ci-dessus.*

### Article 121-5 du code pénal

*Voir ci-dessus.*

### Article 121-6 du code pénal

*Voir ci-dessus.*

### Article 121-7 du code pénal

*Voir ci-dessus.*

## COMPLICITE D'ATTEINTE A UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES A CARACTERE PERSONNEL MIS EN OEUVRE PAR L'ETAT, COMMISE EN BANDE ORGANISEE

### Article 323-4-1 du code pénal

Lorsque les infractions prévues aux articles 323-1 à 323-3-1 ont été commises en bande organisée, la peine est portée à dix ans d'emprisonnement et à 300 000 € d'amende.

### Article 323-1 du code pénal

*Voir ci-dessus.*

### Article 323-2 du code pénal

*Voir ci-dessus.*

### Article 323-3 du code pénal

*Voir ci-dessus.*

### Article 323-5 du code pénal

*Voir ci-dessus.*

### Article 323-3-1 du code pénal

Le fait, sans motif légitime, notamment de recherche ou de sécurité informatique, d'importer, de détenir, d'offrir, de céder ou de mettre à disposition un équipement, un instrument, un programme informatique ou toute donnée conçus ou spécialement adaptés pour commettre une ou plusieurs des infractions prévues par les articles 323-1 à 323-3 est puni des peines prévues respectivement pour l'infraction elle-même ou pour l'infraction la plus sévèrement réprimée.

**Article 132-71 du code pénal**

*Voir ci-dessus.*

**Article 121-4 du code pénal**

*Voir ci-dessus.*

**Article 121-5 du code pénal**

*Voir ci-dessus.*

**Article 121-6 du code pénal**

*Voir ci-dessus.*

**Article 121-7 du code pénal**

*Voir ci-dessus.*

**BLANCHIMENT AGGRAVE : AIDE EN BANDE ORGANISEE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS OU REVENUS DE L'AUTEUR D'UN DELIT**

**Article 324-2 du code pénal**

Le blanchiment est puni de dix ans d'emprisonnement et de 750 000 euros d'amende :

1° Lorsqu'il est commis de façon habituelle ou en utilisant les facilités que procure l'exercice d'une activité professionnelle ;

2° Lorsqu'il est commis en bande organisée.

**Article 324-1 du code pénal**

Le blanchiment est le fait de faciliter, par tout moyen, la justification mensongère de l'origine des biens ou des revenus de l'auteur d'un crime ou d'un délit ayant procuré à celui-ci un profit direct ou indirect.

Constitue également un blanchiment le fait d'apporter un concours à une opération de placement, de dissimulation ou de conversion du produit direct ou indirect d'un crime ou d'un délit.

Le blanchiment est puni de cinq ans d'emprisonnement et de 375 000 euros d'amende.

Copie certifiée conforme à l'original

**Article 132-71 du code pénal**

*Voir ci-dessus.*




PROCUREUR DE LA REPUBLIQUE PRES LE TRIBUNAL JUDICIAIRE DE PARIS P341



### Article 324-3 du code pénal

Les peines d'amende mentionnées aux articles 324-1 et 324-2 peuvent être élevées jusqu'à la moitié de la valeur des biens ou des fonds sur lesquels ont porté les opérations de blanchiment.

### Article 324-7 du code pénal

Toute personne qui a tenté de commettre les infractions prévues à la présente section est exempte de peine si, ayant averti l'autorité administrative ou judiciaire, elle a permis d'éviter la réalisation de l'infraction et d'identifier, le cas échéant, les autres auteurs ou complices.

La peine privative de liberté encourue par l'auteur ou le complice d'une des infractions prévues à la présente section est réduite de moitié si, ayant averti l'autorité administrative ou judiciaire, il a permis de faire cesser l'infraction ou d'identifier, le cas échéant, les autres auteurs ou complices.

### Article 131-30 du code pénal

La peine d'interdiction du territoire français peut être prononcée, à titre définitif ou pour une durée de dix ans au plus, à l'encontre de tout étranger coupable d'un crime, d'un délit puni d'une peine d'emprisonnement d'une durée supérieure ou égale à trois ans ou d'un délit pour lequel la peine d'interdiction du territoire français est prévue par la loi. Sans préjudice de l'article 131-30-2, la juridiction tient compte de la durée de présence de l'étranger sur le territoire français ainsi que de la nature, de l'ancienneté et de l'intensité de ses liens avec la France pour décider de prononcer l'interdiction du territoire français.

L'interdiction du territoire entraîne de plein droit la reconduite du condamné à la frontière, le cas échéant, à l'expiration de sa peine d'emprisonnement ou de réclusion.

Lorsque l'interdiction du territoire accompagne une peine privative de liberté sans sursis, son application est suspendue pendant le délai d'exécution de la peine. Elle reprend à compter du jour où la privation de liberté a pris fin.

La peine d'interdiction du territoire français cesse ses effets à l'expiration de la durée fixée par la décision de condamnation. Cette durée court à compter de la date à laquelle le condamné a quitté le territoire français, constatée selon des modalités déterminées par décret en Conseil d'Etat.

L'interdiction du territoire français prononcée en même temps qu'une peine d'emprisonnement ne fait pas obstacle à ce que cette peine fasse l'objet, aux fins de préparation d'une demande en relèvement, de mesures de semi-liberté, de placement à l'extérieur, de détention à domicile sous surveillance électronique ou de permissions de sortir.





**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**

### Article 324-2 du code pénal

*Voir ci-dessus.*

### Article 324-1 du code pénal

*Voir ci-dessus.*

### Article 132-71 du code pénal

*Voir ci-dessus.*

### Article 324-3 du code pénal

*Voir ci-dessus.*

### Article 324-7 du code pénal

*Voir ci-dessus.*

### Article 324-8 du code pénal

L'interdiction du territoire français peut être prononcée dans les conditions prévues par l'article 131-30, soit à titre définitif, soit pour une durée de dix ans au plus, à l'encontre de tout étranger coupable de l'une des infractions définies aux articles 324-1 et 324-2.

## SUR LA PRESCRIPTION DE L'ACTION PUBLIQUE

### Article 7 du code de procédure pénale

L'action publique des crimes se prescrit par vingt années révolues à compter du jour où l'infraction a été commise.

L'action publique des crimes mentionnés aux articles 706-16, 706-26 et 706-167 du présent codes, aux articles 214-1 à 2014-4 du code pénal et au livre IV bis du même code se prescrit par trente années révolues à compter du jour où l'infraction a été commise.

L'action publique des crimes mentionnés aux articles 211-1 à 212-3 dudit code est imprescriptible.

### Article 8 du code de procédure pénale

L'action publique des délits se prescrit par six années révolues à compter du jour où l'infraction a été commise.

L'action publique des délits mentionnés à l'article 706-47 du présent code, lorsqu'ils sont

SBU – LAW ENFORCEMENT

commis sur des mineurs, à l'exception de ceux mentionnés aux articles 222-29-1 et 227-26 du code pénal, se prescrit par dix années révolues à compter de la majorité de ces derniers.

L'action publique des délits mentionnés aux articles 222-12, 222-29-1 et 227-26 du même code, lorsqu'ils sont commis sur des mineurs, se prescrit par vingt années révolues à compter de la majorité de ces derniers.

L'action publique des délits mentionnés à l'article 706-167 du présent code, lorsqu'ils sont punis de dix ans d'emprisonnement, ainsi que celle des délits mentionnés aux articles 706-16 du présent code, à l'exclusion de ceux définis aux articles 421-2-5 à 421-2-5-2 du code pénal, et 706-26 du présent code et au livre IV bis du code pénal se prescrivent par vingt années révolues à compter du jour où l'infraction a été commise.

### Article 9-2 du code de procédure pénale

Le délai de prescription de l'action publique est interrompu par :

1° Tout acte, émanant du ministère public ou de la partie civile, tendant à la mise en mouvement de l'action publique, prévu aux articles 80, 82, 87, 88, 388, 531 et 532 du présent code et à l'article 65 de la loi du 29 juillet 1881 sur la liberté de la presse ;

2° Tout acte d'enquête émanant du ministère public, tout procès-verbal dressé par un officier de police judiciaire ou un agent habilité exerçant des pouvoirs de police judiciaire tendant effectivement à la recherche et à la poursuite des auteurs d'une infraction ;

3° Tout acte d'instruction prévu aux articles 79 à 230 du présent code, accompli par un juge d'instruction, une chambre de l'instruction ou des magistrats et officiers de police judiciaire par eux délégués, tendant effectivement à la recherche et à la poursuite des auteurs d'une infraction ;

4° Tout jugement ou arrêt, même non définitif, s'il n'est pas entaché de nullité.

Tout acte, jugement ou arrêt mentionné aux 1° à 4° fait courir un délai de prescription d'une durée égale au délai initial.

Le présent article est applicable aux infractions connexes ainsi qu'aux auteurs ou complices non visés par l'un de ces mêmes acte, jugement ou arrêt.

### SUR LA COMPETENCE EXTRATERRITORIALE DES JURIDICTIONS FRANCAISES

### Article 113-6 du code pénal

La loi pénale française est applicable à tout crime commis par un Français hors du territoire de la République.

Elle est applicable aux délits commis par des Français hors du territoire de la République si les faits sont punis par la législation du pays où ils ont été commis.

Elle est applicable aux infractions aux dispositions du règlement (CE) n° 561/2006 du Parlement européen et du Conseil du 15 mars 2006 relatif à l'harmonisation de certaines

SBU - LAW ENFORCEMENT

dispositions de la législation sociale dans le domaine des transports par route, commises dans un autre Etat membre de l'Union européenne et constatées en France, sous réserve des dispositions de l'article 692 du code de procédure pénale ou de la justification d'une sanction administrative qui a été exécutée ou ne peut plus être mise à exécution.

Il est fait application du présent article lors même que le prévenu aurait acquis la nationalité française postérieurement au fait qui lui est imputé.

### Article 113-7 du code pénal

La loi pénale française est applicable à tout crime, ainsi qu'à tout délit puni d'emprisonnement, commis par un Français ou par un étranger hors du territoire de la République lorsque la victime est de nationalité française au moment de l'infraction.

### Article 113-8 du code pénal

Dans les cas prévus aux articles 113-6 et 113-7, la poursuite des délits ne peut être exercée qu'à la requête du ministère public. Elle doit être précédée d'une plainte de la victime ou de ses ayants droit ou d'une dénonciation officielle par l'autorité du pays où le fait a été commis.

### Article 113-8-1 du code pénal

Sans préjudice de l'application des articles 113-6 à 113-8, la loi pénale française est également applicable à tout crime ou à tout délit puni d'au moins cinq ans d'emprisonnement commis hors du territoire de la République par un étranger dont l'extradition a été refusée à l'Etat requérant par les autorités françaises aux motifs, soit que le fait à raison duquel l'extradition avait été demandée est puni d'une peine ou d'une mesure de sûreté contraire à l'ordre public français, soit que la personne réclamée aurait été jugée dans ledit Etat par un tribunal n'assurant pas les garanties fondamentales de procédure et de protection des droits de la défense, soit que le fait considéré revêt le caractère d'infraction politique.

La poursuite des infractions mentionnées au premier alinéa ne peut être exercée qu'à la requête du ministère public. Elle doit être précédée d'une dénonciation officielle, transmise par le ministre de la justice, de l'autorité du pays où le fait a été commis et qui avait requis l'extradition.

### Article 113-9 du code pénal

Dans les cas prévus aux articles 113-6 et 113-7, aucune poursuite ne peut être exercée contre une personne justifiant qu'elle a été jugée définitivement à l'étranger pour les mêmes faits et, en cas de condamnation, que la peine a été subie ou prescrite.

### Article 113-10 du code pénal

Dans les cas prévus aux articles 113-6 et 113-7, aucune poursuite ne peut être exercée contre une personne justifiant qu'elle a été jugée définitivement à l'étranger pour les mêmes faits et, en cas de condamnation, que la peine a été subie ou prescrite.



Visé sous le n° 222499A
(Ce n° correspond au n° de la traduction)
«NE VARIETUR»

2 7 AOUT 2024

Copie certifiée conforme à l'original

SBU - LAW ENFORCEMENT