UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF ) | |
| ) | |
| THE EXTRADITION OF ) | Misc. No. 25-mc-123 |
| ) | **[UNDER SEAL]** |
| ANATOLII LEGKODYMOV ) | |

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligation to France.

2. There is an extradition treaty in force between the United States and the Government of France. *See* Extradition Treaty Between the United States of America and France, U.S.-Fr., Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997) (the "1996 Treaty"), *as amended by* the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and France signed 23 April 1996, U.S.-Fr., Sept. 30, 2004, S. Treaty Doc. No. 109-14 (2006) (the "Instrument"; together with the 1996 Treaty, the "Treaty").

3. Pursuant to the Treaty, the Government of France has submitted a formal request through diplomatic channels for the extradition of Anatolii LEGKODYMOV (LEGKODYMOV or the "fugitive"), a national of Russia and St. Kitts, who also holds a Chinese visa.

4. According to the information France has provided, LEGKODYMOV is accused of offenses including: (1) money laundering (aiding an organized group to falsify the origin of

1

assets or income of the perpetrator of a crime), in violation of Articles 324-2 2°, 324-1(1), and 132-71 of the French Penal Code ("FPC"); (2) money laundering (participation in an organized group for concealment or conversion of the proceeds of a crime), in violation of Articles 324-2 2°, 324-1(2), 324-1-1, and 132-71 of the FPC; and (3) criminal conspiracy to prepare a crime (money laundering), in violation of Article 450-1 (1) (2) of the FPC.[1]

5. These offenses were committed within the jurisdiction of France. On August 14, 2024, Natacha Rateau, Senior Deputy Prosecutor at the Paris Judicial Court, issued a warrant for LEGKODYMOV's arrest. The warrant remains valid and enforceable.

6. According to the information the Government of France has provided:

a. On September 6, 2022, as part of a European operation, the Paris Public Prosecutor's Office initiated a preliminary investigation into twenty priority targets to identify and dismantle crypto-asset laundering services. One of the main targets was Bitzlato, a Russian cryptocurrency asset exchange platform that facilitated exchanges of crypto assets (including Bitcoin, Ethereum, Litecoin, Bitcoin Cash, Dash, Dogecoin and Tether) into Russian rubles, with an estimated transaction volume of over $1 billion since 2019. Bitzlato offered these services in countries including France. Bitzlato advertised online, through its application, and via Telegram.

b. Bitzlato was registered in Hong Kong on December 1, 2017, as Bitzlato Limited. Its founding members were LEGKODYMOV, Lev Legkodymov, Sergei Shakhnov, and Anton Shkurenko ("Shkurenko"). Since August 25, 2018, LEGKODYMOV was the director and the majority shareholder of Bitzlato. He also served as an administrator and technician for the platform.

---

[1] LEGKODYMOV is also accused of additional offenses against French law, but these are not currently referred to the Court for consideration.

c. As noted above, Bitzlato allowed for decentralized P2P (peer to peer), exchange and quick exchange services. The platform allowed users to sell and buy cryptocurrencies directly between themselves without going through a central authority to facilitate transactions. Bitzlato allowed bots, via the messaging program Telegram, to facilitate the sale and/or purchase of various cryptocurrencies. This peer-to-peer exchange utilizing Telegram bots preserved users' anonymity and afforded them a shared wallet with the Telegram bots, exchanges without an intermediary or a regulating central authority, elimination of commission payments on transactions made under the terms of the available ads, and ease of use compared to other platforms. Consequently, Bitzlato was an attractive platform for hindering the traceability of criminal proceeds and the identities of those involved, while allowing users to make instantaneous, unlimited, and anonymous cross-border virtual transactions while bypassing financial institutions. Once criminals exchanged cryptocurrency through Bitzlato, they were able to use the proceeds of their crimes.

d. Bitzlato, which had a website in both English and Russian, was one of many companies headquartered in Federation Tower in Moscow. Blockchain analysis and web traffic data reflect that in 2021, Bitzlato received approximately $206,000,000 from darknet markets, $224,500,000 from scams, and $9,000,000 from ransomware attacks.[2]

e. Bitzlato used at least one French host, OVH, from which it rented 56 dedicated servers, one of which investigators identified as the "management" server that communicates with and administers other servers. French authorities shut down Bitzlato's servers in January 2023.

---

[2] Bitzlato also has allegedly received $32,000 from Russian paramilitary groups.

f. From the management server, French investigators determined that Bitzlato members utilized an internal communication application called Mattermost, which functioned as a chat and instant messaging service.

g. Chat logs from 2018-2019 reflect that LEGKODYMOV and Shkurenko knew that part of their turnover came from people involved in drug trafficking. For example, in October 2018, they discussed the possibility of occasionally excluding users tied to drug trafficking to project that Bitzlato was under control, but with the actual goal of retaining the majority of the drug trafficking clientele. Shkurenko suggested taking a nominal approach to drug traffickers. LEGKODYMOV effectively agreed and advocated blocking only those transactions where the parties made explicit reference to drugs.

h. Chat logs from the summer of 2019 reflect that LEGKODYMOV estimated that drug addicts were bringing in 4.5% of Bitzlato's profits, and Shkurenko estimated that losing bigger narcotrafficking players ("narcos") would result in a 30 percent loss of Bitzlato's turnover. Additionally, they discussed a 3% commission fee for "narcos," or, at minimum, a $25 monthly fee for each user.

i. On May 29, 2019, LEGKODYMOV, in a chat with a colleague, described Bitzlato users as crooks who signed up with fake identities.

j. From a group conversation on the Mattermost server between LEGKODYMOV, Shkurenko, and Bitzlato CEO Mikhail a/k/a Michael a/k/a Mike Lunov ("Lunov"), investigators recovered an undated document titled "Compliance goals of the company." The document reflects that a company called Crystal performed an audit and recommend compliance practices for Bitzlato, in accordance with international standards, to be implemented by summer 2021. The recommendations included implementing a know your

4

customer ("KYC") procedure to identify users and transactions occurring on the platform. The report also indicated that 8 to 9% of the deposits Bitzlato accepted came from crime and that some users were laundering money through the platform. Further analysis of Bitzlato indicated that its KYC checks accounted for only a small fraction of its more than 3 million users.

    k.  Bitzlato was a large counterparty of Hydra Market Place ("Hydra"), a dark web market that eventually was shut down due to coordinated international law enforcement.

    l.  In October 2021, LEGKODYMOV asked employees about Hydra Market and was sent a Wikipedia article whose first sentence, as it appeared in a version from October 26, 2021, characterized Hydra Market as "Russia's largest darknet market for drug trafficking, the world's largest resource in terms of volume of illegal transactions with cryptocurrencies." The article also stated that "more than drugs, popular products on Hydra include counterfeit currency and documents, [and] instructions for illegal activities. The resource also provides services such as drug sales, Internet security and account hacking."

    m.  Also in October 2021, after hearing that others in the industry accused Bitzlato of cooperating with Hydra and facilitating drug transactions, LEGOKODYMOV wrote to his fellow executives and acknowledged that Bitzlato's critics were "right about Hydra."

    n.  In February 2022, after receiving a critical report from blockchain analytics firm Chainalysis, LEGKODYMOV and his colleagues determined that over the past three months, 20% of Bitzlato's trades had sent funds to Hydra Market, causing him to acknowledge to a colleague that, "we have at least 20 percent 'dirt.'"

    o.  A "Memo" attached to Lunov's Bitzlato email address, dated approximately March 15, 2022, and seemingly intended for Bitzlato employees, highlighted a

compliance strategy that Bitzlato ostensibly intended to implement, including a KYC policy and prevention of money laundering on the platform.

p.  In April 2022, after law enforcement action took down Hydra Market, LEGKODYMOV expressed frustration with his compliance staff for failing to investigate his own exposure to illicit funds, using the tools at their disposal, including the compliance provider, Valega.  He wrote to his staff "[y]ou still haven't calculated how many transfers we have made to black markets in the last three months (according to Valega)…[t]his ignorance is alarming."  Three days later, a compliance officer told him that in the previous six months, 27,000 users had attempted to transfer funds to or from what the compliance officer described as "dirty" cryptocurrency addresses.  Another employee, in the same chat, commented that "services with a low AML level are very convenient for [money] launderers.  As soon as we implement all the AML/KYC tools, the number of suspicious transactions will drop considerably."

q.  LEGKODYMOV continued to call for improvements at Bitzlato while failing to make any real changes.

7.  On January 14, 2023, the U.S. Attorney's Office for the Eastern District of New York filed an amended criminal complaint charging LEGKODYMOV with operating an unlicensed money transmitting business.  *See United States v. Legkodymov*, No. 23-cr-496 (E.D.N.Y.).  On January 18, 2023, law enforcement arrested him in the Southern District of Florida.  On March 14, 2023, he was arraigned in the Eastern District of New York.  On December 6, 2023, he waived indictment and pled guilty to the charged offense.  *See* Minute Entry, ECF No. 21, *id*.  On July 30, 2024, the court sentenced him to time served and two years of supervised release.  *See* Judgment, ECF No. 55, *id*.

8.  On February 6, 2025, the U.S. District Court for the Middle District of

Pennsylvania issued a sealed warrant for LEGKODYMOV based on an extradition complaint that alleged substantially the same facts as those set forth above. The United States subsequently became aware that LEGKODYMOV may be found within the jurisdiction of this Court. He is currently detained by the U.S. Department of Homeland Security, Immigration and Customs Enforcement, at Moshannon Valley Processing Center, 555 GEO Drive, Philipsburg, PA.

9. Stacy Hauf, an Attorney Adviser in the Office of the Legal Adviser for the U.S. Department of State, has provided the U.S. Department of Justice with a declaration attaching copies of the Treaty, and the diplomatic notes by which France requested extradition, stating that the Treaty covers the aforementioned offenses for which France seeks extradition, and confirming that the documents supporting the request for extradition comply with the Treaty's authentication requirements.

10. The declaration from the U.S. Department of State with its attachments, including copies of the Treaty and the aforementioned diplomatic notes, and the certified documents France submitted in support of the request (marked collectively as Government's **Exhibit A**) are filed herewith and incorporated by reference herein.

WHEREFORE, the undersigned requests that a warrant for LEGKODYMOV's arrest issue in accordance with 18 U.S.C. § 3184 and the Treaty, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered.

Respectfully submitted,

*s/Mark V. Gurzo*
MARK V. GURZO
Assistant United States Attorney
Maryland Bar

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 10th day of February 2025.

_____
HONORABLE CHRISTOPHER B. BROWN
UNITED STATES MAGISTRATE JUDGE

\